

FILED

SEP 1 6 2020

CARMELITA REEDER SHINN
CLERK, U.S. DISTRICT COURT
_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | SLP |
| | ) | |
| Plaintiff, | ) | CR 20-240 |
| | ) | |
| -vs- | ) | No. _____ |
| | ) | |
| BOBBY CHRIS MAYES, | ) | Violations: |
| CHARLES GOOCH, and | ) |    18 U.S.C. § 1349 |
| COURTNEY WELLS, | ) |    18 U.S.C. § 1343 |
| | ) |    18 U.S.C. § 2 |
| Defendants. | ) |    18 U.S.C. § 513(a) |
| | ) |    18 U.S.C. § 1028A(a)(1) |
| | ) |    18 U.S.C. § 981(a)(1)(C) |
| | ) |    28 U.S.C. § 2461 |

## I N D I C T M E N T

The Federal Grand Jury charges:

### Introduction

At all times relevant to this Indictment:

1.    **BOBBY CHRIS MAYES** was a resident of the Western District of Oklahoma and owner or part owner of a group of car dealerships located in the Western District of Oklahoma, including BRSI LLC (d/b/a Big Red Sports/Imports), Big Red Kia, Tower Motorsports, LLC (d/b/a Norman Yamaha Motorsports), NMD Holding LLC (d/b/a Norman Mitsubishi), and DKR LLC (d/b/a Mayes Kia) (collectively, the "Big Red Dealerships"). He was the President and Chief Executive Officer of the Big Red Dealerships, along with several other companies, including Trident Warranty Advisors ("Trident").

2.    **CHARLES GOOCH** was a resident of the Western District of Oklahoma and Vice President and Compliance Officer of the Big Red Dealerships from approximately 2014 until approximately August 2018.  **GOOCH** also had an ownership interest in Trident, Mayes Kia, and Norman Mitsubishi.  As Compliance Officer, **GOOCH** reviewed the documentation for every vehicle sale and its terms at the Big Red Dealerships before the documentation was approved and transmitted to various lenders for financing. **GOOCH** was also sole owner, President, and Chief Executive Officer of Norman Pawn & Gun, which was created in or about February 2015.

3.    **COURTNEY WELLS** was a resident of the Western District of Oklahoma and Comptroller of the Big Red Dealerships.  As Comptroller, **WELLS** oversaw the finance and accounting department of the Big Red Dealerships. Among other duties, she prepared checks, reviewed bank statements, paid invoices, helped prepare tax returns, and managed the accounting system for the Big Red Dealerships. **WELLS** also managed the accounting system and helped prepare tax returns for Norman Pawn & Gun. **WELLS** had an ownership interest in Trident.

### Lenders

4.    Ally Financial Inc. was a financial institution headquartered in Detroit, Michigan, that held deposits insured by the Federal Deposit Insurance Corporation ("FDIC").  Among other services, Ally Financial Inc. provided consumer loans for the purchase of vehicles across the United States.

5.    American Credit Acceptance was a business headquartered in Spartanburg, South Carolina, that provided consumer loans for the purchase of vehicles across the

2

United States.

6.      Americredit Financial Services Inc., now GM Financial, was a business headquartered in Fort Worth, Texas, that provided consumer loans for the purchase of vehicles across the United States.

7.      BBVA Compass was a financial institution headquartered in Birmingham, Alabama, that held deposits insured by the FDIC. Among other services, BBVA Compass provided consumer loans for the purchase of vehicles across the United States.

8.      Consumer Portfolio Services was a business headquartered in Irvine, California, that provided consumer loans for the purchase of vehicles across the United States.

9.      Credit Acceptance was a business headquartered in Southfield, Michigan, that provided consumer loans for the purchase of vehicles across the United States.

10.     Crescent Bank & Trust was a financial institution headquartered in New Orleans, Louisiana, that held deposits insured by the FDIC. Among other services, Crescent Bank & Trust provided consumer loans for the purchase of vehicles across the United States.

11.     Encore Automotive Acceptance Corp. was a business headquartered in Plano, Texas, that provided consumer loans for the purchase of vehicles across the United States.

12.     Exeter Finance Corporation was a business headquartered in Irving, Texas, that provided consumer loans for the purchase of vehicles across the United States.

13.     FinancePoint was a business headquartered in Del City, Oklahoma, that

provided consumer loans for the purchase of vehicles across the United States.

14.     First Investors Financial Services was a business headquartered in Houston, Texas, that provided consumer loans for the purchase of vehicles across the United States.

15.     Flagship Credit Acceptance was a business headquartered in Chadds Ford Township, Pennsylvania, that provided consumer loans for the purchase of vehicles across the United States.

16.     Foursight Capital LLC was a business headquartered in Salt Lake City, Utah, that provided consumer loans for the purchase of vehicles across the United States.

17.     Global Lending Services, LLC, was a business headquartered in Atlanta, Georgia, that provided consumer loans for the purchase of vehicles across the United States.

18.     Globe Acceptance, Inc. was a business headquartered in West Des Moines, Iowa, that provided consumer loans for the purchase of vehicles across the United States.

19.     Kia Motors Finance was a business headquartered in Fountain Valley, California, that provided consumer loans for the purchase of vehicles across the United States.

20.     OU Federal Credit Union was headquartered in Norman, Oklahoma, and a member of the National Credit Union Administration, with its accounts insured by the National Credit Union Share Insurance Fund.  Among other services, OU Federal Credit Union provided consumer loans for the purchase of vehicles.

21.     Peak Acceptance, LLC, was a business headquartered in Dallas, Texas, that provided consumer loans for the purchase of vehicles across the United States.

4

22.    Prestige Financial Services was a business headquartered in Draper, Utah, that provided consumer loans for the purchase of vehicles across the United States.

