```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE WESTERN DISTRICT OF OKLAHOMA

 3

 4   UNITED STATES OF AMERICA,

 5           Plaintiff,

 6   vs.                          Case No. CR-20-240-F

 7   BOBBY CHRIS MAYES,
     CHARLES GOOCH, and
 8   COURTNEY WELLS,

 9           Defendants.
     ----------------------------
10

11

12

13                   * * * * * * * * *

14          TRANSCRIPT OF JURY TRIAL PROCEEDINGS

15         BEFORE THE HONORABLE STEPHEN P. FRIOT

16             UNITED STATES DISTRICT JUDGE

17                  NOVEMBER 5, 2021

18                     9:00 A.M.

19                  VOLUME III OF XII

20                   * * * * * * * * *

21

22

23

24

25   Proceedings reported by mechanical stenography; transcript
     produced by computer-aided transcription.
```

*Tracy Thompson, RDR, CRR*
United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5505

```
 1                    A P P E A R A N C E S:

 2   FOR THE GOVERNMENT:
     Ms. K. McKenzie Anderson and Mr. Thomas B. Snyder, Assistant
 3   United States Attorneys, United States Attorney's Office, 210
     W. Park Ave., Suite 400, Oklahoma City, OK 73102
 4
     FOR MR. BOBBY CHRIS MAYES:
 5   Ms. Vicki Z. Behenna and Mr. W. Brett Behenna, Behenna Goerke
     Krahl & Meyer, 210 W. Park Ave., Suite 3030, Oklahoma City, OK
 6   73102

 7   Mr. William H. Bock and Ms. Michelle L. Greene, Attorneys at
     Law, 6402 N. Santa Fe Ave., Suite A, Oklahoma City, OK 73116
 8
     Ms. Rachel N. Jordan, Mulinix Goerke & Meyer, PLLC, 210 W. Park
 9   Ave., Suite 3030, Oklahoma City, OK 73102

10
     FOR MR. CHARLES GOOCH:
11   Mr. Joseph G. Shannonhouse, IV, Shannonhouse Law Office, PLLC,
     500 N. Walker Ave., Suite C-100, Oklahoma City, OK 73102
12
13   FOR MS. COURTNEY WELLS:
     Mr. Robert D. Gifford, II, Gifford Law, PLLC, P.O. Box 2682,
14   Oklahoma City, OK 73101

15   Mr. S. Thomas Adler, II, Atkins & Markoff, 9211 N. Lake Hefner
     Parkway, Suite 104, Oklahoma City, OK 73120
16

17

18

19

20

21

22

23

24

25
```

```
 1                    EXAMINATION INDEX

 2   GOVERNMENT'S WITNESSES:

 3   ANDREW ELLIOTT
          CONTINUED DIRECT BY MS. ANDERSON       410
 4        CROSS BY MR. BEHENNA                    434
          CROSS BY MR. ADLER                      523
 5
     TAMIA GRAY
 6        DIRECT BY MS. ANDERSON                  566
          CROSS BY MR. BOCK                       575
 7        CROSS BY MR. GIFFORD                    577

 8   ANDREW ELLIOTT (RESUMED)
          REDIRECT BY MS. ANDERSON               579
 9        RECROSS BY MR. BEHENNA                  588
          RECROSS BY MR. ADLER                    591
10
     JASON WILDEMAN
11        DIRECT BY MS. ANDERSON                  597

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (PROCEEDINGS HAD NOVEMBER 5, 2021.)

 2              THE COURT:  We are resuming in United States of

 3   America vs. Bobby Chris Mayes, Charles Gooch and Courtney Wells

 4   with all the parties and counsel present as before.

 5      Welcome back, members of the jury.

 6      The government may continue.

 7              MS. ANDERSON:  Your Honor, may we just restart the

 8   video that was playing when we finished?

 9              THE COURT:  Yes.  And as I mentioned yesterday, if

10   you want to back it up a minute or so to -- so that we can all

11   have some understanding of where it left off, that's fine.

12              MS. ANDERSON:  And to be clear, when this one

13   finishes, there's -- the recording device cut it, so there will

14   be a little bit more after this in a separate file.

15              THE COURT:  Very well.

16              MS. ANDERSON:  Thank you.

17                          ANDREW ELLIOTT,

18      (PREVIOUSLY SWORN.)

19                      CONTINUED DIRECT EXAMINATION

20      (GOVERNMENT'S EXHIBIT 9 CONTINUED.)

21      (VIDEO PAUSED.)

22   Q.  (BY MS. ANDERSON) Mr. Elliott, how does it feel to watch

23   and listen to that recording?

24   A.  Disgusting.

25   Q.  Why is that?
```

1          MR. BEHENNA:  Objection to relevance, how he feels

2  about it, Your Honor.

3          THE COURT:  Overruled.

4  Q.   (BY MS. ANDERSON) Why does it feel disgusting?

5  A.   Well, the way that I would speak to her.  I was told

6  directly by Chris, "keep her fucking mouth shut," and all I

7  cared about was to just shut her up so we didn't get in

8  trouble.

9  Q.   In that recording, you told Ms. Mullins repeatedly that

10  she had never done anything wrong and had never gotten a

11  dollar.  Was that true?

12  A.   Absolutely not.

13  Q.   Why did you keep saying it?

14  A.   Because that was the story that we had role-played so many

15  times with me and Chris, where if we ever got in trouble, we

16  needed her to be on that page.

17  Q.   What do you mean by "role-played"?

18  A.   "Role-played."  For probably two years straight, every

19  day, me and him would go to the gym.  When we would get back to

20  the gym, most days we would go upstairs, we would sit for hours

21  and role-play different scenarios every day of what would

22  happen today, what would happen tomorrow, what if this happens.

23  If the FBI came in today and they grabbed both of us and they

24  put you in that room and they put me in that room, we have to

25  say the same thing, the exact same thing.  If you break, you're

ANDREW ELLIOTT - DIRECT EXAMINATION                                    412

1  not with me.  You better have it exactly planned.

2       So I was trying to brainwash her to believe that no matter

3  what pressure she was under, gun to the head, that she didn't

4  take any money.

5       And Chris had assured me that there was no way they could

6  -- I mean, I never gave her the money out of my bank account,

7  so the money that was given was given from Courtney out of

8  accounting by Chris's permission, and he said that he could

9  hide traces where they couldn't find that money.  And that's

10 why we believe no cash trace, then she just had to stick to her

11 word.

12 Q.   At the beginning of that, she handed you a paper and said

13 she got it in the mail from Tinker.  What was that?

14 A.   It was an invoice.

15 Q.   And what kind of an invoice?

16 A.   A Yamaha invoice, the invoices that we used to make.

17 Q.   Okay.  So is that -- let's see.

18       MS. ANDERSON:  Pull up Government Exhibit 36 on page

19 14 or something like that.  Anything in the middle.  Just

20 scroll to one of the pages after page 5, please.

21 Q.   (BY MS. ANDERSON) So was it an invoice like this?

22 A.   Yes.

23 Q.   All right.  And when you were talking to her, you said

24 that the dealership, when this had been going on, had made

25 those invoices and used MSRP and added 1,295 to it?

ANDREW ELLIOTT - DIRECT EXAMINATION                    413

1   A.    Yeah.   So, basically, Donna was fired from Tinker.   She

2   was working for us at this time.   This is a long ways after she

3   got fired from Tinker.

4        And we were doing a deal with Tinker because there was no

5   trust anymore.   Don't know how they didn't cut us off.   I think

6   they were still trying to figure it out.

7        But we made an agreement that we would take just a crate

8   sheet -- you know what I mean -- from what Yamaha sent us for

9   what we paid for the motorcycle and then they could give us a

10  markup, and they said:   No, we don't want any more invoices

11  from you guys.   What we want is an MSRP from Yamaha.

12  Q.    And was that what you were doing on all of these invoices?

13  A.    No.   No.   This -- so an MSRP from Yamaha is basically --

14  she wanted us to go to Yamaha.com, pull up a -- this is a

15  Yamaha Bolt.   We would pull up a Yamaha Bolt, and a Yamaha Bolt

16  would list for, like, $7,000, and then she would give us 1,295

17  of markup, and that was the new loan system, the new one.

18       This is the old one.   This is the way that we did invoices

19  when Donna worked there.   We were making our own stuff, not

20  printed off of any website.   It was our own internal template.

21  Q.    Okay.   And you told Ms. Mullins to give the invoice to

22  Mr. Mayes.   Why him?

23  A.    Because Chris had gotten her an attorney.   And anything

24  that anybody got, I was told to give it to Chris, but since

25  Chris paid for her attorney, I needed to make sure that she got

1  it to Chris.

2  Q.   And you told her, "don't ever talk on the phone, never

3  text, never talk on the phone."  Why did you say that?

4  A.   Because Chris told me to never talk on the phone, never

5  text, never -- when this Donna thing went down, I mean, he took

6  everybody's phones, immediately.  So none of us had access to

7  our old phones anymore.  He wanted to make sure they were gone.

8  Q.   Whose phones?

9  A.   My phone, Donna Mullins' phone, Courtney Wells' phone,

10  maybe Chuck's.  I know Courtney for sure.

11  Q.   How do you know?

12  A.   Because Chris told me, give him your phone.  Like, I gave

13  it to him.  I gave my phone to Chuck Gooch.  Chris told her to

14  give it to him.  And Courtney paid for me to get a new phone.

15  Q.   And on that recording, you said Chris has a very long line

16  of loyalty and as long as you never cross him, he will never

17  cross you.  Why did you say that?

18  A.   Because as long as you do what he says when you work for

19  him, then you're good; but the second you don't, it can get

20  ugly fast.

21  Q.   And after that recording --

22       MS. ANDERSON:  We can take that one down.  Thank you.

23  Q.   (BY MS. ANDERSON) After that recording, at some point, did

24  an FBI agent come to the dealership?

25  A.   Yes.

ANDREW ELLIOTT - DIRECT EXAMINATION                    415

1   Q.   What happened?

2   A.   He came in and Chris spoke with him, with one of Chris's

3   buddies' attorneys, Rodney.

4   Q.   All right.  And did you talk to Mr. Mayes right after

5   that?

6   A.   Yes, for a moment.  But every day we spoke, he just said

7   that we just got to stick to our story.

8   Q.   And later that afternoon, did you have a conversation with

9   Donna Mullins?

10  A.   I'm trying to remember in context.  Maybe.

11  Q.   Did you have some later conversation with Ms. Mullins that

12  you later found out had been recorded?

13  A.   Yes.  I had the FBI come to my house and tell me that they

14  have a recording of me and Donna Mullins.

15  Q.   Okay.

16  A.   And then I told them I wasn't going to speak to them, and

17  I called Chris immediately, and he came over.

18  Q.   Let me direct your attention to what's been marked as

19  Government Exhibit 10.

20           THE COURT:  Let me interrupt for just a minute.

21      Either by way of representation from Ms. Anderson or from

22  the witness, I'm unclear as to when the video we just saw was

23  made.  I have it down as in 2017.  When in 2017 was that

24  Government Exhibit 9 video made?

25           MS. ANDERSON:  May I answer that?

ANDREW ELLIOTT - DIRECT EXAMINATION                    416

```
 1              THE COURT:  And --
 2              MR. BEHENNA:  I believe it is June 16th, Your Honor,
 3  2017.
 4              MS. ANDERSON:  It's June 21st, 2017.
 5              MR. BEHENNA:  Oh, forgive me.
 6              THE COURT:  Well, that's close enough.  Essentially
 7  sometime in mid June of 2017.
 8        I just wanted the jury to be able to understand the
 9  general chronological context.
10        So the one we just saw was essentially from mid June of
11  2017.  I take it there's no dispute about that.
12        You may proceed.
13              MS. ANDERSON:  Thank you, Your Honor.
14  Q.   (BY MS. ANDERSON) Are you looking at what's been marked as
15  Government Exhibit 10?
16  A.   Yes, a CD.
17  Q.   And do you recall -- do you recognize this?
18  A.   Yes.
19  Q.   What is it?
20  A.   It's a recording of me.
21  Q.   Is this the second recording that was made by Ms. Mullins?
22  A.   Yes.
23  Q.   And was this after the FBI had come to the dealership?
24  A.   Yes.
25  Q.   And when this was recorded, where was Ms. Mullins working,
```

1    if you recall?

2    A.    I think she was down the road, at Arvest Bank.

3    Q.    And where were you working?

4    A.    I was working at Norman Mitsubishi.

5    Q.    Who did you report to?

6    A.    Chris Mayes.

7    Q.    And in this recording, what were you talking to

8    Ms. Mullins about?

9    A.    So this is where things started to get really heated up,

10   and this is where, you know, it wasn't like other people were

11   being visited by the FBI; we were.

12        And every day, it felt like somebody was going to come in

13   and just lock up everybody and shut down the doors.  Because I

14   role-played every scenario with Chris every day, so this

15   recording was about making sure Donna was very aware about

16   keeping her mouth shut again, more aggressively.

17   Q.    And was she -- what was she supposed to keep her mouth

18   shut about?

19   A.    About talking about any money coming out of Tinker.

20   Q.    Money coming out of --

21   A.    I'm sorry.  Money getting bribed for loans from us from

22   Tinker.

23   Q.    And so it related to loans for customers of Norman Yamaha

24   while you worked there?

25   A.    Yeah, Norman Yamaha and Big Red -- I mean, and Mitsubishi.

ANDREW ELLIOTT - DIRECT EXAMINATION                    418

```
 1   I'm sorry.
 2   Q.   Okay.  And does that video that you've watched truly and
 3   accurately reflect the conversation you had with Ms. Mullins
 4   that day?
 5   A.   Absolutely.
 6           MS. ANDERSON:  Your Honor, the government moves to
 7   admit Government Exhibit 10 and to publish it.
 8           THE COURT:  Any objection?
 9           MR. BEHENNA:  No objection, Your Honor.
10           MR. ADLER:  No objection.
11           THE COURT:  It will be received.
12       Now, is this the one that has the transcript?
13           MS. ANDERSON:  Yes, Your Honor.
14           THE COURT:  You might want to cover that before you
15   play the video.
16           MS. ANDERSON:  That's what I was just checking on.
17   Q.   (BY MS. ANDERSON) In the book, along with that disk, is
18   there also a transcript of that conversation?
19   A.   Yes, there is.
20   Q.   Have you reviewed that?
21   A.   Yes, I have.
22   Q.   Is it a fairly accurate transcription of what was said in
23   that recording?
24   A.   Absolutely.
25           MS. ANDERSON:  Your Honor, may we share that with the
```

1   jury?

2            THE COURT:  Do you have copies for each juror?

3            MS. ANDERSON:  We do, Your Honor.

4            THE COURT:  Okay.  Very well.  You may.

5        And let me just take just a minute to explain to the jury

6   what we're about to do.

7        You are about to see a video.  I'm told that there are at

8   least some parts of it where the audio or what is being said is

9   not completely clear.  A transcript has been prepared of the

10  video of at least some, if not all, of the dialogue, if you

11  will, the conversation in the video.

12       In the jury room, you will have -- at the end of the trial

13  I'll explain this a little bit more -- but you will have what's

14  called the JERS system, J-E-R-S.  That stands for Jury Evidence

15  Review System.  And you will have all of the paper exhibits and

16  all of the video exhibits in electronic form on that JERS unit.

17  And by poking the right buttons, you can pull up an exhibit and

18  play a recording and that sort of a thing.

19       So in the jury room, you will have these videos.  But the

20  point here is that the video itself is the evidence of the

21  conversation.  The transcript is perhaps an aid to your

22  comprehension of what is said on the video, but in the event of

23  any difference or any inconsistency between what you hear on

24  the video and what's in the transcript, your perception of what

25  is on the video prevails.  The transcript is only an aid to

ANDREW ELLIOTT - DIRECT EXAMINATION                           420

```
 1  assist you in evaluating the video.
 2      At the end of the day, the evidence for you to rely on, if
 3  you will, is the video itself, as opposed to the transcript.
 4      With that understanding, the government may proceed.
 5          MS. ANDERSON:  Your Honor --
 6          THE COURT:  Wait just a minute.
 7      Yeah, go ahead.
 8          MS. ANDERSON:  May I pass these out?
 9          THE COURT:  You may.
10      (GOVERNMENT COUNSEL HANDS OUT THE TRANSCRIPT OF GOVERNMENT
11  EXHIBIT 10 TO THE JURY.)
12          THE COURT:  And roughly how long is this video?
13          MS. ANDERSON:  This one is 49 minutes, Your Honor.
14          THE COURT:  You may proceed.
15          MS. ANDERSON:  May I pause it a couple of times
16  during it?
17          THE COURT:  To ask questions?
18          MS. ANDERSON:  Yes, Your Honor.
19          THE COURT:  You may.
20          MS. ANDERSON:  Thank you.
21      (GOVERNMENT EXHIBIT 10 PLAYED FOR THE COURT AND JURY.)
22      (VIDEO PAUSED.)
23  Q.  (BY MS. ANDERSON) Mr. Elliott, the radio seems really loud
24  on this.  Why is that?
25  A.  So at this point in time, paranoia in the company was
```

1    through the roof.  Basically, every day Chris had his office

2    scanned for bugs, for recordings.  When I was in the car with

3    her, the first thing I did was crank the radio up and I asked

4    her, do you have your phone on you?  Because that's what we

5    were taught to do.  That's what Chris taught me to do, is do

6    not get caught.

7        So I wanted to make sure, number one, if she was recording

8    me and she was wired, I cranked the radio up.  And then, number

9    two, I wanted to make sure she did not have her phone on her.

10   And so she said she left it.  That's why the radio is so loud.

11           THE COURT:  Forgive the interruption, but Plaintiff's

12   Exhibit 10, what's the approximate date of that recording?

13           MS. ANDERSON:  This is July 17, 2017.

14           THE COURT:  Is there any dispute about that?

15           MR. BEHENNA:  No, Your Honor.

16           THE COURT:  July 17th of 2017.  Very well.

17       You may proceed.

18   Q.   (BY MS. ANDERSON) And are you the one driving?

19   A.   I believe so.

20   Q.   All right.

21       (GOVERNMENT EXHIBIT 10 CONTINUED.)

22       (AUDIO PAUSED.)

23   Q.   (BY MS. ANDERSON) Mr. Elliott, I was having a little hard

24   time hearing -- did you say six to eight grand a month for,

25   like, four to five months, and then you said she made $30,000?

ANDREW ELLIOTT - DIRECT EXAMINATION                    422

1   A.    Yeah.  I don't know the total amount we gave her, but it

2   was, like, the first month we started with, like, a thousand a

3   month.  And then we increased it to 2,000 -- I'm sorry -- a

4   thousand a week, and then we increased it to 2,000 a week.

5   Q.    Okay.  And you were estimating it was about $30,000 over

6   four or five months?

7   A.    Yes.

8   Q.    All right.  Let's go ahead.

9         (GOVERNMENT EXHIBIT 10 CONTINUED.)

10        (FILES SWITCHED AND VIDEO CONTINUED PLAYING.)

11             THE COURT:  Interrupt the play, please.

12        (AUDIO PAUSED.)

13             THE COURT:  Members of the jury, we'll take our

14   mid-morning break at this time.

15        I will ask you to please remember my usual admonition not

16   to discuss the case with any person for any purpose until it's

17   been given to you for your deliberations and verdict and not to

18   reach any conclusions about the case until it has been given to

19   you for your deliberations and verdict and not to undertake any

20   form of independent investigation of any aspect of the case.

21        We'll resume, guided, as always, by the clock on the wall,

22   at 25 minutes till 11:00.  And so please do plan to be prepared

23   to resume at that time.

24        All persons in the courtroom will please remain seated

25   while the jury departs.

1          (JURY EXITS THE COURTROOM.)

2          THE COURT:  Mr. Elliott, you may step down.

3  Obviously, make sure that you don't come near any jurors.

4      And we'll take our mid-morning break at this point.

5      But while it's fresh in my mind, I wanted to say, looking

6  back at what we heard on Government Exhibit 9, if that's any

7  indication, there may be -- and obviously every recording is

8  unique -- but if Government Exhibit 9 is any indication, there

9  may be considerable room for editing on the -- what apparently

10  is the one remaining recording.

11      So I'm just going to leave that thought with you.  It's

12  your case, not mine, but I'm just going to leave that thought

13  with you.

14      Anything else we need to address before we take our

15  mid-morning break?

16      Hearing nothing, court will be in recess.

17       (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING PROCEEDINGS

18  WERE HAD IN OPEN COURT AND WITHIN THE PRESENCE AND HEARING OF

19  THE JURY.)

20          THE COURT:  Welcome back, members of the jury.

21      Ms. Anderson, you may continue.

22          MS. ANDERSON:  Yes, Your Honor.

23      May we continue playing Exhibit 10?

24          THE COURT:  Surely.

25          MS. ANDERSON:  Thank you.

1          (GOVERNMENT EXHIBIT 10 CONTINUED.)

2          (AUDIO CONCLUDED.)

3    Q.   (BY MS. ANDERSON) Mr. Elliott, how did it feel to listen

4    to that one?

5    A.   Absolutely awful.

6    Q.   Why?

7    A.   Well, number one, it was our last chance for her to

8    realize that -- she opened her mouth telling Tinker that she

9    took money from us, and we wanted her -- we wanted her to just

10   -- that was her -- to feel that that was her mistake and that

11   if she didn't -- what Chris told me is, if she goes off on her

12   own, then she's a whore.  She slept with Chris, she slept with

13   a lot of people in the store, and we will throw her out to dry.

14   Do not get your own attorney; use Chris's.

15        Chris had a TracFone set up with this attorney so they

16   could stay connected, so everybody would be connected.  It was

17   just our last attempt; either she was with us or not with us

18   anymore.  So I was trying to be as hard on her as possible.

19   Q.   And why did Mr. Mayes want to pick Donna Mullins'

20   attorney?

21   A.   So that he could control everything that was going on and

22   what her next move was and what was being said and what she was

23   thinking.  Like was she going to turn on us, was she with us?

24   Q.   Did you have an attorney?

25   A.   Yes.

1   Q.   Who hired your attorney?

2   A.   Chris Mayes.

3   Q.   And do you have an attorney now?

4   A.   Yes.

5   Q.   Who is paying for your attorney?

6   A.   I pay for my attorney.

7   Q.   When did that change?

8   A.   That changed after I left Big Red.

9   Q.   After Mr. Mayes found out that the FBI was investigating,

10  what happened?

11  A.   Well, so number one, massively, every day was -- again,

12  I'm going back into role play.  We role-played every single

13  scenario every single day, as in we would sit down, we would

14  play out she's a whore, what if she says she slept with you,

15  what if she said she slept with me.  And she did sleep with

16  Chris, but what if she said she slept with you, what are you

17  going to say?  I'm like, well, I didn't touch her.

18              THE COURT:  I'm going to ask you to slow down,

19  please.

20              THE WITNESS:  I'm sorry.

21       So we would role-play multiple different scenarios.  What

22  if she said she took the money, what if she said she didn't.

23  We role-played everything under the sun.  What if they ask

24  about old stuff, you know, like, going back in the past?  Like,

25  we just role-played every single thing possible like it was

1  present and happening, as in like if the FBI came in right now,

2  if we're in court and they're -- you're on the stand and you're

3  over here, me and you have to be the exact same way.  I've

4  never even been in court so I'm just picturing in my head

5  what -- we have to be on the same thing.

6      So we didn't sell cars, we practiced what would happen

7  when this happened.

8  Q.   (BY MS. ANDERSON) And when you say "we," who are you

9  talking about?

10  A.   Me and Chris Mayes.

11  Q.   Did anyone else?

12  A.   And occasionally Courtney and Chuck, but mostly just

13  Courtney.  Chuck was not a part of a lot of our conversations

14  with this deal, except for when it came to the end, him taking

15  the phone.

16  Q.   And did anything change at the dealership after Mr. Mayes

17  found out about the FBI investigation?

18  A.   Absolutely.  A lot of things started changing all the way

19  around.  Everything started tightening up, you know.  I believe

20  Faith became the new compliance person.  Obviously, Chuck was

21  over at the pawn shop.  Everything got really strict.

22  Everything started getting dialed in to the T.

23      And it was planning everybody going rogue, in case

24  somebody went rogue.  The ultimate plan here is if someone goes

25  rogue, we have them recorded, we have them pinned down, and we

1  are ready to burn them.

2      And we had Courtney ready to get burned, Chuck ready to

3  get burned.  We have everybody.  It is all ready to go.  So if

4  somebody turns on Chris at any time, you're done.

5  Q.   Who made recordings?

6  A.   I'm pretty sure everything is recorded all the time around

7  Chris in every room.  I'm pretty sure of it.

8  Q.   In every room?

9  A.   Well, there was rooms that were upstairs.  When me and him

10  would go speak every day and we would practice these

11  role-playing deals, we would always go to one room upstairs in

12  Mitsubishi.  Before the accounting room was there, it was an

13  empty office.  We would go into the same --

14          THE COURT:  I'm going to ask you to slow down,

15  please.

16          THE WITNESS:  I'm sorry, sir.

17      He would ask us to go into the same office every single

18  time and we would role-play different scenarios.

19      If there's a recording, I can give you a thousand

20  different things we role-played in that office every day, after

21  the gym, for hours.

22  Q.   (BY MS. ANDERSON) And did Ms. Wells have to -- did she

23  participate in any role-playing?

24          MR. ADLER:  Objection; asked and answered.

25          THE COURT:  Overruled.

1    Q.    (BY MS. ANDERSON) And were there any sort of meetings with

2    other folks at the dealership?

3    A.    Yeah.  So we had a lot of meetings, and a lot of the

4    meetings was to isolate Chris.  Chris wanted insulation.

5    He didn't want anybody near him.

6          And what we ended up doing, there was a meeting and it was

7    like, hey, if anybody needs anything, from now on, they talk to

8    me.  You're not allowed to go up to Chris's office unless he

9    asks you to.

10         And there was a girl that he placed in his office named

11   Christina to make sure that somebody was always in there with

12   him, so nobody could get private with him anymore.

13         When we would have meetings -- I mean, this is -- we would

14   go and literally take our phones, put them on the pavement and,

15   like, walk out to, like, a field, a yard, I mean, so we were

16   away from our phones because he was always afraid somebody was

17   recording him.

18   Q.    And after that recorded conversation, did you continue

19   talking to Ms. Mullins?

20   A.    I don't believe so.  I think after we took her phone, I

21   don't -- to my recollection -- once we took her phone, I was

22   told to never speak to her again.

23   Q.    Why -- who told you that?

24   A.    Chris Mayes.

25   Q.    And what did he say?

ANDREW ELLIOTT - DIRECT EXAMINATION                                429

1  A.   He said don't speak to her anymore because more than

2  likely she's got her own attorney now.  And if she goes left,

3  she's probably going to start recording us.

4       And when I got in the car with her, why I drove, why I

5  asked her, "do you have your phone," and why I cranked the

6  radio up, is because I had a feeling that she was recording me.

7       But Chris told me to go handle it, which is at the end of

8  that video, I said "yes, sir," and that was Chris.  He knew I

9  was with her.  He told me to shut her up.  He wanted to find

10 out what happened.

11 Q.   So yesterday we went through a timeline.  And you left the

12 dealership in -- I think if we -- we looked at that check, the

13 $10,000 check, that was in mid June 2014; is that right?

14 A.   Yes, ma'am.

15 Q.   And you came back in January 2015; is that right?

16 A.   Yes, ma'am.

17 Q.   And then you left in October 2015?

18 A.   Yes, ma'am.

19 Q.   And you came back in January 2016?

20 A.   Yes, ma'am.

21 Q.   And then you said that you worked there until the summer

22 of 2019; is that right?

23 A.   Yes.

24 Q.   And then what happened?

25 A.   Well, number one, I was so stressed out, I wanted to quit

1    for a long time, but I didn't want to separate from Chris,

2    because separating from him is very dangerous.

3         I mean, I went to the gym with him every single day for

4    three or four hours a day just to stay close to him.  You're

5    away from him for one day, he'll turn on you.

6         And, you know, honestly, I felt threatened, like,

7    financially or even physically, so I just -- I went to Mexico

8    for a month, and then I came back, and then I ended up buying

9    cars for a while until I could start my own business.  And I

10   tried to stay close to him because I figured this day was

11   coming.

12   Q.   And when you came back from Mexico, why did you quit?

13   A.   I quit when I came back.  The first thing that I heard

14   that Chris was trying to frame me for a fraudulent warranty

15   repair on a car.  And he had had lots of meetings while I was

16   gone and, you know, everybody is, like, Dude, you're a good guy

17   and you've been close to him, but he's turned on you and he's

18   trying to frame you.

19   Q.   What do you mean by he was trying to frame you on a

20   warranty?

