# IN THE UNITED STATES DISTRICT COURT FOR THE

# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| -vs- | ) | **No. 20-CR-240-F** |
| | ) | |
| **BOBBY CHRIS MAYES,** | ) | |
| **CHARLES GOOCH, and** | ) | |
| **COURTNEY WELLS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## UNITED STATES' RESPONSE TO DEFENDANTS' MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, EVIDENTIARY HEARING

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney

s/ THOMAS B. SNYDER
THOMAS B. SNYDER (OK 31428)
Assistant United States Attorney
210 W. Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 (office)
(405) 553-8888 (fax)
thomas.snyder@usdoj.gov

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. ii

BACKGROUND ............................................................................................1

ARGUMENT ..................................................................................................3

    I.     Defendants Cannot Show Any Prejudice as A Result of The
          Presence Of The Cameras In Courtroom 401 And Therefore
          Are Not Entitled To A New Trial ........................................................3

    II.    Defendants' Motion Is Subject to Plain Error Review ..................... 12

    III.   Any Potential Impact of The Presence of The Cameras
          Is Harmless ..................................................................................... 16

    IV.   Defendants Have Not Shown The Need For An Evidentiary
          Hearing ............................................................................................ 19

CONCLUSION ............................................................................................ 21

CERTIFICATE OF SERVICE ...................................................................... 22

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*Grubbs v. O'Neil*,
   744 F. App'x 20 (2d Cir. 2018) ........................................................................ 8

*Johnson v. Duckworth*,
   650 F.2d 122 (7th Cir. 1981) ......................................................................... 5

*United States v. Beasley*,
   464 F.2d 468 (10th Cir. 1972) ....................................................................... 4

*United States v. Dempsey*,
   830 F.2d 1084 (10th Cir. 1987)................................................................*passim*

*United States v. Durham*,
   902 F.3d 1180 (10th Cir. 2018) ........................................................... 12, 18

*United States v. Frady*,
   456 U.S. 152 (1982) ...................................................................................... 13

*United States v. Hornung*,
   848 F.2d 1040 (10th Cir. 1988)................................................................... 16

*United States v. Houlihan*,
   92 F.3d 1271 (1st Cir. 1996) ................................................................... 6, 18

*United States v. Kupfer*,
   792 F.3d 1226–32 (10th Cir. 2015) ............................................................ 20

*United States v. Nichols*,
   CR-21-222-SLP (W.D. Okla. Feb. 2, 2022) .......................................... 11, 12

*United States v. Olano*,
   507 U.S. 725 (1993) ...............................................................................*passim*

*United States v. Sinclair*,
   109 F.3d 1527 (10th Cir.1997).................................................................... 9

*United States v. Toro-Pelaez*,
   107 F.3d 819 (10th Cir. 1997) .................................................................... 13

*United States v. Virginia Erection Corp.,*
  335 F.2d 868 (4th Cir. 1993) ........................................................ 4

*United States v. Watson,*
  669 F.2d 1374 (11th Cir. 1982)...................................................... 4

*Vigil v. Zavaras,*
  298 F.3d 935 (10th Cir. 2002) ................................................... 17

## Federal Statutes

18 U.S.C. § 513(a) ...........................................................................1

18 U.S.C. § 1028A(a)(1) ...................................................................1

18 U.S.C. § 1343.............................................................................1

18 U.S.C. § 1349.............................................................................1

## Other Authority

Charles A. Moore, 8A Moore's Fed. Prac. § 633.21[1]....................................... 13

Jury Room Secrecy:  Has the Time Come to Unlock the Door?
  32 Suffolk U. L. Rev. 481 (1999) ............................................. 9, 10

Defendants Bobby Chris Mayes, Charles Gooch, and Courtney Wells, by and through their respective counsel of record, have requested that the Court grant a new trial based on the fact that jury deliberations took place in this Court's regular courtroom, Courtroom 401, and that the presence of cameras in that courtroom during deliberations was inherently prejudicial. (Doc. 184.) In the alternative, the defendants request an evidentiary hearing on the matter. (*Id.*) Both requests should be denied.