23.    Santander Consumer USA was a business headquartered in Dallas, Texas, that provided consumer loans for the purchase of vehicles across the United States.

24.    Sierra Auto Finance, LLC, was a business headquartered in Dallas, Texas, that provided consumer loans for the purchase of vehicles across the United States.

25.    Skopos Financial, LLC, was a business headquartered in Irving, Texas, that provided consumer loans for the purchase of vehicles across the United States.

26.    Tinker Federal Credit Union was headquartered in Oklahoma City, Oklahoma, and a member of the National Credit Union Administration, with its accounts insured by the National Credit Union Share Insurance Fund. Among other services, Tinker Federal Credit Union provided consumer loans for the purchase of vehicles.

## Big Red Dealership Operations

27.    Beginning no later than 2012 and continuing until the spring of 2019, the Big Red Dealerships sold vehicles to customers that were financed by the lenders identified in paragraphs 4–25 ("Lenders").

28.    The Big Red Dealerships had relationships and agreements with certain Lenders, who had lender policies and guidelines for indirect lending to dealership customers. When a customer needed to finance the purchase of a vehicle, the Big Red Dealership employees would prepare sales contracts, financing applications and related documents for the deal. These materials would be reviewed and approved by supervisory employees of the Big Red Dealerships, including **GOOCH**, before they were submitted

to the Lenders. The Big Red Dealership employees would sometimes directly contact the Lenders and transmit documentation relating to the proposed transaction. Specifically, Big Red Dealership employees transmitted sales contracts, loan applications, and financing documents to the Lenders by email or fax for their review and approval. When a loan was finalized, the Lender would fund the loan and the proceeds would be disbursed to the applicable Big Red Dealership selling the vehicle by wire transfers, checks, or cash concentration disbursements, a type of direct transfer used from the Lenders to dealerships.

29.     The Big Red Dealerships could also access financing for customers through online aggregator services that allow dealerships to electronically submit sales terms and borrower information to numerous lenders simultaneously. Again, the Big Red Dealership employees would prepare the same type of documentation relating to the sale. This documentation would again be reviewed by supervisory employees at the Big Red Dealership, including **GOOCH**. Big Red Dealership employees submitted customer information and sales terms to the aggregator over the Internet, and Lenders could offer loans, issue counteroffers, negotiate, and approve financing arrangements and contracts on the same digital interface with the Big Red Dealership employees. When a loan was finalized on the digital platform, the Lender would fund the loan and the proceeds would be disbursed to the applicable Big Red Dealership selling the vehicle by wire transfer, check, or cash concentration disbursements.

## COUNT 1
### (Conspiracy – MAYES, GOOCH, and WELLS)

30.    The Federal Grand Jury incorporates paragraphs 1–29 by reference.

31.    From in or around January 2014 until in or around March 2019, in the Western District of Oklahoma and elsewhere,

----------------------------------------- **BOBBY CHRIS MAYES,**
**CHARLES GOOCH, and**
**COURTNEY WELLS** -------------------------------------

knowingly, intentionally, and with interdependence, combined conspired, and agreed with each other and with others known and unknown to the Federal Grand Jury to commit the offense of wire fraud, in violation of Title 18, United States Code, Section 1343.

### The Object of the Conspiracy

32.    The object of the conspiracy was to obtain millions of dollars of loan proceeds from various banks, credit unions, and automobile financing lenders based on: (1) material misrepresentations and omissions to the Lenders about the type, source, and amount of borrowers' down payments or vehicle trade-ins; and (2) unlawful payments and bribes paid to at least one financial institution employee designed to bypass the scrutiny the loan officer was obligated to provide before approving such loans.

### Manner and Means

33.    The object of the conspiracy was accomplished as follows:

A.    From approximately January 2014, through the spring of 2019, the Big Red Dealerships, under the control of **MAYES**, **GOOCH**, and **WELLS**, advertised on local radio stations and elsewhere that they were able to sell cars and secure financing for vehicle

purchases to individuals with bad credit or no credit. Big Red Dealerships advertised that they had cultivated relationships with the most forgiving lenders, enticing customers to Big Red Dealerships who frequently would not qualify for lending under banking guidelines. Lenders who provide financing for individuals with bad credit or no credit often require a substantial down payment or a trade-in with significant value in order to qualify for financing. This requirement is designed to verify the borrower's ability to make payments on the loan over time and to ensure that they are invested in the loan, which in turn incentivizes them to make the necessary loan payments and avoid default. **MAYES, GOOCH**, and **WELLS** were all familiar with these requirements and the importance of down payments and trade-ins in order for the Big Red Dealerships to sell vehicles to the no credit or poor credit customers that they targeted in their advertising.

B.   In order to circumvent these requirements, **MAYES, GOOCH** and **WELLS** engaged in a number of schemes designed to falsely induce Lenders to finance customer purchases that they would not otherwise approve. Each of these schemes is described in more detail below, but includes the following: (1) paying the down payment for the customer but falsely representing to the Lender that it was a legitimate cash down payment; (2) creating false pawn shop transactions that made it appear that the customer had pawned personal property of significant value which generated a false down payment, the nature of which was concealed from the Lender; (3) orchestrating false trade-in transactions where a customer was induced to "trade in" a vehicle (whether it was operational or not or even whether the customer actually owned the vehicle) and then buy it back for $1; and (4) at least in one instance bribing a loan officer with one Lender to avoid bank scrutiny of bad

loan deals.