21   A.   I bought a car at the auction, had like 7,000 miles.

22   Because I was buying cars, and I guess before I left for

23   Mexico, I had bought one and they had sold it.  And I guess it

24   had -- the engine had problems or something and they took it

25   back to the service station.  Before I left, I told them to

ANDREW ELLIOTT - DIRECT EXAMINATION                        431

1   make sure that it's under warranty, get it looked at.  By the

2   time I came back, I guess he had told the service manager that

3   I had told him --

4            MR. BEHENNA:  Objection, Your Honor.  We've got

5   multiple layers of hearsay, him telling a service manager who

6   told him.

7            THE COURT:  Sustained.

8   Q.   (BY MS. ANDERSON) All right.  And so you quit?

9   A.   Yes.  And I ended up just buying cars so I could keep

10  making money because I didn't want to stay in the car business

11  anymore.

12  Q.   Okay.  May I direct you to what's been marked as

13  Government Exhibit 244 in your book.  It's in the second volume

14  of the binders.

15       Do you recognize that document?

16  A.   Yes.  This is a bill of sale for a vehicle that I bought.

17  Q.   And what's the date on this?

18  A.   I bought it in October 10th of 2019, when I was still

19  buying cars for them.

20  Q.   Okay.  Is this something that you provided?

21  A.   Yeah -- well, the auction prints this, out and this is --

22  if you look at the bottom, it says "Buyer:  Andrew Jeffrey

23  Elliott."  I purchased it.

24  Q.   And this is something you got through working with the

25  dealership?

ANDREW ELLIOTT - DIRECT EXAMINATION                                432

1   A.   Yeah.  This is something that dealers -- that the auction

2   gave me because I bought it, so it's -- I was a buyer for Big

3   Red in Norman Mitsubishi, and I purchased this vehicle for them

4   on October 10, 2019.

5           MS. ANDERSON:  Your Honor, the government moves to

6   admit Government Exhibit 244 and to publish it.

7           MR. BEHENNA:  No objection, Your Honor.

8           MR. SHANNONHOUSE:  No objection.

9           MR. ADLER:  No objection.

10          THE COURT:  It will be received.

11  Q.   (BY MS. ANDERSON) All right.  So I think you were pointing

12  out on the --

13  A.   Top right.

14  Q.   -- top right, sorry.

15       What are you pointing out to us?  It says the sale date?

16  A.   The sale date.

17  Q.   Okay.  And that was -- what was the sale date?

18  A.   October 19th of 2019 -- oh, October 10th, I'm sorry, of

19  2019.

20  Q.   Okay.  And did you say your name was on this somewhere?

21  A.   Yes.  So if you'll go down to the bottom, it says "SELLER"

22  and then it says "BUYER," kind of a little bit above the

23  signature --

24  Q.   On the right?

25  A.   -- to the left.  Sorry.

ANDREW ELLIOTT - DIRECT EXAMINATION                    433

```
 1   Q.   Okay.

 2   A.   If you'll go to the left.

 3   Q.   On the left under -- it says "BUYER(Transferee)"?

 4   A.   Yeah, there we go.

 5        And on the buyer transferee, Big Red Sports attending, and

 6   that was me who purchased it.  I was the buyer, Andrew Jeffrey

 7   Elliott.

 8   Q.   I'm going to direct you to what's been marked as

 9   Government Exhibit 245.

10        Do you recognize this?

11   A.   Yes, I do.

12   Q.   What is this?

13   A.   This is another bill of sale from the auction where I

14   bought a car for Big Red.

15   Q.   Is this a different vehicle, same day?

16   A.   Yes, ma'am.

17   Q.   Same kind of document we just looked at?

18   A.   Yes, ma'am.

19           MS. ANDERSON:  Your Honor, the government moves to

20   admit and publish Government Exhibit 245.

21           MR. BEHENNA:  No objection, Your Honor.

22           MR. SHANNONHOUSE:  No objection.

23           MR. ADLER:  No objection.

24           THE COURT:  It will be received.

25   Q.   (BY MS. ANDERSON) And the same date on the top right?
```

```
 1   A.    Yes, ma'am.

 2   Q.    Okay.  And who does it --

 3   A.    It's October 10, 2019.  I was the buyer.

 4   Q.    All right.  And that's on the --

 5   A.    Under the buyer, yeah.

 6   Q.    Okay.  At some point, did you stop doing that, buying for

 7   Big Red Sports & Imports?

 8   A.    Yes, I did.

 9   Q.    Okay.  And I think you mentioned you now live in Arizona;

10   is that right?

11   A.    Yes.

12   Q.    Why did you move?

13   A.    Just to get away from all this.

14   Q.    All right.  Now that there's some distance, how do you

15   feel about your time working for Mr. Mayes, Mr. Gooch and

16   Ms. Wells?

17   A.    It was horrible.

18              MR. ADLER:  Objection; assumes facts not in evidence.

19              THE COURT:  That objection will be sustained.

20              MS. ANDERSON:  Pass the witness, Your Honor.

21              THE COURT:  Cross-examination.

22                          CROSS-EXAMINATION

23   BY MR. BEHENNA:

24   Q.    Good morning, Mr. Elliott.

25   A.    Good morning.
```

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    435

1   Q.   Today is November the 5th, correct?

2   A.   Yes, sir.

3   Q.   You've been testifying all morning, right?

4   A.   Yes, sir.

5   Q.   And yesterday was November the 4th, right?

6   A.   Yes.

7   Q.   And you testified pretty much most of yesterday's

8   testimony, correct?

9   A.   Yes.

10  Q.   Day before that was November the 3rd, correct?

11  A.   Yes.

12  Q.   Before you testified here on the 4th, was anyone passing

13  you information about what witnesses were testifying to here in

14  court?

15       And I want you to think very carefully before you answer

16  because you're under oath.

17  A.   Can you re-explain the question?

18  Q.   Was anyone passing you information about what witnesses

19  were testifying to here in court before you came to testify?

20  A.   When I was speaking to my -- the U.S. Attorney, there was

21  some names that they listed off that they heard about this room

22  of people who would be here.

23  Q.   So you talked with the U.S. Attorney about testimony of

24  witnesses before you came to testify?

25  A.   No.  I just heard a list of people that may be in the

```
 1   room.
 2              MS. ANDERSON:  Objection, Your Honor.  Objection,
 3   Your Honor.
 4              THE COURT:  State your grounds.  And pull the mic
 5   around where it picks you up.
 6              MS. ANDERSON:  Withdrawn.
 7              THE COURT:  Pardon me?
 8              MS. ANDERSON:  I'm sorry.  Withdrawn.
 9              THE COURT:  You may proceed.
10              MR. BEHENNA:  Thank you, Your Honor.
11         May I approach the witness, Your Honor?
12              THE COURT:  You may.
13   Q.   (BY MR. BEHENNA) I'm going to hand you what I've marked as
14   Defendant's Exhibit 100.  Will you take a look at that for me.
15         Do you recognize that?
16   A.   Yeah.
17   Q.   That's your Facebook page, right?
18   A.   Yes.
19   Q.   That's the Facebook post you made, right?
20   A.   Yes.
21   Q.   May I have that back, please?
22   A.   Yeah.
23              MR. BEHENNA:  At this time, Your Honor, defendant
24   moves to admit Defendant's Exhibit 100.
25              THE COURT:  Any objection?
```

1           MS. ANDERSON:  Not as to this page, Your Honor.

2           THE COURT:  It will be received.

3    Q.   (BY MR. BEHENNA) Okay.  First, I want you to notice down

4    in the bottom right-hand corner, it says November the 4th at

5    8:02 a.m., correct?

6         Do you see that bottom right-hand corner?

7    A.   Yes, I see.

8    Q.   That was yesterday at 8:02 a.m., right?

9    A.   Yes.

10   Q.   Yes?

11   A.   Yes.

12   Q.   Seventeen hours before that would be 3:00 p.m. on November

13   the 3rd, correct?

14   A.   Okay.  Say that again.

15   Q.   Seventeen hours -- there's a post you made 17 hours before

16   November the 4th at 8:02 a.m., correct?

17   A.   I made this post.  If it's time-stamped 8:02, that's when

18   I made it.

19   Q.   No, no, no.  8:02 is my computer screen.

20   A.   Okay.

21   Q.   Seventeen hours before 8:02 a.m. is November the 3rd at

22   3:00 p.m.

23   A.   I see.  I'm looking next to Facebook, it says that this

24   post is made 17 hours ago.  I see that.

25   Q.   Get it now.

 1      Donna Mullins was testifying November 3rd between 3:00 and

 2  4:00 p.m.  Are you aware of that?

 3  A.   I am not aware of that.

 4  Q.   Are you aware that she described you as relentless?

 5  A.   Okay.

 6  Q.   And your post -- read it for the jury.  What does that

 7  say?

 8  A.   It says, "Nobody wants to stand in front of somebody who

 9  is relentless."

10  Q.   What is the only word that's capitalized there?

11  A.   Relentless.

12  Q.   And then your hash tag is what?

13  A.   It says "taking souls."

14  Q.   Thank you.

15      Now, I think that's important because there's a part of

16  you, Andy Elliott, that you haven't shown the jury at this

17  point, right?

18  A.   I don't understand.

19  Q.   Okay.  Well, let's go through.

20      You currently own a car training -- or a sales training

21  company, correct?

22  A.   Yes, I do.

23  Q.   You teach people how to sell cars?

24  A.   Yes, I do.

25  Q.   And you put on training videos with your techniques,

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    439

1   correct?

2   A.   Yes, I do.

3   Q.   You have over 400 videos on YouTube where you teach your

4   sales tactics, correct?

5   A.   Okay.

6   Q.   Correct?

7   A.   I don't know if there's 400, but I know I have videos all

8   over YouTube.  I don't know the exact correct count, so I'm not

9   going to -- I'm going to stick to the truth.  I don't know the

10  number.

11  Q.   More than a hundred, right?

12  A.   I'm sure there's probably more than a hundred.

13  Q.   In those videos, you brag about how you mislead customers,

14  correct?

15  A.   No.

16  Q.   You don't?

17       Have you watched any of the videos here recently?

18  A.   Sir, are you stating that I said I mislead customers and I

19  brag about it?

20  Q.   Yeah.

21  A.   If I have that, I haven't seen that -- or it was a long --

22  I mean, I don't know.

23  Q.   Okay.

24       MR. BEHENNA:  Permission to approach the witness,

25  Your Honor?

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                          440

 1                THE COURT:  You may.

 2                MR. BEHENNA:  They're brand-new, so they're

 3   COVID-friendly.  How about that?  Just go ahead and hit "play"

 4   whenever you're ready.

 5        (MR. BEHENNA GAVE THE WITNESS A COMPUTER TO WATCH VIDEO ON

 6   YOUTUBE.)

 7                THE WITNESS:  This is a great video.

 8   Q.   (BY MR. BEHENNA) That's a great video, in your mind?

 9   A.   Yeah, it's a great video.

10        Would you like me to explain it?

11   Q.   No, I don't.  I just want to ask you, first, is that the

12   video that you created?  Correct?

13   A.   Absolutely.

14   Q.   And that fairly and accurately depicts a story you're

15   telling about misleading a customer.

16   A.   I'm telling a story about a -- did you ask me a question?

17   Q.   No.  I'm saying does that fairly and accurately depict a

18   video that you made, for now?

19   A.   You asked me if it is misleading customers.

20   Q.   Does that fairly and accurately depict a video that you

21   made?

22   A.   I made that video.

23   Q.   Okay.

24                MR. BEHENNA:  Your Honor, at this time, we move to

25   admit as Exhibit 101 the video played for the witness.

```
 1              MS. ANDERSON:  No objection, Your Honor.

 2              THE COURT:  It will be received.

 3          (DEFENDANT'S EXHIBIT 101 PLAYED FOR THE COURT AND JURY.)

 4   Q.  (BY MR. BEHENNA) You also had videos where you tell the

 5   people you trained that you need to become an actor.

 6   A.   Yes.

 7   Q.   That within the first five minutes of meeting them, you

 8   have to master the interaction.

 9   A.   That's right.

10   Q.   You have videos where you talk about customers have walls

11   and you have to pull them down, right?

12   A.   It's called "relationship building."

13   Q.   Okay.  Have walls and you have to pull them down and you

14   have to make them feel special and you have to use your words

15   and you have to be flawless with your words, right?

16   A.   Yeah.  I want to treat people like I want to be treated

17   when I buy something.

18   Q.   That wasn't my question.

19        You have to be flawless with your words, right?

20   A.   I think it's important.

21   Q.   That's what you teach them, right?

22   A.   Yes, we teach them to speak well.

23   Q.   Okay.  Let me just show you.

24              MS. ANDERSON:  Your Honor, may we have a brief --

25              THE COURT:  I can't hear you.  You need to speak
```

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                          442

```
1   where a microphone picks you up.
2            MS. ANDERSON:  Yes, Your Honor.
3        May we have a brief bench conference?
4            THE COURT:  You may.
5            MS. ANDERSON:  Thank you.
6        (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND OUT
7   OF THE HEARING OF THE JURY.)
8            THE COURT:  Okay.  Can government counsel hear me?
9            MS. ANDERSON:  Yes, Your Honor.
10           THE COURT:  And can defense counsel hear me?
11           MR. ADLER:  Uh-huh.
12           THE COURT:  Mr. Shannonhouse, can you hear me?
13           (NO RESPONSE.)
14           THE COURT:  And, Mr. Behenna, can you hear me?
15           MR. BEHENNA:  Yes, Your Honor.
16           THE COURT:  Okay.  I'll hear the government.
17           MS. ANDERSON:  Yes, Your Honor.
18       If these are the videos that were provided by defense
19  counsel on that thumb drive, we are okay with them being played
20  without --
21           THE COURT:  Wait, wait, wait.  Mr. Shannonhouse can't
22  hear.
23           MR. SHANNONHOUSE:  Your Honor, my --
24           THE COURT:  Okay.  Mr. Shannonhouse, can you hear me?
25           MR. SHANNONHOUSE:  I can, Your Honor.
```

1          THE COURT:  Okay.  Ms. Anderson, you may resume.

2          MS. ANDERSON:  Yes, Your Honor.

3      If these are the videos that were provided on the thumb

4   drive to the United States yesterday, we are okay with them

5   being played without Mr. Elliott first sitting there and

6   watching them silently by himself, if it would save everybody

7   some time.

8          THE COURT:  Are they the ones that were on that thumb

9   drive?

10         MR. BEHENNA:  Yes, Your Honor.

11         THE COURT:  And I presume there's no objection to

12  excusing Mr. Elliott from listening to them before they're

13  presented; am I right about that?

14         MR. BEHENNA:  No, Your Honor.

15         THE COURT:  I'm not right about that?

16         MR. BEHENNA:  Oh, sorry, forgive me.  Yes, Your

17  Honor.

18         THE COURT:  Okay.  Very well.  I do -- I certainly

19  applaud that accommodation to the time of the jurors, and we'll

20  proceed on that basis.

21      Lori, what's the matter?

22         COURTROOM DEPUTY:  Nothing has been provided to me on

23  a thumb drive to load into the JERS system.

24         THE COURT:  Well, we can take care of that.

25      You may proceed.

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    444

```
 1          (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITH
 2     ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE PRESENCE AND
 3     HEARING OF THE JURY.)
 4              MR. BEHENNA:  Your Honor, defendant moves to admit
 5     Defendant's Exhibit 102.
 6              THE COURT:  And on the --
 7              MR. BEHENNA:  I think this is 101, I'm sorry.
 8              THE COURT:  And that's one of the ones we were
 9     addressing just a minute ago?
10              MR. BEHENNA:  Yes, Your Honor.
11              COURTROOM DEPUTY:  101 is the one you just played.
12              MR. BEHENNA:  Thank you.  This would be 102.  I'm
13     sorry.
14              THE COURT:  Okay.  This would be 102.
15         And since the clerk doesn't have these and since they're
16     apparently on a thumb drive that's been provided to the
17     government but perhaps not to the Court, there's got to be some
18     way to date these or differentiate these for purposes of the
19     record.
20         And so 101 -- it's perhaps convenient that it was 101.  We
21     can call that YouTube Video Number 1.  And I don't know if
22     there's any other way to identify it, but on the basis of our
23     bench conference just a minute ago, Defendant's Exhibit 102 is
24     received.
25         How many of these do you have?
```

1          MR. BEHENNA:  I believe there's five, Your Honor.

2          THE COURT:  And how long are they?

3          MR. BEHENNA:  None of them are longer than three

4    minutes.  Some are one; some are two.

5          THE COURT:  102 is received.

6       You may proceed.

7          MR. BEHENNA:  Thank you, Your Honor.

8      (DEFENDANT'S EXHIBIT 102 PLAYED FOR THE COURT AND JURY.)

9          MR. BEHENNA:  Your Honor, at this time, we would move

10   to admit Defendant's Exhibit 103.

11         THE COURT:  It's also one of the ones we discussed a

12   moment ago?

13         MR. BEHENNA:  Yes, Your Honor.

14         THE COURT:  It will be received.

15     (DEFENDANT'S EXHIBIT 103 PLAYED FOR THE COURT AND JURY.)

16         MR. BEHENNA:  Your Honor, at this time defense moves

17   to admit Defendant's Exhibit Number 104, which would be

18   "Charisma."

19         THE COURT:  And I take it this is one of the same

20   ones we just discussed a moment ago?

21         MR. BEHENNA:  Yes, Your Honor.

22         THE COURT:  It is received.

23     (DEFENDANT'S EXHIBIT 104 PLAYED FOR THE COURT AND JURY.)

24         MS. BEHENNA:  Your Honor, at this time, defense moves

25   to admit Defendant's Exhibit 105, which is titled "Internet

1    Ad."

2              THE COURT:  It is received.

3              MR. BEHENNA:  Sorry.  "Online Ad."  Forgive me.

4        (DEFENDANT'S EXHIBIT 105 PLAYED FOR THE COURT AND JURY.)

5              MR. BEHENNA:  And, Your Honor, at this time, defense

6    moves to admit Defendant's Exhibit 106, which is "Tell a

7    Story."

8              THE COURT:  It will be received.

9        (DEFENDANT'S EXHIBIT 106 PLAYED FOR THE COURT AND JURY.)

10   Q.   (BY MR. BEHENNA) Mr. Elliott, that's what you're doing

11   here is selling a story, right?

12   A.   I disagree.

13   Q.   Okay.  All these videos we watched were made after you

14   left Big Red Sports & Imports, right?

15   A.   That's not correct.

16   Q.   Oh, which one was made before you left?

17   A.   The Craigslist video was made in 2015.

18   Q.   Was that '15?  And I might have to check on that.

19        Bear with me.

20              MR. BEHENNA:  We'll take a break in a little bit.

21              THE WITNESS:  I posted this video when I worked for

22   Oklahoma Motor Cars.  That's why I put "Oklahoma Motor Cars" on

23   there, June 26, 2016.

24   Q.   (BY MR. BEHENNA) It could have been a mistake on my part.

25   A.   That's okay.

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                                   447

1   Q.   Okay.  But you went to work for Chris's dealership in

2   2012, right?

3   A.   Yes, sir.

4   Q.   Okay.  And Big Red Sports & Imports hired you as the

5   general manager, correct?

6   A.   Yes, sir.

7   Q.   You were in charge of the store?

8   A.   I had the title; Chris Mayes was in charge.

9   Q.   Okay.  But you ran the store?

10  A.   I had the title.

11  Q.   Of general manager?

12  A.   I had the title of a general manager.

13  Q.   Okay.  And you claim that you got sucked into a bad

14  culture?

15  A.   I started working in a bad culture and I adapted to it.

16  Q.   Okay.  And let's remove the Internet ad, because I might

17  be wrong about that.

18       All these other videos were made after you left Big Red

19  Sports & Imports, right?

20  A.   Yes.

21  Q.   You are the culture, right?

22  A.   What does that mean?

23  Q.   You're the one that teaches people to mislead customers,

24  right?

25  A.   No.

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                          448

1   Q.   You don't think you were misleading those "blue hairs"

2   when you sold them a car that they originally said no to?

3   A.   No, sir.  I was teaching them it's not about the color;

4   it's about that people don't like you.

5   Q.   Right.  But the car -- the person said they originally

6   didn't want that car and you got them to buy it?

7   A.   They didn't like Bob.

8   Q.   So you think it was the person they didn't like, not the

9   car?

10  A.   Exactly.  Exactly.

11  Q.   Okay.  You teach -- well, you tell people to make up

12  coupons that don't exist?

13  A.   In our life, selling since I was 18, 23 years in the car

14  business, we create sense of urgency.  And on the phone, we

15  will say almost anything to get somebody in.

16  Q.   You create your own reality, right?

17  A.   What does that mean?

18  Q.   Well, that's what you said in your video.

19  A.   The video says that what you think is going to happen will

20  eventually happen.  If you have a good attitude, your customers

21  will feel they have a great attitude.  If you have a bad

22  attitude, they'll feel like they're being treated bad.

23  Q.   That's not what that "Be flexible" coupon ad said.  It

24  says you create your own reality.  That's what your words were,

25  right?

1   A.    No.

2   Q.    Those weren't your words?

3   A.    No.  We can play it again.  We can go through it.

4   Q.    Okay.

5         (BE FLEXIBLE COUPON EXHIBIT PLAYED AGAIN.)

6   A.    Can I answer?

7   Q.    No.

8         Those are your words, right, "creating your own reality"?

9         That's what we just had this fight about, did I really say

10  it.  Your words are "you create your own reality," right?

11  A.    I wasn't fighting with you.  Can I answer?

12        THE COURT:  That will be stricken.  It's necessary to

13  answer the question as put.  If there's anything more by way of

14  elaboration that's appropriate, you can do that on redirect.

15  Q.    (BY MR. BEHENNA) Your words are you "create your own

16  reality."

17  A.    I said in this video "create your own reality."

18  Q.    Yes, thank you.

19        THE COURT:  Okay.  Next question.

20  Q.    (BY MR. BEHENNA) You are the culture, Andy, right?

21  A.    What does that mean?

22  Q.    You were the person that created the culture.  When things

23  happened at Big Red, it was because of your doing.

24  A.    No, sir.

25  Q.    Okay.  In 2014, you got fired from Big Red, correct?

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    450

```
 1   A.    Yes.

 2   Q.    And that was in June of 2014, right?

 3   A.    Yes, sir.

 4   Q.    You know a woman named LeAnne Waters?

 5   A.    Yes, I do.

 6   Q.    She was one of your employees at Big Red Sports & Imports?

 7   A.    She worked, yes, for us.

 8   Q.    Right.

 9         She was a receptionist?

10   A.    Yes, she was.

11   Q.    You asked her to help you fabricate insurance loss

12   letters?

13   A.    She did it for the entire company.

14   Q.    That's not my question.

15         You asked her to create or fabricate false insurance

16   letters?  You.

17   A.    Yes, I did.

18   Q.    Thank you.

19         And you and LeAnne created 32 of them?

20   A.    There were 32 letters that she took with her when she

21   left.

22   Q.    That's not my question.

23         You and LeAnne created 32 of them?

24   A.    No, sir.

25   Q.    Okay.  And these letters were sent to lenders to make
```

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    451

```
 1  lenders think that a car had been totaled?
 2  A.   Yes, sir.
 3  Q.   So that the lender would fund a new loan?
 4  A.   That's correct.
 5  Q.   And the car wasn't totaled?
 6  A.   That is correct.
 7  Q.   And when Chris found out about what you were doing, you
 8  got fired?
 9  A.   Chris was very aware of what was going on.
10  Q.   And the jury just has to take you at your word on that,
11  right?
12  A.   What does that mean?
13  Q.   Well, they just -- you don't have any evidence, other than
14  your words, that Chris knew about it?
15  A.   Chris knew about everything in the company that was going
16  on.
17  Q.   And that's fair.
18       And when you got fired, you stated on direct that you were
19  given a severance payment, right?
20  A.   I received $10,000.
21  Q.   But that's not the complete story, is it?
22  A.   What does that mean?
23  Q.   Well, you left out some key details about your severance
24  from the jury, right?
25  A.   What does that mean?
```

1  Q.   Well, you mentioned on direct that you also owned a 5

2  percent ownership in Norman Mitsubishi at the time, correct?

3  A.   Yes, I did.

4  Q.   You paid $50,000 for that ownership interest, correct?

5  A.   Yes, I did.

6  Q.   When you were fired, you were stripped of that ownership

7  interest?

8  A.   Yes, I was.

9  Q.   Your $50,000 disappeared, right?

10 A.   Yes.  I was threatened by Jarrod Cunningham.

11 Q.   Okay.  So in the end, when you said you left and were

12 given $10,000, what really happened is you had a global

13 settlement where you lost $40,000?

14 A.   I don't even understand what you're saying.

15 Q.   Okay.  Well, you had a $50,000 ownership in Norman

16 Mitsubishi, right?

17 A.   Okay.

18 Q.   At the time you were fired, you have $50,000 ownership

19 interest, right?

20 A.   Okay.

21 Q.   You're paid $10,000 when you leave, correct?

22 A.   Yes.

23 Q.   And your $50,000 ownership interest is wiped away?

24 A.   We didn't handle it that day.

25 Q.   Okay.

```
 1              MS. BEHENNA:  May I approach the witness, Your Honor?
 2              THE COURT:  You may.
 3              MR. BEHENNA:  I'm going to hand you what I've marked
 4    as Defendant's Exhibit Number 107.  Can you take a minute and
 5    look at that.
 6              THE COURT:  I tell you what, we'll take our midday
 7    break at this time, and the witness can remain on the stand for
 8    a moment to continue reviewing the document.
 9         Mr. Behenna, you may be seated.
10              MR. BEHENNA:  Thank you, Your Honor.
11              THE COURT:  Members of the jury, we'll take our
12    midday break at this point.  We'll resume at 20 minutes after
13    1:00.  I will not repeat my usual threefold admonition, but
14    I'll ask you to please bear it carefully in mind.  I hope you
15    have a good lunch, and I do look forward to resuming promptly
16    at 20 minutes after 1:00.
17         All persons in the courtroom will please remain seated
18    while the jury departs.
19         (JURY EXITS THE COURTROOM.)
20              THE COURT:  Okay.  The jury has left the courtroom.
21         Anything we need to take up before we take our midday
22    break?
23              MS. ANDERSON:  Yes, Your Honor, just briefly.
24              THE COURT:  Surely.
25              MS. ANDERSON:  Do we want to excuse the witness?
```

1          THE COURT:  Yeah.  Why don't you leave the document

2    there and then step out in the hall, and after we take care of

3    business for a moment or two here, then you can come back in

4    and look at the document.  But I don't want the jury to wait

5    any more while you review the document.

6          (WITNESS EXITS THE COURTROOM.)

7          THE COURT:  Ms. Anderson.

8          MS. ANDERSON:  Yes, Your Honor.

9      We mentioned this to the courtroom deputy and also to

10   defense counsel, but I just want to let you know that our next

11   witness is here.  She, in an abundance of caution, wanted to

12   let us know that she has a sick daughter at home.  She feels

13   pretty well.  She has a little bit of sniffles.  She's

14   volunteered that she's been fully vaccinated, but just in an

15   abundance of caution, I wanted to let you know she is the

16   witness who has plans to travel internationally and will be

17   gone for the next full week.  So we would like to still have

18   her testify today so that she can testify, but I wanted to

19   disclose that to the Court and to everyone here so everyone

20   knows.

21         THE COURT:  Has she said anything about whether she's

22   had a test?

23         MS. ANDERSON:  She is planning to get tested tomorrow

24   because she needs it to travel internationally anyway, but she

25   has not been tested at this point.

 1              THE COURT:  So I take it her daughter is -- has her

 2   daughter had a diagnosis?

 3              MS. ANDERSON:  No, Your Honor, her daughter has not

 4   been diagnosed.

 5              THE COURT:  But her daughter is sick and the witness

 6   herself is slightly puny?

 7              MS. ANDERSON:  She has some nasal congestion and a

 8   mild headache.

 9              THE COURT:  Okay.  And so what do you propose?

10              MS. ANDERSON:  We would like for her to still

11   testify, and I just wanted to disclose that to everyone and

12   make sure that is acceptable.

13              THE COURT:  What say the defendants?

14              MS. BEHENNA:  Your Honor, if the Court is fine with

15   it -- if the Court is okay with the witness testifying, we

16   don't have an objection to that.

17       We would like to do a little bit more cross-examination

18   and wait until later in the day if we're not finished with

19   cross before this witness goes on.  We didn't want to start

20   right after lunch with this new witness in the middle of cross-

21   examination.

22              THE COURT:  Okay.  That's understood.

23       Do any of the -- either of the other two defendants feel

24   otherwise?