## BACKGROUND

On September 16, 2020, Bobby Chris Mayes, Charles Gooch and Courtney Wells were indicted by a federal grand jury with twenty-five counts, including Conspiracy to Commit Wire Fraud (Count 1), in violation of 18 U.S.C. § 1349; Wire Fraud (Counts 2–3), in violation of 18 U.S.C. § 1343; Uttering Forged Securities (Counts 14–19), in violation of 18 U.S.C. § 513(a) and Aggravated Identity Theft (Counts 20-25), in violation of 18 U.S.C. § 1028A(a)(1). (Doc. 1.)

On November 3, 2021, all three defendants proceeded to trial. The trial spanned 13 days, and following the close of evidence, the jury was charged and retired to deliberate on the morning of November 19, 2021. In part to accommodate the need for social distancing due to COVID-19, the Court allowed the jury to deliberate in a courtroom rather than the standard jury deliberation room. The Court stated its intention to use Courtroom 401 for

1

jury deliberations and there was no objection raised to that plan by any party at any time. During deliberations, the courtroom was secured from outside interference, and there is no suggestion that anybody, apart from the jury, entered the space during deliberations.

Based on preliminary discussions with the United States Marshals Service (USMS), the closed-circuit video that is used for courthouse security remained on in Courtroom 401 while the jury deliberated. This system does not capture audio. However, the feed from that closed circuit video, along with the feed from dozens of other cameras placed in and around the courthouse and courtrooms, is displayed on screens in the courthouse security office. Those screens are monitored by courthouse security officers (CSOs), and, consequently, the particular feed from Courtroom 401 *could* have been viewed by one or more CSOs while they were generally monitoring all of the multiple security cameras. Apart from the possible passive recording of the jury deliberations without sound, there is no allegation of any impropriety in connection with the jury's deliberations or that there was any actual interaction between the jury and anyone during the full day that they deliberated on November 19, 2021.

After a full day of deliberations, the jury returned its verdicts – guilty as to Mr. Mayes and Mr. Gooch on all counts, and guilty as Ms. Wells on Counts 1, 3, 4, 7–10 and 14–25. The jury, however, returned verdicts of not guilty as

to Ms. Wells on Counts 2, 5, 6, 11, 12, and 13. The defendants do not suggest—and there is no evidence suggesting—that the jury was aware that the video camera in the courtroom was active. Furthermore, the defendants do not—and cannot—make any specific claims as to how the presence of this video camera in the courtroom affected the deliberative process, and, relatedly, how they were prejudiced by the fact that there was a security camera inside the courtroom where the deliberations were taking place. Nevertheless, they seek to overturn the jury's verdict in this case based on the speculation that passive video security camera system *may* have had a "chilling" impact on the deliberations to justify. Neither the law nor the facts support this drastic remedy and defendants' motion should be denied accordingly.

## ARGUMENT

### I. Defendants Cannot Show Any Prejudice as A Result of The Presence of The Cameras In Courtroom 401 And Therefore Are Not Entitled To A New Trial

As a general rule, there is a "cardinal principle that the deliberations of the jury shall remain private and secret." *United States v. Olano*, 507 U.S. 725, 737 (1993) (citing Advisory Committee's Notes on Fed. R. Crim. P. 23(b)). Flowing from this "cardinal principle" is the recognition that "[t]he *presence* of *any person* other than the jurors to whom the case has been

submitted for decision impinges upon that secrecy and privacy."[1] *United States v. Virginia Erection Corp.*, 335 F.2d 868, 872 (4th Cir. 1993) (emphasis added), *abrogated by Olano*, 507 U.S. at 737–38. Nevertheless, courts have recognized that "[i]f no harm resulted from the intrusion . . . [,] reversal would be pointless." *Olano*, 507 U.S. at 737 (quoting *United States v. Watson*, 669 F.2d 1374, 1391 (11th Cir. 1982)). The "ultimate inquiry" is this: "Did the intrusion affect the jury's deliberations and thereby its verdict?" *Id.* at 739.