## Acts in Furtherance of the Conspiracy

34.    To effect the object of the conspiracy, **MAYES**, **GOOCH**, and **WELLS** committed the following overt acts, among others:

### KING CASH

A.    From approximately 2012 to 2014, **MAYES**, **GOOCH**, **WELLS**, and others operating under their direction and control at the Big Red Dealerships generated sales contracts and financing documents that were wired to Lenders falsely indicating the car buyer had provided a certain cash down payment required by the Lenders. In reality, the car buyer had provided no down payment or a smaller cash down payment. On internal Big Red Dealership documents, salespeople, sales managers, and finance office staff were taught to write that the down payment was comprised of "King Cash." However, in the paperwork submitted to the Lenders, the Big Red Dealerships falsely represented that customer had made the full down payment. Customers were also coached to tell lenders, if they were contacted by one, to repeat the lie that they had made the down payment as indicated. In or around late 2014, **MAYES** instructed employees and officers at the Big Red Dealerships to no longer offer "special financing" with King Cash.

### NORMAN PAWN & GUN

B.    In or around January 2015, **MAYES** suggested to **GOOCH** that the Big Red Dealerships could replace King Cash fake down payments with another method of faking down payments to secure loans for customers by using a pawn shop.

C.    On or about February 20, 2015, **MAYES** and **GOOCH** filed Articles of

Organization with the Oklahoma Secretary of States for Norman Pawn & Gun LLC. **GOOCH** was the sole owner for Norman Pawn & Gun LLC and opened a bank account with Republic Bank and Trust in Norman, Oklahoma.

D.      In or around February 2015, **MAYES, GOOCH,** and **WELLS** instructed managers and car salespeople at the Big Red Dealerships to offer individuals interested in buying vehicles who did not have cash for a down payment that they could instead pawn items with Norman Pawn & Gun.

E.      **MAYES, GOOCH,** and others acting at their direction instructed salespeople to suggest that potential vehicle buyers could satisfy the Lenders' cash down payment requirements by pawning items.  When a salesperson or manager was negotiating with a customer about a potential sale, they would ask the customer to identify items they would be willing to pawn to satisfy the down payment requirement and complete a pawn slip or pawn ticket describing the items.  **GOOCH,** the manager, or the salesperson would typically write an appraisal value of the items that matched the amount needed to satisfy a Lender's cash down payment requirement.

F.      Sales managers, salespeople, and finance office workers at the Big Red Dealerships—operating at the direction of **WELLS, MAYES,** and **GOOCH**—submitted proposed sales terms and down payment amounts to Lenders through Internet-based loan aggregators to secure financing for the sales of vehicles.  When items were offered to satisfy a cash down payment requirement, the Lenders were instead provided information that the customer had provided cash as a down payment.

G.      Between approximately February 23, 2015, and October 31, 2017, sales

managers and salespeople at the Big Red Dealerships, acting at the direction of **MAYES**, and with **GOOCH** and **WELLS**'s approval, completed retail sales contracts and finalized loan contracts approximately 476 times, indicating a cash down payment had been made in the amount required by the lender and not disclosing that the customer had agreed to provide pawned items and not cash. Specifically, Big Red Dealerships secured financing based on fictitious cash payments from the following Lenders, without disclosing the source or nature of the down payment in connection with pawned items: Ally Financial Inc., American Credit Acceptance, Consumer Portfolio Services, Crescent Bank & Trust, Encore Automotive Acceptance Corp., Exeter Finance Corporation, FinancePoint, First Investors Financial Services, Flagship Credit Acceptance, Foursight Capital, LLC, Global Lending Services, LLC, Globe Acceptance, Inc., Kia Motors Finance, OU Federal Credit Union, Prestige Financial Services, Santander Consumer USA, Sierra Auto Finance, LLC, and Skopos Financial LLC.

H.     **MAYES**, **GOOCH**, and others acting at their direction and control instructed sales managers and salespeople to coach the customers that when a Lender called, the customer should explain that they had provided a cash down payment to the Big Red Dealership. The customers were warned not to tell the Lenders about the purported pawn shop.

I.     After the Lender funded a loan and disbursed the funds to the applicable Big Red Dealership, **GOOCH** generated a check from Norman Pawn & Gun to the car buyer for the amount on the pawn slip, usually describing the pawned item(s) in the memo line. **GOOCH**, **WELLS**, and others acting at their direction then forged the customer's

11

signature on the back of the check and endorsed it over to the relevant Big Red Dealership. **MAYES, GOOCH, WELLS,** and others acting at their direction then deposited the check into the account of the relevant Big Red Dealership.

J.      **MAYES, WELLS,** and others operating under their direction and control regularly transferred funds from the Big Red Dealerships to Trident for the amounts of Norman Pawn & Gun checks that had been endorsed over to the Big Red Dealerships.

K.      **WELLS** and **MAYES** regularly prepared checks from Trident to Norman Pawn & Gun to reimburse the amounts of Norman Pawn & Gun checks that had been endorsed over to the Big Red Dealerships.

## BRIBERY OF A FINANCIAL INSTITUTION EMPLOYEE

L.      Between January and April 2016, a Big Red Dealership manager—operating at the direction and control of **MAYES**—met routinely with a loan officer at a local financial institution and made approximately $30,000 total in cash payments in exchange for her approval of loans for customers at Big Red Dealerships. The Big Red Dealership manager sometimes would call the loan officer to give notice that a questionable loan application was being sent over or otherwise direct the loan application to the attention of that loan officer. Some of those loans were for vehicles for which employees at the Big Red Dealership had generated their own invoices to support prices above the manufacturer's suggested retail price.

## DOLLAR BUYBACKS

M.      From around January 2014 until in or around the spring of 2019, **MAYES, GOOCH, WELLS,** and others operating under their direction and control encouraged

12

sales managers and salespeople at the Big Red Dealerships to offer financing to customers if the customer was willing to document a vehicle trade-in, even when the customer was not actually providing the trade-in vehicle to Big Red Dealerships. **MAYES, GOOCH, WELLS,** and others operating under their direction and control referred to these trades as "In and Outs" or "Dollar Buybacks."