25              MR. SHANNONHOUSE:  No, Your Honor.

```
 1              MR. ADLER:  We would trust the Court with any

 2    protocol and procedures that the Court --

 3              THE COURT:  Okay.  Well, one of the benefits of using

 4    this courtroom is that it is obviously to keep a wide berth.

 5    And who knows what she's got.  But I would certainly state my

 6    expectation that she will be instructed before she comes to the

 7    courtroom to just keep her distance from everybody, which can

 8    be done in this courtroom, and keep her distance from everybody

 9    coming in and keep her distance as she leaves.

10        Is it going to be necessary to approach the witness stand

11    on direct?

12              MS. ANDERSON:  No, Your Honor.

13              THE COURT:  Okay.  Well, I think that's probably a

14    good practical solution to it so that we can get her on and off

15    the stand.

16        Mr. Shannonhouse, please speak where the microphone picks

17    you up.

18              MR. SHANNONHOUSE:  We would ask that she be

19    admonished to make sure to wear a mask except when she's

20    speaking in the witness --

21              THE COURT:  I think that's appropriate, so I'll ask

22    your witness coordinator to make sure she does that.

23        Anything else we need to take up before we take our midday

24    break?

25        Hearing nothing, court will be in recess.
```

 1          (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING PROCEEDINGS

 2    WERE HAD IN OPEN COURT AND WITHIN THE PRESENCE AND HEARING OF

 3    THE JURY.)

 4            THE COURT:  Welcome back, members of the jury.

 5       We're resuming in United States of America v. Bobby Chris

 6    Mayes, Charles Gooch and Courtney Wells.

 7       Mr. Behenna, you may continue.

 8            MR. BEHENNA:  Thank you, Your Honor.

 9    Q.  (BY MR. BEHENNA) Mr. Elliott, when we left off, you were

10    going to look at Defendant's Exhibit 107.

11       But before we do that, I wanted to ask you, over the

12    break, did you get a chance to look up that Internet ad video?

13    A.  Which one?

14    Q.  The one that you thought you made back in 2015.

15    A.  No, I did not.

16    Q.  Well, I did.

17    A.  Okay.

18    Q.  Do you want to refresh your memory as to when you posted

19    that video?

20    A.  Yeah.  So the video that was posted --

21    Q.  My question was, do you want to refresh your memory as to

22    when you posted that video?

23    A.  Sure.

24       (MR. BEHENNA APPROACHES THE BENCH AND HANDS DOCUMENT TO

25    THE WITNESS.)

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    458

1    Q.   Take as long as you need.

2    A.   Okay.  Can I answer?

3    Q.   Let me ask a question first.

4    A.   Okay.

5         (GOVERNMENT COUNSEL REVIEWING DOCUMENT.)

6    Q.   (BY MR. BEHENNA) And that video was published on YouTube

7    November 29th of 2019, correct?

8    A.   Yes, published on YouTube.

9    Q.   And that is after you left Big Red Sports & Imports,

10   correct?

11   A.   Yes, published on YouTube.

12   Q.   Thank you.

13        Okay.  Now, we were looking at Exhibit 107.  Do you

14   recognize that document?

15   A.   Yes, I do.

16   Q.   Is that a fair and accurate depiction of your settlement

17   agreement with Big Red Sports & Imports?

18   A.   Yes.

19   Q.   Okay.  May I have it back, please.

20   A.   Can I tell you what you asked me earlier or no?

21   Q.   Let me just admit it first.

22   A.   Oh, okay, okay, here.

23   Q.   Can I have all those papers?

24   A.   There you go.

25   Q.   Thank you very much.

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                          459

1          MR. BEHENNA:  Your Honor, at this time, defendants

2   move to admit Defendant's Exhibit 107.

3          THE COURT:  Any objection?

4          MS. ANDERSON:  No, Your Honor.

5          THE COURT:  It will be received.

6   Q.   (BY MR. BEHENNA) This is the severance agreement from Big

7   Red Sports & Imports, correct?

8   A.   Yes, it is.

9   Q.   Okay.  And on page 6, there is an assignment of membership

10  interest, correct?

11  A.   Yes, there is.

12  Q.   That's where you signed over your 5 percent ownership to

13  Norman Mitsubishi, correct?

14  A.   On July 31st.

15  Q.   Right.  But you signed over your interests, correct?

16  A.   On July 31st, yes.

17  Q.   Right.  The $50,000 you invested was taken away from you?

18  A.   Forty-five days after termination.

19  Q.   Right.  For the Peak income loss letters?

20  A.   That was written afterwards.  I did not initial that.

21  Q.   Okay.  Okay.

22  A.   There's a page behind it.

23  Q.   Thank you.  This will go back to the jury where they can

24  review it in full, but I appreciate it.

25       So when you left Big Red Sports & Imports, you were

1  unhappy, weren't you?

2  A.    Which time?

3  Q.    In June of 2014.

4  A.    When I left, I was very heartbroken, yes.

5  Q.    Yes.  Because you had just lost $40,000, correct?

6  A.    Are you -- what's the question?

7  Q.    When you left Big Red Sports & Imports, you had lost

8  $40,000?

9  A.    I signed over $50,000 of my equity.

10  Q.    Right.  But you got a 10 percent check.  It was a global

11  agreement, right?

12  A.    On the statement I signed, it said that they gave me

13  $10,000 so it would help me get situated with a new job.  It

14  says that.

15  Q.    And I get that.  But my point is, totally, you didn't just

16  part with a $10,000 check, right?

17  A.    That was my severance.

18  Q.    Right.  But you were also stripped of your ownership

19  interests in Norman Mitsubishi.

20  A.    Yes, I was stripped of it.

21  Q.    Thank you.

22        And you were upset by that, correct?

23  A.    Well, I was telling -- they told me that I owed them 500

24  grand on the back page on that.  Says Chris Mayes said that he

25  had to take a loan on Mitsubishi for $495,000 and if I didn't

```
 1  sign over --
 2          THE COURT:  I'm going to ask you to slow down,
 3  please.
 4          THE WITNESS:  I'm sorry, sir.
 5      There's a page behind that that said -- that Chris Mayes
 6  signed that says that he was going to make me pay him $495,000
 7  if I did not sign over my $50,000.  It's the page behind that
 8  one.
 9  Q.  (BY MR. BEHENNA) Yeah.  Right.
10      The point is he was blaming -- or he found out that you
11  committed the actions with Peak, right?
12  A.  I was a part of it.  He told me to admit, on a recording,
13  the whole company was a part of it.
14  Q.  And I get that's your story, and I don't want to get into
15  the semantics of that.
16      But the point is you left and you signed over your
17  interests in Norman Mitsubishi.  Fair?
18  A.  Stripped of it, like you said.
19  Q.  Yeah, stripped of it.
20      And after you did -- you know a guy named Bob Steele,
21  correct?
22  A.  I don't know the last name.
23  Q.  But he works for Peak, right?
24  A.  If it's Bob with Peak, yes.
25  Q.  And after you were fired, you went down to Dallas to meet
```

1   with Bob, correct?

2   A.   Yes, I did.

3   Q.   And you did this to retaliate against Chris?

4   A.   No, I did not do it to retaliate.

5   Q.   Okay.  And when you left, you had no interest in going

6   back to work for Chris, correct?

7   A.   We had spoke about getting back together, and I felt that

8   that would be the only way where I would be safe is going back

9   to work with him.

10  Q.   Okay.  Here is my question:  When you left, you had no

11  interest in going back to Big Red Sports & Imports, correct?

12  A.   Yes, I did.

13  Q.   You did have an interest or you did not?

14  A.   I did.

15  Q.   You did what?

16  A.   Have an interest.

17  Q.   In going back?

18  A.   (NO RESPONSE.)

19  Q.   You testified in grand jury in this case, right?

20  A.   What's that mean?

21  Q.   Okay.  You were called to testify in a grand jury in this

22  case before we got to trial here, correct?

23  A.   I don't understand.

24  Q.   Have you testified before a jury before in this case, the

25  grand jury?

 1  A.   Have I been in a room and testified in a jury on a case?

 2  Q.   Let's just make this simple --

 3            THE COURT:  Hold up just a minute.  Just stand by.

 4       (SHORT PAUSE FOR THE REPORTER TO RECONNECT REALTIME.)

 5            THE COURT:  Okay.  You may continue.

 6  Q.   (BY MR. BEHENNA) On July 21st of 2020, did you testify

 7  before a grand jury in this case?

 8  A.   July 21st?

 9  Q.   Of 2020.

10  A.   Of 2020?

11  Q.   Did you testify before a grand jury?

12  A.   I don't think so, if that's in a courtroom like this.

13  Q.   Okay.  Did you testify where either Ms. Anderson or

14  Mr. Snyder were asking you questions and you sat in a witness

15  box?

16  A.   Okay.  I guess I'm confused.  I'm not trying to answer the

17  wrong answer.

18       Did I sit with them and did they ask me questions?

19  Q.   Did you get a subpoena to appear before a grand jury?

20  A.   I got a letter from the FBI a long time ago.

21  Q.   Right.

22       And have you ever been to this courthouse to testify about

23  this case?

24       It's, like, really simple.

25  A.   No.

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    464

1  Q.   You've never been to this courthouse to testify about this

2  case?

3  A.   No.

4  Q.   And I'm not talking about this courtroom.  You've never

5  been to this building, this federal courthouse, with your

6  attorney to testify about this case?

7  A.   In -- I guess I'm confused.

8  Q.   Well, how can I help you understand?

9  A.   Is this -- is this what you're talking about?  Like, have

10 I sat down with the U.S. Attorney and my attorney?

11 Q.   This is a jury trial.

12 A.   Okay.

13 Q.   Before you get to a jury trial, there's a thing called a

14 grand jury, and grand juries decide whether charges should be

15 filed or not.

16 A.   I guess I don't -- I don't know how to answer that

17 question because I don't know if I did or not.  I mean, I

18 honestly don't understand the question enough for me to answer

19 it, so I don't feel comfortable answering it.

20 Q.   Okay.  Forgive me.  Give me one sec.

21      The grand jury is located on the fourth floor in this

22 building, and you're telling me you never remember going there?

23 A.   I don't remember so I'm telling you I don't recall it.

24 Q.   Well, would it refresh your memory just to review your

25 transcript?

1    A.    Yeah.

2    Q.    Okay.  Page 15, I'm looking here.  And you can refresh

3    your memory of whatever else.

4    A.    Okay.  That's my transcript, yes, it is.

5    Q.    Okay.

6    A.    Okay.  I apologize.

7    Q.    Does that refresh your memory?

8    A.    Yes, I do remember that.

9    Q.    Thank you.

10         So at grand jury, you were asked if you ever planned on

11   going back to Big Red after you left.  You said no.

12   A.    Yes.  And -- go ahead.

13   Q.    Correct?

14   A.    I said no and --

15   Q.    That's it.

16   A.    -- I went back when Chris invited me.

17   Q.    That's all I have for now.  Okay?

18   A.    Okay.

19   Q.    And you told -- when you're down there at this meeting

20   with Bob Steele with Peak, you told them that there was more

21   going on at the dealership than the total loss letters, right?

22   A.    Is that what it says?

23   Q.    I'm asking you, man, your memory.

24   A.    I don't remember two years ago.  I mean, if it's in this

25   transcript, I'd like to review it with you.

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    466

1   Q.   Well, let's just start with this.  In 2015, you went down

2   to meet with -- or 2014 -- forgive me -- you went down to meet

3   with Bob Steele, right?

4   A.   Yes, I did.

5   Q.   And you told them, or him, that there was more going on at

6   the dealership than the total loss letters, correct?

7   A.   If that's what it states.  Does it state that?

8   Q.   Don't worry about that.  I'm asking you whether you

9   remember.

10  A.   I don't remember.

11  Q.   Okay.  And you -- and after you had that meeting with

12  Peak, Peak went on the attack against Chris Mayes?

13  A.   I don't know that.

14  Q.   Okay.  Would it help you refresh your memory by reviewing

15  your transcript?

16  A.   Sure.

17  Q.   I'm looking down here, but you can read whatever you need.

18  A.   I saw it.

19  Q.   Thank you.  Let me have that back.

20       Appreciate it.

21       So after you go down -- after you go down to meet with Bob

22  Steele, you tell them you plan on never going back to Big Red

23  Sports & Imports, correct?

24  A.   Yes, that's what I put in there.

25  Q.   It's what you testified to under oath --

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    467

```
 1   A.    Yes.

 2   Q.    -- right?

 3         You tell them there's more going on at the dealership than

 4   just total loss letters, right?

 5   A.    I didn't see that.

 6   Q.    Okay.  Do you remember doing that?

 7   A.    I don't remember doing that.  That's why I said I thought

 8   you were going to show me that, and you didn't show me that.

 9   Q.    I'm asking you if you remember that.

10   A.    I said, no, I don't remember it, for the second time.

11   Q.    But following your conversation with Bob Steele, they went

12   on the attack against Chris Mayes?

13   A.    That's what I put on there because they were already --

14   Q.    No.

15   A.    They were already in the attack with Chris.

16   Q.    I'm not asking what you put on here.  This isn't like

17   something you put down.  This is your testimony under oath,

18   correct?

19   A.    Okay.  Yes.

20   Q.    You swore to tell the truth, correct?

21   A.    That's why I'm reading it with you.

22   Q.    Right.

23         And after you went down to meet with Bob Steele, you told

24   the government, under oath, that Peak went on the attack

25   against Chris Mayes?
```

```
 1   A.    They were already attacking.

 2         And I said they went on the attack?

 3   Q.    That's what you said.

 4   A.    Okay.

 5   Q.    They went on the attack, right?

 6   A.    Okay.

 7   Q.    Not they're attacking, they were attacking before --

 8   A.    They went on the attack.

 9         THE COURT:  One at a time, gentlemen.

10   Q.    (BY MR. BEHENNA) Right?

11   A.    Okay.  Yes.

12   Q.    You said they went on the attack?

13   A.    Yes, sir, I said that.

14   Q.    Because you were doing that to hurt Chris Mayes, right?

15   A.    No, sir.

16   Q.    To make yourself look better?

17   A.    No, sir.

18   Q.    Because you got caught and you got fired for those total

19   loss letters?

20   A.    No, sir.

21         THE COURT:  Excuse me.

22         It's necessary for spectators in the gallery to be

23   motionless and show no reaction to the testimony as it comes

24   in.

25         You may continue.
```

1   Q.   (BY MR. BEHENNA) And when you tell Bob Steele about the

2   King Cash program, the truth is you're the one that created the

3   program at Big Red Sports & Imports?

4   A.   No, I did not.

5   Q.   Do you know someone named Mike Henry?

6   A.   I don't remember.

7   Q.   You don't remember if you know someone named Mike Henry?

8   A.   I don't remember.

9   Q.   Okay.  You worked with him at Keystone Chevrolet, correct?

10  A.   The owner?

11  Q.   I'm asking you, man.  Do you know Mike Henry from Keystone

12  Chevrolet?

13  A.   If it's the owner of Keystone Chevrolet, I know Mike

14  Henry.

15  Q.   And he taught you, before you ever went to Big Red Sports

16  & Imports, how to do the King Cash program, correct?

17  A.   No, sir.

18  Q.   And this King Cash program, what it was, like you said,

19  you put money on a back screen, but you would have a customer

20  sign a promissory note, a promise to pay, right?

21  A.   No, sir.

22  Q.   The whole talk about Chris sending you away to bring you

23  back is not true, is it?

24  A.   Yes, it is.

25  Q.   But you had no intention of going back?

1  A.   I figure -- I was making so much money with Chris that

2  when he called me in November to go back, I went right back and

3  started in January.

4  Q.   The truth is you were trying to salvage your reputation

5  with Peak, weren't you?

6  A.   No.  I had a relationship with Chris at that time and I

7  felt like when we parted, it was very awkward.

8  Q.   Okay.  Chris didn't know you were going down to meet with

9  Peak, right?

10  A.   No, he did not.

11  Q.   And when you left Big Red Sports & Imports, you went to

12  work at Lawton Dodge?

13  A.   For one day, yes.

14  Q.   Okay.  And you went to work at David Stanley?

15  A.   Yes, sir.

16  Q.   And at both dealerships, you introduced the dealership to

17  Peak?

18  A.   Yes, I did.

19  Q.   You set up their dealing arrangements?

20  A.   Yeah, I told them they were a bank they could use.

21  Q.   Yeah, right.

22       But in January of 2015, you start trying to reach out to

23  Chris again, right?

24  A.   Chris reached out to me.

25  Q.   Okay.  You were the one asking for your job back?

1  A.   Chris reached out to me and said they came up with a

2  settlement with Peak and he said that I'll probably be able to

3  bring you back on here pretty soon.  And I was a trainer at

4  David Stanley.

5  Q.   Right.

6       At first, when you convinced Chris to bring you back, you

7  were a trainer at Big Red Sports & Imports, correct?

8  A.   Before I ever got hired as a GM.

9       MS. ANDERSON:  Objection, Your Honor; misstates the

10 testimony.

11      THE COURT:  Overruled.

12 Q.   (BY MR. BEHENNA) And I didn't hear your answer.  I'll let

13 you give it again.

14 A.   Before I ever started working at Big Red as a GM.

15 Q.   No, no, no.  When you went back in January of 2015, it was

16 a trainer?

17 A.   I was training, yes.

18 Q.   Right.

19      That check -- give me a minute.  I'll find it.

20      MR. BEHENNA:  Can I have Government's Exhibit 243?

21 Q.   (BY MR. BEHENNA) This check that was introduced, it's paid

22 to the order of The Elliott Group, right?

23 A.   That's correct.

24 Q.   Not you individually, correct?

25 A.   Right.  To my company.

```
 1   Q.   Right.

 2        Because this was a check to hire your company to train

 3   sales staff in January of 2015, correct?

 4   A.   Yeah.

 5   Q.   You actually didn't go to work at the dealership to be an

 6   employee of the dealership until May of 2015, correct?

 7   A.   Yeah.  Chris just said I'm going to pay you a 1099.  So I

 8   used my license.

 9   Q.   Okay.  So are you telling me that you went back as a full-

10   time employee at Big Red Sports & Imports in January of 2015?

11   A.   Yes, and they paid me 1099.

12   Q.   Okay.  So it wasn't to train; you were actually a sales

13   staff employee at that time?

14   A.   No.  I was training.  This is how they paid me.

15   Q.   Right.

16        And that's what I'm trying to get at.  I'm not trying to

17   play semantics with you.

18        You went back to train.  That was your first step back.

19   You convinced Chris to let me train some of your sales staff,

20   right?

21   A.   Chris asked me to come back and train, and that's when I

22   started.

23   Q.   In January of 2015, right?

24   A.   Yes, sir.

25   Q.   And then four months later is when you got hired back as
```

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    473

1   an actual employee, in May of 2015, correct?

2   A.    He told me to start back on the desk.

3   Q.    Is the answer yes or no?

4   A.    Yes.

5   Q.    Thank you.

6         And at the time you went back, you were apologizing for

7   what you did, correct?

8   A.    No.

9   Q.    Okay.  You promised you would kill it at the store, right?

10  A.    Chris told me that he was losing --

11  Q.    Not my question.

12        You promised --

13  A.    No.

14  Q.    -- that you would kill it at the store?

15  A.    No, sir.

16  Q.    You promised you would do everything for the store, right?

17  A.    No.

18  Q.    And that you left your past behind you and you won't do

19  that again, right?

20  A.    No.

21  Q.    Now, when you came back to Big Red Sports & Imports, you

22  came back on a reduced salary, correct?

23  A.    He told me what he would pay me to train, and I took that

24  offer.

25  Q.    No, not my question.

1     When you returned to Big Red Sports & Imports, you agreed

2 to come back on a reduced salary?

3 A.    I never agreed on any reduced salary.  He offered me less

4 money than I was making before.  The word "reduced" was never

5 used.  He said this is what I'll offer to pay you to train, and

6 I came back and trained.

7 Q.    Okay.  I'm talking about in May, when you're hired back as

8 a full-time employee.

9 A.    Yeah, I just started a different position.

10 Q.    Right.

11     And your salary was less, correct?

12 A.    From what I was making as training?

13 Q.    No.  What you were making before you left the store in

14 June of 2012.

15 A.    Okay.

16 Q.    Or 2014.  Forgive me.

17 A.    Okay.

18 Q.    2014.

19 A.    In 2014, when I left, I did have a higher salary.

20 Q.    That's all I'm trying to get at.

21     That's true, right?

22 A.    Yeah.  But there wasn't a -- you say "you agreed," which

23 means there was an agreement.  And there was never an

24 agreement.  It was just I went to work for Chris, and this is

25 what he offered to pay me, and I took it.

1  Q.   And that's fair.  That's your testimony, right?

2  A.   Yeah.

3  Q.   Okay.  And when you returned to Big Red Sports & Imports,

4  it was being operated by -- or Norman Pawn & Gun was being

5  operated by Chuck Gooch, correct?

6  A.   Yes, sir.

7  Q.   And the pawn shop was an avenue for customers to obtain

8  money for a down payment, correct?

9  A.   Yes.

10  Q.   The idea was that a customer might have property but no

11  cash?

12  A.   Yes.

13  Q.   And they could sell that property to get cash?

14  A.   Correct.

15  Q.   And the pawn shop started out as a legitimate business?

16  A.   Yes.

17  Q.   And Chuck was a stickler for the values?

18  A.   In the beginning, yes.

19  Q.   And there were pawn slips put in the file?

20  A.   That's correct.

21  Q.   Customers were endorsing checks?

22  A.   I don't know the answer to that.

23  Q.   Will it refresh your memory to look at your grand jury --

24  A.   Yeah.

25  Q.   I'm looking here.  Just stop wherever you need to.

1   A.   Can I read this or no?

2   Q.   No.  It's to refresh your memory.

3   A.   It says, "In the beginning, the idea."

4   Q.   It's to refresh your memory.

5   A.   I didn't say they would sign the checks.  I said the idea

6   would be that the customers would sign the checks.

7   Q.   Okay.  So let's just start there.

8        The idea was the customers would sign the checks.  That

9   was the idea, correct?

10  A.   Yes, sir.

11  Q.   And you -- well, then the standards, over time, started to

12  slip with the pawn shop items, correct?

13  A.   Absolutely.

14  Q.   And items were getting overvalued, correct?

15  A.   Yes, sir.

16  Q.   And you were a manager at the time?

17  A.   Yes.

18  Q.   You were in charge of all the managers at your store?

19  A.   Chris Mayes was in charge of everybody.

20  Q.   I didn't ask about Chris Mayes; I asked about you.

21  A.   You asked me if I was in charge of all the managers.

22  Q.   You were in charge of all the managers?

23  A.   No, sir.

24  Q.   You had managers below you?

25  A.   No, sir.

1  Q.   And you're telling me you had no responsibilities over

2  anyone?

3  A.   I was a manager at that time, equal to all the other

4  managers.

5  Q.   Okay.  You had sales staff underneath you?

6  A.   Yes, I did.

7  Q.   You were in charge of them, correct?

8  A.   Exactly.

9  Q.   You were in charge of dealership sales practices at the

10 time?

11 A.   Yes.

12 Q.   You were part of the problem of the items getting

13 overvalued?

14 A.   Yes.

15 Q.   You were allowing the employees to do it?

16 A.   Everybody was doing it.

17 Q.   Not my question.

18      You were allowing the employees to do it?

19 A.   Every manager allowed the entire company to do it.

20 Q.   Again, it's not my question.

21      Did you allow employees to do it?

22 A.   No, because employees didn't put the value on it.

23 Q.   Okay.  As a manager, employees worked deals with

24 customers, right?

25 A.   Right.

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                478

1  Q.   And they have to get approval from managers on trade-in

2  value, signing pawn slips, things like that, right?

3  A.   Okay.  Back up.

4       Trade-in values, yes.  Signing pawn slips has nothing to

5  do with the salesperson.

6  Q.   It's a manager's job?

7  A.   The managers are the ones that put what they needed for

8  the banks.

9  Q.   And you were the manager?

10 A.   I was one of the managers, yes.

11 Q.   And you would do this, right?

12 A.   Yes, I would.

13 Q.   And you would send deals back to sales staff telling them

14 to do it?

15 A.   What does that mean, "send deals back to sales staff"?

16 Q.   Well, a salesman can't approve a deal on his own.  He has

17 to get a manager's approval before he can finalize everything

18 with the customer, right?

19 A.   Right.

20 Q.   And you would give that approval to the salesmen to

21 finalize the deal with the customer?

22 A.   Upper management would decide what these pawn slips needed

23 to be and Chuck would either okay it, and at the time when no

24 one was around, literally, nobody cared what we wrote down.

25 Q.   Right.

```
 1        And when you say "we" --
 2  A.    And I was a part of that.
 3  Q.    -- you, right?
 4  A.    Yes, sir.
 5  Q.    You were the one doing this?
 6  A.    Yes.
 7             THE COURT:  One at a time.
 8        (DISCUSSION OFF THE RECORD.)
 9  Q.    (BY MR. BEHENNA) You said on direct that the pawn shop
10  transactions were huge for Chris's business?
11  A.    Yes, they were.
12  Q.    That's not true, is it?
13  A.    I don't understand.
14  Q.    Well, do you know how many cars Chris sold between 2015
15  and 2017, the time frame of when these pawn shop deals existed?
16  A.    I don't know these numbers.
17  Q.    Okay.  Do you have a guess?
18  A.    I have no guess.
19  Q.    I mean, you know how much a dealership would sell per
20  month, right?
21  A.    I don't have a guess.
22  Q.    If I were to tell you it's over 14,000 vehicles, would you
23  have any reason to dispute that?
24  A.    No, if you told me that.
25  Q.    Do you know how many pawn shop deals we're talking about
```

1  in this case?

2  A.   How many?

3  Q.   489.  Did you know that?

4  A.   I did not know that.

5  Q.   Okay.  We're talking about 3.37 percent of total vehicle

6  sales.

7  A.   I don't know those numbers.

8  Q.   Do you have any reason to dispute them?

9  A.   No.

10 Q.   But it's your testimony these were huge for Chris's

11 business?

12 A.   Yes.  I know that because every day if we didn't have the

13 cash down these customers had to leave.

14 Q.   Right.

15 A.   And when the pawn shop was getting attacked, just like

16 when King Cash went away, Chris told me -- he's, like, we have

17 to figure out a way to keep doing special finance business.

18 Q.   And I get that's your testimony.

19 A.   Right.

20 Q.   But roughly 97 percent of car deals that took place during

21 that time frame had nothing to do with these pawn slips, right?

22 A.   That's -- those are your numbers you're giving me.

23 Q.   Right.

24      And, again, I'm just asking you whether you have any

25 reason to dispute it.

1   A.   No.  My idea of it is, is there was pawn books everywhere,

2   so the fact there's only 500 is pretty crazy to believe.

3   Q.   You want it to be more?

4   A.   No.

5   Q.   You're okay with it being 489?

6   A.   No, whatever number it is, I just want to tell the truth.

7   Q.   Got it.

8        Now, you were at Big Red Sports & Imports in November of

9   2015, correct?

10  A.   No.  That's when I left.

11  Q.   Right.

12       But you were in there for part of November of 2015?

13  A.   I'm not sure of the date I left.  I think it was the end

14  of October, but I can double check.  I think it was November

15  1st I left.

16  Q.   All right.  Well, here is one way we can check, I think.

17       If we look at Government's Exhibit 26 -- Government

18  Exhibit 26.

19       You said on direct that you were still working for Chris

20  when you printed this off, Exhibit 26, at his store, correct?

21  A.   Yes, I did say that.  That's what I believed.

22  Q.   Right.

23       And so you were there on November 2nd of 2015, correct?

24  A.   That's what it looks like.

25  Q.   And, you know, I didn't understand what this exhibit was

1  until I heard your direct, but you printed this off right
2  before you quit Chris's store, right?
3  A.   Yes, I did.
4  Q.   And first -- let me back up real quick.  You also said on
5  direct that the dealership deleted all the files relating to
6  King Cash, correct?
7  A.   They were going through and deleting them, yes.
8  Q.   But you mysteriously were able to find one on November 2nd
9  of 2015, over a year later?
10 A.   Clearly, I did.
11 Q.   Right.
12      And you chose this deal for a reason, correct?
13 A.   No.  I just printed it.
14 Q.   Well, the deal date on this is January 30th of 2014; isn't
15 that true?
16      MS. ANDERSON:  Objection, Your Honor; misstates the
17 evidence.
18      THE WITNESS:  7/30 of '14.
19 Q.   (BY MS. BEHENNA) That's July.  And forgive me --
20 A.   It was after I left.
21 Q.   Right.  And that's the point I'm trying to make.
22      This deal date is July 30th of 2014, correct?
23 A.   Yes.
24 Q.   You left in June of 2014, correct?
25 A.   Yes.

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                          483

1   Q.   You were building your own little secret "gotcha" file

2   against Chris Mayes.

3   A.   What does that mean?

4   Q.   It means you were finding a deal that happened after you

5   left in June as a way to say "King Cash wasn't my problem, I

6   didn't do it," right?

7   A.   No.  I just got in the screen and printed it because Chris

8   was so irate that I truly felt threatened physically and

9   financially, and I saved that in case I had to go to court.