In the past, several Tenth Circuit cases appear to have adopted a *per se* rule requiring an automatic declaration of a mistrial based on the presence of alternate jurors in the deliberation. *See, e.g.*, *United States v. Beasley*, 464 F.2d 468 (10th Cir. 1972). In *Olano*, however, the Supreme Court rejected that proposition, holding that the mere presence of an alternate juror in the jury room during deliberations—a much greater intrusion than what is at issue here—did not create a presumption of prejudice."[2] *Id.* at 739. Under a plain

---

[1]  The decisions discussing the sanctity of jury deliberations have almost exclusively dealt with the impact of the physical presence of a non-juror in the jury deliberation space. *See, e.g.*, *Olano*, 507 U.S. at 737 (alternate juror); *United States v. Dempsey*, 830 F.2d 1084 (10th Cir. 1987) (interpreter). The United States has not found any cases—and defendants have cited none—addressing the specific issue at play here: the passive recording of a video only of jury deliberations through a court security camera.

[2]  Although the Supreme Court acknowledged that "[t]here may be cases where an intrusion should be presumed prejudicial," *Olano*, 507 U.S. at 739, those situations certainly would be more extreme than the present case. As

error standard, the *Olano* Court held that the respondent, who "made no specific showing that the alternate jurors . . . either participated in the jury's deliberation or "chilled' deliberation by the regular jurors," failed to establish actual prejudice. *Id*. at 739–40.

Consistent with *Olano*, appellate courts—including the Tenth Circuit—now look to whether an alleged intrusion into the jury's deliberative space actually affected the deliberative process. In *Dempsey*, for instance, the defendant claimed that his right to a fair and impartial jury was violated because of the presence of an interpreter in the jury deliberation. 830 F.2d at 1089.[3] The Tenth Circuit, however, declined to "adopt a per se rule that an

---

noted by the *Olano* Court, "[w]e cannot imagine why egregious comments by a bailiff to a juror . . . or an apparent bribe followed by an official investigation . . . should be evaluated in terms of 'prejudice' while the mere *presence* of alternate jurors during jury deliberations should not." *Id*. It likewise follows that this less intrusive scenario—where nobody was physically present in the jury deliberation space—also falls into the category of intrusions that should be evaluated for prejudice.

[3]     The shift towards requiring a showing of actual prejudice actually predated *Olano*, although *Olano* definitively resolved the matter. *Dempsey*, for instance, was decided by the Tenth Circuit in 1987—some six years before *Olano*. And other circuits, including the Seventh Circuit, had rejected the Tenth Circuit's *per se* rule regarding alternate jurors even earlier. *See Johnson v. Duckworth*, 650 F.2d 122, 125 (7th Cir. 1981) ("The question we must decide, therefore, is whether the presence of the alternate juror is the sort of invasion of the jury's privacy that will tend to stifle the jury's debate, thus endangering the defendant's right to trial by jury. We hold that it is not." (footnote omitted)).

The cases relied on by defendants in their motion, *Johnson* and *Beasley*,

interpreter's presence in the jury room requires a new trial." *Id.* at 1091. The appellate court instead looked to whether there was any indication of improper behavior by the interpreter, and, finding none, rejected the defendant's request for relief. *Id.* at 1091–92 ("Were we to set aside defendant's conviction and require a new trial in this case because of the interpreter's undue influence, it would not be based upon any fact. Instead, it would rest upon speculation no different than that we have rejected in holding that mere presence of the interpreter is not enough to require reversal. This we decline to do.").