N.      To execute the Dollar Buybacks or In and Out transactions, at the direction of **MAYES, GOOCH,** and **WELLS,** Big Red Dealership employees prepared hundreds of sales contracts and financing documents that were wired to lenders in which the documentation falsely showed that customers had provided trade-in vehicles to the Big Red Dealerships as part of their purchase of the vehicle. Customers were informed that they could trade in any vehicle, regardless of whether it was operational and regardless of whether it was even owned by the customer. All the Big Red Dealership needed was a vehicle identification number. In most cases the vehicle was never inspected or actually even brought into the dealerships. The Big Red Dealership employees would prepare documentation indicating that the vehicle had been traded in and assigning it a value, often well in excess of any legitimate value and again not coincidentally in the exact amount required by the lender as a down payment or trade in. However, the Big Red Dealership employees also prepared a corresponding invoice showing the customer had repurchased the vehicle for $1, which was not provided to the Lenders.

O.      Between on or about January 6, 2014, and on or about March 27, 2019, the Big Red Dealerships, controlled by **MAYES, GOOCH,** and **WELLS,** sold approximately 636 vehicles to customers and secured loan proceeds from Lenders by sending information

by wire to the Lenders for the loans to be approved based on fictitious trade-ins. At the direction of **MAYES**, **GOOCH**, and **WELLS**, Big Red Dealership employees sent false information to the Lenders that showed trade-in values for vehicles that were never transferred to the Big Red Dealerships. Specifically, the Big Red Dealerships secured financing based on fictitious trade-ins from the following Lenders: American Credit Acceptance, Americredit Financial, BBVA Compass, Consumer Portfolio Services, Credit Acceptance, Crescent Bank & Trust, Foursight Capital, LLC, Global Lending Services, LLC, Peak Acceptance, LLC, Santander Consumer USA, Skopos Financial LLC, and Tinker Federal Credit Union.

P.     The Big Red Dealerships never informed the Lenders that a corresponding invoice was generated to return the purported trade-in vehicle back to the customer for $1. **MAYES**, **GOOCH**, and **WELLS** knew that the lenders would not have agreed to provide or purchase such loans if the true nature of the sale was described to the lenders.

## EXAMPLES OF DOLLAR BUYBACKS AND FAKE PAWN TRANSACTIONS

Q.     On or about January 18, 2016, T.G. went to Big Red Sports/Imports to purchase a vehicle for her daughter. T.G. advised the salesperson that she had only $500 for a down payment. The Big Red Sports/Imports salesperson asked if she had a vehicle to trade in, and she advised that she only had a 1998 Honda Accord that was not in working condition. The salesperson told T.G. that she could trade in the Accord and repurchase it for $1 without even bringing it to the dealership. The salesperson prepared a sales contract for a 2015 Kia Soul that showed a $500 cash payment and a trade-in allowance of $1,000

14

for the 1998 Honda Accord, with $18,486.00 total financed, with $14,456.00 in finance charges, and a total amount of payments of $32,942.00 over 72 months. **GOOCH**, as Compliance Officer, approved the terms of the sale. Big Red Dealership employees transmitted the contract terms over the Internet to Global Lending Services, who agreed to fund the loan and subsequently disbursed funds to Big Red Sports/Imports. On or about January 18, 2016, a Big Red Dealership employee generated a wholesale bill of sale showing T.G. purchased a 1998 Honda Accord for $1 from Big Red Sports/Imports. T.G. could not make payments on the Kia Soul, and Global Lending Services repossessed the car and recognized a loss on the loan.

R.      On or about February 22, 2016, T.C. went to Big Red Sports/Imports to purchase a vehicle. The Big Red Sports/Imports salesperson told T.C. that he was required to make a $1,000 down payment to purchase a 2015 Kia Forte. T.C. did not have $1,000 in cash, so the salesperson told T.C. that there was a loophole available to cover the down payment if he had anything electronic. T.C. said he had a broken Xbox 360, and the salesperson said the broken Xbox 360 could be used to cover the $1,000 down payment. The salesperson prepared a sales contract for a 2015 Kia Forte that showed a $1,000 cash payment, with $22,367.00 total financed with a 21% annual percentage rate, $17,492.00 in finance charges, and a total amount of payments of $43,050.00 over 72 months. The salesperson also generated a pawn ticket showing an Xbox 360 was to be provided as collateral on or about January 22, 2016. **GOOCH**, as Compliance Officer, approved the terms of the sale. Big Red Dealership employees transmitted the contract terms over the Internet to Global Lending Services, who agreed to fund the loan and subsequently

disbursed funds to Big Red Sports/Imports. **GOOCH, WELLS,** or someone acting at their direction in the finance or accounting office generated a Norman Pawn & Gun check to T.C. dated January 22, 2016, then forged the signature of T.C., endorsed the check over to BRSI LLC, and deposited it into BRSI LLC's bank account on or about May 2, 2016. T.C. did not make all the payments on the loan, and Global Lending Services repossessed the Kia Forte and recognized a loss on the loan.

S.      On or about August 15, 2016, S.O. went to Big Red Sports/Imports to purchase a vehicle. The salesperson told S.O. that she could provide electronics for a down payment, and she agreed to provide a used iPhone 5C and a used Amazon tablet. The salesperson provided S.O. with a pawn ticket that showed $3,700 in appraised value for the two items. The salesperson prepared a sales contract for the 2008 Honda Accord that showed a $3,700 cash payment. **GOOCH,** as Compliance Officer, approved the terms of the sale. Big Red Dealership employees transmitted the contract terms over the Internet to American Credit Acceptance, who agreed to fund the loan and subsequently disbursed funds to Big Red Sports/Imports. **GOOCH, WELLS,** or someone acting at their direction in the finance or accounting office generated a Norman Pawn & Gun check to S.O. dated August 15, 2016, then forged the signature of S.O., endorsed the check over to BRSI LLC, and deposited it into BRSI LLC's bank account on or about October 6, 2016. S.O. did not make all payments on the loan, and American Credit Acceptance repossessed the Honda Accord and recognized a loss on the loan.