10  Q.   Okay.  I want to come back to the threats in a little bit.

11  A.   Okay.

12  Q.   But you chose this -- right before you quit with Chris,

13  you went into his computer system and printed a deal, correct?

14  Just one?

15  A.   Yes.

16  Q.   And that deal just so happens to be a King Cash deal that

17  happens after you left?

18  A.   Yeah.  I wasn't aware of the dates.  I just printed the

19  King Cash.

20  Q.   That's what you want the jury to believe?

21  A.   I'm sorry?

22           MS. ANDERSON:  Objection, Your Honor.

23           THE COURT:  That will be sustained.

24       Next question.

25           MR. BEHENNA:  Thank you.

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                      484

1   Q.   (BY MR. BEHENNA) And while Chris was in the hospital with

2   his dad, you quit?

3   A.   Yes, I did.

4   Q.   And you took managers of his store with you?

5   A.   I did not take any managers.

6   Q.   Managers quit at the same time as you quit, correct?

7   A.   They quit because --

8   Q.   I didn't ask why.

9   A.   Well, if you want to know why, you can ask.

10  Q.   They quit at the same time, correct?

11  A.   Everybody quit at the same time.

12  Q.   You left.  At that time, he had no one to run his store,

13  and he was in the hospital with his sick dad, correct?

14  A.   That was a scenario.

15  Q.   Right.

16       And so when you left, he told you he was going to sue

17  you --

18  A.   Yes, he did.

19  Q.   -- right?

20       And that's Government's Exhibit 28, I believe.  Yeah, 28.

21       And he says, because you left and because of what you did

22  with Peak, you owe me $750,000, right?

23  A.   That's correct.

24  Q.   And it says, at the time, you admitted your role in the

25  involvement, right?

1  A.    That was the recording, yes.

2  Q.    And it says you agreed to work for a lower salary to pay

3  off the loss you caused, right?

4  A.    I didn't agree to that.

5  Q.    Well, that's what the letter says, right?

6  A.    That he wrote me.

7  Q.    Yeah.

8        And you do admit, objectively, that when you went back to

9  work for Big Red Sports & Imports, your salary was less?

10  A.    I took a lower offer, yes.

11  Q.    Right.

12        Okay.  And in truth, you could have defended this lawsuit,

13  right?

14  A.    No.

15  Q.    You hired a lawyer at the time?

16  A.    I did hire a lawyer.

17  Q.    I mean, you could have said this isn't true, I don't owe

18  you anything.

19  A.    We called and they said we have a recording.  And then I

20  reached out to Chris, and then he worked it out where I came

21  back and everything was dropped.

22  Q.    Right.  And that's the point, is you ultimately didn't

23  want to pay $750,000 that you owed him?

24  A.    I didn't owe him that.

25  Q.    Okay.  But you chose to go back to work with him?

1   A.   Right, because I felt threatened, I told you.

2   Q.   Okay.  Again, I'm going to come back to the threats.

3   A.   Please.

4   Q.   And when you come back, you go to work at Norman

5   Mitsubishi and Yamaha, right?

6   A.   Yes.

7   Q.   Not at Big Red Sports & Imports anymore, correct?

8   A.   That is correct.

9   Q.   And maybe before we get there, I also want to ask you

10  about in-and-outs.

11       In-and-outs are common in the industry; isn't that true?

12  A.   In the -- back in 2007, 2008, I've seen a couple of them.

13  Q.   I think you previously said at every dealership you've

14  worked at has done in-and-outs?

15  A.   Where I was at -- they're not commonly done.  I have seen

16  one.  I know what one is.

17  Q.   Right.

18       And they happened at other dealerships you worked at?

19  A.   Yes.

20  Q.   Right.  That don't involve Chris Mayes?

21  A.   Right.

22  Q.   And what we now know -- well, what we'll find out over

23  time is that in-and-outs have been going on at Big Red Sports &

24  Imports since 2014, correct?

25  A.   Yes.

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                                487

1   Q.   Okay.  And you were there at that time?

2   A.   Yes, I was there.

3   Q.   And managers, as you said earlier, determined value of a

4   trade-in, correct?

5   A.   Yes.

6   Q.   And do you know what the term "allowance" is?

7   A.   It's what you show the customer.

8   Q.   Right.

9        And dealerships can choose to overallow on a trade,

10  correct?

11  A.   Yes.  They can put any value they want.

12  Q.   If they want to work that out with a customer -- if a

13  customer says, I think my car is worth 3,000, we're at five, I

14  only want to give you one, how about we meet in the middle at

15  two, right?

16  A.   Yes.  You can put any allowance you want.

17  Q.   Right.

18       And that's common in the industry?

19  A.   Yes, for a trade-in allowance.

20  Q.   And that's why it's not called "trade value;" it's called

21  "trade allowance"?

22  A.   Right.

23  Q.   Right.

24       And "in-and-out" is the same thing as a "trade allowance,"

25  true?

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    488

```
 1  A.    No, it's not true.
 2  Q.    Okay.  Well, if you have a car worth $5,000 and you allow
 3  $8,000 for that trade-in to facilitate a deal with the
 4  customer, you have overallowed $3,000 on that trade?
 5  A.    That's called an "allowance," not an "in-and-out."
 6  Q.    I'm just stopping there.
 7        That's called a "trade allowance," right?
 8  A.    Yes, sir.
 9  Q.    If you have a car that maybe is worth a hundred dollars,
10  maybe $200, because it's not in good shape, it's barely -- it's
11  not even running, okay, and you allow $1,000 for that car,
12  you're overallowing on that item, right?
13  A.    Yes, trade allowance.
14  Q.    Right.
15        What I just described to you, if you give a thousand
16  dollars for the car and then sell it back to the customer for a
17  dollar, its value is a dollar, right?
18  A.    So are you asking me what an "in-and-out" is?
19  Q.    I know what an "in-and-out" is.
20        I'm talking about a car can have a value of a dollar,
21  right?
22  A.    Yes.
23  Q.    And the dealership can give more for that car than what
24  it's worth, right?
25  A.    Yes.
```

1   Q.    If it chooses to do that?

2   A.    Any value, yes.

3   Q.    That happens all the time?

4   A.    Yes, trade allowance.

5   Q.    And maybe instead of having to call a scrap yard to come

6   get a car that would cost you money, if you just want to give

7   it back to the customer for a dollar, all you've done is

8   overallow on that item, right?

9   A.    Yes.

10  Q.    That's what I started with.  A trade-in -- or an

11  "overallowance" and an "in-and-out" are the same thing.

12  A.    No, they're not.

13  Q.    And you testified that in-and-outs became the new thing to

14  do after the pawn shop stopped, right?

15  A.    They were used during, and they became -- once the pawn

16  was, like, a dead-end, they became the only source to figure

17  out how to get past cash down.

18  Q.    And would you say that their use of them increased?

19  A.    Absolutely.

20  Q.    Like, substantially?

21  A.    I can't tell you the numbers, but I know they increased

22  because we used them all the time.

23  Q.    And I just want to tie you to that.  As sure as you are,

24  you're a hundred percent sure they increased after the pawn

25  shop deal happened?

1   A.    That trade-ins increased?

2   Q.    Yes -- or no, that in-and-outs increased.

3         After the pawn shop stopped, in-and-outs, your testimony,

4   is that that became the new thing and it increased in use?

5   A.    It was the new thing, but I can't tell you how much the

6   increase was.  I know it was --

7   Q.    Right.

8         So the truth is they didn't increase, right?

9   A.    I don't know.

10  Q.    Well, I'm asking you.  Your testimony on direct, that

11  became the new thing to use, right?

12  A.    It is the new thing to use.

13  Q.    And if you couldn't use a pawn, you had to use in-and-outs

14  now, right?

15  A.    Yes.

16  Q.    And --

17  A.    It was another way, yes.

18  Q.    I'm asking you.  So does that mean that the use of in-and-

19  outs increased after the pawn shop deal stopped?

20  A.    It became the new way of trying to figure out how to use

21  for cash down.

22  Q.    I'm --

23  A.    But I don't have stats, so I can't -- I mean, I can't show

24  you that.  If I say it increased and then you show it didn't, I

25  can't see that because I don't see the numbers.

1   Q.   And that's the problem about testimony.

2        I'm asking you to go off what your memory is, okay, and

3   what the truth is to you.

4   A.   The truth is it was the new way that we started doing it,

5   yes.

6   Q.   Do you have anything that supports the idea that in-and-

7   outs increased after pawn shop deals stopped?  Anything?

8   A.   Yes, I do.

9   Q.   What?

10  A.   Ed Kelso was the person who worked for us who would --

11  every day, he would be, like, what are all these cars on our

12  inventory?

13       And I would say they're not -- he's, like, where are they?

14  They're not -- we've got to get fax backs, tags; you know,

15  we've got to get them stocked in.  And they're in-and-outs.

16       So every week, he would take and write those cars off the

17  inventory because there was no car.

18  Q.   I get it.

19       So your testimony is that you had a conversation with Ed

20  Kelso and that leads you to think that in-and-outs increased?

21  A.   Daily, uh-huh.

22  Q.   But nothing else?

23  A.   Yes.

24  Q.   Nothing else or there is something else?

25  A.   No.  With Ed Kelso, that we had conversations daily about

1   him complaining that he's having to write these cars off the

2   inventory that aren't there.

3   Q.   In-and-outs.  Okay.

4        So if it comes to light that in-and-outs decreased after

5   the pawn shop stops, you don't know why that would be?

6   A.   I wouldn't know why that would be.

7   Q.   Okay.  And, again, at the same time these in-and-outs are

8   happening, you're a manager at a dealership owned by Chris

9   Mayes, correct?

10  A.   Yes.

11  Q.   You're the GM, correct?

12  A.   Of Mitsubishi and Norman Yamaha, uh-huh.

13  Q.   You were in charge of sales staff?

14  A.   Yes.

15  Q.   You were in charge of all managers underneath you?

16  A.   Yes, sir.

17  Q.   You were in charge of all sales techniques?

18  A.   Yeah, I mean, all the process.

19  Q.   You were in charge of training?

20  A.   Yes, I did -- I did some of the training, yes.

21  Q.   You were doing these deals and approving them?

22  A.   Yes.

23  Q.   Okay.  I think -- well, do you remember saying that Chris

24  would not be in business without in-and-out deals?

25  A.   I don't -- I don't remember saying that, but it wouldn't

1  surprise me if I just said it.

2  Q.   Do you think that is a true statement?

3  A.   Not -- not be in business, no.

4  Q.   Okay.  Because, in truth, in-and-out deals from 2014 to

5  '19 account for about 2 percent of the car sales from Chris

6  Mayes; isn't that true?

7  A.   I don't have those numbers.

8  Q.   Now, a dealership's relationship with its lenders is

9  critical, correct?

10  A.   Yes, it is.

11  Q.   If a lender cuts off a dealership, that can end a

12  dealership?

13  A.   Yes, it can.

14  Q.   Because if you can't fund a deal, you can't sell cars?

15  A.   That's correct.

16  Q.   Previously, you talked about a mini, that salespeople or

17  sales staff get a mini for selling a car, right?

18  A.   Yes.

19  Q.   And you talked about that is -- you can be a hundred

20  dollars per car sold, right?

21  A.   Yeah, it would be the base minimum commission.

22  Q.   Right.

23       Because it can go up more than that, right?

24  A.   Yes, it can.

25  Q.   Right.

1          If you say you hit ten cars sold that month, your mini
2     goes up to 500 per car?
3     A.   I don't know that, but I know that you can get paid
4     commission versus a mini if it makes a gross profit.
5     Q.   And I'm mainly asking this in reference to the backing out
6     of sales staff or denying them commission.
7          Sales staff would get minis on every deal they sold,
8     correct?
9     A.   They would get a commission on every car they sold.
10    Q.   And if they hit certain sales numbers, that number could
11    go from -- say you have a hundred -- say you sell nine cars and
12    you get a hundred per car, right?  That's a mini, correct?
13    A.   Yeah, but that wasn't our pay plan.
14    Q.   Okay.  Let me just stop you there.
15         If you hit to a ten, tenth car, your mini could go up to,
16    say, 500 per car that you sold?
17    A.   That's not correct.
18    Q.   And a -- this was talked about yesterday, but I want to be
19    clear.  A power of attorney was put in every car deal.
20    A.   Yes.
21    Q.   That was just a generic formal document that went along
22    with every car deal?
23    A.   Yes, it was in every car deal.
24    Q.   Whether it be in-and-out, whether it be pawn shop or some
25    other deal, at Big Red Sports & Imports, everyone signed a

1   power of attorney?

2   A.   Yes.

3   Q.   In January of 2016, when you went back to work at -- or

4   not back to work -- well, yeah, back to work for the Big Red

5   Dealerships, right?  This is after the dispute about the

6   letter.

7   A.   In 2015.

8   Q.   You go back in January of 2016, correct?

9   A.   Uh-huh, yes.

10  Q.   And you go to work at Norman Mitsubishi and Yamaha?

11  A.   That's correct.

12  Q.   Okay.  And you were the GM there?

13  A.   Yes, I was.

14  Q.   And when you were there as the GM, you found another

15  loophole?

16  A.   Explain.

17  Q.   Okay.  Well, you found that Tinker funded deals based on

18  purchase price?

19  A.   Yes, we found that out.

20  Q.   I'm not asking about "we."

21       You found that out?

22  A.   No, not me.  The company was already doing it before I

23  started back in '16.

24  Q.   And you started doing deals based on that purchase price

25  difference -- bad question.

1      You would sell a bike for whatever you could -- a

2  motorcycle or bike for whatever you could -- and Tinker would

3  fund those deals based off the purchase price you set?

4  A.   That's correct.

5  Q.   And after the system was going on for a while, you were

6  giving money to Donna Mullins?

7  A.   We were giving money to her, that's correct.

8  Q.   I get the "we," but you gave the money to Donna Mullins?

9  A.   That is correct.

10 Q.   No one else?

11 A.   I handed her the money.

12 Q.   Not one time did anyone else ever give Donna Mullins

13 money?

14 A.   I was the one who always handed her the money.

15 Q.   All right.  And you were slipping her loans to approve

16 loan deals for you?

17 A.   Say that again.

18 Q.   You were giving her money to approve loan deals for you?

19 A.   Yes, we paid her to do loans.

20 Q.   I'm not asking about "we."  You.

21      You were handing her money to approve loan deals for you?

22 A.   From Chris Mayes, yes.

23 Q.   Okay.  And when you got caught, you told her to lie?

24 A.   When she got fired, she immediately came to Chris Mayes'

25 office.

1   Q.   That's not my question.

2   A.   What's your question?

3   Q.   When you got caught -- when she got caught taking money,

4   you told her to lie?

5   A.   Yes, by the permission of Chris Mayes.

6   Q.   I get that.

7        It's always Chris Mayes giving you permission to do these

8   things?

9   A.   This is correct.

10  Q.   And you gave Donna money at your so-called Bible study?

11  A.   Yes.

12  Q.   Isn't it true at the same time you're talking with Donna,

13  you're also talking to Chris separately?

14  A.   What does that mean?

15  Q.   Well, you're having conversations with Donna and then

16  you're having conversations with Chris Mayes separate.

17  A.   Explain.

18  Q.   Are there times where you and Donna have a conversation

19  about this bribery incident?

20  A.   Is there -- just me and her?

21  Q.   Yes.

22  A.   Yes.

23  Q.   Are there times when you have a conversation with Chris

24  Mayes separately?

25  A.   Yes.  And there are times with all three of us.

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                      498

```
 1   Q.   Okay.  And you were telling Chris that Donna didn't do
 2   anything wrong?
 3   A.   Say again.
 4   Q.   You were telling Chris Mayes that Donna did not do
 5   anything wrong?
 6   A.   I was telling Chris Mayes that Donna did not do anything
 7   wrong?
 8   Q.   Yes.
 9   A.   Me and Chris gave Donna money.
10   Q.   I'm not asking that.
11        I'm asking, you were telling Chris that Donna did not do
12   anything wrong?
13   A.   No.
14   Q.   Okay.
15   A.   We role-played that -- sorry to cut you off.  We did
16   role-play that many times.
17   Q.   You were explaining that Tinker's guidelines were messed
18   up.  You were explaining that to Chris, right?
19   A.   Me and Chris found that Tinker's guidelines -- there was a
20   hole in it.
21   Q.   And my question is, you were explaining that to Chris,
22   correct?
23   A.   I wasn't explaining it to Chris.  Me and Chris were
24   talking about how we could maximize it together.
25   Q.   You were telling Chris there was nothing wrong with the
```

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                               499

1  deals that you and Donna were doing?

2  A.   Me and Chris knew that Tinker would not figure it out.

3  Q.   Not my question.

4       You were telling Chris --

5  A.   I was not telling Chris that.

6  Q.   Okay.  Thank you.

7       You were the one who told Chris he should hire Donna?

8  A.   No, sir.

9  Q.   Because you told Chris that Tinker did her wrong?

10  A.   No, sir.

11  Q.   And fast-forward into 2017.  There is a civil dispute

12  between Tinker and Big Red Sports & Imports taking place,

13  correct?

14  A.   Yes.

15  Q.   And it's about the pricing grid, correct?

16  A.   Yes.

17  Q.   And Chris was standing up for you, as GM, because he

18  agreed that Tinker's pricing grid was wrong?

19  A.   Chris was not standing up for me.

20  Q.   Well, he was in a dispute with Tinker about whether he

21  should have to pay any money back because of the deals you were

22  doing as GM?

23  A.   Yes, the deals that we did as a company.  Tinker audited

24  all the deals.

25  Q.   Right.

1          And Chris Mayes was in a dispute with Tinker about whether

2     he should have to pay that money back and he was pointing to

3     them that their guidelines were wrong?

4     A.    That is correct.

5     Q.    Okay.  And when the FBI goes to visit Donna about the

6     invoices, you're telling Chris that he should take care of her?

7     A.    Chris told me to tell Donna.

8     Q.    That's not what --

9     A.    That's not correct.

10    Q.    Okay.  You were telling Chris that Donna didn't do

11    anything wrong?

12    A.    That's not correct.

13    Q.    Isn't it true, on these recordings, when you're telling

14    Donna to give the invoices to Chris, you know that he is

15    handling a dispute about those invoices with Tinker at that

16    time, correct?

17    A.    No.  I wanted her to know -- I wanted Chris to see what

18    the FBI gave her.

19    Q.    No, no -- which would be the invoices, correct?

20    A.    Correct.

21    Q.    And the invoices were the dispute with Tinker, right?

22    A.    I wanted Donna to show Chris what the FBI had given her.

23    Q.    We just established that.  And that was the invoices,

24    correct?

25    A.    Yeah.  It was a letter and an invoice is what she said.  I

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    501

```
 1   said, give it to Chris immediately.
 2   Q.   And the invoices was something that Chris was having a
 3   civil dispute with Tinker about at that very time?
 4   A.   I don't know if it was that time, but I know that Tinker
 5   audited the deals.
 6   Q.   Right.
 7        You know there was a civil dispute in 2017, right?
 8   A.   I know there was an audit, a big audit.
 9   Q.   And it happened before June of 2017, correct?
10   A.   I don't know the time.
11   Q.   Okay.
12   A.   But the audit is correct.
13   Q.   In that video, when you're talking about Chris, you're
14   doing that to keep Donna in line, correct?
15   A.   On which video, the first or the second?
16   Q.   Both.
17   A.   Both?
18        We wanted to keep Donna on our side.
19   Q.   Not my question.
20        When you were in those videos, you were telling her that
21   Chris could protect her, right?
22   A.   Yes.
23   Q.   You were doing that because you wanted to keep Donna in
24   line, correct?
25   A.   Yes, I was told to keep Donna in line.
```

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                           502

1   Q.   That's not -- I didn't ask you whether you were told.

2        I said you were doing it to keep Donna in line.

3   A.   No.

4   Q.   Okay.  You knew that if Chris protected Donna, it

5   protected you.

6   A.   It, yeah, protected us, yeah.

7   Q.   Right.

8        And you would tell Donna in some of those videos that

9   Chris will get you a lawyer?

10  A.   Yes, because Chris told me he was getting her a lawyer.

11  Q.   Not my question.

12       You told Donna that Chris will get you a lawyer, correct?

13  A.   That's what I was told, yes.

14  Q.   I didn't ask what you were told.

15       I asked, what did you tell Donna?  That Chris will get you

16  a lawyer, correct?

17  A.   Yes.

18  Q.   Because you're trying to keep her in line, correct?

19  A.   Okay.  When you say "me" and then I say "us," you don't

20  like that, so...

21  Q.   I'm ask -- because I'm only asking about you.  I'm not

22  asking about a collective group.  I'm asking what you did.

23  A.   Well, it was a group of us doing it, so if you want me to

24  say I was a part of it, yes.

25  Q.   I'm asking what you -- you're on the recording, right?

1   A.   Yes.

2   Q.   No one else is on the recording?

3   A.   Correct.

4   Q.   I get now that you're saying they're all involved, but who

5   is the person on the recording?

6   A.   It was me.

7   Q.   There you go.

8        Okay.  You were trying to keep Donna in line at that point

9   by telling her Chris can get you an attorney, fair?

10  A.   Fair.

11  Q.   Okay.  But what's interesting about that recording, you're

12  also telling her not to tell the lawyer that Chris gets her

13  about your guys' conversation?

14  A.   No, that's not what I said.

15       I told her not to tell -- not to call the lawyer that she

16  was trying to call, which was her friend.

17  Q.   Well, let me ask this first.  You told Donna, don't tell

18  your attorney that you did something wrong so he can cover for

19  you?

20  A.   Right.  Because she was talking about her friend is going

21  to hire her -- she was going to hire her friend.

22  Q.   And you tell her, your attorney -- that your attorney --

23  tell your attorney that you never did anything wrong, right?

24  A.   Yes.  Chris told me to make it clear that she made sure

25  the guy that he hired for her, that she told him that she

1  didn't do anything and that's all he needs to know.

2  Q.   But the truth is she hasn't hired anyone at that point,

3  right?

4  A.   I don't know at that point whether she had been hired by

5  somebody or not.  I just remember when Chris paid for the

6  attorney because --

7  Q.   To be fair, in this recording, you're trying to tell her

8  to let Chris get her an attorney?

9  A.   Yeah, because Chris told me he wanted to make sure that he

10  had her attorneyed-up.

11  Q.   I didn't ask why.  I just want to be very clear.  You're

12  telling her to let Chris get her an attorney?

13  A.   Yes.

14  Q.   You want Chris to be the one that gets her the attorney,

15  right?

16  A.   Yeah, because Chris told me he was going to get her an

17  attorney.

18  Q.   Right.

19      But then you tell Donna, I'm telling you this.  Listen,

20  Donna, when we have -- can I tell you this -- remember, the

21  attorney that you get, they don't know about this conversation.

22  Does that make sense?

23  A.   Okay.  Say that again.

24  Q.   Listen, Donna, we have -- can I tell you this to

25  remember -- the attorney you get, they don't know about this

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    505

1   conversation.  Does that make sense?

2   A.   I'll have to read it into context.

3           MR. BEHENNA:  May I approach the witness, Your Honor?

4           THE COURT:  You may.

5       (MR. BEHENNA HANDS THE WITNESS THE TRANSCRIPT OF THE VIDEO

6   GOVERNMENT EXHIBIT 10.)

7   Q.   (BY MR. BEHENNA) Have you refreshed your memory?

8   A.   Yeah.  She's telling me she has a friend who is an

9   attorney --

10          THE COURT:  One at a time, gentlemen.

11      And just wait for the next question.

12          THE WITNESS:  I'm sorry, yeah.

13  Q.   (BY MR. BEHENNA) My point is, on this recording, you say,

14  Can I tell you this to remember, the attorney you get, they

15  don't know about this conversation.  Does that make sense.

16      That's what you said to Donna, right?

17  A.   Five sentences before that, she says she's going to get an

18  attorney somewhere else.  That's on there.  And I told her that

19  that person will not know about this conversation.

20  Q.   I get that.

21          THE COURT:  Okay.  Next question.

22  Q.   (BY MR. BEHENNA) The truth is, Andy, no one knew that you

23  were bribing Donna, right?

24  A.   Me, Chris, and Courtney.

25  Q.   Okay.  Everyone knew that you had messed with Tinker's

1  buying guidelines.  You were buying deals.  Everyone knew that,

2  right?

3  A.   I wasn't buying any deals.

4  Q.   And Chris was -- well, you were selling deals, according

5  to Tinker's buying guidelines, correct?

6  A.   The entire company was doing deals with Tinker.

7  Q.   I get you keep saying "we."  I'm asking you.  You were

8  doing it, right?

9  A.   I did deals with Tinker, yes.

10  Q.   You were the general manager of the store that it was

11  happening at, right?

12  A.   That's correct.

13  Q.   And Chris knew about that and there was a civil dispute

14  about that, right?

15  A.   Yes.

16  Q.   But no one knew about your bribes with Donna, right?

17  A.   When you say "no one" --

18  Q.   I mean no one.

19  A.   Chris Mayes and Courtney and Donna.

20  Q.   And it's true -- the reason you're telling her not even to

21  tell an attorney that Chris gets her because no one knows what

22  you're doing, this secret bribery, that was you and Donna?

23  A.   I'm sorry.  That's not the truth.

24  Q.   Okay.  And you agree that Chris worked with Loretta Ross

25  to change the pricing guidelines after it came to light,

1   correct?

2   A.    Yes.

3   Q.    To correct that loophole, correct?

4   A.    Yes.  They changed the guidelines in, I believe, April.

5   Q.    Right.

6         You came up with an idea to have MSRP and then you could

7   add $1,200 to it?

8   A.    Yeah.  1,295, yes, sir.

9   Q.    Now, at the beginning of your direct examination

10  yesterday, I wrote down that you said you never did any shady

11  stuff at any other dealership until you went to Big Red.

12        Do you remember that?

13  A.    In here?

14  Q.    Huh?

15  A.    In here?

16  Q.    Yes.

17  A.    Yesterday?

18  Q.    Yes.

19  A.    I said I never did any shady stuff?

20  Q.    At any other dealership until you came to Big Red.

21  A.    And --

22  Q.    My question is, do you remember that, yes or no?

23  A.    I don't remember that word, but --

24  Q.    That's fair.

25  A.    Okay.

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                              508

1   Q.   You said you got sucked into this culture at Big Red

2   Sports & Imports --

3   A.   That is correct.

4   Q.   -- correct.

5        But then at the end of your testimony, you admit that you

6   bribed bank officials before you ever came to Big Red Sports &

7   Imports?

8   A.   We call it bird dog.

9   Q.   I'm not asking about "we."  I'm asking about you.

10  A.   Oh, yes, yes.

11  Q.   You paid money to bank officials?

12  A.   From dealerships, yes.

13  Q.   My question is, did you talk with the government about

14  that before you came in to give that testimony?

15  A.   No.

16  Q.   They never asked you about whether you had ever given

17  money to bank officials in the past?

18  A.   No.

19  Q.   Okay.  But you did admit that you did that before you ever

20  went to work at Big Red Sports & Imports, correct?

21  A.   Yes.

22  Q.   Okay.  Do you know someone named Alicia Scott?

23  A.   Yes.

24  Q.   Do you know someone named Traci Kopaczynski?

25  A.   Yes.

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    509

1  Q.   They worked at Communications Federal Credit Union in

2  where?

3  A.   Traci works at Tinker in Oklahoma City, and then the other

4  one works in Communications in Ardmore.

5  Q.   But at the time -- and I'm looking mainly in 2010 -- they

6  both worked together at Communications Federal Credit Union?

7  A.   No, they did not work together.  One of them worked at

8  Tinker; one of them worked at Communications.

9  Q.   Okay.  And Traci is someone who you bribed when she was at

10 Communications Federal Credit Union, correct?

11 A.   We were paying her, yeah, $200 out of Carter County Dodge.

12 Q.   And that was in 2010, correct?

13 A.   Yeah.

14 Q.   And you were fired from Carter County Dodge because you

15 did that?

16 A.   No.

17 Q.   That was your culture before you ever went to Big Red

18 Sports & Imports, correct?

19 A.   No.

20 Q.   Well, you were paying bank officials before you ever

21 worked for Chris Mayes.

22 A.   I worked for David Stanley.  And if there was any other

23 bank place that would get a deal approved, they would bird-dog

24 out $200.  That was Traci Kopaczynski.

25      When I moved down to Ardmore, at Carter County, she did

1    the same thing for Carter County Dodge for $200 a deal that

2    Carter County Dodge would pay her for doing the deal.

3          And whenever she got fired, Tinker called her and said,

4    hey, did you know that there was a girl here doing loans for

5    you guys, we are direct, why didn't you just send it to us.