An example of the approach adopted by most courts following *Olano* can be found in *United States v. Houlihan*, 92 F.3d 1271 (1st Cir. 1996). In that case, the court was faced with a situation where alternates were not officially discharged prior to the deliberations. While those alternates were in contact to some extent with the regular jurors, they were not allowed into the deliberation room or allowed to participate in the deliberations. Because the defendant in that case raised a contemporaneous objection to the district court about the failure to discharge the alternates, the court did not apply plain error review. *Id.* at 1286. Nevertheless, the court declined to adopt a per se rule requiring a new trial. Rather, it undertook a "particularized inquiry" whether

---

were both decided prior to the Supreme Court's decision in *Olano*, and one of them—*Johnson*—specifically rejects the *per se* rule defendants now seek to impose

the instant violation caused prejudice to the defendants. *Id*. Because it was not plain error review, the court put the burden on the government to show the absence of any prejudice but found that the government had met its burden. Applying that particularized inquiry, the court found no prejudice and no violation, noting:

> If the mere presence of silent alternates *in the jury room during ongoing deliberations* cannot in and of itself be deemed to chill discourse to establish prejudice, see *Olano* 507 U.S. at 740-41, 113 S.Ct. at 1781-82, it is surpassingly difficult to imagine how absent (though undischarged alternates), properly instructed could have a toxic effect on the deliberative process.

*Id*. at 1287–88.

This case, of course, is even further removed from the risk of prejudice than what was posed by the interpreter in *Dempsey* or the presence of alternates in the deliberation room in *Olano*. Here, the security camera was nothing more than a passive observer, at best, that could show no emotion and have no interaction with the jurors. It could not sway jurors' actions through signs of approbation or disgust. It could not voice or signal an opinion one way or another because it had no opinion. Moreover, there is no evidence that the jury was aware that the camera was present, much less functioning. And there is certainly nothing in the record to suggest that their behavior was in any way affected by its mere presence.

Apparently recognizing that the passive cameras are far less of an intrusion than the cases in which an outside person was *actually in the deliberation room*, like in *Olano*, *Dempsey* and others, the defendants base their motion on the contention that the mere presence of the cameras was an "unjustifiable intrusion into the jury's privacy" that "erodes confidence in the verdict and requires a new trial." (Doc. 184 at 9.) The defendants' claim that the mere presence of cameras has a chilling effect on the ability of the jury to properly deliberate is simply not well founded. The only case cited, *Grubbs v. O'Neil*, 744 F. App'x 20 (2d Cir. 2018), did not address jury deliberations; rather, it addressed whether the presence of cameras in the holding cell of a jail could potentially chill a defendant's exercise of his right to consult with his attorney and was the outgrowth of a long civil rights lawsuit involving a city jail. Most importantly, while noting the *possibility* that cameras could have such a chilling effect on a criminal defendant's willingness to speak openly to his or her attorney, the court actually made no ruling that the cameras in that case did have such an effect. Rather, the case was remanded so the district court could engage in a proper balancing test between the *possible* chilling effect and the city's institutional justifications. Despite the defendants' suggestion otherwise, this case does not stand for the proposition that the mere presence of a camera in a jury deliberation room necessarily has a chilling effect on deliberations.

The defendants' next argument fares no better. Perhaps recognizing the inapplicability of *Grubbs*, the motion falls back on research articles which defendants claim demonstrate the "psychological impact of being watched", arguing that these articles raise the possibility that the mere presence of cameras in the courtroom could have adversely impacted the jury deliberations in this case. (Doc. 184 at 7-8.) All of these authorities, however, amount to little more than speculation and conjecture. For instance, their primary source (as emphasized through a block quote) notes that studies *imply* being watched *may* have an effect on behavior and that a *possible* explanation is that the *possible* presence of others *may* induce a feeling of being evaluated which *might* result in behavior adjustments. (*Id.*) *Dempsey* and the prevailing case law surely requires that prejudice be based on something more concrete than this type of "evidence," particularly where the remedy requested is as drastic as a new trial. *See United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir.1997) (noting that motions for new trials are regarded with disfavor and should only be granted with great caution).