T.      On or about August 20, 2016, J.D. went to Big Red Sports/Imports to buy a vehicle after hearing an advertisement that Big Red Sports/Imports could provide financing

to individuals with no credit. J.D. was 18, had no credit, and had never financed the purchase of a vehicle before. J.D. agreed to provide a $200 cash payment and to trade in a 1994 Chevrolet truck and a 2005 Ninja motorcycle, neither of which was in working condition, which he advised the salesperson. J.D. believed the truck and motorcycle were not worth $1,200 together. The salesperson prepared a sales contract for a 2011 Ford truck that showed a $200 cash payment and $4,800 trade-in allowance. **GOOCH**, as Compliance Officer, approved the terms of the sale. Big Red Dealership employees transmitted the contract terms over the Internet to American Credit Acceptance, who agreed to fund the loan and subsequently disbursed funds to Big Red Sports/Imports. On or about August 20, 2016, a Big Red Dealership employee generated a wholesale bill of sale showing J.D. purchased a 1994 Chevrolet truck for $1 from Big Red Sports/Imports. J.D. subsequently called Big Red Sports/Imports about picking up the Chevrolet truck and motorcycle and was advised that Big Red Sports/Imports did not want the truck or motorcycle. J.D. lost his job and was unable to make the monthly payment, and American Credit Acceptance repossessed the 2011 Ford truck and recognized a loss on the loan.

U.     On or about September 21, 2016, C.M. went to Mayes Kia to purchase a vehicle he had identified on an Internet advertisement. Once at Mayes Kia, he was advised the vehicle was no longer available, and he agreed to purchase a 2010 Ford F-150. C.M. advised the salesperson that he did not have any cash for a down payment. The salesperson suggested that C.M. could trade in a 2000 Hyundai C.M. owned that was not in working condition and was in Ohio, without actually trading it in. C.M. believed the Hyundai was worth approximately $1,000. The salesperson prepared a sales contract for a 2010 Ford F-

17

150 that showed a $6,800 trade-in allowance, with $19,158.00 total financed with a 21% annual percentage rate, $14,962.00 in finance charges, and a total amount of payments of $34,120.00 over 72 months.  **GOOCH**, as Compliance Officer, approved the terms of the sale.  Big Red Dealership employees transmitted the contract terms over the Internet to American Credit Acceptance, who agreed to fund the loan and subsequently disbursed funds to Big Red Sports/Imports.  A Big Red Dealership employee enclosed the title to the Hyundai in the file for C.M.'s deal, along with a slip of paper with a handwritten note that said "In & Out."  C.M. was unable to make payments on the Ford F-150 and American Credit Acceptance repossessed the truck and recognized a loss on the loan.

V.     On or about November 11, 2016, M.C. went to Big Red Sports/Imports to purchase a vehicle.  She advised the Big Red Dealership salesperson that she did not have money for a down payment.  The salesperson offered that M.C. could instead pawn an item with Norman Pawn & Gun.  The salesperson generated a pawn slip showing M.C. had pawned an Apple iPad 2 to Norman Pawn & Gun.  M.C. never provided an Apple iPad 2 to Norman Pawn & Gun or the Big Red Dealerships.  The Big Red Dealership salesperson prepared a retail installment sale contract showing M.C. made a $500 cash down payment to purchase a 2012 Dodge Journey.  **GOOCH** approved the terms of the sale.  The sales contract was transmitted over the Internet to Santander Consumer USA, who approved a loan to M.C. and disbursed the proceeds to BRSI LLC.  **GOOCH**, **WELLS**, or someone acting at their direction in the finance or accounting office generated a Norman Pawn & Gun check to M.C. that was dated with September 22, 2016, then forged the signature of M.C., endorsed the check over to BRSI LLC, and deposited it into BRSI LLC's bank

account on or about November 23, 2016.    M.C. could not make the payments, and Santander Consumer USA repossessed the vehicle and recognized a loss on the loan.

W.    On or about January 5, 2017, F.A. went to Mayes Kia to purchase a vehicle. F.A. had a nonworking Buick LeSabre for a trade-in, as well as $500 for a cash down payment.    The salesperson suggested that F.A. could also trade in electronics—his PlayStation 4—to help with the down payment.    The salesperson provided F.A. with a pawn ticket that showed $2,300 in appraised value for the PlayStation 4 Pro video game console.    The salesperson prepared a sales contract for the 2010 Chevrolet Malibu that showed a $5,500 trade-in allowance for the 1997 Buick and a $2,800 cash payment, with $15,017.00 total financed.    **GOOCH**, as Compliance Officer, approved the terms of the sale.    Big Red Dealership employees transmitted the contract terms over the Internet to American Credit Acceptance, who agreed to fund the loan and subsequently disbursed funds to Big Red Sports/Imports.    **GOOCH, WELLS,** or someone acting at their direction in the finance or accounting office generated a Norman Pawn & Gun check to F.A. dated January 5, 2017, then forged the signature of F.A., endorsed the check over to DKR LLC, and deposited it into DKR LLC's bank account on or about January 23, 2017.    F.A. was unable to make payments and American Credit Acceptance repossessed the Malibu and recognized a loss on F.A.'s loan.