6          And he said, I'm sorry, and then they fired her.  And then

7    I stayed there for another year.

8          It wasn't an issue.

9    Q.    Okay.  Are you aware that Communications Federal Credit

10   Union cut off Carter County Dodge because they found out you

11   were bribing Traci Kopaczynski?

12   A.    I wasn't aware of that.

13   Q.    Do you have any reason to dispute that it happened?

14   A.    I was never told that.  And the owner was really close to

15   me.

16   Q.    The truth is you were paying bank officials for car deals

17   before you ever went to work for Chris Mayes.

18   A.    I did.

19   Q.    Thank you.

20         In September of 2019, you indicated that you were still

21   buying car deals for Chris Mayes, correct -- or buying cars at

22   auction for Chris Mayes?

23         Is it September?  Do I have that right?

24   A.    In September, yes, of 2019.

25   Q.    Isn't it true you were caught stealing from Chris Mayes at

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    511

```
1  that auction?
2  A.    What does that mean?
3  Q.    That -- well, there were, say, lanes, car lanes, and you
4  would get money if you bought cars out of certain lanes, right?
5       And that money would go to the dealership.  Are you aware
6  of that?
7  A.    I had a conversation with Chris about this.
8  Q.    Okay.  You went and you would collect the money at auction
9  that was bought with Chris Mayes' or Big Red Sports & Imports'
10 money, correct?
11 A.    No.
12 Q.    You wouldn't collect the money and take it?
13 A.    No.
14      Do you want me to explain or not?
15 Q.    No.  I'm asking you, would you take the money from the
16 auction that Big Red had earned from buying at the auction?
17 A.    No.
18 Q.    And, ultimately, that's the reason why you were cut off
19 completely from Big Red Sports & Imports?
20 A.    No.
21 Q.    Okay.  I also want to talk to you about your immunity
22 deal.  Okay?
23 A.    Okay.
24 Q.    In March of 2018, law enforcement tried to talk to you in
25 an interview about your interaction with Donna and anything
```

1  else going on at the dealership, correct?

2  A.   I'm not sure if that was the date, but, yes, I was

3  approached by FBI.

4  Q.   You know it was in 2018?

5  A.   I can look.  I mean, it's the only way for me to check

6  facts and dates.

7  Q.   I think that's fair.

8         MR. BEHENNA:  May I approach the witness, Your Honor?

9         THE COURT:  You may.

10        (DOCUMENT HANDED TO THE WITNESS BY MR. BEHENNA.)

11        THE WITNESS:  March 11, 2018.

12  Q.   (BY MR. BEHENNA) Has that refreshed your memory?

13  A.   Yes, sir, it does.  Thank you.

14  Q.   March of 2018, law enforcement tried to talk to you,

15  correct?

16  A.   Yes.

17  Q.   And at that time, you received a target letter from

18  federal agents, correct?

19  A.   Yes.

20  Q.   And you knew you were the target of a federal

21  investigation?

22  A.   Yes.

23  Q.   And you refused to talk to them at that time?

24  A.   That is correct.

25  Q.   And then you ultimately leave -- I mean, you were

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    513

1  terminated from the dealership in June of 2019, correct?

2  A.    I continued to buy cars until October.

3  Q.    You weren't working at the dealership in June of 2019,

4  correct?

5  A.    That is in March, but you're asking me in June?

6  Q.    No, no, no.

7        June of 2019, when you were terminated from the dealership

8  as being an employee -- right?  Do you remember that?

9  A.    Yeah.  June or July, I left.

10 Q.    But then you continued to buy cars for the dealership,

11 right?

12 A.    Yes, after I left.

13 Q.    And then that was stopped in October of 2019?

14 A.    Yeah.  Really, November, but, yeah.

15 Q.    Okay.  And you are still under investigation at that time?

16 A.    That is correct.

17 Q.    And in January of 2020, your lawyer writes a letter to the

18 federal government?

19 A.    I'm not sure of the date, but that could be right.

20 Q.    You're aware of that?

21 A.    Yeah, we did write them a letter.

22 Q.    And it's letting the government know that you wanted to be

23 a witness?

24 A.    It was participating to give information, yeah.

25 Q.    That you wanted to be a witness for the government?

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                              514

```
 1   A.    Yeah.  I'm not sure the way that the letter reads, but we
 2   can look at it.
 3   Q.    Okay.  And you, at the time, were facing a federal prison
 4   sentence, potentially?
 5   A.    We were all going to be in trouble.
 6   Q.    I'm not talking about "we're all."
 7         You -- you were facing a federal prison sentence at that
 8   time?
 9   A.    Yes.
10   Q.    For bribery, one, correct?
11   A.    Yes.
12   Q.    Potentially, obstruction of justice, correct?
13   A.    I don't know what that means.
14   Q.    Okay.  How about conspiracy?
15   A.    I don't know what that means.
16   Q.    Are you aware that bribery carries up to 15 years in
17   prison?
18   A.    No, I'm not.
19   Q.    Are you aware that conspiracy carries up to 30 years in
20   prison?
21              MS. ANDERSON:  Objection, Your Honor.
22              THE COURT:  Overruled.
23              THE WITNESS:  No, I'm not.
24   Q.    (BY MR. BEHENNA) You never had those conversations with
25   your lawyer?
```

```
 1   A.    No.
 2            MS. ANDERSON:  Objection, Your Honor.
 3            THE COURT:  Bear with me just a minute.
 4       Overruled.
 5   Q.   (BY MR. BEHENNA) Individual wire fraud can carry up to 20
 6   years in prison?
 7   A.    Okay.
 8   Q.    Are you aware of that?
 9   A.    No, I'm not.
10   Q.    Uttering forged securities can carry up to ten years in
11   prison.  Are you aware of that?
12   A.    No.
13   Q.    Are you aware that these counts could have been stacked on
14   top of each other?
15   A.    I am aware of that.
16   Q.    Right.
17       Meaning if you get one, you could do 30, you could do 20,
18   you could do 10, you could do another 10, right?
19            MS. ANDERSON:  Objection, Your Honor.
20            THE COURT:  Let's have a bench conference.
21       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND OUT
22   OF THE HEARING OF THE JURY.)
23            THE COURT:  Okay.  Can government counsel hear me?
24            MS. ANDERSON:  Yes.
25            THE COURT:  Okay.  And can Mr. Behenna hear me?
```

1    Can Mr. Behenna hear me?

2    Can Mr. Behenna hear me?

3         MR. BEHENNA:  Yes, Your Honor.

4         THE COURT:  Okay.  Now, I think I know what the basis

5    of the government's objection is, but let me hear it.

6         MS. ANDERSON:  Yes, Your Honor.

7    Mr. Behenna is going into the punishment and exposure for

8    different things.  The jury is not supposed to be considering

9    punishment in its decision.  He's talking about counts like

10   uttering forged securities, which is not something that is --

11   there's not evidence that Mr. Elliott knew anything about the

12   checks.  And they're just trying to talk about what a large

13   punishment is possible here, which is not something that the

14   jury should be considering.

15        THE COURT:  Okay.  Well, I'm going to make one

16   comment, and then I'll hear what defense counsel has to say.

17   Yes.  On one hand, Ms. Anderson has a point, when that

18   information is used for one purpose, but there's also a

19   permissible purpose, in general, and that is to show the

20   reasons that the witness has to be biased.  So those are two

21   considerations that go in opposite directions, if you will.

22   My personal take on it -- and I'm going to hear from

23   Mr. Behenna about this.  My personal take, balancing those two

24   competing considerations, is that you've really gone as far

25   down that road as you should.

```
 1        But -- so let me ask you this.  Do you have any intent to
 2   pursue this particular point any further?
 3             MR. BEHENNA:  No, Your Honor, not as it relates to
 4   ranges of punishment.  I do -- would like to pursue a little
 5   bit more about 5K letters, that there's benefits witnesses get
 6   that offer benefit after pleading guilty, but he got immunity,
 7   which is the --
 8             THE COURT:  Well, you can certainly pursue this
 9   immunity.  If there's -- if you have some basis, as an officer
10   of the court, to suggest that he also hopes to have a 5K
11   letter, that's fair game.
12        But in terms of what the penalty might be for any
13   particular offense or how those penalties might be stacked, in
14   fairness, my conclusion is that you've gone as far down that
15   road as you should, balancing the two competing considerations
16   that I have mentioned.  Is that understood?
17             MR. BEHENNA:  Yes, Your Honor --
18             MS. ANDERSON:  Your Honor --
19             THE COURT:  I've already ruled for you.
20             MS. ANDERSON:  Yes, Your Honor, but a 5K is not
21   something that's on the table here because he has a
22   nonprosecution agreement.
23             THE COURT:  Well, then -- well, if his answer to that
24   question is "no," then we will quickly get on to the next
25   question.
```

1              MS. ANDERSON:  Thank you, Your Honor.

2         (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITH

3    ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE PRESENCE AND

4    HEARING OF THE JURY.)

5              THE COURT:  You may continue.

6              MR. BEHENNA:  Thank you, Your Honor.

7    Q.   (BY MR. BEHENNA) But to all of that, all that we've talked

8    about, the crimes that you have admitted to or say that you

9    participated in, you got immunity?

10   A.   Yes, I have.  I did.

11   Q.   Not charged with one crime?

12   A.   Yes.  To tell the truth.

13   Q.   Well, let me ask you this:  Were you given immunity before

14   you said Chris Mayes did it?

15   A.   What does that mean?

16   Q.   Well, in 2018, were you offered immunity?

17   A.   No, I was not offered immunity.

18   Q.   In 2019, were you offered immunity?

19   A.   No.

20   Q.   It was only when you said "Chris Mayes did it" that you

21   were offered immunity?

22   A.   That's not correct.

23   Q.   Okay.  Do you think you would have got immunity if you

24   would have said Chris Mayes had nothing to do with it?

25   A.   I got immunity to tell the truth.

1  Q.   That's not my question.

2      Would you have got immunity if you said Chris Mayes had

3  nothing to do with it?

4  A.   I don't know the answer to that.

5  Q.   Now, after your lawyer sent that letter, did you talk with

6  the government before you testified at the grand jury?

7  A.   I don't believe so.

8  Q.   Okay.  So if I set the timeline, your lawyer sends a

9  letter to the government requesting immunity for you in January

10 of 2020?

11 A.   I need to check those dates.  I'm sorry.

12          MR. BEHENNA:  May I approach the witness, Your Honor?

13          THE COURT:  You may.

14      (DOCUMENT HANDED TO THE WITNESS BY MR. BEHENNA.)

15 Q.   (BY MR. BEHENNA) I'm only interested in that time.

16 A.   January 30, 2020.  Hand-delivered January 31, 2020.

17 Q.   Did that sufficiently refresh your memory?

18 A.   Yes.

19 Q.   So your lawyer sent a letter on January 20th requesting

20 immunity for you, correct?

21 A.   I'm not sure of the exact request, but I believe that was

22 what we wanted.

23 Q.   Okay.  And if I could have -- well, I can't remember if

24 it's been admitted.

25      The key here is that date.  You were offered immunity on

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                         520

1    July 20th of 2020, correct?

2    A.    That is correct.

3    Q.    Prior to being offered immunity by the government, did you

4    ever have a meeting with them?

5    A.    I don't believe so.

6    Q.    So the government offered you immunity without ever

7    talking to you?

8    A.    We had been communicating through a lawyer.

9    Q.    So your -- the government had talked to your lawyer and,

10   through that, they decided to give you immunity without ever

11   talking to you directly?

12   A.    They spoke many times.

13   Q.    I get that.

14         Did they ever talk to you directly?

15   A.    I don't believe so.

16   Q.    Did they ever ask you to give a statement about what you

17   would say before you got immunity?

18   A.    We gave them a handwritten letter --

19   Q.    Right, your lawyer --

20   A.    -- before that.

21   Q.    Your lawyer wrote what you might say, right?

22         I think he called it a "hypothetical statement," right?

23   A.    Right.

24   Q.    These events, should they turn out to be real or

25   hypothetical situations or vignettes?

ANDREW ELLIOTT - CROSS BY MR. BEHENNA                    521

1   A.   Yes, I wanted to tell the truth.

2   Q.   Right.

3        But -- and so your lawyer wrote a hypothetical letter to

4   the government in January, correct?

5   A.   Yes.

6   Q.   And the government offered you immunity in July, without

7   ever talking to you?

8   A.   After reading the letter, yes.

9        THE COURT:  When you -- for the sake of clarity, when

10  you refer in this line of questioning to the government, are

11  you including just the U.S. Attorney's Office or are you

12  including the U.S. Attorney's Office and the FBI?

13       MR. BEHENNA:  I will say the U.S. Attorney's Office.

14  They're the name on the letter.  Forgive me, Your Honor.

15  Q.   (BY MR. BEHENNA) Correct?

16  A.   Yes, sir.

17  Q.   Okay.

18       MR. BEHENNA:  May I have one moment, Your Honor?

19       THE COURT:  Surely.

20  Q.   (BY MR. BEHENNA) In truth, Mr. Elliott, when someone gets

21  in your way, what you do is run them over, right?

22  A.   Is that, like, a saying?

23  Q.   Yeah, it's your saying.

24  A.   I was going to say that's a saying that's on the Internet,

25  but that's not who I am.

1  Q.    But that's what you tell the people you train?

2  A.    We tell them to go get what they want in life.

3  Q.    No, no, no.  You tell them if someone gets in your way,

4  run them over.

5  A.    It's a saying.  I post it all over social media.

6  Q.    Okay.

7         MR. BEHENNA:  Your Honor, at this time, we move to

8  admit Defendant's Exhibit 108.

9      (DEFENDANT'S EXHIBIT 108 PLAYED FOR THE COURT AND JURY.)

10         THE COURT:  Wait, wait, wait.  Stop it.

11     (AUDIO PAUSED.)

12         THE COURT:  First of all, any objection to it?

13         MS. ANDERSON:  No, Your Honor.

14         THE COURT:  Okay.  We just don't fire up the player

15  and play it before it's been admitted.  Do you understand that?

16         MR. BEHENNA:  Yes, Your Honor.

17         THE COURT:  It's admitted.

18     (DEFENDANT'S EXHIBIT 108 PLAYED FOR THE COURT AND JURY.)

19         MR. BEHENNA:  With that, we have no further

20  questions, Your Honor.

21         THE COURT:  Further cross?

22         MR. BEHENNA:  Forgive me, Your Honor.  May I have a

23  moment?

24      Your Honor, if you'll bear with me, I said "pass the

25  witness."  There is a line of questioning I would like to go

```
 1   into further, if I could.
 2               THE COURT:  Proceed.
 3        How long do you anticipate this will be?
 4               MR. BEHENNA:  Maybe another 20 minutes, Your Honor.
 5               THE COURT:  We'll take it one question at a time.
 6               MR. BEHENNA:  Okay.  Sorry, Your Honor.  May I have
 7   one moment?
 8               THE COURT:  Surely.
 9               MR. BEHENNA:  Your Honor, I think we're okay.  I
10   think I'm going to pass the witness.
11               THE COURT:  Very well.
12        Is there further cross-examination?
13               MR. SHANNONHOUSE:  No additional questions on behalf
14   of Mr. Gooch.
15               THE COURT:  Cross-examination on behalf of Ms. Wells?
16               MR. ADLER:  Yes, please.  Thank you, Your Honor.
17                         CROSS-EXAMINATION
18   BY MR. ADLER:
19   Q.   Good afternoon, Mr. Elliott.
20   A.   Good afternoon.
21   Q.   My name is Tommy Adler.  I represent Courtney Wells.  And
22   I have some questions for you, if that's all right with you.
23   A.   Yes, sir.
24   Q.   I'm going to try to go chronologically, but I might jump
25   around a little bit.  If you ever need me to orient you to what
```

```
 1   I'm talking about, just let me know.  Okay?
 2   A.   Okay.
 3   Q.   I'm going to do my very best to ask you as many yes-or-no
 4   questions about yourself as possible.  Can you try to follow me
 5   with that?
 6   A.   Sure.
 7   Q.   I want to start back with these recordings that Donna
 8   Mullins made with you, right?
 9   A.   Okay.
10   Q.   The only people in the car are you and Donna Mullins,
11   right?
12   A.   Yes.
13   Q.   And you invoke the name of Chris Mayes again and again and
14   again, correct?
15   A.   Yes.
16   Q.   Chris Mayes was never in that car?
17   A.   Correct.
18   Q.   Courtney Wells was never in that car?
19   A.   Correct.
20   Q.   And so these things that you're telling her are from you
21   to her, correct?
22   A.   I'm only relaying the message to her, yes.
23   Q.   Yes or no.  The things that you're telling her in that car
24   are from you to her.  Yes or no?
25   A.   Yes.
```

ANDREW ELLIOTT - CROSS BY MR. ADLER                          525

```
1   Q.    Thank you.

2         And she's trying to be honest, right?

3         She's trying to admit that she knows, as well as you know,

4   that you handed her money for a long time, right?

5   A.    No.

6   Q.    You don't remember her saying "but I did take money"?

7   A.    Yes, she did take money.

8   Q.    Okay.  So she's trying to be honest about it, right?

9   A.    Yes.

10  Q.    And you are gaslighting her to get her to deny it, right?

11  A.    We wanted her to believe that, yes.

12  Q.    I'm asking what you were doing in that car that day.

13  You're gaslighting her, aren't you?

14  A.    Yes.

15  Q.    Tell the jury what "gaslighting" is.

16  A.    I think you mean it like pressuring her.

17  Q.    Okay.  Tell the jury what "gaslighting" means to you.

18  A.    Pressuring her.

19  Q.    Okay.  You're trying to convince her of something that's

20  not true, right?

21  A.    No.  We were telling her -- she knew that she took the

22  money.

23  Q.    Who is "we"?

24  A.    Me and Chris Mayes.

25  Q.    Chris was in the car?
```

1   A.   Okay.  So --

2   Q.   Answer the question.  Was Chris in the car?

3   A.   Chris was not in the car.

4   Q.   Okay.  So just say "I was telling her" because you were

5   the one telling her that day, right?

6   A.   Okay.

7   Q.   Right?

8   A.   Okay.

9   Q.   Okay.  She's trying to be honest about it and admit that

10  it happened, right?

11  A.   Yes.

12  Q.   You're trying to convince her of a false reality?

13  A.   No, we weren't trying to convince her.

14  Q.   Who is "we"?

15  A.   I was not trying to convince her that she did not take

16  money.  I was reminding her of the game plan that we have all

17  spoke about, that she had not ever taken any money.  So when

18  she left, she knew to stick to that story.

19  Q.   Okay.  And when you say "the game plan that we had spoken

20  to her about," you mean you and her, correct?

21  A.   Me and her.

22  Q.   Okay.  So you're the one that came up with the game plan

23  and told it to her, correct?

24  A.   No.

25  Q.   Okay.  Who told her about the game plan?

1   A.   That she didn't take money?

2   Q.   Correct.

3   A.   Me and Chris Mayes, the day she got fired from Tinker.

4   Q.   And where did that happen?

5   A.   In his office, in Roger Mayes' office.

6   Q.   And who was present?

7   A.   Chris Mayes, me, and Donna Mullins.

8   Q.   And nobody else?

9   A.   And nobody else.

10  Q.   And you know -- would it surprise you to know that Donna

11  Mullins never testified that that conversation took place?

12  A.   Yeah, it did.

13  Q.   I asked you if it would surprise you to know that Donna

14  Mullins testified under oath that that conversation never took

15  place.  Would that surprise You; yes or no?

16  A.   I don't have an opinion towards that.

17  Q.   Okay.  Would Donna Mullins have any reason to lie about

18  that?

19  A.   I don't believe so, no.

20  Q.   Okay.  But we should believe you, and not Donna Mullins,

21  that this took place, that this conversation took place?

22  A.   Yeah.  She got fired, came straight to the dealership.

23  Q.   Okay.  And that's your story, right?

24  A.   Yeah, yes.

25  Q.   Okay.  How do you prove it?

1  A.    She came to the dealership and we gave her a job.

2  Q.    Right.

3        I'm asking what evidence do you have that that

4  conversation never happened if nobody else --

5  A.    I mean, you could ask Donna.

6  Q.    I believe she was asked.

7  A.    Okay.

8  Q.    So we just have your word that this conversation took

9  place?

10 A.    I guess, yeah.

11 Q.    Okay.  You don't have a recording?

12 A.    We didn't -- I didn't record her.

13 Q.    You didn't take notes from it?

14 A.    No.

15 Q.    Didn't go tell anybody else about it right away that could

16 come in here and verify what it is you say happened?

17 A.    No.  She just started.

18 Q.    Okay.  So just your version and your memory that it

19 happened, correct?

20 A.    Well, she did start.

21 Q.    You were angry with her for telling the truth to her

22 employer about taking money from you, correct?

23 A.    Yeah, we were upset.

24 Q.    I'm not asking you how anybody else felt about it.  You --

25 A.    I was upset.

ANDREW ELLIOTT - CROSS BY MR. ADLER                           529

```
1   Q.   Okay.  Can you try, as best you can, to only speak about
2   you and your thoughts and your feelings and what you said and
3   what you did?
4   A.   Sure, sure.
5   Q.   You were angry with her for telling the truth to her
6   employer, correct?
7   A.   I wasn't angry.  We were disappointed.
8   Q.   Who is "we"?
9   A.   I was disappointed.
10  Q.   Why?
11  A.   Because we had helped her so much.  And she had helped us
12  a lot, but we had helped her so much with money.
13  Q.   Who is -- again, steer clear of "we" for me.
14       Why were you angry with Donna for telling the truth to her
15  employer?
16  A.   We had given her money.  I had given her money.
17  Q.   Thank you.
18  A.   And she told her employer.  And it was like, man, if she
19  didn't tell, we wouldn't have had that problem: so, you know,
20  we got caught.
21  Q.   Okay.  And so did -- when you're giving her this money,
22  did you also communicate to her "don't ever tell anybody about
23  this"?
24  A.   Oh, yeah.
25  Q.   Okay.  So you felt that she broke your trust in being
```

ANDREW ELLIOTT - CROSS BY MR. ADLER                          530

```
 1  honest with her employer?
 2  A.   Yeah.
 3  Q.   Was that the right thing for her to do, though?
 4  A.   Yeah.
 5  Q.   But you beat her down about it in that car on two
 6  occasions, right?
 7  A.   I can tell you for sure the beat-down I got before I got
 8  in that car --
 9  Q.   I didn't ask you a single question about that.  I said you
10  beat her down on multiple occasions about that, right?
11  A.   Yes.
12  Q.   You admitted to her in that car that you knew where those
13  fake invoices came from, right?
14  A.   Yes.
15  Q.   And these bike deals that you're sending over to her, you
16  were proud of the fact that you were exploiting what you saw
17  was a flaw in their system, were you not?
18  A.   Yeah.
19  Q.   Okay.  You got a kick out of selling somebody a $6,000
20  bike for $24,000, didn't you?
21  A.   We got excited to make money.
22  Q.   I'm asking you how you felt about it.
23  A.   I was excited to make money.
24  Q.   You're quite a salesman, aren't you?
25  A.   I've been selling my whole life.
```

1  Q.   Okay.  Consider yourself one of the best?

2  A.   I like to say.

3  Q.   Okay.  Give me generally the psychology of a deal.  What

4  are you thinking internally, in your head, to get any deal

5  done?

6       I mean, all of life is a deal to you, right?

7  A.   No.

8  Q.   Okay.

9       THE COURT:  Mr. Adler, please pull the microphone

10  where it points more towards you.

11       MR. ADLER:  Thank you, Your Honor.

12  Q.   (BY MR. ADLER) Give me the 30,000-foot view of what makes

13  a deal go, what it is you're trying to accomplish.

14  A.   Solve the customer's problem.

15  Q.   Okay.  And -- but the highest priority is what's best for

16  you, right?

17  A.   No.

18  Q.   Okay.  What's the highest priority?

19  A.   Making sure the customer is happy.

20  Q.   Okay.  Do you think it makes people happy to pay 4X value

21  on things?

22  A.   If you treat them like a million dollars.

23  Q.   That would make you happy to make a deal like that?

24  A.   I'm just answering your question.

25  Q.   Okay.  I'm asking you if it would make you happy to pay 4X

1    value on something that you could get for 25 percent of the

2    price across the street?

3    A.    No.

4    Q.    Okay.  You think that's honest?

5    A.    I don't think it's honest.

6    Q.    Okay.  But you don't have a problem doing it, right?

7    A.    Well, we found a loophole, so we took advantage of it.

8    Q.    I'm asking you about your own personal decisions and

9    activities.  You had no problem doing deals like that, did you?

10   A.    At that time, no.

11   Q.    And you -- in fact, you told the jury you were proud of

12   those kinds of deals, right?

13   A.    We wanted to make money.

14   Q.    Who is "we"?

15   A.    The company.

16   Q.    Okay.  You wanted to make money, right?

17   A.    Yeah.

18   Q.    Okay.  So that's your motivation in doing these deals, is

19   how much money can I make on this deal?

20   A.    Yeah.  We could carry money.

21   Q.    When you're talking with Donna Mullins in that car, you're

22   trying to convince her or prepare her to perjure herself,

23   correct?

24   A.    What does that mean?

25   Q.    You're talking to her about you and her till the day you

1   die, till the grave, in a courtroom, this is the story and

2   we're sticking to it, right?  You remember that part?

3   A.    Yeah.  Me, Chris, and her.

4   Q.    Was Chris in the car?

5   A.    No, but you'll remember I used Chris's name multiple

6   times.

7   Q.    Amen, you did.

8   A.    I wouldn't have used it if it wasn't a part of it.

9   Q.    You were telling her -- you were coaching her to perjure

10  herself, correct?

11  A.    To lie, yes.

12  Q.    And you were telling her that you were going to do the

13  same thing, that you were going to walk into a courtroom and

14  you were going to lie?

15  A.    Yes.  We were all planning on lying.

16  Q.    I'm asking you about what you were saying to her.

17  A.    Yes.

18  Q.    Please listen to the questions.

19  A.    Yes.

20  Q.    Okay.  And that's something that you expressed a clear

21  willingness to do, correct?

22  A.    To Donna.

23  Q.    Right.  Yeah.  You're telling Donna you have no problem

24  lying under oath?

25  A.    I do have a problem.  It was -- it was the way that we had

1  worked this out.

2  Q.   So what you're saying to Donna here isn't true.  You would

3  never come into a courtroom and tell something untrue, correct?

4  A.   I have never been in a courtroom and told a lie.  That was

5  a plan that me and Chris Mayes had made for Donna.

6  Q.   And why did you think it was important to counsel her on

7  how to perjure herself?

8  A.   Chris told me to make sure that she was prepared and

9  willing or else we were going to turn against her.

10  Q.   Why did you say those things to her?

11  A.   Because Chris told me to.

12  Q.   Chris made you?

13  A.   Chris made me, yes.

14  Q.   And in these conversations, you're the one that tells her

15  the story to go with about where the money came from, right?

16  A.   I was giving her ideas where she should say it came from.

17  Q.   Well, you gave her more than an idea, didn't you?

18  A.   What do you mean?

19  Q.   You gave her quite a few specific examples of where she

20  can say this money came from.

21  A.   Yes.

22  Q.   Okay.  And you're coaching her to lie, and you're coaching

23  her to have a complete story, and you're coaching her to

24  practice it again and again and again, right?

25  A.   Yeah.

1   Q.    How does that make you feel today?

2   A.    Makes me feel disgusting and sick.

3   Q.    It is disgusting and sick, is it not?

4   A.    Yeah.  You know, we were --

5   Q.    That was the end of the question.

6   A.    Sure.

7   Q.    Do you remember telling Donna in those -- in one of those

8   car rides that "I'll give you anything you need"?

9   A.    Yes.

10  Q.    Do you remember telling the government, when you met with

11  them, "I'll give you anything you need"?

12  A.    I told them I would tell the truth, yes.

13  Q.    You did, in fact, meet with these lawyers for the

14  government at some point, correct?

15  A.    You mean, like, in person, after we made a deal?  Yes.

16  Q.    Okay.  I'm not trying to trick you.

17        If I told you that was in October of 2020, would you have

18  any reason to disagree with that?

19  A.    October of 2020 was when I met with them?

20  Q.    Uh-huh.

21  A.    I don't know the dates, but --

22  Q.    And that's why my question was phrased "would you have any

23  reason to disagree with that."