Moreover, there is more compelling evidence that the presence of cameras in courtrooms *does not* adversely impact jury deliberations. In *Jury Room Secrecy: Has the Time Come to Unlock the Door?*, 32 Suffolk U. L. Rev. 481, 502–03 (1999), attached hereto as Exhibit 1, the author recounts various case studies where jurors were actually filmed during deliberations and the

cameras' potential impacts on that deliberative process.  After discussing these

case studies, the author concludes:

> No evidence exists demonstrating that the recording of jury deliberations will have a per se negative impact on jury deliberations. Rather, all arguments supporting this contention rest on conclusory statements rather than data collected from any organized studies of jury deliberations. In truth, neither these arguments nor the one set forth herein can fairly claim to be conclusively supported by such evidence because there is clearly not enough data presently available to reach any definitive conclusions. The CBS and PBS documentaries, and studies performed utilizing mock juries, however, support the likelihood that recording deliberations will not adversely affect the process.
>
> Although the CBS and PBS documentaries provide a limited pool of information from which to draw any absolute conclusions, they demonstrate that jurors will concentrate on the task before them and forget about the presence of a recording devise. In the PBS documentary, for example, the jurors explicitly ignored the law and elected to acquit the obviously guilty defendant. In addition, the *Solano I* jurors in the CBS documentary discussed matters that the judge had specifically prohibited from consideration. These documentaries provide evidence that the presence of recording devices in the jury room will not deter jurors from discussing issues they consider relevant.
>
> In addition to the above documentaries which recorded actual deliberations, mock jury studies have also provided some data of the likely effect of recording devices on deliberations. Data obtained from one prominent study supports the conclusion that the recording of the deliberative process will have a positive affect.  The study evaluated the deliberations on a variety bases, including the relevance of material discussed. The study found that while the jurors discussed almost all of the relevant issues presented, they generally refrained from discussing facts that the judge had explicitly prohibited from consideration. Hence, this study

> demonstrates that recording deliberations will likely encourage jurors to stay within the boundaries of acceptable material.

*Id.* at 502-03.

Finally, defendants' brief refers to at least one other case in which the same issue has been raised by other defendants in this courthouse, *United States v. Nichols*, Case No. CR-21-222-SLP (W.D. Okla. Feb. 2, 2022). (Doc. 184 at 9.) Indeed, defendants' motion appears to be an opportunistic derivation of the motion in *Nichols*. In any event, on February 2, 2022, Judge Palk issued his ruling in *Nichols* (Ex. 2, Order in Case No. CR-21-222-SLP (Dkt. 56).) In that order, Judge Palk denied the motion for mistrial/motion for new trial. In so doing, Judge Palk rejected many of the same arguments raised here. While the facts are not identical, the relevant facts are: a jury reached a verdict after deliberating in a courtroom where security cameras were present. In fact, in *Nichols* the parties agreed that a CSO had actually monitored the security cameras during the deliberations (*Id.* at 2.) Following *Olano*, Judge Palk found that the defendant had failed to articulate any potential that the cameras could have "chilled" the jury's deliberation to justify a presumption of prejudice or otherwise support their motion. (*Id.* at 4.) The mere presence of the cameras, even if they were monitored, was simply speculation that was "insufficient to either declare a mistrial on grounds of any impairment of Defendants' right to

a fair and impartial trial or warrant a new trial in the interest of justice." (*Id.* at 5.)[4]

In sum, contrary to the defendants' suggestion, there is scant evidence or reason to believe that the mere presence of cameras during jury deliberations could have or did have a chilling effect on the jury's work.

## II.   Defendants' Motion Is Subject To Plain Error Review

To avoid *Olano's* clear rejection of the *per se* prejudice rule that the defendants now seek to have this Court apply, they attempt to distinguish *Olano* by claiming that its ruling depending on its procedural posture – that is, they claim that *Olano* is inapplicable because it was a decision based on Fed. R. Crim. P. 52 and plain error review, and here the defendants have claimed to have timely raised the issue. (Doc. 184 at 9-11.) They are mistaken.