X.    On or about February 10, 2017, Mr. B.C. went to Big Red Sports/Imports to purchase a 2013 Hyundai Accent.    After taking the vehicle home, he received a call on February 14, 2017, from a Big Red Dealership finance employee that the lender had rejected the loan and that a new lender required a $1,000 down payment.    The finance

employee told Mr. B.C. that he could sell something to Norman Pawn & Gun to cover the down payment. Mr. B.C. offered to provide a wifi hot spot he had purchased for about $60, and the Big Red Dealership employee said that was sufficient and prepared a pawn ticket for the ZTE Internet wifi hotspot for $1,000. A Big Red Dealership employee prepared a sales contract showing a $1,000 cash down payment. **GOOCH**, as Compliance Officer, approved the terms of the sale. Big Red Dealership employees transmitted the contract terms over the Internet to Global Lending Services, who agreed to fund the loan and subsequently disbursed funds to Big Red Sports/Imports. **GOOCH, WELLS**, or someone acting at their direction in the finance or accounting office generated a Norman Pawn & Gun check to B.C. dated February 10, 2017, then forged the signature of Mr. B.C, endorsed the check over to BRSI LLC, and deposited it into BRSI LLC's bank account on or about March 31, 2017. Mr. B.C. stopped making payments, and the Hyundai was repossessed by Global Lending Services, which recognized a loss on Mr. B.C.'s loan.

Y.      On or about April 15, 2017, Ms. B.C. went to Big Red Sports/Imports to purchase a vehicle. The salesperson told Ms. B.C. that she could trade in a television to cover the down payment for the purchase of a 2014 Mitsubishi Outlander. She agreed to trade in her father's 32" Vizio television, which had been purchased for $200 new. The salesperson prepared a pawn ticket for the television, showing an appraisal value of $1,500. **GOOCH** signed the pawn ticket. The salesperson prepared a sales contract showing a $1,500 cash down payment. Big Red Dealership employees transmitted the contract terms over the Internet to Santander Consumer USA, who agreed to fund the loan and subsequently disbursed funds to Big Red Sports/Imports. **GOOCH, WELLS**, or someone

acting at their direction in the finance or accounting office generated a Norman Pawn & Gun check to Ms. B.C. dated April 15, 2017, then forged the signature of Ms. B.C, endorsed the check over to BRSI LLC, and deposited it into BRSI LLC's bank account on or about June 7, 2017.   Ms. B.C. could not make timely payments or keep up with late fees, and Santander repossessed the vehicle and recognized a loss on the loan.

Z.     On or about May 8, 2017, D.D. went to Big Red Sports/Imports to purchase a used Ford Mustang he saw advertised on the Internet.  A salesperson told D.D. that his fast food service income did not qualify him to purchase the used Mustang.  However, the salesperson told D.D. that he could qualify for financing for a new Kia if he would put down on the sales contract that he traded in his 2002 Nissan truck, which D.D. explained was not in working condition.  The salesperson said that did not matter and that the trade in could satisfy D.D.'s down payment with the lender.  The salesperson prepared a retail sales contract showing D.D was given a trade-in allowance of $3,000 for a Nissan truck, with $20,459.00 financed at a 21% APR, with $15,994.60 in finance charges, and a total of $36,453.60 in payments over 72 months.  **GOOCH**, as Compliance Officer, approved the terms of the sale.  Big Red Dealership employees transmitted the contract terms over the Internet to Santander Consumer USA, who agreed to fund the loan and subsequently disbursed funds to BRSI.  On or about May 13, 2017, a Big Red Dealership employee generated a wholesale bill of sale showing D.D. purchased a 2002 Nissan for $1 from Big Red Sports/Imports.  D.D. never provided the Nissan truck to the dealership.  D.D. lost his fast food job, and the Kia Forte was repossessed, with Santander Consumer USA recognizing a loss on D.D.'s loan.

AA.    On or about May 10, 2017, B.W. went to Norman Mitsubishi to purchase a vehicle. He told the salesperson that he did not have cash for a down payment and did not have a vehicle to trade in to purchase a 2015 Dodge Ram truck. The salesperson prepared a sales contract that showed a $500 trade-in allowance for a 2003 Mercury Grand Marquis, with $26,904.00 financed, $16,438.56 in finance charges, and a total amount of payments of $43,342.56 over 72 months. **GOOCH**, as Compliance Officer, approved the terms of the sale. Big Red Dealership employees transmitted the contract terms over the Internet to Global Lending Services LLC, who agreed to fund the loan and subsequently disbursed funds to Norman Mitsubishi. On or about May 10, 2017, a Norman Mitsubishi or Big Red Dealership employee generated a wholesale bill of sale showing B.W. purchased a 2003 Mercury Grand Marquis for $1 from Big Red Sports/Imports. B.W. did not trade in any vehicle and did not own a Mercury Grand Marquis.

BB.    On or about June 1, 2017, A.B. went to Big Red Sports/Imports with her son for her son and his fiancé to purchase a vehicle. A.B., her son, and his fiancé met with a Big Red Dealership finance department employee. A.B.'s future daughter-in-law had a 2002 Dodge Intrepid to trade-in, although it was not in working condition. A.B. said she could not purchase the vehicle because she was unemployed. The finance employee told her that it would be in A.B.'s name for a short period and would then transfer to her son and his fiancé, and A.B. believed she was a co-signer. A.B. is partially blind and could not read the paperwork generated by the Big Red Dealership employee. The Big Red Dealership employee prepared a retail sales contract that showed a $3,000 trade-in allowance for a Dodge Intrepid, with total payments under the financing package of

22

$34,200.72 over 72 months. **GOOCH**, as Compliance Officer, approved the terms of the sale. Big Red Dealership employees transmitted the contract terms over the Internet to Santander Consumer USA, who agreed to fund the loan and subsequently disbursed funds to BRSI. On or about June 1, 2017, a Big Red Dealership employee generated a wholesale bill of sale showing A.B. purchased a Dodge Intrepid for $1 from Big Red Sports/Imports. A.B.'s son and his fiancé only made one payment, and A.B. started receiving calls from Santander Consumer USA, which is when she realized she was the sole purchaser and borrower; the car was repossessed, and Santander Consumer USA recognized a loss on the loan to A.B.