24  A.    Yeah, I mean, I'm not good with dates.  That's why I keep

25  asking for dates.

```
 1   Q.   Okay.

 2   A.   And I apologize.

 3   Q.   Do you believe that date is inaccurate?

 4   A.   If you have that that is the date, then I'll go with it.

 5   Q.   Okay.  And do you remember telling them, "Whatever you

 6   need, I can help you with"?

 7   A.   I don't remember that.

 8   Q.   Okay.  Do you deny that you told that to them?

 9   A.   No.

10   Q.   Okay.  And that's part of the sale, right?  You're

11   building trust.  That's a sales tactic, right?

12   A.   There's no tactic in this room.  It's the truth.  That's

13   it.

14   Q.   I'm talking about your dealings with Donna, your dealings

15   with the government, you're trying to convey to them something

16   they perceive to be of value, right?

17   A.   Everything was a lie until I met them, and that's why I'm

18   here to tell the truth.

19   Q.   Okay.  So anything you said until what date was a lie?

20   A.   Everything that I did while I worked for Norman

21   Mitsubishi, the entire time, the way that we worked, the way

22   that me and Chris planned everything for everybody, if they

23   didn't fall in line, to have an exit out, including Chuck,

24   Courtney, all them, everything was a lie.  It was a daily new

25   lie.
```

ANDREW ELLIOTT - CROSS BY MR. ADLER                    537

1         And when I had the opportunity to get immunity, I'm not

2    lying.  I'm so glad to tell the damn truth.  So you're not

3    going to get a lie out of me.

4    Q.   Okay.  Well, there's a lot of value in immunity, is there

5    not?

6    A.   Yeah.

7    Q.   It's priceless, right?

8    A.   Yeah.  I don't have to lie.  It feels amazing.

9    Q.   You don't have to be sitting over there (pointing), do

10   you?

11   A.   I get to tell the truth.

12   Q.   It keeps you from sitting at the defense table, does it

13   not?

14   A.   Yes.  I get to tell the truth.

15   Q.   And this investigation allegedly started looking into

16   illegal bribes, cash bribes, that you paid to Donna Mullins,

17   correct?

18   A.   That me and Chris and Courtney paid to her, yes.

19   Q.   Okay.  On what date did Courtney Wells give Donna Mullins

20   cash?

21   A.   Courtney brought me money every single Friday.

22   Q.   Please listen carefully to the question.

23         On what day, to your knowledge, did Courtney Wells hand

24   Donna Mullins money?

25   A.   Nobody ever handed Donna Mullins a dollar, except me, and

1  I was handed it from Courtney by permission of Chris.

2  Q.   Okay.  We'll get into that in a minute.

3  A.   Sure.

4  Q.   The point is, the FBI tells you this investigation is

5  about you bribing a bank official, correct?

6  A.   No.

7  Q.   When they came and saw you in March of '18, they didn't

8  say:  Hey, we'd like to talk to you about you bribing a bank

9  official, and we've got you on recording?

10 A.   In 2018, yes.

11 Q.   Okay.  So that was what they told you this investigation

12 was about, right?

13 A.   Yes.

14 Q.   And they had solved that case, right?

15 A.   I don't know what that means.

16 Q.   They -- Donna had admitted that it happened.  They had you

17 on recording admitted (sic) it happened.  You consider that

18 case solved?

19 A.   No.  I'm not in -- I'm not in law.

20       THE COURT:  Mr. Adler, let me know when you get to a

21 convenient stopping point, we'll take our mid-afternoon break.

22       MR. ADLER:  I'm happy to take a break now.

23       THE COURT:  Very well.

24     You may be seated.

25     Members of the jury, we'll take our mid-afternoon break at

1    this time.  Let's plan on resuming at 20 minutes after 3:00.

2         At this point, I think there's very little I need to

3    explain to you, so please do remember my usual admonition.  And

4    I look forward to seeing you so that we can resume at 20 after

5    3:00.

6         All persons will please remain seated while the jury

7    departs.

8         (JURY EXITS THE COURTROOM.)

9         THE COURT:  The jury has left the courtroom.

10        Anything we need to take up before we take our

11   mid-afternoon break?

12        MR. SNYDER:  Your Honor, just real briefly, I'm led

13   to believe I have permission to skip the last bit of the day

14   today.  I thought I might leave now, with the break, so as to

15   not create an undue disturbance during the course of someone

16   else's examination.

17        THE COURT:  That would make sense.  That's fine.

18        MR. SNYDER:  Thank you, Your Honor.

19        THE COURT:  Anything else?

20        Hearing nothing, court will be in recess.

21        (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING PROCEEDINGS

22   WERE HAD IN OPEN COURT AND WITHIN THE PRESENCE AND HEARING OF

23   THE JURY.)

24        THE COURT:  Welcome back, members of the jury.

25        Mr. Adler, you may continue.

1              MR. ADLER:  Thank you, Your Honor.

2   Q.  (BY MR. ADLER) Mr. Elliott, we were having a conversation

3   about these conversations that you had with Donna Mullins in

4   the car.  Do you remember telling Donna Mullins that she was

5   the most honest woman in the world?

6   A.   I believe I saw that in there.

7   Q.   Okay.  Do you remember telling her that?

8   A.   I don't remember.

9   Q.   Do you dispute that you told Donna Mullins she's the most

10  honest lady in the world?

11  A.   I don't dispute it.  If you can show it to me, I can agree

12  to it.

13  Q.   As long as you're not disputing it, I don't need to show

14  it to you.  Is that okay?

15  A.   Sure.

16  Q.   Okay.  Were you lying to her, or is that something you

17  actually thought and believed?

18  A.   I don't believe she's the most honest person in the world.

19  Q.   So you were lying to her?

20  A.   I was wanting her to believe that she's a good person.

21  Q.   Okay.  Because that's part of the make-her-feel-special,

22  make-her-feel-important thing, right?

23  A.   No.  I was trying to have her follow the game plan that

24  was in place for me, her and Chris.

25  Q.   Okay.  And by doing so, you're lying to her.  You're using

ANDREW ELLIOTT - CROSS BY MR. ADLER                    541

1   deceit to get what it is you want to see happen, correct?

2   A.   We were lying every day.

3   Q.   Who is "we"?

4   A.   Me, Chris.

5   Q.   Was Chris in the car?

6   A.   Every day Chris was with me.

7   Q.   Was Chris in that car when you're telling her --

8   A.   He was not in the car.

9   Q.   Okay.  I'm going to stick to this conversation between you

10  and Donna Mullins in the car.

11       When you -- when I ask you questions about what you're

12  saying, try to stick to what it is you were saying, okay?

13  Because if there was somebody else in the car, tell me; if not,

14  "I said."

15       Does that make sense?

16  A.   Sure.

17  Q.   And that's the truth of what was happening in that car,

18  correct?

19  A.   In that car, yes.

20  Q.   Okay.  So you're lying to her to get her to trust you so

21  that she will do whatever it is you want her to do from what

22  you're telling her, correct?

23  A.   Yes.

24  Q.   And you tell her that you'll get a hundred people to come

25  testify that she never took a penny?

ANDREW ELLIOTT - CROSS BY MR. ADLER                        542

1    A.    Yeah.  It was like an exaggeration.

2    Q.    Okay.  But you're proposing to her that you'll line people

3    up around the courthouse to come perjure themselves, correct?

4    A.    No.  It was just like a -- it was like a bad joke.

5    Q.    Agreed.

6          Is there one person that can verify that any of these

7    conversations with you and Chris and Courtney took place about

8    these payments?

9    A.    No.  There's only three of us.

10   Q.    Okay.  But --

11   A.    Two of them are right there (indicating).

12   Q.    Okay.  But to your knowledge, is there anybody that's

13   going to testify that any of those conversations took place?

14   A.    No.  Because Courtney had the money, Chris gave permission

15   and I handed it over.

16   Q.    Okay.  But you were the one telling Courtney -- according

17   to you, you would tell Courtney how much money to get you,

18   right?

19   A.    Every Friday, I would text her.

20   Q.    Okay.  Do you have those text messages?

21   A.    I had my phone taken away from me, so did she.

22   Q.    Do you know if the FBI ever looked through your phone?

23   A.    I didn't have a phone.  They might have got it from Chris

24   because he took it from me.

25   Q.    Okay.  Did they ever ask you to look through your phone?

ANDREW ELLIOTT - CROSS BY MR. ADLER                      543

1   A.    No.

2   Q.    Okay.  What kind of phone did you have?

3   A.    IPhone.

4   Q.    Okay.  Backed up on the iCloud?

5   A.    I don't know.

6   Q.    Did the government ever ask you to look through your

7   iCloud account?

8   A.    No.

9   Q.    So you -- the answer is, no, you don't have any of these

10  text messages, correct?

11  A.    No.  My phone was taken from me.

12  Q.    Okay.  And was there ever any other way that you

13  communicated to Courtney how much money it is that you wanted

14  to give Donna?

15  A.    I just text her.  That was the deal between me, her and

16  Chris.  Chris said text her on Friday, she'll bring you the

17  cash, you hand it to her on Saturday morning.

18  Q.    Okay.  And you said that she would bring that by in a bank

19  envelope, right?

20  A.    Like clockwork, every Friday.

21  Q.    What bank?

22  A.    I don't remember.

23  Q.    This happened --

24  A.    2017, 2016.  This happened --

25  Q.    But it happened --

1    A.    -- six months -- six years ago.

2    Q.    -- every week for five months and you don't remember what

3    bank envelope this stuff came from?

4    A.    That's correct.

5    Q.    Okay.  Outside of Chris as an authority figure, whose name

6    you invoked over and over again in that car, what other

7    authority did you invoke in that car?

8    A.    Who else did we discuss anything with?

9    Q.    Yeah.  What other power -- what other authority figure did

10   you discuss with Donna in that car when you're trying to

11   convince her to stick to your story?

12   A.    It was just me and Chris every day.

13   Q.    Do you remember telling her how God felt about stuff like

14   this?

15   A.    Yeah.  We were lost.

16   Q.    Okay.  But you talked to her about forgiveness, right?

17   A.    Uh-huh.

18   Q.    Forgiveness for what you had done in the past, correct?

19   A.    Yeah.  We wanted massive amounts of it.

20   Q.    Okay.  Did -- in your mind, does asking for forgiveness

21   for something you did in the past make it okay to just continue

22   to lie about that for as long as you need to?

23   A.    No.  I was just trying to stick to the plan.  I was scared

24   to death.

25   Q.    Okay.  But you said "we're better people now," right?

ANDREW ELLIOTT - CROSS BY MR. ADLER                    545

1    A.    Yeah.  Like, we won't repeat history with giving cash out

2    anymore, I wish it could go away.

3    Q.    Okay.  But we're -- you're actively encouraging her to lie

4    again and again and again until the grave, and you don't

5    consider that a bad idea or a bad thing?

6    A.    That was the only choice I had on the table.

7    Q.    But at some point, somebody presented you another option,

8    right?

9    A.    I would have taken that option any day, to tell the truth.

10   Q.    When the agent came and met you on March 18th -- or pardon

11   me -- March 12th of 2018 and asked you "will you talk to me and

12   tell me the truth," did you take him up on it?

13   A.    If I would have taken him up on it, I would have had to

14   fight that guy.

15   Q.    Yes or no.  Did you take him up on that opportunity to

16   tell the truth?

17   A.    No, I didn't.

18   Q.    Do you remember telling him that you have done nothing

19   wrong?

20   A.    Yes.

21   Q.    Okay.  So you did, in fact, have an opportunity to tell

22   the truth, did you not?

23   A.    We role-played that moment for three years.

24   Q.    Did or did you not have an opportunity to tell the agents

25   the truth in March of 2018?

1   A.   Of course.

2   Q.   Okay.  Why was it that you felt it was necessary to tell

3   Ms. Mullins how smoking hot she was for her age?

4   A.   I was just always telling her that.  She was 45 years old,

5   50, whatever -- however old she is, that she's a good-looking

6   woman, you know, carry herself well.  She was divorced, you

7   know.  She's been my friend for a long time.  I always built

8   her up.

9   Q.   But I'm asking --

10   A.   And that's the truth.

11   Q.   Yeah, I'm asking you in the context of your own mind as a

12   salesman, why is it that you feel that that's a good thing to

13   throw in right after talking to her about God's forgiveness?

14   A.   Well, I just told her at that point.

15   Q.   It just occurred to you?

16   A.   No.  I've told her before.  She's a great woman.

17   Q.   Right.

18        I'm asking you why you felt it necessary to tell her that.

19   A.   I don't know why.

20   Q.   It's part of the sale, right?

21   A.   No.

22   Q.   In any of these conversations that you have with Donna

23   Mullins in the car, did you ever speak the name of Courtney

24   Wells?

25   A.   Yes.

ANDREW ELLIOTT - CROSS BY MR. ADLER                          547

1   Q.   Okay.  At what point in the conversation --

2   A.   In the cars -- my bad.  I'm sorry.  In those conversations

3   recorded, never, that I believe, unless we go back through it

4   and go through the records.

5   Q.   Okay.  My question was, you don't remember ever even so

6   much as mentioning Courtney's name in those conversations with

7   Donna, correct?

8   A.   Yeah.  If it's not on the recording, I don't see it in

9   there.

10  Q.   And the recording doesn't lie, does it?

11  A.   No.

12  Q.   People do, though, right?

13  A.   Sure.  People lie all the time.

14  Q.   I want to move to your grand jury testimony.

15       Are you a little more oriented now as to what the grand

16  jury is and when that was?

17  A.   In 2020 of June?

18  Q.   21st July 2020; fair enough?

19  A.   Okay.

20  Q.   And that's when you came into this building and you took

21  an oath to tell the truth and you testified and you had this

22  kind of a question-and-answer with only the government, right?

23  A.   Yes.

24  Q.   Okay.  And you said in that testimony that when you worked

25  at Big Red, you worked for who or you answered to who?

1  A.   I answered to Chris Mayes.

2  Q.   Okay.  And you said only to Chris, correct?

3  A.   Yeah.  I mean, there's three people that are in charge.

4  You got Chuck at certain times; you got Courtney -- you're

5  asking me a question, so...

6  Q.   I'm trying to ask you a very direct question.

7       Your testimony before the grand jury --

8            THE COURT:  Mr. Adler, it's necessary to ask the

9  question straight up; and then if you get an answer that's

10 squarely contradicted by his grand jury testimony, then you go

11 to that.

12           MR. ADLER:  Thank you.

13           MR. ADLER:  Just a moment, Your Honor.

14 Q.   (BY MR. ADLER) Tell me if you remember being asked the

15 following question and giving the following answer, okay?

16 A.   Okay.

17 Q.   Do you remember being asked:

18           "When you were at Big Red, who did you report to?

19           "ANSWER:  Only Chris."

20      Do you remember that?

21 A.   No.

22 Q.   Do you dispute that?

23 A.   No.

24      I'd like to review it, though.  If it's important, then I

25 want to make sure I give you the right answer.

ANDREW ELLIOTT - CROSS BY MR. ADLER                    549

1    Q.   If you don't dispute it, I'm good to move on.

2        Do you remember testifying that every dollar that moves in

3    and out of that place doesn't move unless Courtney is aware of

4    it and he has given her permission to be aware of it?

5              THE COURT:  Mr. Adler --

6              MR. ADLER:  Pardon me.

7              THE COURT:  -- it's necessary to ask the question

8    straight up, without even looking at the transcript.  And then

9    if he gives an inconsistent answer, then you go to the black

10   letters on white paper in the grand jury transcript.

11             MR. ADLER:  Understood.  Thank you.

12   Q.   (BY MR. ADLER) What was Ms. Wells' function at Big Red?

13   A.   She handled all of accounting.  She handled money for

14   Chris, simply put.

15   Q.   And that was a broad spectrum of things, both professional

16   and personal, correct?

17   A.   Super broad.

18   Q.   Okay.  So she was juggling a lot of balls in terms of

19   accounting purposes, right?

20   A.   Yeah.  She did everything for him.

21   Q.   Okay.  And you -- everything that he allowed her to do or

22   everything he allowed her to see, correct?

23   A.   Yes.

24   Q.   Okay.  So he would have been the gatekeeper of what she

25   either did or didn't know about?

ANDREW ELLIOTT - CROSS BY MR. ADLER                            550

1    A.    One hundred percent.

2    Q.    Do you remember being showed approximately 33 different

3    documents when you testified at grand jury?

4    A.    I was shown a lot of documents.

5    Q.    Okay.  Do you remember seeing Courtney Wells' signature or

6    initials or markings on any of those?

7    A.    I can't remember, but I can -- you can show it to me.

8    Q.    I'm asking you if you have any personal recollection of

9    seeing her signature, initials, or other markings on any of

10   them.

11   A.    I don't remember.

12   Q.    Okay.  And in -- yesterday we looked at a lot of

13   documentation, right?

14   A.    Yeah.  We looked at Chuck's signature a lot yesterday.

15   Q.    Okay.  Did you see Courtney's signature yesterday?

16   A.    No.

17   Q.    Okay.  You talked about this plug-and-play culture.  The

18   plug-and-play concept is kind of how you guys interacted with

19   Dealertrack, right?

20   A.    Yeah, the plug-and-play was on Dealertrack.

21   Q.    Okay.  And that is -- when you're interacting with

22   Dealertrack, it's basically a game to you, right?

23         You're trying to figure out what numbers do I have to feed

24   into this computer to get the greatest return for me, right?

25   A.    Or to just get an approval, right.

ANDREW ELLIOTT - CROSS BY MR. ADLER                        551

```
1   Q.   Right.
2        Get the deal done and what puts the most money in my
3   pocket, right?
4   A.   Yeah.  To sell the car, correct.
5   Q.   And to you, the realities connected with those numbers was
6   irrelevant, right?
7   A.   What does that mean?
8   Q.   You didn't care whether a trade-in was worth a dollar or
9   $10,000, as long as you could put the right numbers into the
10  game, right?
11  A.   Right.
12  Q.   Okay.  You testified about fake pay stubs and fake utility
13  bills?
14  A.   Yes.
15  Q.   Had you ever testified about that previously?
16  A.   Testified?
17  Q.   Yes.
18  A.   I don't remember.  I don't recall.
19  Q.   Okay.  Had you ever told the government about that
20  previous?
21  A.   I don't recall.  I don't know the answer to that.
22  Q.   Okay.  So you're telling this jury you have no memory of
23  ever conveying that to anybody until yesterday, right?
24  A.   Fraudulent documents was what we called it, so...
25  Q.   Okay.  I'm trying to get back on the question I asked you,
```

1  which was you spoke specifically about fake pay stubs and fake

2  utility bills was something you used to get deals done, right?

3  A.   I did not discuss -- I don't believe specific things.  We

4  talked about fraudulent -- fraudulent documents as a whole.

5  Q.   Okay.  So you're now denying that you specifically

6  referenced fake utility bills or --

7            MS. ANDERSON:  Objection.

8            THE WITNESS:  I'm not denying.

9            THE COURT:  Wait, wait.  When counsel stands up to

10 object, you need to wait until I hear the objection --

11           THE WITNESS:  Sorry, sir.

12           THE COURT:  -- and the basis for it.

13           MS. ANDERSON:  May we have a bench conference,

14 please?

15           THE COURT:  We'll have a bench conference.

16    (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND OUT

17 OF THE HEARING OF THE JURY.)

18           THE COURT:  Okay.  Can government counsel hear me?

19           MS. ANDERSON:  Yes, sir.

20           THE COURT:  And, Mr. Adler, can you hear me?

21           MR. ADLER:  I can, Your Honor.

22           THE COURT:  Ms. Anderson, I'll hear you.

23           MS. ANDERSON:  Yes, Your Honor --

24           THE COURT:  You need to speak up a little bit.

25           MS. ANDERSON:  Can you hear me now?

ANDREW ELLIOTT - CROSS BY MR. ADLER                    553

```
1              THE COURT:  I can.

2              MS. ANDERSON:  Thank you.

3         Your Honor, this is becoming a pop quiz of what the

4    witness remembers about his grand jury testimony.  There is a

5    transcript of the grand jury testimony that he's not giving --

6    answering questions and giving inconsistent testimony and being

7    pointed to something that is different.

8         I mean, I happen to remember that he talked about the fake

9    documents on page 9 of the grand jury transcript, but he

10   doesn't have that sort of recollection.

11        So I just would object that this isn't a fair way to ask

12   questions or impeach him.

13             THE COURT:  Okay.  Well, if that's an objection, it's

14   overruled, but I'm going to give both sides just a little bit

15   of guidance, and that is this:  I do expect that Mr. Adler, as

16   an officer of the court, if he asks a question implying the

17   presence or absence of testimony in the grand jury transcript

18   to this effect or that effect, it's my firm expectation that

19   he, as an officer of the court, is not going to put the

20   question in a way that is inconsistent with the grand jury

21   transcript.

22        And it's on the basis of my assumption that that

23   expectation will be fulfilled that I overrule the objection.

24        I intentionally set the guardrails pretty wide on cross-

25   examination; and I'm going to continue to do that, for that
```

1  matter, for the benefit of both sides; but I've already set one

2  ground rule twice this afternoon that is nothing more than a

3  repetition about what I said at the docket call.  And I'm sure

4  Mr. Adler will comply with that.

5      But with that explanation, the objection will be

6  overruled.

7      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITH

8  ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE PRESENCE AND

9  HEARING OF THE JURY.)

10 Q.  (BY MR. ADLER) Before you left on any of these several

11 occasions that you left Big Red, did you happen to grab copies

12 of these fake -- falsified documents?

13 A.  No.

14 Q.  Did you take any with you or still have them or use them

15 later somewhere else?

16 A.  No.

17 Q.  I mean, how did you consider the customer when you're

18 basically lying to get these deals done?

19     When you're just plugging these numbers in to make them

20 work in the loan system, what consideration are you giving the

21 customer?

22 A.  What do you mean?

23 Q.  What do you think about the customer?

24 A.  So can I answer that?

25     Okay.  First day of work, show up, lady comes in, doesn't

1   have a job.  I'm watching the other managers.  They give her a

2   job; they put in some income; they send it over, get her

3   approved.  She doesn't have a job; she buys a car.  I'm, like,

4   shit, that's pretty easy, wow.

5        That's where it all started.  And we started understanding

6   the plug-and-play method was that everything went -- it went

7   the day I walked in there December 6, 2012 -- and I don't mean,

8   like, I have seen this or that in a certain dealership; I mean,

9   it was every day, all day, sun up, sun down.

10  Q.   Okay.  And you were the leader of that team, right?

11  A.   I ended up leading the team.  The team taught me what the

12  practice was of the previous GM that was already there before I

13  got there.

14  Q.   But you testified moments ago that you did sideways deals

15  like this before, right?

16  A.   I knew what they looked like.  I've been part of a bad

17  deal before, just not every day like this.

18  Q.   And back to my original question.  What are your thoughts

19  for the customer when you're plugging in these fake numbers to

20  get them into a loan?

21  A.   So a lot of the times -- sometimes it was, like, they

22  could get a car here that they couldn't get anywhere else and

23  it turned out to be a really good thing.

24       And then, you know, sometimes maybe that person didn't

25  need a car because they weren't going to pay for it anyways and

1  we just set the bank up for an easy repo.

2  Q.   Okay.  So you would sell somebody a car whether or not you

3  personally felt they needed it or would benefit from it, right?

4  A.   If they came in and wanted it, our goal was to try to

5  figure out how to sell them one.

6  Q.   Okay.  Regardless of whether it was a good financial

7  decision for the customer or something they actually needed,

8  correct?

9  A.   Well, if they came in and said they needed it.

10 Q.   Okay.  You've testified a moment ago that there were

11 people that didn't need a car.  How did you identify those

12 people?

13 A.   I mean, those people, they didn't need a loan because they

14 didn't have a job, they weren't going to pay for it.  That's

15 what I meant.  I apologize for miswording it.

16 Q.   No problem.  And I thank you for clearing it up.

17      Putting somebody into a high-interest, predatory loan on

18 an overvalued vehicle wasn't a concern of yours, correct?

19 A.   It was a big mistake.

20 Q.   That's a, no, I didn't care about that?

21 A.   It was a concern, but our profit over concern at that time

22 as a culture was higher than the concern.

23 Q.   Okay.  So you making money is at the top of the pyramid of

24 what's important in a deal?

25 A.   At that time, it was ours, and it's awful.

ANDREW ELLIOTT - CROSS BY MR. ADLER                          557

1  Q.   A couple of times yesterday you talked about when the idea

2  first came up to pay Donna.  Do you remember answering that

3  question on more than one occasion?

4  A.   Uh-huh.

5  Q.   And the first time you were asked, you said it was Chris's

6  idea and he told you "we'll pay her money," correct?

7  A.   Yeah, Chris said, "Why don't we give her some money."

8  Q.   Okay.  And the first time you described that, you didn't

9  so much as mention Courtney Wells' name, correct?

10 A.   Right.  Courtney was a part of the conversation when we

11 decided to pay Donna.  It was me and Chris, and then Chris

12 called Courtney and told Courtney that we would be paying Donna

13 every Friday.

14 Q.   Okay.

15 A.   Or maybe not called her, maybe told her in person, but it

16 was then for -- it was then told to her.

17 Q.   Okay.  And so I thought later that you -- when you

18 testified about it, you said, "No, Courtney was in there."

19 A.   Courtney, after me and Chris had spoke about paying Donna

20 money, had to be involved for her to be able to give me money.

21 Q.   If what you're saying is true, correct?

22 A.   It is true.

23 Q.   I'm saying, if what you're saying is true, then Courtney

24 has to be involved, correct?

25 A.   Absolutely.

1   Q.   Okay.  I was just trying to clarify the two different

2   versions that you gave about who was in the room when Chris

3   allegedly gives you this idea.

4   A.   Chris told me that we need to pay Donna so we can do more

5   income in the Yamaha and Mitsubishi store.  We got Courtney

6   involved.

7   Q.   After the fact?

8   A.   It was probably right after the fact, because I needed

9   money now.  And no money comes out of Big Red or any store

10  without Chris's permission, without going through Courtney.  No

11  one else is going to give anybody cash.

12  Q.   Okay.  What are some legitimate reasons that cash would be

13  given to a sales manager?

14  A.   Maybe for reimbursement of a trip or something, but then

15  there's a check request that has to be filled out and sent in,

16  and then that has to be approved by Chris.

17  Q.   Okay.  What about, like, sales spiffs or bonuses to --

18  A.   Oh, like a sales spiff or a bonus or -- well, bonuses just

19  come because they're part of the pay plan, so that's an

20  accounting deal.

21       Now let's say there was an additional spiff put up.  A

22  manager would have to sign it.  He'd have to turn a sheet, a

23  spiff sheet --

24            THE COURT:  For the reporter, what is that word,

25  "spiff"?

1           THE WITNESS:  It's a document that just says that we

2  are --

3           THE COURT:  Just -- I'm not -- spell it, please.

4           THE WITNESS:  Oh, S-P-I-F-F.  I'm sorry.

5           THE COURT:  Next question.

6           THE WITNESS:  So we would fill out a bonus sheet, and

7  a manager would sign it and then they would turn it in to

8  accounting, but rarely did -- I mean, rarely, which means there

9  is an exception -- but was that given as cash.  Most of the

10 time that was always in a check form, because cash wasn't

11 something that was given out very often.

12 Q.   (BY MR. ADLER) Name all the people that saw Courtney

13 giving you this money.

14 A.   Me and Courtney.

15 Q.   And where did it happen?

16 A.   Most of the time it was at Norman Mitsubishi.  Either she

17 would bring it to me or sometimes I would go pick it up from

18 her, but probably 80 percent of the time, eight out of ten, she

19 would bring it to me.

20 Q.   How many people work at Norman Mitsubishi?

21 A.   A lot.

22 Q.   And never once did any of them see her give you this

23 money?

24 A.   I assure you I wouldn't put myself in a position to have

25 somebody see somebody giving me fake -- or money -- cash money

1   to give to a loan officer.

2   Q.   But it happened at the dealership where there were lots of

3   people working?

4   A.   Yeah.

5   Q.   Okay.  How was it that you were able to hide it from all

6   these people?

7   A.   Well, I'm not hiding it.  Me and her are supervisors.  We

8   can go wherever.  She walks up, I walk over, we walk to the

9   side, she hands it to me.  I mean, it's literally -- it's a

10  two-second process.

11  Q.   And you said it was 2,000 a week for five months?

12  A.   Yeah.  Started out as a thousand and then it would go,

13  like, 2,000, 2,000, 2,000, and we did that until Donna got

14  fired.

15  Q.   Okay.  And so there's got to be a bank record somewhere of

16  2,000, 2,000, 2,000, every Friday, right?

17  A.   Yeah.  So when it first happened, first thing Chris said

18  is, there is a way that they can pull the records and see that

19  we've taken the money.  And then he's, like, wait a minute, we

20  can probably hide it this way.

21       So I don't know because I don't have access to their

22  banking accounts, but I know you can scrape mine.

23  Q.   Hide it what way?

24  A.   I don't know.  I just heard him say that to Courtney, that

25  there's a way that we can -- or she told him there's a way they

ANDREW ELLIOTT - CROSS BY MR. ADLER                    561

1   can hide it, so they're figuring out how to hide it in the

2   computer system.

3   Q.   And you don't remember what bank this was?

4   A.   No, sir.

5   Q.   Okay.  And --

6   A.   But you can check my bank accounts.  They've all been

7   checked.