To the extent that defendants are contending that their motion for a new trial is sufficient to raise this objection and to avoid Rule 52(b), this argument is foreclosed by precedent. *See United States v. Durham*, 902 F.3d 1180, 1228 n.33 (10th Cir. 2018) (rejecting a defendant's argument that he preserved his claim for review by raising it in a motion for a new trial and explaining proper preservation requires a contemporaneous objection); *see also United States v.*

---

[4]    Judge Palk also found that under the facts and arguments presented, there was no basis for the court to conduct an evidentiary hearing into the allegatons raised. (*Id.* at 5, n.5.)

*Toro-Pelaez*, 107 F.3d 819, 828 (10th Cir. 1997) (observing that where a defendant fails to contemporaneously object (i.e. at a time when the trial court could have actually acted to fix any error without having to re-do the entire proceeding) the issue can only be reached if the defendant establishes plain error); *United States v. Frady*, 456 U.S. 152, 179 (1982) (Brennan, J., dissenting) ("Significantly, although some of the Rules of Criminal Procedure appear under headings such as 'Preliminary Proceedings,' 'Trial,' or 'Appeal,' Rule 52(b) is one of the 'General Provisions' of the Rules, applicable to all stages of all criminal proceedings in federal courts.") Charles A. Moore, 8A Moore's Fed. Prac. § 633.21[1] ("The requirement of Rule 51 that objections must have been made at the trial court level and the doctrines of harmless and plain error as stated in Rule 52 apply to Rule 33 motions.").

Here, none of the defendants raised any issue with the location where the Court proposed to have the jury deliberate or the presence of cameras in Courtroom 401 *before* the jury retired. In fact, the Court specifically addressed this issue on the record with all parties informing them that:

> THE COURT: … Tomorrow morning, when we resume at 8:30, I'm going to, of course, have the bailiff sworn, I'm going to give the instructions to the bailiff. I'm going to tell the jury about the JERS system and then the bailiff will proceed – what facility are we using as the deliberation room?
>
> COURTROOM DEPUTY: Courtroom 401.
>
> THE COURT: Okay. My Courtroom 401.

Interestingly enough, we had a trial a year ago this month. And we had them deliberate in a courtroom so that they could be spaced out because here's the typical jury deliberation room, there is absolutely not room to be socially distanced from each other.

So at one point during the deliberations a CSO got a peek in there and they were all coveyed up around one of the tables just shoulder to shoulder. That's what happens with juries, they bond.

But to afford them the opportunity to socially distance, if they choose to do so, we're going to have the deliberations in Courtroom 401.

Trial Tr. 2623:7–25 (attached hereto as Ex. 3.)

Given this exchange, the defendants cannot credibly argue that they were not aware of the Court's intention to have the jury deliberate in a courtroom, nor can they credibly suggest they were not at least aware of the possibility that the jury would be recorded during deliberations or that at a minimum there would be cameras present in the courtroom. There were collectively eight attorneys representing the three defendants, including former federal prosecutors and longtime defense attorneys who have undoubtedly appeared hundreds of times in the federal courthouse—a number of those appearances were likely in Courtroom 401—and are well-aware of the presence of cameras in the courtroom.

Nor does it do the defendants any good to try to split hairs and argue that while they knew about the cameras, they had no reason to believe that

they would be active when the jury was deliberating. Indeed, their argument as to why they are entitled to a new trial does not depend on whether the cameras were actually rolling. Rather, they contend that the mere *existence* of the cameras in the courtroom could be enough to chill the jury's deliberations and that the jurors simply could not miss the existence of the cameras in Courtroom 401. (*See, e.g.,* Doc. 184 at 8 ("their presence alone is inherently prejudicial"), *id*. at 9 ("Nor does it matter if the jury knew they were being watched."), *id*. at 3, n.3 (noting that while three of the four cameras in Courtroom 401 are used only for videoconferencing, "it is unlikely that the jurors would have drawn that distinction.")[5] If that is the case and the real issue is the *presence* of cameras, regardless of whether they were rolling, it is clear that the defendants were fully aware of this issue and had everything they needed to raise this issue contemporaneously, prior to the jury beginning their deliberations, when the Court could have easily made other arrangements that would have avoided this very issue.