### REIMBURSEMENTS OF NORMAN PAWN & GUN

CC.     When Norman Pawn & Gun was first started in February 2015, Norman Pawn & Gun did not have funds to draw upon for the checks written to Big Red Dealership customers who were pawning items. On or about March 11, 2015, **MAYES** provided $7,000 in funds to **GOOCH** by personal check, to be deposited into Norman Pawn & Gun's bank account to begin covering checks to Big Red Dealership customers.

DD.     Between in or around March 2015 until in or around July 2015, at the direction of **MAYES**, **GOOCH**, and **WELLS**, the Big Red Dealerships each regularly consolidated the amounts of Norman Pawn & Gun checks that had been endorsed to them and paid Norman Pawn & Gun back by check.

EE.     Beginning in or around July 2015, **MAYES**, **GOOCH**, **WELLS**, and others operating under their direction and control began issuing checks from the Big Red Dealerships to Trident for the amounts received from Norman Pawn & Gun. **MAYES** and

**WELLS** then issued reimbursement checks from Trident to Norman Pawn & Gun for the amounts that had been used for purported pawns in connection with Big Red Dealership sales.

FF.     For example, in or around July 2017, checks from Norman Pawn and Gun that were endorsed to BRSI totaled $12,000, to NMD totaled $500, and to Mayes Kia totaled $13,300.  On or about July 28, 2017, BRSI transferred $12,000 to Trident, NMD transferred $500, and Mayes Kia transferred $13,300 to Trident.  The transfers to Trident were described as "commissions."  **WELLS**, **MAYES**, and **GOOCH** prepared a check from Trident to Norman Pawn & Gun for $25,800.00, dated July 3, 2017, and it was signed by **MAYES** and deposited into the Norman Pawn & Gun bank account.

GG.     In or around July 2017, checks from Norman Pawn and Gun that were endorsed to Mayes Kia totaled $41,850.00, to NMD totaled $3,000, and to BRSI totaled $7,700.  On or about August 15, 2017, Mayes Kia transferred $41,850.00, BRSI transferred $7,700, and NMD transferred $3,000 to Trident.  The transfers to Trident were described as "commissions."  **WELLS** prepared a check from Trident to Norman Pawn & Gun for $52,550.00, dated August 3, 2017, and it was signed by **MAYES** and deposited into the Norman Pawn & Gun bank account with **GOOCH's** endorsement.

HH.     In or around August 2017, checks from Norman Pawn and Gun that were endorsed to BRSI totaled $7,000, to NMD totaled $1,000, and to Mayes Kia totaled $55,600.  On or about September 5, 2017, BRSI transferred $7,000 to Trident, and on September 7, 2017, NMD transferred $1,000, and Mayes Kia transferred $55,600 to Trident.  The transfers to Trident were described as "commissions."  **WELLS** prepared a

check from Trident to Norman Pawn & Gun for $63,600, dated September 5, 2017, and it was deposited into the Norman Pawn & Gun bank account by **GOOCH**.

II.     The Federal Grand Jury hereby alleges and incorporates by reference all of the allegations and statements contained in Counts 2 through 19 of this Indictment as acts in furtherance of the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS 2–13
### (Wire Fraud)

35.     The Federal Grand Jury incorporates paragraphs 1–34 by reference.

36.     On or about the dates listed below, in the Western District of Oklahoma and elsewhere,



**BOBBY CHRIS MAYES,**
**CHARLES GOOCH, and**
**COURTNEY WELLS,**

aided and abetted by each other and by others known and unknown to the Federal Grand Jury, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations and promises, did knowingly transmit and cause to be transmitted, in interstate commerce, by means of wire communication, certain writings, signs, and signals described below:

| COUNT | DATE | DESCRIPTION OF WIRE |
|---|---|---|
| 2 | January 18, 2016 | Retail sales contract and terms of sale between BRSI and T.G. transmitted over the Internet to Global Lending Services for loan funding premised on fake trade-in and undisclosed $1 repurchase |
| 3 | February 23, 2016 | Retail sales contract and terms of sale between BRSI and T.C. transmitted over the Internet to Global Lending Services for loan funding premised on fictitious cash down payment and undisclosed pawn of an Xbox 360 |
| 4 | August 15, 2016 | Retail sales contract and terms of sale between BRSI and S.O. transmitted over the Internet to American Credit Acceptance for loan funding premised on fictitious cash down payment and undisclosed pawn of an iPhone 5C and an Amazon tablet |
| 5 | August 20, 2016 | Retail sales contract and terms of sale between BRSI and J.D. transmitted over the Internet to American Credit Acceptance for loan funding premised on fake trade-in and undisclosed $1 repurchase |
| 6 | September 21, 2016 | Retail sales contract and terms of sale between Mayes Kia and C.M. transmitted over the Internet to American Credit Acceptance for loan funding premised on fake trade-in |
| 7 | November 11, 2016 | Retail sales contract and terms of sale between BRSI and M.C. transmitted over the Internet to Santander Consumer USA for loan funding premised on fictitious cash down payment and undisclosed pawn of an Apple iPad 2 that was never provided |
| 8 | January 5, 2017 | Retail sales contract and terms of sale between Mayes Kia and F.A. transmitted over the Internet to American Credit Acceptance for loan funding premised on fake $2,700 cash down payment, when $2,300 was the undisclosed pawn of a PlayStation 4 |
| 9 | February 10, 2017 | Retail sales contract and terms of sale between BRSI and Mr. B.C. transmitted over the Internet to Global Lending Services for loan funding premised on fictitious $1,000 cash down payment and undisclosed pawn of ZTE Internet wifi hotspot |

| 10 | April 15, 2017 | Retail sales contract and terms of sale between BRSI and Ms. B.C. transmitted over the Internet to Santander Consumer USA for loan funding premised on fictitious $1,500 cash down payment and undisclosed pawn of television that was never provided |
| 11 | May 8, 2017 | Retail sales contract and terms of sale between BRSI and D.D. transmitted over the Internet to Santander Consumer USA for loan funding premised on fake trade-in and undisclosed $1 repurchase |
| 12 | May 10, 2017 | Retail sales contract and terms of sale between Norman Mitsubishi and B.W. transmitted over Internet to Global Lending Services premised on a fake trade-in and undisclosed $1 repurchase |
| 13 | June 1, 2017 | Retail sales contract and terms of sale between BRSI and A.B. transmitted over Internet to Santander Consumer USA premised on a fake trade-in and undisclosed $1 repurchase |

All in violation of Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.