8   Q.   Sure.  I didn't ask a question.

9        But you said you were there for this conversation about

10  how to hide the bank transactions?

11  A.   The money that was taken out each week that was given to

12  me, when we first got in trouble, Chris said, Let me see if

13  this is something they can go back and look and see and see us

14  deposit -- withdrawing this money.

15       And, you know -- and then it was, like, there's no way we

16  can hide it, let's just say we gave it to her.

17       I mean, we role-played so many different stories.  Let's

18  say we just gave it to Donna because she's dead broke, you

19  know.  Let's say that, you know, she got in trouble so we gave

20  it to her.  Let's say that Chris is screwing her, we paid her

21  money to screw him.

22       I mean, we thought of every scenario possible and then --

23  but the hiding it part, it was simple.  It was said there's a

24  way that we could probably hide it in the system.

25       I don't see the computer.  I get on Reynolds & Reynolds

ANDREW ELLIOTT - CROSS BY MR. ADLER                              562

1    and Dealertrack.  I can't see anything in accounting.  So it's

2    like speaking Chinese to me.  I'm just speaking the

3    conversation that I was around and what was said, and then I'm

4    relaying it to you.

5    Q.   Are you saying that Chris told you he has some way of

6    altering the bank's records?

7    A.   No, sir, I did not say that.

8    Q.   Okay.  So if you withdraw $2,000 a week out of a bank,

9    would you think there would be a record of that?

10   A.   If you withdrawed it out of a bank, yes.

11   Q.   Okay.  And if they handed it to you in a bank envelope and

12   you went and gave it to Andy Elliott every week on Friday in a

13   bank envelope?

14   A.   Yeah.  I didn't go to the bank with her.  I don't know if

15   she went to the bank.  I just told you what she handed it to me

16   in.

17   Q.   You've talked a lot about these role-playing sessions that

18   you and Chris had, right?

19   A.   Yes, sir.

20   Q.   And you said they were hours long every single day, you

21   and Chris, right?

22   A.   Yes, absolutely.

23   Q.   And then they -- the government asked you a follow-up

24   question.  Do you remember that?

25   A.   Explain.

1  Q.   Do you remember them asking you who else was there?

2  A.   At what specific point?

3  Q.   Right after the last -- the fifth time that you testified

4  about these hours every day role-playing sessions, do you

5  remember them finally asking you who else was there?

6  A.   I don't remember that.

7            THE COURT:  Excuse me just a minute.

8       Does the government still plan to call a witness out of

9  order?

10           MS. ANDERSON:  We have one witness that we'd like to

11 call before -- this is out of order, yes, Your Honor.

12           THE COURT:  And how long do you anticipate that

13 witness's direct testimony would run?

14           MS. ANDERSON:  Your Honor, no more than 30 minutes.

15           THE COURT:  Well, if you want to do that today, I'm

16 going to ask Mr. Adler to let me know when you get to a

17 convenient stopping point and there will be an interruption so

18 that, as we have previously discussed, the government can call

19 a witness out of order.

20      So just let me know when you get to a convenient stopping

21 point, Mr. Adler, and we can do that.

22           MR. ADLER:  I think I can hopefully be done very

23 soon.

24           THE COURT:  Very well.

25           MR. ADLER:  Thank you.

ANDREW ELLIOTT - CROSS BY MR. ADLER                    564

1    Q.    (BY MR. ADLER) So the -- do you remember finally saying,

2    Oh, yeah, Chuck and Courtney were part of those conversations?

3    A.    Okay.  Reask the whole question.

4    Q.    Do you remember finally, after being asked several times

5    or explaining it several times, only then incorporating Chuck

6    and Courtney into those role-playing sessions?

7    A.    So me and --

8    Q.    Yes or no.  Do you remember that being your testimony?

9    A.    Yes, they were in there in some of those conversations.

10   Q.    Right.

11         And my question is, the first several times you testified

12   about role playing, you didn't mention them, correct?

13   A.    Okay.  In context of the question, me and Chris are the

14   ones who talked every single day about what was going to happen

15   with Donna Mullins, and if something came in or if we got

16   arrested tomorrow or if the FBI came in, what we were going to

17   do, to the T.  And we would role-play different things.

18         Now, these conversations did exist in front of Chuck and

19   Courtney with me and Chris on strategizing what we are going to

20   do, what problems we have.

21         And Chris would handle his business with Courtney, and

22   then me and Chris would go handle our business over here, and

23   he would handle his business with him and Chuck.

24   Q.    Okay.  You understand that the government wants your help

25   in trying to convict all three of these defendants, correct?

1   A.   They want my help to tell the truth, and that's all I want

2   to do.  I don't want anybody to get in trouble; I'm just going

3   to tell the truth.

4   Q.   Okay.  You understand the government's goal is to try to

5   get this jury to convict all three of these defendants,

6   correct?

7   A.   I believe the government just wants the truth from me.

8   Q.   Okay.  And the reason that -- when asked "was there

9   anybody else there," the reason that you then added Chuck and

10  Courtney is because you remembered, oh, yeah, I left them out

11  the first four times I testified that --

12  A.   Sir, I believe that they just want to do the right thing,

13  and I'm just telling the truth.

14  Q.   True or false:  That's why you added them the fifth time

15  --

16  A.   That is false why I added them.

17          MR. ADLER:  Just a moment, Your Honor.

18          THE COURT:  Surely.

19          MR. ADLER:  Thank you very much, Mr. Elliott.  No

20  further questions.

21          THE WITNESS:  Thank you.

22          THE COURT:  Now, we can either have redirect or take

23  the witness that the government wants to take out of time.  It

24  would seem -- or out of order.  It would seem to me logical to

25  take the witness.

1          Is that witness ready to go?

2          Very well.  We'll have the government's witness out of

3    order.

4              MS. ANDERSON:  All right.  And so --

5              THE COURT:  And, Mr. Elliott, you'll please step down

6    and remain available out in the hall.

7          Members of the jury, the next witness, I'm told, is an

8    individual who -- and you heard this expression before -- "has

9    travel plans bought and paid for."  And so in order to

10   accommodate that, although this is apparently a witness that

11   you would otherwise be hearing at a little bit later stage, the

12   government has requested and the defendants have graciously

13   agreed to let her come testify at this point.  So she's being

14   called, if you will, out of order.  And this will be,

15   effectively, an interruption in the testimony of Mr. Elliott.

16         So we'll proceed with that witness.

17             MS. ANDERSON:  United States calls Tamia Gray.

18                         TAMIA GRAY,

19       (WITNESS SWORN.)

20             THE COURT:  You may proceed.

21                       DIRECT EXAMINATION

22   BY MS. ANDERSON:

23   Q.   Could you please state your name and spell it.

24   A.   Yes.  Tamia Gray, T-A-M-I-A, G-R-A-Y.

25   Q.   And where do you live, Ms. Gray?

TAMIA GRAY - DIRECT BY MS. ANDERSON                    567

```
 1   A.    In Moore, Oklahoma, Cleveland County.

 2   Q.    And where do you work?

 3   A.    At Department of Corrections.

 4   Q.    Are you married?

 5   A.    No, ma'am.

 6   Q.    Do you have any kids?

 7   A.    Yes.  Two.

 8   Q.    And at some point, have you purchased a car from Big Red

 9   Sports & Imports?

10   A.    I did back in 2016 of January.

11   Q.    Okay.  And who were you buying the car for?

12   A.    My daughter.  She was just now turning 16.

13   Q.    Why did you go to Big Red?

14   A.    I heard that they do good deals as far as bad credit and

15   everything.  My credit wasn't the best.

16   Q.    And how did you hear that?

17   A.    Through my friend.

18   Q.    Through a friend.

19         And did you hear it from anywhere else or just from a

20   friend?

21   A.    As far as advertising it, that they do over the radio,

22   which they still do, so...

23   Q.    And what happened when you -- when you got there?

24   A.    Basically, I filled out my application, and they ran my

25   credit, and they told me that I was basically approved.  And
```

1   then we went, I guess, across the highway to another car lot

2   that had a vehicle.  It was a 2015 Kia Soul, red Kia Soul, that

3   they said they could get me in.

4   Q.   And what were you looking for?

5   A.   Basically, a Kia Soul.  That's what my daughter was

6   interested in.

7   Q.   Okay.  And did they talk to you about what sort of terms

8   for the deal?

9   A.   No.  I didn't go over anything like that.

10  Q.   Did they talk about down payments?

11  A.   Yes.  Down payment -- my down payment would have been

12  1,500.  I was going to do a trade-in for a '98 Honda Accord and

13  I put down -- I wrote a check for $500, and then the Honda

14  Accord would have been my thousand dollars.

15  Q.   Okay.  And what did you tell them about your Honda Accord?

16  A.   That it was a not-working vehicle.  Basically, it was just

17  old, it didn't run; but at that time, they said it didn't

18  matter, I could bring it, they would still take it for a trade-

19  in.

20  Q.   How did you get to the dealership?

21  A.   I was with my daughter's father.

22       You mean who brought me there?

23  Q.   Yeah.

24  A.   My daughter's father.

25  Q.   Okay.  So you didn't drive the Honda Accord there?

1  A.   No, ma'am.

2  Q.   And how were they going to get the Honda Accord?

3  A.   From my understanding, they would have to go pick it up.

4  I mean, it was not drivable.

5  Q.   Okay.  How long were you at the dealership?

6  A.   As I remember, probably, like, maybe four to five hours.

7  Q.   And then what happened next?

8  A.   Next I signed the application.  They -- I was able to get

9  approved for the vehicle.  I wrote a $500 check and I left with

10 the vehicle.

11 Q.   Okay.  And did you give them that Honda Accord?

12 A.   No, ma'am.  I had got a phone call maybe two days later

13 telling me that I need to come back in to sign another

14 application.  And I went back in, signed another application.

15      Then I was told that they were -- I would get -- I didn't

16 have to pay the thousand dollars, that they would pay me back

17 in return with -- it was -- sell it back to them for a dollar,

18 so I never had to turn the Honda Accord over.

19 Q.   Okay.  So you went back a few days later?

20 A.   Yes, and signed another -- I'm sorry.  Not the

21 application, but the actual loan agreement.

22 Q.   Okay.  I'm going to direct you to what I think has been

23 previously admitted as Government's Exhibit 41.

24      You can put it on the screen or there's also binders back

25 there if you want to look at a hard copy.

TAMIA GRAY - DIRECT BY MS. ANDERSON                    570

1          Is this your contract?

2   A.    Yes.

3   Q.    And is that your signature on it?

4   A.    I want to say the one on the right is.

5   Q.    Okay.  And do you see on the -- is that the car that you

6   purchased on that day, on the left side, the vehicle buyer's

7   order?

8   A.    Yes.

9   Q.    Okay.  And then on the right side, in the top-right

10  half -- we could zoom in a little bit -- does it show on line

11  10 -- what does it have for your trade-in allowance?

12  A.    $1,000.

13  Q.    Okay.  And what did that represent?

14  A.    That would have been for my trade-in, for my Honda Accord.

15  Q.    Okay.  And does it also, on line 16, show an extended

16  service plan?

17  A.    Uh-huh.

18  Q.    Do you remember buying an extended service plan?

19  A.    I do remember purchasing the extended warranty.

20  Q.    Okay.

21          MS. ANDERSON:  And then if we could zoom out, and

22  then zoom in, please, a little bit below that with the deposit

23  receipt and the trade-in record.

24  Q.    (BY MS. ANDERSON) Is that the Honda Accord that you had?

25  A.    The '98 Honda Accord, yes.

TAMIA GRAY - DIRECT BY MS. ANDERSON                    571

1   Q.   Okay.  And did you -- did you ever give that Honda Accord

2   to the dealership?

3   A.   No, ma'am, I didn't.

4   Q.   What happened to it?

5   A.   I kept the Honda Accord.  They told me that that I would

6   -- they would sell it back to me for a dollar.

7   Q.   Did you actually give them a dollar?

8   A.   No.

9   Q.   Let's go to Government Exhibit 42, which was previously

10  admitted, I believe.

11       Is this the -- another contract that you signed that day?

12       And if you -- we can go to the next page to see

13  signatures.

14       Is that your signature in the middle of that page?

15  A.   Yes.  As far as I can tell, yes.

16  Q.   Okay.  And on the front page, if we could again, is that

17  the interest rate and number of payments that you agreed to?

18  A.   Yes.  Because I do remember the amount of the payment, so,

19  yes.

20  Q.   Okay.  And let's go to Exhibit 43, please, which was

21  previously admitted.

22       What's this?

23  A.   That's the check that I wrote.  That's my check.

24  Q.   Okay.  And you actually provided that $500 check to the

25  dealership; is that right?

TAMIA GRAY - DIRECT BY MS. ANDERSON                                  572

1   A.   Yes.

2   Q.   And let's go to Exhibit 47, please, which was previously

3   admitted.

4        Did you get this at the dealership that day?

5   A.   Not the first day, but I do recall the second time I went,

6   because that's when I was told that I'd only have to pay a

7   dollar to keep my Honda Accord.

8   Q.   Okay.  And do you know if you saw this document when you

9   were there or was that the conversation that they told you?

10  A.   That was the conversation.

11  Q.   Okay.  Did they ever ask you for a VIN number for your

12  Honda Accord?

13  A.   No.

14  Q.   Let's look at Government Exhibit 44, which was previously

15  admitted.

16       Is that your signature on this document?

17  A.   No, it doesn't look like it.

18  Q.   The one at the bottom doesn't look like it?

19  A.   Huh-uh.

20  Q.   Okay.  All right.  Let's go to Government Exhibit 45,

21  which was previously admitted.

22       Is that your signature on this new vehicle extended

23  service agreement?

24  A.   Yes.

25  Q.   And can you tell what kind of coverage this has in the

1   Section 3?

2   A.    The comprehensive.

3   Q.    Okay.

4         MS. ANDERSON:  And so if we go to the second page,

5   please.  And the top half, if we could, please.

6   Q.    (BY MS. ANDERSON) Was -- can you tell what's covered by

7   comprehensive coverage?

8   A.    Just the powertrain coverage above and high-tech coverage

9   above and then the following.

10  Q.    Okay.  So the powertrain coverage, that would include

11  engine problems or transmission problems?

12  A.    Correct.

13  Q.    What happened to the Kia Soul?

14  A.    The motor blew out on it.

15  Q.    About how long after you bought it?

16  A.    Maybe three years.

17  Q.    Okay.

18  A.    It was about three years, the motor blew out.

19  Q.    And what did you do?

20  A.    I voluntary (sic) gave it back, so it's now on my credit

21  as a repo.  I'm not able to do anything with my credit.

22  Q.    Okay.  What do you mean by that?

23  A.    As far as it's hard for me to do anything.  I can't buy a

24  home or anything right now.

25  Q.    Okay.  I'm going to direct you to what's been marked as

1    Government Exhibit 49.  And that you'll have to look in a book

2    for it.  I'm not sure which one.  It's 49.  One of those has

3    high numbers and one of them has lower numbers.

4    A.    Can you repeat the number again, please?

5    Q.    Forty-nine.

6    A.    I don't see it.

7    Q.    I think it may be in the other binder.  There's another

8    one over there on the other side.  Sorry if those are too high

9    of numbers.

10   A.    Okay.

11   Q.    Did you find it?

12   A.    Yes.

13   Q.    All right.  Do you recognize this document?

14   A.    No.

15   Q.    You don't?

16   A.    No.

17   Q.    Okay.  All right.  I think you mentioned that the Kia Soul

18   was -- you can set it aside, if you want.

19         You mentioned that the Kia Soul was repossessed?

20   A.    Correct.

21   Q.    Did you ever finish paying off Global Lending Services,

22   your lender, on that?

23   A.    No.

24   Q.    And have you been able to get credit cards since then?

25   A.    No.

1    Q.    Have you bought any other cars?

2    A.    No.

3    Q.    Why not?

4    A.    Not able to.

5            MS. ANDERSON:  I'll pass the witness, Your Honor.

6            THE COURT:  Cross-examination.

7                          CROSS-EXAMINATION

8    BY MR. BOCK:

9    Q.    Good afternoon, Ms. Gray.  How are you?

10   A.    Fine.  How are you?

11   Q.    Good.

12         I'm Billy Bock.  We just met outside, right?

13   A.    Correct.

14   Q.    And I'll just ask you a couple questions, and that's all

15   I'm going to do today, okay?

16   A.    Uh-huh.

17   Q.    If I don't -- if you need me to ask anything different,

18   just let me know, but I'm not going to ask you a whole lot of

19   questions.

20         Was Big Red the first dealership you went to that day to

21   buy your daughter a car?

22   A.    Yes.

23   Q.    Okay.  And do you remember the name of your salesman?

24   A.    No.

25   Q.    Was it a male or a female?

```
 1    A.    Male.

 2    Q.    Okay.  And when you left, your daughter was with you,

 3    right?

 4    A.    No, sir.

 5    Q.    Okay.  Did she know she got a new car?

 6    A.    Yes.

 7    Q.    And you were content when you left that day with the car,

 8    right?

 9    A.    Yes.

10    Q.    And you were happy you got your daughter a car?

11    A.    Correct.

12    Q.    Do you know who owns Big Red Sports & Imports?

13    A.    No.

14    Q.    Do you know who -- any of the employee names that work in

15    the accounting office?

16    A.    No.

17    Q.    Do you know anything about a place -- well, do you know a

18    term called a "dollar buyback"?

19    A.    As far as what went on that day -- I mean, well, the day I

20    came back to redo the paperwork is the first time I heard of

21    that.

22    Q.    Do you know the name Chris Mayes?

23    A.    No.

24    Q.    Do you know the name Courtney Wells?

25    A.    No.
```

TAMIA GRAY - CROSS BY MR. GIFFORD                        577

```
1   Q.   Do you know the name Chuck Gooch?

2   A.   No.

3   Q.   Do you know if they had anything to do with your

4   transaction whatsoever?

5   A.   No.

6           MR. BOCK:  Can I have a second, Your Honor?

7           THE COURT:  Surely.

8           MR. BOCK:  Thank you very much.  I appreciate you

9   coming into court today.

10          THE WITNESS:  You're welcome.

11          THE COURT:  Cross by Mr. Gooch?

12          MR. SHANNONHOUSE:  No questions, Your Honor.

13          THE COURT:  And cross on behalf of Ms. Wells?

14          MR. GIFFORD:  Just a few questions.

15                       CROSS-EXAMINATION

16  BY MR. GIFFORD:

17  Q.   Ms. Gray, you mentioned you didn't remember the salesman.

18  Do you remember what he looked like, by any chance?

19  A.   No, sir.

20  Q.   Didn't happen to see him today, by any chance?

21  A.   No.

22  Q.   Do you recall speaking with someone from the FBI?

23  A.   When?  Since -- when I was purchasing the vehicle?  Or are

24  you talking about prior -- I mean, prior to today?

25  Q.   Prior to today.
```

TAMIA GRAY - CROSS BY MR. GIFFORD                                    578

1    A.    Yes, I did.

2    Q.    And do you recall meeting or -- meeting with any female

3    employees during your process?

4    A.    No.

5    Q.    Okay.  And the paperwork that you were shown, did you

6    provide that paperwork to the government?

7    A.    No.

8    Q.    Okay.  Do you still have a copy of all that paperwork?

9    A.    No.  Probably not, no.

10   Q.    Do you remember filling out a power of attorney for Big

11   Red?

12   A.    No.

13              MR. GIFFORD:  No further questions.

14              THE COURT:  Any redirect?

15              MS. ANDERSON:  No, Your Honor.

16              THE COURT:  Very well.

17        You may step down.

18              MR. BEHENNA:  Your Honor, I do have one request --

19              THE COURT:  Oh, I'm sorry.

20              MR. BEHENNA:  No, not with this witness, Your Honor.

21   And I'm sorry to waste the Court's time, but could we have a

22   two-minute comfort break before we --

23              THE COURT:  Surely.  I'll let Lori regulate the total

24   length of this break, but we'll take a short break at this

25   time, and we'll resume just as soon as Lori can get everybody

1    back here.

2         Court will be in recess.

3         (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING PROCEEDINGS

4    WERE HAD IN OPEN COURT AND WITHIN THE PRESENCE AND HEARING OF

5    THE JURY.)

6              THE COURT:  And we are to the point of redirect with

7    Mr. Elliott.

8         You may proceed.

9                        ANDREW ELLIOTT,

10        (RESUMED.)

11                   REDIRECT EXAMINATION

12   BY MS. ANDERSON:

13   Q.   Mr. Elliott, on cross-examination, you seemed to be having

14   trouble with "I" versus "we."  Why was that?

15   A.   Because there was never -- there was never an "I."  It was

16   always "we."  Me and Chris, every single thing that happened

17   from 2016 and up, we were together by the hip every day, all

18   day.

19        So when I say "I," I was told everything that I was --

20   done under my job by Chris.

21             MS. ANDERSON:  And I'd like to pull up Government

22   Exhibit 193, please.  I believe it was previously admitted.

23   Q.   (BY MS. ANDERSON) So if this is a list of the Norman

24   Yamaha deals through Tinker -- when did you come back to Norman

25   Mitsubishi and Norman Yamaha?

ANDREW ELLIOTT - REDIRECT EXAMINATION                              580

1    A.    January 2015.

2    Q.    Okay.  And then you left at some point?

3    A.    Wait, wait.  January 2016.  I'm sorry, 2016.  I'm sorry.

4    Q.    So for these deals, the ones where you were at Norman

5    Yamaha don't start until line 17; is that right?

6    A.    Yeah, line 17, 2016.

7    Q.    The ones before that are all before you got there?

8    A.    Yes, ma'am.

9    Q.    All right.  And you weren't the one who found the loophole

10   in the Tinker lending guidelines, were you?

11   A.    No.

12   Q.    All right.  Now, what's the difference between a bird dog

13   and what you were doing with Donna Mullins?

14   A.    So a bird dog, what we have called it in the car business

15   since I was 18, is anytime somebody comes in and would refer

16   you to a customer, you would give them $200.

17         Well, sometimes we would have independent loan companies

18   like -- man, just places that we didn't do business with at our

19   dealership, that we would go out and offer if they could get a

20   loan done that we couldn't get done in our dealership, we would

21   pay them $200 because we could create a car deal because of it.

22   So that's what a bird dog is.

23   Q.    Was it under the table?

24   A.    No.  It was always paid by the dealership through a check.

25   Q.    Okay.  And --

ANDREW ELLIOTT - REDIRECT EXAMINATION                    581

1   A.   Through accounting.

2   Q.   And you had a meeting with FBI agents and with the

3   government to prepare for trial on Tuesday night, right?

4   A.   Yes, ma'am.

5   Q.   Okay.  And at that meeting, you said that you had never

6   given a loan officer money under the table before, other than

7   Donna Mullins; is that right?

8   A.   That's correct.

9   Q.   And you did tell the government at that time that you had

10  given bird dogs before?

11  A.   Yes.

12  Q.   But you said that was something that dealerships did that

13  was not under the table; is that right?

14  A.   Yes.  And it is wrong.  And the dealership cuts the check,

15  so it's just not cash under the table.

16  Q.   On cross, you were asked about the idea for the pawn shop.

17  And when you came back as a full-time employee in May of 2015,

18  you said that the pawn shop was already working; is that right?

19  A.   I believe so.

20  Q.   Okay.  And you said that the idea was that customers would

21  sign the checks, correct?

22  A.   Yeah.  In the beginning, the idea was that the customers

23  would -- the way I had it explained to me was the customers

24  would get a check for their pawn items and then, you know, they

25  would just sign it back over to us.

ANDREW ELLIOTT - REDIRECT EXAMINATION                                582

1  Q.   Did you ever see a customer given a check from the pawn
2  shop?
3  A.   No.
4  Q.   And did you ever see items for the pawn shop being sold?
5  A.   Never.
6  Q.   And did you ever see the --
7       MS. ANDERSON:   That Exhibit 32, if we could pull it
8  up.
9  Q.   (BY MS. ANDERSON) Did you ever see this building open with
10 cars or customers, like that?
11 A.   Only when it was a bar.
12 Q.   Okay.  And when you were a general manager at Big Red
13 Sports & Imports or Big Red Kia, were there other managers?
14 A.   Yes, lots of them.
15 Q.   And were there other general managers?
16 A.   No, just me.
17 Q.   What about at the other dealerships?
18 A.   Yeah.  At Mitsubishi, there was a general manager, and
19 then when we had Mayes Kia, there was -- Cory Harris was a
20 general manager for a while.
21 Q.   Okay.  And then when you were the general manager at
22 Norman Mitsubishi, were there other managers?
23 A.   Yes, lots of them.
24 Q.   And were there other general managers?
25 A.   Yes.  Over at Big Red, there were general managers, et

1  cetera.

2  Q.   And on cross, you were asked if it was true that you only

3  told the government about Mr. Mayes after getting your

4  nonprosecution agreement in July 2020; is that right?

5  A.   That was the question, yes.

6  Q.   Yeah.  And you said that's correct, that was the first

7  time you had talked about Mr. Mayes, is that right, with the

8  government?

9  A.   With the government, yes, except for the letter that we

10  had wrote to you guys.

11  Q.   Okay.  And those two recordings with Donna Mullins, when

12  were those done?

13  A.   Those were done a couple years previous.

14  Q.   Were they in the summer of 2017?

15  A.   Yes, ma'am.

16  Q.   So how much time -- and those recordings, you mentioned

17  Mr. Mayes; is that right?

18  A.   Yes, many, many times.

19  Q.   And that was three years before you were given a

20  nonprosecution agreement?

21  A.   Yes.

22  Q.   And then in March 2018, they talked about the FBI agent

23  coming to your house?

24  A.   Yes.

25  Q.   You didn't talk to the FBI agent at all at that point,

1   right?

2   A.    No.

3   Q.    So the only time you talked to the FBI or the government

4   was after you had the nonprosecution agreement?

5   A.    Yes, ma'am.

6   Q.    Let's see, this severance agreement, Defendant's Exhibit

7   107 --

8   A.    Yes, ma'am.

9   Q.    -- sounded like you wanted to say something about the last

10  page of it.

11  A.    Well, on the last page, it clearly states that I was told

12  that I owe $495,000 or I can forfeit my $50,000 of Norman

13  Mitsubishi equity.  It was a choice.

14        And when I signed my letter stating that I was going to

15  give my 50,000 back to Chris, Chris then signed the last sheet,

16  saying he removed me from the $495,000 that he was going to

17  come after me for.  And that's why that was the back sheet.

18  Q.    We watched Defendant's Exhibit Number 103, the "be

19  flexible" video.  Do you remember that one?

20  A.    Yeah.

21  Q.    To make sure we understand, in that, you were suggesting a

22  fact pattern where a customer brings a trade-in and you have an

23  appraiser at the dealership who gives it value for that trade-

24  in vehicle; is that right?

25  A.    Yes.

ANDREW ELLIOTT - REDIRECT EXAMINATION                    585

1  Q.   And in that scenario, you suggested that the appraiser

2  would come back with an $8,000 appraisal value and you would

3  tell the customer that the appraiser came back with a $6,500

4  appraisal value and you were going to bump it to 8,000 with the

5  "be flexible" coupon; is that right?

6  A.   Yeah.  Just to make them feel like because we didn't have

7  the right car, we were going to do something special.  And

8  since we hadn't talked about their trade-in yet, it would give

9  us grounds to speak about it in person.

10 Q.   And, really, you were just giving them an accurate

11 appraisal that was consistent with what your appraisal guy had

12 said; is that right?

13 A.   That's right.

14 Q.   And so you weren't suggesting that there be a lie to the

15 lender about the appraisal value?

16 A.   No.

17 Q.   Okay.  Your plan or your hypothetical was to give the

18 lender the exact appraisal amount that the appraiser --

19 A.   Yeah.

20      And on the "be flexible," I don't even talk about a

21 lender.  I just talk about, like, a customer on the phone.  You

22 know what I mean?

23      So there's nothing to do with -- I don't ever talk on any

24 of my sales training about lending; you know, banks.  I don't

25 get into giving advice on how to do loans.

ANDREW ELLIOTT - REDIRECT EXAMINATION                    586

1  Q.   Okay.  And then there was a Defendant's Exhibit 105, which
2  was -- it's an online ad -- it's a Craigslist video?
3  A.   Yes.
4  Q.   You told them to put the dealership name in lower case,
5  but why did you have them put the dealership name on there?
6  A.   Because the Motor Vehicle Commission would make it
7  compliant for it to be on there.
8  Q.   So it was required by the Oklahoma law?
9  A.   Yes.  So I just wanted everybody watching the video to
10 follow the law.
11 Q.   Okay.  When did you create The Elliott Group?
12 A.   In 2011.
13 Q.   And so when did you start doing trainings?
14 A.   In 2011.
15 Q.   And did you do those -- is it training like what we saw on
16 those videos?
17 A.   Yeah.
18 Q.   And when did you first start doing trainings for Big Red?
19 A.   Maybe the summer of 2012.  Because I was training Big Red,
20 and Chris had made me offers a couple times.  And then I
21 actually took one of the offers and started a job as an
22 employee December 6, 2012.  So I had been training their store
23 for a couple months.  They were one of the accounts.
24 Q.   And he -- he hired you to do that kind of training; is
25 that right?