Given the failure to timely object, the proper standard of review is plain error, putting this case squarely within *Olano*'s ambit. Thus, consistent with

---

[5]     Defendants claim that the basis of this motion is "newly discovered evidence" under Fed. R. Crim. P. 33(b)(2). (Doc. 184 at 1, n.1.) Crediting this argument that the mere *presence* of the cameras in the courtroom were sufficient to "chill" jury deliberations and require a new trial, it is difficult to see how the *fact* of the cameras could be deemed to be "newly discovered evidence."

*Olano*, the defendants must demonstrate prejudice and a clear violation of their substantial rights. Because the defendants cannot meet the high burden, this motion should be denied.

## III. Any Potential Impact of The Presence of The Cameras Is Harmless

Even were this Court to apply a presumption of prejudice (and it should not), this presumption "c[ould] be overcome upon the government meeting its burden of establishing that the [improper] contact with the [jury] was harmless to the defendant." *United States v. Hornung*, 848 F.2d 1040, 1045 (10th Cir. 1988) (citing *Remmer v. United States*, 347 U.S. 227, 229 (1954)) (affirming conviction where juror had outside communication during the trial with an individual who indicated that the defendant had attempted to "launder" $6,000 in her bank, noting that any potential prejudice was outweighed by the "overwhelming evidence of defendant's guilt").

Here, the evidence against the defendants was significant. The jury heard from dozens of witnesses and saw dozens of exhibits over an almost three-week trial. They heard testimony from two of the three defendants, multiple lenders, customers and slew of character witnesses offered by the defense. Among other evidence, the jury saw documentary evidence of the fact that all of the defendants were aware that the pawn shop was illegitimate from the start, and that the pawn shop never sold anything and that it only

purchased items for the amount that was required as a down payment by the lenders. Mr. Mayes took the stand and admitted that overpaying for pawned items was improper and that he was required to shut the practice down after he allegedly discovered it, attempting to shift the blame to Mr. Gooch and others (a ploy that the jury plainly rejected in their verdict). The jury saw the evidence of fake vehicle trade-ins which was a further method of defrauding lenders into making loans they never would have made had they known the truth. Faced with such significant evidence, the jury took just one full day to return their verdicts. *Cf. Vigil v. Zavaras*, 298 F.3d 935, 941 (10th Cir. 2002) (citing "the strength of the legitimate evidence" and "the extent to which the jury had difficulty reaching a verdict" as factors a court can consider when assessing whether outside information influenced a jury's verdict).

The defendants argue in their motion that any claim of harmlessness would be incorrect because the jury only spent "6.4 minutes (approximately)" deliberating each count, suggesting that the speed of its deliberation showed that the jury simply adopted "the Government's theory of the case." (Doc. 184 at 9.) It is difficult to understand the logic behind this interpretation of the verdict. As the Court is fully aware, the evidence of the defendants' schemes was strong and voluminous. The jury spent an entire day deliberating. To the extent there was any speed to the jury's deliberation, this is likely reflective of the fact that they simply found the government's evidence strong and the

defendants' attempted justifications weak. There is nothing to suggest that spending an entire day deliberating the case signifies any abdication by the jury of their duties.