## COUNTS 14–19
(Uttering Forged Security)

37.    The Federal Grand Jury incorporates paragraphs 1–34 by reference.

38.    On or about the following dates, in the Western District of Oklahoma,

-------------------------------------- **BOBBY CHRIS MAYES,**
**CHARLES GOOCH, and**
**COURTNEY WELLS,** -----------------------------------

aided and abetted by each other and by others known and unknown to the Federal Grand Jury, knowingly and intentionally made, uttered, and possessed securities of Norman Pawn & Gun, an organization which operates in interstate commerce, with forged endorsements of the payees, with the intent to deceive Republic Bank and Trust in Norman, Oklahoma,

another organization which operates in interstate commerce, in particular the following checks payable to individuals, which purported to bear the true signatures of such individuals as endorsements, but which signatures were forged by or at the direction of **MAYES, GOOCH**, and **WELLS**:

| Count | Date of Check (On or About) | Payee | Amount | Check No. | Date of Deposit (On or About) |
|-------|------------------------------|---------|-----------|-----------|-------------------------------|
| 14 | 1/22/2016 | T.C. | $1,000.00 | 1211 | 5/2/2016 |
| 15 | 8/15/2016 | S.O. | $3,700.00 | 1299 | 10/6/2016 |
| 16 | 9/22/2016 | M.C. | $500.00 | 1333 | 11/23/2016 |
| 17 | 1/5/2017 | F.A. | $2,300.00 | 1377 | 1/23/2017 |
| 18 | 2/10/2017 | Mr. B.C. | $1,000.00 | 1439 | 3/31/2017 |
| 19 | 4/15/2017 | Ms. B.C. | $1,500.00 | 1487 | 6/7/2017 |

All in violation of Title 18, United States Code, Section 513(a), and Title 18, United States Code, Section 2.

### COUNTS 20–25
### (Aggravated Identity Theft)

39.     The Federal Grand Jury incorporates paragraphs 1–34 and 38 by reference.

40.     On or about the following dates, in the Western District of Oklahoma,



**BOBBY CHRIS MAYES,
CHARLES GOOCH, and
COURTNEY WELLS,** ---------------------------------

aided and abetted by each other and by others known and unknown to the Federal Grand Jury, knowingly transferred, possessed and used, without lawful authority, a means of identification of another person, that is, they knowingly possessed and used the name and

signature of the individuals identified below, during and in relation to the federal felony of wire fraud, enumerated in Title 18, United States Code, Section 1343, as charged in Counts 3, 4, 7, 8, 9, and 10, and uttering forged securities, in violation of Title 18, United States Code, Section 513(a), as charged in Counts 14-19.   In particular, **MAYES**, **GOOCH**, **WELLS**, and others acting under their direction and control fraudulently forged the signatures of the following individuals in endorsing checks from Norman Pawn & Gun over to the Big Red Dealerships and depositing such checks in dealership accounts:

| Count | Date of Check (On or About) | Payee | Amount | Check No. | Date of Deposit (On or About) |
|-------|------------------------------|-------|--------|-----------|-------------------------------|
| 20 | 1/22/2016 | T.C. | $1,000.00 | 1211 | 5/2/2016 |
| 21 | 8/15/2016 | S.O. | $3,700.00 | 1299 | 10/6/2016 |
| 22 | 9/22/2016 | M.C. | $500.00 | 1333 | 11/23/2016 |
| 23 | 1/5/2017 | F.A. | $2,300.00 | 1377 | 1/23/2017 |
| 24 | 2/10/2017 | Mr. B.C. | $1,000.00 | 1439 | 3/31/2017 |
| 25 | 4/15/2017 | Ms. B.C. | $1,500.00 | 1487 | 6/7/2017 |

All in violation of Title 18, United States Code, Section 1028A(a)(1) and Title 18, United States Code, Section 2.

## Forfeiture

The allegations contained in this Indictment are hereby re-alleged and incorporated for the purpose of alleging forfeiture.

Upon conviction of one or more of the offenses alleged in Counts 1 through 19 of this Indictment, **BOBBY CHRIS MAYES**, **CHARLES GOOCH**, and **COURTNEY**

29

**WELLS** shall forfeit to the United States, any property, real or personal, constituting or derived from proceeds traceable to said offenses. The property to be forfeited includes, but is not limited to a money judgment representing the proceeds obtained as a result of the offenses.

Pursuant to Title 21, United States Code, Section 853(p), as adopted by Title 28, United States Code, Section 2461(c), **BOBBY CHRIS MAYES**, **CHARLES GOOCH**, and **COURTNEY WELLS** shall forfeit substitute property, up to the value of the property described above if, by any act or omission of the defendant, the property described above, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property that cannot be subdivided without difficulty.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461.

A TRUE BILL:

FOREPERSON OF THE GRAND JURY

TIMOTHY J. DOWNING
United States Attorney

K. McKENZIE ANDERSON
THOMAS SNYDER
Assistant United States Attorneys