1    A.    Yes.

2    Q.    And whenever you left the Big Red dealerships in June 2014

3    or in November 2015, Mr. Mayes brought you back and rehired

4    you?

5    A.    Both times, yes.

6    Q.    And did you come back and end up as general manager each

7    time?

8    A.    One time I came back, it was as a manager in 2015.  I was

9    doing the training and then I went over to Big Red as a

10   manager.  And then I became a general manager for the Norman

11   Mitsubishi store when I came back in 2016.

12   Q.    So in 2015, you were a manager.  Who was the general

13   manager?

14   A.    I think it was Chuck Gooch or Richard Howard.  I don't

15   remember.

16   Q.    Okay.

17   A.    Or Scott Banfield.

18   Q.    And both of the times that he brought you back, did you

19   reach out to him or did he reach out to you?

20   A.    He reached out to me.

21   Q.    Did you have to beg him to take you back?

22   A.    No.

23   Q.    Yesterday, you said he wanted you back because you made

24   him money; is that right?

25   A.    Yes.

ANDREW ELLIOTT - RECROSS BY MR. BEHENNA                    588

1   Q.   Why were you good at making money?

2   A.   I just worked really hard.  You know, I was really

3   dedicated and I was really loyal to him.  A lot of people in

4   the car business have got a lot of problems.  I was a

5   workaholic.

6   Q.   Were you persistent?

7   A.   Very.

8   Q.   And willing to push the envelope?

9   A.   Yes.

10  Q.   Is that what you teach in your trainings?

11  A.   Yes, I teach to be persistent, but not to break the law or

12  push the envelope in the way we did.

13  Q.   All right.  And Mr. Mayes hired you to do those trainings?

14  A.   Yes.

15           MS. ANDERSON:  Nothing further, Your Honor.

16           THE COURT:  Any recross, limited to redirect?

17           MR. BEHENNA:  Yeah.

18                        RECROSS-EXAMINATION

19  BY MR. BEHENNA:

20  Q.   Just on redirect, you were asked whether there were other

21  GMs at different times at other stores; is that correct?

22  A.   Yes, sir.

23  Q.   But every problem we're talking about here takes place

24  when you're the GM at the store, right?

25  A.   I don't understand.

1   Q.   Well, Peak happens you're the GM at Big Red at the time,

2   right?

3   A.   I was the GM, yes.

4   Q.   Right.

5        The bribery with Donna Mullins takes place, you're the GM

6   at Norman Yahama, right?

7   A.   I was the GM at the Mitsubishi store.

8             MR. BEHENNA:  And could I have Exhibit 193.

9   A.   Now, the pawn shop -- what about the Big Red, the whole

10  time -- I mean, there's lots of GMs.

11  Q.   Right.  We'll get to that.

12       I want to show you 193.

13  A.   Okay.

14  Q.   So this is the government exhibit that they just showed

15  you and they told you that there were 17 deals between '14 and

16  '15 -- or -- yeah -- sorry, '14 and '15.

17       And I made a mark on here.  Hopefully the jury will

18  forgive me.

19       '14 to '15, there are 16 deals.

20       So starting at 17 --

21             MR. BEHENNA:  Could you scroll to the next page,

22  please.  And then the next page, please.

23  Q.   (BY MR. BEHENNA) Seventeen through 84 are all after you

24  become GM of Norman Yamaha?

25  A.   Yes.

1  Q.   Right.

2       You're the one that expanded this loophole, right?

3  A.   Yes.

4  Q.   Right.

5  A.   With Chris.

6  Q.   Right.  It's always with Chris.  And maybe that's one

7  other point I want to make.

8       You don't have a single text message that confirms

9  anything you're saying about Chris?

10 A.   I don't need a text message to confirm everything.

11 Q.   You don't have a single document, other than your word,

12 for the jury to believe that anything you're saying is true?

13 A.   I would not be in here under oath telling a lie.  And if I

14 didn't have anything to lie about, I wouldn't have had a -- I

15 wouldn't have had an agreement with the U.S. Attorney.  I would

16 have just told the truth over here at this table.

17 Q.   Right.

18      Well, Andy, in truth, you could have told the truth at any

19 time.  You could have come and been a defendant, pled guilty to

20 bribery, you would have admitted your mistake.  You never did

21 any of that, right?

22 A.   Right.  I didn't do that stuff.

23 Q.   In fact --

24 A.   We were all going to lie about it.

25 Q.   -- all you ever did was tell people to not tell the truth.

1   Donna specifically.

2   A.   Yeah.  Yeah.  So I --

3   Q.   Let me stop you.

4        Did you tell Donna not to tell the truth?

5   A.   Of course.  We made a plan to tell her she could not tell

6   the truth.

7   Q.   The only time you're here telling your story is after you

8   received immunity for every crime you've ever committed?

9   A.   If I wouldn't have had --

10  Q.   The only time you're here is after you received immunity,

11  yes or no?

12  A.   That's right.

13  Q.   Okay.

14        MR. BEHENNA:  And with that, Your Honor, I have no

15  further questions.

16        THE COURT:  Any cross-examination on behalf of

17  Mr. Gooch -- or recross?

18        MR. SHANNONHOUSE:  No, Your Honor.

19        THE COURT:  Any recross on behalf of Ms. Wells?

20        MR. ADLER:  Yes, please, Your Honor.

21                    RECROSS-EXAMINATION

22  BY MR. ADLER:

23  Q.   Does saying it was "we" that did these things instead of

24  "you" that did these things make you feel better about it?

25  A.   Explain.

ANDREW ELLIOTT - RECROSS BY MR. ADLER                                          592

1   Q.   Does it make it easier for you to compute in your own mind
2   that you're not such a bad guy because everything you did, you
3   did because Chris told you?
4   A.   I believe these things that I did were awful, but I'm
5   going to tell you that I did them with everybody sitting right
6   there at that table.
7   Q.   Okay.  I'm asking you does it make you feel better in your
8   own mind to blame what you did on somebody else?
9   A.   See, those words, that's not the truth, and I'm going to
10  stick to the truth.
11  Q.   Okay.  So these deals that you made, these loopholes that
12  you exploited, these overpriced vehicles that you get these
13  people to buy, those were things you personally participated
14  in, right?
15  A.   Communicated from above what we were allowed to do
16  internally in that store, we talked about it, and then we
17  attacked it as a plan through the company to make more money,
18  which is how we did more deals when I was there.
19  Q.   Did you hear my question?
20  A.   You said "me."
21  Q.   I said all of those were things that you personally
22  participated in.  Yes or no?
23  A.   I personally did, absolutely.
24  Q.   And that was a decision you made, to be involved in those
25  sorts of things, right?

1  A.   I did make the decision to be involved in that stuff.

2  Q.   In the "be flexible" video, you again invoke a higher

3  power, right?

4       You're tricking the customer.  It's not true, but in the

5  "be flexible" video, you tell them, Hey, my GM is really cool

6  and I can get you this hook-up, right?

7  A.   We say we can get them good money for their trade-in that

8  we haven't seen yet.

9  Q.   And you specifically mention that you've got an authority

10 figure, a power player, that you can get them a favor from,

11 right?

12 A.   Yeah.  We're always trying to put together deals in a

13 dealership.

14 Q.   Is it true or not true -- or it's a lie that you're

15 telling a potential customer, right?

16 A.   It's not a lie.

17 Q.   So there is a GM that gave you a, you know, flexible

18 coupon?

19 A.   GMs will give money for -- used car managers, new car

20 managers, will give money for anything that you bring in.

21 Q.   Okay.  So you're telling this jury that you're portraying

22 an actual, real, truthful thing to those potential customers?

23 A.   There's not an actual coupon.  It's literally getting a

24 customer in.  And then when their vehicle comes in, we are

25 going to work on giving them more money for their trade-in that

1   will make them okay with the car they came in to buy that

2   wasn't really what they wanted.

3   Q.   And it's based on a misrepresentation to them that you're

4   acquiring them something of value from somebody in authority,

5   right?

6   A.   We are giving them something of value when they come in,

7   which would be more money for their trade-in when it gets

8   there.

9   Q.   Try to listen to my question carefully and tell me yes or

10  no if I've got this right.

11       In the "be flexible" video, this $1,500 coupon that you're

12  referencing doesn't really exist, correct?

13  A.   A coupon does not exist.

14  Q.   And in the video, you're lying to a potential customer,

15  telling them that you're acquiring them a coupon that doesn't

16  exist from an authority figure that is not actually involved in

17  that process, correct?

18  A.   There is not a coupon; that is a lie.  But the authority

19  figure does exist to get those people in the door.

20  Q.   Right.  But you've never had the conversation that you're

21  representing to the customer about having that conversation

22  with that authority figure, right?

23  A.   That conversation is had all day long.

24  Q.   About getting this person a $1,500 coupon?

25  A.   About doing whatever it takes to get a customer in the

ANDREW ELLIOTT - RECROSS BY MR. ADLER                                595

1  door.

2  Q.   Okay.  Again, you're telling them, Hey, I've got this

3  powerful person that I can get you something valuable for --

4  from, for your benefit, right?

5  A.   Yes.  Sit a day in a car dealership.

6  Q.   That sounds a lot like what you told Donna you could get

7  for her, right?

8  A.   No, that's not right.

9  Q.   You told Donna a powerful person, Chris, is going to get

10  you protection, right?

11  A.   Chris told me that if she did not --

12  Q.   I'm asking you if you told that to Donna.

13  A.   I'm telling you that I did tell that to Donna, but --

14  Q.   Thank you.

15  A.   -- why I told her.

16  Q.   Thank you.

17       You said you made a lot of money because you're a hard

18  worker?

19  A.   Yeah.

20  Q.   Okay.  Would you have been as profitable as you were if

21  you didn't break the law?

22  A.   Absolutely not.

23  Q.   Would you have been as profitable as you were if you

24  didn't put people into bad deals?

25  A.   No.

ANDREW ELLIOTT - RECROSS BY MR. ADLER                    596

```
1   Q.   But you were willing to push the envelope and break the
2   law to get the deal done, right?
3   A.   When I walked into Big Red and that's what I saw --
4   Q.   I'm asking you what you did.  I'm asking you, was that
5   something you were willing to do?
6   A.   I was willing to do that in the company, yes.
7   Q.   Because it was best for you, correct?
8   A.   It was best for the company.
9   Q.   Was it best for you, also?
10  A.   And I played out very well with it, too.
11       I have full admittance in it.  I just want you to know it
12  was the company.
13            MR. ADLER:  Move to strike.  That was nonresponsive
14  to any question.
15            THE COURT:  That will be stricken.
16            MR. ADLER:  Nothing further.
17            THE COURT:  You may step down.
18       Is the government ready to get started with the next
19  witness?
20       We'll have the next witness.
21            MS. ANDERSON:  The government calls Special Agent
22  Jason Wildeman of the FBI.
23            THE COURT:  Very well.
24                      JASON WILDEMAN,
25       (WITNESS SWORN.)
```

JASON WILDEMAN - DIRECT BY MS. ANDERSON                 597

1            THE COURT:  Why don't you go ahead and lay your mask

2    on the table.

3        You may proceed.

4                       DIRECT EXAMINATION

5    BY MS. ANDERSON:

6    Q.   Could you please state your name and spell it.

7    A.   Jason Wildeman, J-A-S-O-N, W-I-L-D-E-M-A-N.

8    Q.   And where do you work, Mr. Wildeman?

9    A.   I work as a Special Agent with the FBI.

10   Q.   And what do you -- how long have you been there?

11   A.   I started with the FBI in April of this year.  I've been

12   in Oklahoma City working as an agent for the last two months.

13   Q.   The last two months, did you say?

14   A.   The last two months, yep.

15   Q.   What was your educational background?

16   A.   I have a bachelor's degree from Minnesota State University

17   Mankato, in Minnesota, and I have an MBA from OU down in

18   Norman.

19   Q.   And since you started at the Oklahoma City office of the

20   FBI, have you been assisting with this case?

21   A.   Yes.  Yeah.  I believe Special Agent Johnson tasked me

22   with assisting with the case after one or two weeks in the

23   office.

24   Q.   What sort of work have you done on this investigation?

25   A.   Mostly compiling data.

JASON WILDEMAN - DIRECT BY MS. ANDERSON                    598

1   Q.   Are you familiar, from the documents that you reviewed,

2   with an entity called Norman Pawn & Gun?

3   A.   Yes, I am.

4   Q.   What about BRSI, LLC?

5   A.   Yes.  That's familiar as well.

6   Q.   And does that company do business by another name?

7   A.   Big Red Sports & Imports.

8   Q.   Okay.  What about DKR, LLC?

9   A.   Yes, also familiar; I know it as Mayes Kia.

10  Q.   What about NMD Holding, LLC?

11  A.   I know that as Norman Mitsubishi.

12  Q.   What about Tower Motorsports?

13  A.   Uh-huh, also familiar.  I know them as Norman Yamaha.

14  Q.   And Trident Warranty Advisors?

15  A.   Yes, also familiar.

16  Q.   Okay.  And are you familiar, from the records you've

17  reviewed at least, with Bobby Chris Mayes, Courtney Wells and

18  Charles Gooch?

19  A.   I'm familiar with their names, yes.

20  Q.   Okay.  And have you reviewed bank records and parts of tax

21  returns for all of those entities and individuals?

22  A.   Yes, I have.

23  Q.   Or a lot of them?

24  A.   Yeah, quite a few.  Yeah.

25  Q.   Where did all of those entities and individuals do their

1  banking?

2  A.   Republic Bank and Trust.

3  Q.   I'm going to direct you to what's been marked as

4  Government Exhibit 37.  It will be in one of those two binders

5  up there, whichever one has the lower numbers.

6       Are you at tab 37?

7  A.   Yes, I am.

8  Q.   What is that document?

9  A.   It is a certificate of authenticity signed by Nicholas

10 Kazmerski, counsel for FDIC, stating that --

11 Q.   And then are there other pages behind that?

12 A.   Yes, there are.

13 Q.   All right.  Are those documents that were provided to the

14 FBI by Republic Bank and Trust?

15 A.   Yes, they are.

16 Q.   And do they speak to that bank's status with the FDIC?

17 A.   Yes.

18      MS. ANDERSON:  Your Honor, the government moves to

19 admit Government's Exhibit 37 and to publish it for the jury.

20      THE COURT:  Any objection?

21      MS. BEHENNA:  No objection, Your Honor.

22      MR. SHANNONHOUSE:  No objection, Your Honor.

23      MR. ADLER:  No objection.

24      THE COURT:  It will be received.

25 Q.   (BY MS. ANDERSON) And if we go to page -- go to the fourth

1    page -- sorry -- fifth page of this, please.

2        What is this document?

3    A.   This looks to be a certificate showing the FDIC -- that

4    the bank is FDIC-insured.

5    Q.   Okay.  And from these records you've reviewed, was it

6    insured by the FDIC until the end of 2019, at least?

7    A.   Yes, it was.

8    Q.   Okay.  I'm going to direct you to what's been marked as

9    Government's Exhibit 17.  And if you want to flip through it

10   and make sure you know what all is in there, great.

11   A.   Okay.  I'm at 17.

12   Q.   All right.  Do you recognize this set of documents?

13   A.   Yes, I do.

14   Q.   Are these also documents that the FBI received from

15   Republic Bank and Trust?

16   A.   Yes, they are.

17   Q.   And are they part of the records you reviewed in your work

18   at the FBI?

19   A.   Yes.

20   Q.   Are they signature cards for a bunch of different

21   accounts?

22   A.   Yes.  These are signature cards for personal and business

23   accounts.

24            MS. ANDERSON:  Your Honor, the United States moves to

25   admit into evidence Government's Exhibit 17.

```
1              MS. BEHENNA:  No objection, Your Honor.

2              MR. SHANNONHOUSE:  No objection, Your Honor.

3              MR. GIFFORD:  No objection.

4              THE COURT:  Be received.

5    Q.   (BY MS. ANDERSON) Start on the first page of this, 17.1,

6    please.

7    A.   Okay.

8    Q.   What is this one?

9    A.   This is a signature card at Republic Bank and Trust for

10   Bobby Chris Mayes.

11   Q.   All right.  And is that his signature on the right side,

12   according to the document?

13   A.   Yes.  According to the document, that is his signature,

14   yes.

15   Q.   Okay.  Let's go to the second page, 17.2.  What's this

16   one?

17   A.   This looks to be a personal account for Charles Gooch.

18   That looks to be his signature.  Also payable upon death, all

19   assets should move to Bobby Chris Mayes is also on there.  I

20   found that noteworthy.

21   Q.   And that's in the top left, if we zoom in?

22   A.   Yes.  Yeah, that top left quadrant.

23   Q.   So Mr. Mayes is the beneficiary of this account in the

24   event of Mr. Gooch's passing?

25   A.   That's correct.
```

1    Q.    Let's go to page 17.3.

2    A.    Okay.  We have the personal account for Courtney Wells,

3    with her signature on there.

4    Q.    Okay.  And if we could skip to page 17.5, please.

5    A.    Yes.

6    Q.    All right.  What is this?

7    A.    This is a signature card for Big Red.

8    Q.    And who has signature authority on this account?

9    A.    There are a number of signatures.  You'll see in line 1

10   there, Charles Gooch; and then in the second line, Mary

11   Lillard; third line, we have Courtney Wells; and on the fourth

12   line, we have Bobby Chris Mayes.

13   Q.    Okay.  Could we go to 17.6, please.

14   A.    Yes.

15   Q.    What is this one?

16   A.    This is for Trident Warranty Advisors.  And if we look

17   down, the signature -- at all the collected signatures, we have

18   Courtney Wells, Roger Mayes, Charles Gooch and Chris Mayes, as

19   well.

20   Q.    And let's go to page 17.7, please.

21   A.    Okay.  All right.  And this is DKR, LLC, Mayes Kia.

22   Again, we have Courtney Wells, Bobby Chris Mayes; and then at

23   the top, we have Brittany Mayes.

24   Q.    And all those signatures have signature authority on this

25   one?

1   A.   Yes, that's correct.

2   Q.   Let's go to 17.8, please.

3   A.   Okay.  Here we're looking at NMD Holding, also known as

4   Norman Mitsubishi.  And here we have four signatories, as well.

5   We have Robert Banfield, Faith Edwards, Charles Gooch and

6   Courtney Wells.

7   Q.   And on the bottom left?

8   A.   On the bottom left, we have Bobby Chris Mayes.

9   Q.   And is that -- how do you know that?

10  A.   Just from looking at all the other signatures, it's

11  consistent with the signatures we find on all the other

12  signature cards.

13  Q.   Okay.  And let's go back to 17.4, please.  Which is this

14  one?

15  A.   This is for Norman Pawn & Gun, and the sole signatory on

16  this is Charles Gooch.

17  Q.   Okay.

18          MS. ANDERSON:  And if we could zoom in on that box in

19  the middle part of the left side, please.

20  Q.   (BY MS. ANDERSON) When was this account opened?

21  A.   This was opened on February 20, 2015, with an initial

22  deposit of $500.

23  Q.   All right.  Let me direct you to what's been marked as

24  Government Exhibit 14 in that binder.

25          Do you recognize that document?

JASON WILDEMAN - DIRECT BY MS. ANDERSON                    604

```
 1   A.   Yes, I do.

 2   Q.   And what is it?

 3   A.   So I'm looking at the certificate of filing for the Norman

 4   Pawn & Gun LLC with the Secretary of State of Oklahoma, as well

 5   as the articles of organization that accompany it.

 6   Q.   And does it have basic information about the creation of

 7   Norman Pawn & Gun?

 8   A.   Yes, it does.

 9           MS. ANDERSON:  Your Honor, the government moves to

10   admit Government's Exhibit 14 and to publish it for the jury.

11           THE COURT:  Any objection?

12           MS. BEHENNA:  No objection.  I think that might be

13   covered by the stipulation, Your Honor.  I'm trying to figure

14   it out.

15           MS. ANDERSON:  The stipulation, too, is to

16   authentication and hearsay, but --

17           MS. BEHENNA:  No objection, Your Honor.

18           MR. SHANNONHOUSE:  No objection.

19           MR. GIFFORD:  No objection, Your Honor.

20           THE COURT:  It is received.

21   Q.   (BY MS. ANDERSON) All right.  Does this show when Norman

22   Pawn & Gun was created?

23   A.   Yes.  Just above where the signature is found at the

24   bottom there, it says filed in the City of Oklahoma City this

25   20th day of February 2015.
```

1  Q.   Okay.  And on page 3, if we could.

2  A.   Uh-huh.

3  Q.   What's the cost to file this type of document, articles of

4  organization?

5  A.   So for this specific LLC, the total payments were 125.

6  Q.   Okay.  All right.  Let me direct you to what's been marked

7  as Government Exhibit 15.

8       When you get there, if you could tell us, do you recognize

9  this document and what is it.

10 A.   Yes, I do.  This is a bank statement from Republic Bank

11 and Trust for the checking account for Norman Pawn & Gun.  It

12 is showing a --

13          THE COURT:  Well, don't get into the content of it

14 until it's been admitted.

15          MS. ANDERSON:  Just a second.

16          THE WITNESS:  My apologies.

17 Q.   (BY MS. ANDERSON) So is this a document that was provided

18 to the FBI by Republic Bank and Trust?

19 A.   Yes, it is.

20 Q.   And it's Norman Pawn & Gun account statements for -- how

21 many statements are there?

22 A.   Just -- looks to be just for February and March of 2015.

23 Q.   Two statements?

24 A.   Just two statements.

25          MS. ANDERSON:  All right.  Your Honor, the United

1  States asks to admit Government's Exhibit 15 and to publish it

2  to the jury.

3          MS. BEHENNA:  No objection, Your Honor.

4          MR. SHANNONHOUSE:  No objection, Your Honor.

5          MR. GIFFORD:  No objection, Your Honor.

6          THE COURT:  It will be received.

7  Q.   (BY MS. ANDERSON) Let's go to 15.1.

8       What does this page show in terms of the deposit -- the

9  balance of Norman Pawn & Gun in February of 2015?

10 A.   A single deposit for $500 on February 20th, and that being

11 the account balance.  If you flip to the next page, 15.2 --

12 Q.   Hang on just a second.  What date did you say the deposit

13 was?

14 A.   On February 23rd -- February 23, 2015.

15 Q.   Okay.  All right.  And then I think you suggested we turn

16 the page?

17 A.   Yes.

18 Q.   To page 15.2; is that right?

19 A.   15.2, yeah.  It looks to just be a cash deposit is all I

20 was going to mention.

21 Q.   Okay.  And let's go to page 15.3, please.

22      Is there another deposit on March 11th?

23 A.   Yes.  On March 11th, there was another deposit for $7,000.

24 Q.   Okay.  I'm going to direct your attention to what's been

25 marked as Government Exhibit 16.

1        And when you get there, I want you to flip through it, and
2   then let us know if you recognize this document.
3   A.   Yes, I recognize this.
4   Q.   And what is it?
5   A.   These are deposit statements from Republic Bank and Trust
6   for Norman Pawn & Gun.
7   Q.   Okay.  And does this document -- was it provided to the
8   FBI by Republic Bank and Trust?
9   A.   Yes, it was.
10  Q.   And is this something that you've reviewed in your work
11  over the last couple of months?
12  A.   Yes, it is.
13  Q.   All right.
14          MS. ANDERSON:  Your Honor, government would move to
15  admit and publish Government's Exhibit 16.
16          MS. BEHENNA:  No objection.
17          MR. SHANNONHOUSE:  No objection.
18          MR. ADLER:  No objection, Your Honor.
19          THE COURT:  It will be received.
20  Q.   (BY MS. ANDERSON) Let's look at this first page.
21       Is this document all of the deposits that -- for Norman
22  Pawn & Gun that you've reviewed?
23  A.   I haven't looked at it in its entirety, but I believe so,
24  yes.
25  Q.   You haven't looked at it in its entirety?

1    A.    In this binder.

2    Q.    Today?

3    A.    Today, yes, at this moment.  I believe it's everything,

4    yes.

5    Q.    All right.  And if we could -- can you tell us how the

6    first deposit was made in the top half of this page?

7    A.    Yeah.  That top deposit is a cash deposit made on February

8    23, 2015.

9    Q.    Okay.  The same one we looked on the statement?

10   A.    That's correct.

11   Q.    And let's look --

12         MS. ANDERSON:  Zoom in on the bottom half of the

13   page.

14   Q.    (BY MS. ANDERSON) What is this second?

15   A.    That is the deposit that took place on March 11, 2015 for

16   $7,000.

17   Q.    And where does that come from?

18   A.    That -- so in the bottom left quadrant there on the

19   screen, you can see it's a personal check from Bobby Chris

20   Mayes to Charles Gooch for $7,000.  And in the memo line, it

21   says "For NPG."

22   Q.    And in the documents you've reviewed, have you seen the

23   acronym NPG?

24   A.    Yes, I have.  That's consistent with Norman Pawn & Gun.

25   Q.    All right.  I'm going to direct you to what's been

1   marked --

2            THE COURT:  Wait just a second.  Are you at a

3   convenient stopping point?

4            MS. ANDERSON:  Yes, Your Honor.

5            THE COURT:  Very well.

6        You may be seated.

7        Members of the jury, we'll take our weekend recess at this

8   time.  And as I previously mentioned, next week will be a

9   four-day week because the courthouse is closed on Veteran's

10  Day.  So we were going to start next week -- on the four days

11  next week that we will be here, we'll be starting at 8:30 in

12  the morning.  So I look forward to seeing you so we can begin

13  at 8:30 in the morning on Monday.

14       Over this weekend, please think of anything other than

15  this case.  And I think you've got -- I don't think OU is

16  playing tomorrow, but I think it's OSU v. West Virginia, if I'm

17  not mistaken.  There's lots of other things to think about.

18       And so give your mind a weekend off in terms of this case

19  and this courtroom.

20       I sincerely thank you for your four days of service to the

21  Court.  It is hard work.  And over the weekend, I urge you to

22  bear in mind my usual admonition, exceedingly important, and

23  that is to not discuss the case with anyone for any purpose,

24  not to undertake any form of independent investigation, and not

25  to reach any conclusions about the case until it has been given

1   to you for your deliberations and verdict.

2        Again, I sincerely thank you for your four days of service

3   to the Court this week.  I hope you have a good weekend, and I

4   look forward to starting with you at 8:30 on Monday morning.

5        All persons will please remain seated while the jury

6   departs.

7        (JURY EXITS THE COURTROOM.)

8             THE COURT:  Agent, you may step down.

9        Counsel, anything we need to address from counsel's

10  perspective before we take our weekend recess?

11            MS. BEHENNA:  No, Your Honor.

12            MR. BEHENNA:  No, Your Honor.

13            MS. ANDERSON:  No, Your Honor.

14            THE COURT:  One thing, just for my benefit, is Agent

15  Wildeman going to be the sponsoring witness for Government's

16  Exhibits 1 through 7?

17            MS. ANDERSON:  Yes, Your Honor.

18            THE COURT:  Okay.  And, of course, everyone is aware

19  of my expectations with respect to sponsorship and foundation

20  for those exhibits, but let me just preliminarily inquire --

21  this is not binding on anyone, but sometimes it's helpful to

22  know what, if anything, I need to be listening for.

23       Do the defendants anticipate pushing back on the -- either

24  the accuracy or the admissibility in any respect of -- again,

25  assuming that all goes as you would expect -- on the accuracy

1  or any other aspect of the admissibility of Government's

2  Exhibits 1 through 7?

3              MS. BEHENNA:  Accuracy, Your Honor.

4              THE COURT:  Okay.  Well, fair enough.  I know what to

5  listen for.

6        Anything else we need to address before we take our

7  weekend recess?

8              MS. BEHENNA:  No, Your Honor.

9              THE COURT:  Hearing nothing, court will be in recess.

10       (COURT ADJOURNED FOR THE WEEKEND RECESS.)

11

12                   CERTIFICATE OF OFFICIAL REPORTER

13          I, Tracy Thompson, Federal Official Realtime Court

14  Reporter, in and for the United States District Court for the

15  Western District of Oklahoma, do hereby certify that pursuant

16  to Section 753, Title 28, United States Code that the foregoing

17  is a true and correct transcript of the stenographically

18  reported proceedings held in the above-entitled matter and that

19  the transcript page format is in conformance with the

20  regulations of the Judicial Conference of the United States.

21                   Dated this 14th day of January 2022.

22

23              */S/ Tracy Thompson*
                --------------------------------
24              Tracy Thompson, RDR, CRR
                Federal Official Court Reporter

25