In fact, the actual jury verdict in this case strongly demonstrates that the jury engaged in a full, thorough, and thoughtful deliberation. As the Court knows, there were two schemes to defraud at issue in the charges in the Indictment: the pawnshop and the fake trade-ins. Although the jury found that all three defendants were fully involved in the pawnshop scheme (as reflected by its guilty verdicts), it clearly felt that the evidence was less compelling as to Ms. Wells' involvement in the trade-in scheme—a fact evident from the not guilty verdicts as to Ms. Wells on counts related to that particular scheme. Given this split verdict, it is clear that the jury carefully listened to and parsed the evidence presented, finding that the government had not met its burden as to some counts, but fully satisfied its burden with respect to other counts. *Cf. United States v. Durham*, 902 F.3d 1180, 1229 (10th Cir. 2018) (noting that the jury's acquittal on several counts despite alleged prosecutorial misconduct demonstrated that the verdict was "based on reason, rather than emotion."); *Houlihan*, 92 F.3d 1271, 1288 (1st Cir. 1996)(finding no prejudice from the failure to discharge alternate jurors based in part on "the discriminating nature of the verdicts that were returned (e.g., the jury acquitted the appellants on sundry counts and also acquitted a fourth

defendant, Herd, outright)"). The proof here is in the pudding—the split verdict shows that even if the jury was aware of the cameras, it was not influenced by them as they were still clearly able to return not guilty verdicts when they felt it appropriate to do so.

Considering all this, even were this Court to assume some error (which there was not), that error was harmless, and the defendants' motion should be denied.

## IV. Defendants Have Not Shown The Need For An Evidentiary Hearing

Finally, there appears to be little utility or need for an evidentiary hearing for the Court to address the defendants' motion. The defendants specifically request a hearing on two topics: (1) to "determine if the presence of cameras in the jury deliberation room had a prejudicial impact"; and (2) "to determine if the cameras were in fact monitored by a CSO during the course of the jury's deliberations in this case." (Doc. 184 at 11.)

With respect to the broad and generic request for a hearing about whether the presence of cameras had a prejudicial impact, the motion suggests no specific evidence or line of inquiry that they believe would produce admissible evidence. In fact, this entire topic is flatly foreclosed by Fed. R. Evid. 606(b) which expressly precludes any juror from testifying about "the effect of anything on that juror's or another juror's vote; or any juror's mental

processes concerning the verdict or indictment." In a footnote, the defendants suggest that this rule might still allow testimony about an objective matter – presumably something like the *fact* that an outsider was in the room. (Doc. 184 at 12, n. 10.) The problem with this attempt to bypass the plain language of Rule 606(b) is, of course, the defendants' complete failure to suggest what sort of objective fact is in dispute. The only conceivable relevant fact is whether the cameras were *in fact* present in Courtroom 401, a fact which is not in dispute and which requires no evidentiary hearing.

With respect to the question of whether the cameras were actually monitored, there is again no apparent relevance to the inquiry. Given the defendants' position that it is the mere presence of the cameras in the courtroom that warrants relief and their suggestion that it does not matter whether the jurors were even aware that the cameras were active, it is unclear what relevance there would be to whether a CSO had actually observed any of the video of the deliberations. Put differently, even according to the defendants' own theory, whether or not someone was passively watching the video of the deliberations seems patently irrelevant to whether the juror's actual deliberations were impacted. *See United States v. Kupfer*, 792 F.3d 1226, 1231–32 (10th Cir. 2015) (holding district court did not abuse its discretion where the hearing would have added little information to the prejudice question).

In sum, defendants have failed to demonstrate or even suggest any relevant evidence that could be generated by an evidentiary hearing into this matter and therefore their request for such a hearing should be denied.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the defendants' motion for a new trial and should do so without a hearing.

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney

s/ THOMAS B. SNYDER
THOMAS B. SNYDER (OK 31428)
Assistant United States Attorney
210 W. Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 (office)
(405) 553-8888 (fax)
thomas.snyder@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2022, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants of record in this matter, including:

For Defendant, Bobby Chris Mayes:
W. Brett Behenna
Michelle L. Greene
William H. Bock
Vicki Zemp Behenna
Rachel Jordan

For Defendant, Charles Gooch:
Joseph Shannonhouse

For Defendant, Courtney Wells:
S. Thomas Adler, II
Robert D. Gifford

s/THOMAS B. SNYDER
Assistant United States Attorney