IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | Case No. CR-20-240-F |
| ) | |
| BOBBY CHRIS MAYES, ) | |
| CHARLES GOOCH, and ) | |
| COURTNEY WELLS, ) | |
| ) | |
| Defendants. ) | |

## ORDER

Before the court is Defendants' Joint Motion for New Trial or, in the Alternative, Evidentiary Hearing, doc. no 184 ("Motion").  The government has responded, doc. no. 189, and the defendants have replied, doc. no. 192.

The defendants seek a new trial "because the presence of cameras in courtroom 401, where the jury deliberated, was inherently prejudicial." Motion, at 1. The defendants, thus, seek a *per se* holding that the presence of cameras mandates a new trial.  Alternatively, defendants seek an evidentiary hearing for the purpose of determining whether "the presence of cameras in the jury deliberation room had a prejudicial impact."  *Id.* at 11.  The purpose of the evidentiary hearing, the defendants suggest, would be to "determine whether the jurors were aware of the cameras and whether the deliberations were monitored by a CSO." *Id.* at 12.  In a footnote, the defendants' motion briefly discusses Rule 606 of the Federal Rules of Evidence (relating to a juror's competency as a witness) and its legislative history, but the motion stops short of asserting that juror testimony is required or even permissible with respect to the matters presented by the motion.

# I.
# FACTS[1]

In November, 2021, the defendants were convicted by a jury on multiple counts of an indictment charging conspiracy to commit wire fraud, wire fraud, uttering forged securities, and aggravated identity theft. Consistent with the usual practice in this court since the onset of the COVID-19 pandemic, the court directed that jury deliberations take place in a courtroom (to allow "social distancing") rather than in the nearly shoulder-to-shoulder setting of a jury deliberation room. A total of fifteen criminal cases went to jury deliberations between April 2021 and December 2021. Thirteen of those juries deliberated in courtrooms due to COVID-19 spacing requirements.

The courtroom used for the deliberations in this case was courtroom 401 in this courthouse. For the purpose of protecting the privacy of deliberations, the windows in the double door into the courtroom were covered with paper.

Before deliberations began, the court informed the parties and counsel that deliberations would take place in courtroom 401. Trial transcript, p. 2623. The parties and their counsel were familiar with courtroom 401. All three defendants attended hearings in this case on December 7, 2020, August 12, 2021, and October 29, 2021. Doc. nos. 66, 86 and 132. Those hearings took place in courtroom 401. None of the defendants raised any objection to the use of courtroom 401 for jury deliberations.

Courtroom 401 has a security camera, as does every other courtroom in this courthouse. It also has three cameras for a videoteleconference ("VTC") system.[2] The VTC cameras were turned off during jury deliberations in this case. None of

---

[1] This account of the facts is drawn substantially from the summary set forth in the order at doc. no. 193. Defendants do not take issue with that summary. Doc. no. 199.

[2] The placement of the cameras is as shown in the photographs in doc. no. 193.

the cameras in courtroom 401 provide any visual indication that the camera is turned on.

During jury deliberations in this case, the security camera in courtroom 401 was on. The security camera provides a video feed, but not a sound feed, to the court security officer ("CSO") control room in the courthouse. In the CSO control room, there are 98 separate video feeds, visible on 12 monitors. The feeds are split among the monitors, and some feeds rotate periodically. Courtroom security video feeds each occupy a space approximately 9-inches by 5-inches on the various monitors. Ordinarily, there are two CSOs posted in the control room who are tasked with monitoring the 98 security camera feeds, among other control room duties. The control room schedule requires the CSOs to rotate through the control room hourly.

None of the jurors in this case indicated to the Bailiff, the Courtroom Deputy, or the Jury Clerk any awareness of or concern about the presence of cameras in courtroom 401.

## II.
## THE DEFENDANTS' MOTION IS SUBJECT TO PLAIN ERROR ANALYSIS

The defendants and their counsel were well aware that the jury would deliberate in courtroom 401, but they made no objection either to the use of that courtroom or to the presence of the cameras. Because there was no contemporaneous objection and the issue is raised for the first time in a motion for new trial, the court finds the plain error analysis of Rule 52(b), Fed. R. Crim. P., applies. *See*, United States v. Durham, 902 F.3d 1180, 1228 n. 33 (10th Cir. 2018) ("[W]hen the defendant 'failed to contemporaneously object regarding the . . . reasons he asserts as justification for a new trial[,] . . . we may . . . only reach the issue if we find plain error.'") (quoting United States v. Toro-Pelaez, 107 F.3d 819, 828 (10th Cir. 1997)); *see also*, United States v. Desu, 23 F.4th 224, 230-31 (3rd Cir.

2022) ("When a defendant fails to lodge a contemporaneous objection and instead raises the issue for the first time in a motion for new trial, we review the district court's ruling for plain error.") (citation, quotation marks and alterations omitted); United States v. Thompson, 27 F.3d 671, 673 (D.C. Cir. 1994) ("[A] post-verdict motion for a new trial is not the same as a timely objection: the delay eliminates any chance that the judge could correct the error without a duplicative trial, and according review as if a timely objection had been raised virtually invites strategic behavior by defense counsel.").[3]

"To establish eligibility for plain-error relief, a defendant must satisfy three threshold requirements." Greer v. United States, 141 S.Ct. 2090, 2096 (2021) (citing Rosales-Mireles v. United States, 138 S.Ct. 1897, 1904-05 (2018)). "*First*, there must be an error. *Second*, the error must be plain. *Third*, the error must affect 'substantial rights,' which generally means that there must be 'a reasonable

---

[3] The court rejects defendants' argument in reply that the plain error analysis does not apply because they did not forfeit their objection by failing to raise it when notified deliberations would be in courtroom 401.  First, defendants argue their counsel could not "have reasonably known that, just because the deliberations were to be held in a courtroom, a CSO would be monitoring them." Reply, at 2.  However, in their motion, defendants primarily seek a *per se* holding that the presence of cameras was inherently prejudicial.  Indeed, defendants assert the "mere presence of cameras … in the room where deliberations took place raises serious concerns about the chilling effect the cameras may have had on the deliberations, *regardless of whether the cameras were actually monitored by a CSO at the time the deliberations were taking place*." Motion, at 3 (emphasis added).  Second, defendants argue their counsel could not "have reasonably been expected to recognize, upon learning the jury would be deliberating in a courtroom, that there would be cameras present." Reply, at 3.  However, the facts, as previously outlined, demonstrate the parties and their counsel were in courtroom 401 for three hearings prior to trial and were familiar with the presence of cameras in that courtroom.  The court is satisfied that, upon notification that jury deliberations would occur in courtroom 401, defendants' failure to contemporaneously object to deliberations in that courtroom forfeited their objection and subjects it to the plain error analysis.

Moreover, the defendants' assertion that they could not have known that "a CSO would be monitoring" deliberations assumes too much.  There is no basis in this record (and, in the nature of things, no basis for an assumption) that any "monitoring" consisted of anything other than a glance at a fleeting image rotating–along with 98 other video feeds–on a 9-inch by 5-inch monitor.  Even less is there a basis for a supposition that jurors were *aware* of "monitoring" by CSOs or– still less likely–a supposition that the monitoring would somehow skew the thinking of a juror.

4

probability that, but for the error, the outcome of the proceeding would have been different.'" Id. (emphasis in original). "If those three requirements are met, [the court] may grant relief if it concludes that the error had a serious effect on the fairness, integrity or public reputation of judicial proceedings.'" Id. at 2096-97 (quoting Rosales-Mireles, 138 S.Ct. at 1905).

"The defendant has 'the burden of establishing entitlement to relief for plain error.'" Greer, 141 S.Ct. at 2097 (quoting United States v. Dominguez Benitez, 542 U.S. 74, 82 (2004)). "That means that the defendant has the burden of establishing each of the four requirements for plain-error relief." Greer, 141 S.Ct. at 2097. "Satisfying all four prongs of the plain-error test 'is difficult.'" Id. (quoting Puckett v. United States, 556 U.S. 129, 135 (2009)).

### III.
### THE PRESENCE OF THE CAMERAS WAS NOT INHERENTLY PREJUDICIAL

Assuming without deciding defendants can satisfy the first two prongs of the plain error analysis, the court finds they cannot satisfy the third prong. In United States v. Olano, 507 U.S. 725 (1993), the Supreme Court addressed whether the presence of alternate jurors during jury deliberations in a federal criminal trial affected substantial rights within the meaning of Rule 52(b). The Court determined the "presence of alternate jurors during jury deliberations is not the kind of error that 'affect[s] substantial rights' independent of its prejudicial impact." Id. at 737. After pointing out that the respondents had not made a specific showing of prejudice, the Court went on to state "we see no reason to presume prejudice here." Id. The Court further stated "we [do not] think that the mere presence of alternate jurors entailed a sufficient risk of 'chill' to justify a presumption of prejudice on that score." Id. at 741.

Prior to Olano, the Tenth Circuit had concluded in United States v. Dempsey, 830 F.2d 1084 (10th Cir. 1987), that the mere presence of an interpreter for a deaf juror did not have a chilling effect or inhibiting influence on jury deliberations and did not support a *per se* rule that the interpreter's presence required a new trial. *Id*. at 1090-91.

Defendants have made no specific showing of prejudice. Indeed, they have not specifically shown that the cameras' "presence exerted a 'chilling' effect on the [] jurors." Olano, 507 U.S. at 739.[4] Defendants' objection rests on the premise that it was inherently prejudicial for the court to allow jury deliberations in courtroom 401 with the presence of cameras. Given the Supreme Court's decision in Olano as well as the Tenth Circuit's decision in Dempsey, the court cannot agree. While the Supreme Court in Olano, stated that "[t]here may be cases where an intrusion should be presumed prejudicial," Olano, 507 U.S. at 739, it determined that the mere presence of alternate jurors during jury deliberations was not presumptively prejudicial. Likewise, the Tenth Circuit found the mere presence of an interpreter during jury deliberations was not presumptively prejudicial. Here, cameras were present in the courtroom during deliberations. If the presence of non-participating persons during jury deliberations was not presumptively prejudicial, the court cannot conclude that the presence of cameras during deliberations was inherently prejudicial. In the court's view, the mere passive presence of cameras did not entail a "sufficient risk of 'chill' to justify a presumption of prejudice[.]" Olano, 507 U.S.

---

[4] The study attached to defendants' motion (doc. no. 184-2), concerning the effects of camera-surveillance on cheating behavior and pro-social behavior, and the references cited in that study, are insufficient to give rise to a specific showing of prejudice. Further, nothing in the record plausibly suggests the cameras chilled or inhibited the jurors' actions.

at 741.[5]  Because defendants have failed to show that the alleged error was prejudicial, the court finds defendants are not eligible for plain-error relief.

## IV.
## AN EVIDENTIARY HEARING IS NOT NECESSARY

Initially, the defendants requested an evidentiary hearing, to be held in the event that (as the court has now done) that the court should determine that the presence of the cameras was not inherently prejudicial. *See*, doc. no. 184, at 1-2. The facts upon which the defendants could conceivably rely in support of this motion fall into two categories. The first category is the physical and historical facts set forth in part I, above. As has been noted, those facts are not contested. No evidentiary hearing is necessary to establish those facts. The second category would be facts ascertainable only via interviews with jurors.[6]

A brief look at the facts the defendants assert to exist (actually or potentially) demonstrates that an evidentiary hearing is not necessary. Defendants assert that "Court personnel were likely in fact able to see the jury during its deliberations." Doc. no. 184, at 9. Assuming that one or more CSOs did in fact see an image on

---

[5] Defendants rely upon Grubbs v. O'Neil, 744 Fed. Appx. 20 (2d Cir. 2018), to support their argument that the presence of cameras was inherently prejudicial because of its chilling effect on candid communication. Aside from being unpublished and non-precedential, the court notes the appellate court did not address whether the mere presence of cameras suffices to establish remedial authority under Rule 52(b). Further, the court notes that the appellate court did make a *per se* ruling that the presence of cameras could exert a chilling effect on or inhibit candid communications. In any event, even if the mere presence of cameras presented a risk of chilling jurors' deliberations, the court concludes it was not a risk sufficient to support a presumption of prejudice.

[6] The defendants make a conditional request to interview jurors: "Alternatively, *should the court desire additional information* supporting Defendants' request for an evidentiary hearing, Defendants respectfully request leave under LCvR47.1 to communicate with the jurors so that Defendants may have an opportunity to gather information in support of their motion, as they are currently prohibited from doing so." Doc. no. 199, at 2 (emphasis added). The court does not desire additional information, so the conditional request is moot. The request would, in any event, be denied.

one of the monitors, that, obviously, provides no basis for speculation that any juror's thinking was affected by the presence of the cameras. The defendants' assertion that "anyone watching [from the CSO control room] could nevertheless interpret gestures such as votes conducted by a show of hands, facial expressions or other body language," *id.*, is equally irrelevant. There is no suggestion here that anyone, with the benefit of a fleeting view of the monitor in the CSO control room, did anything–whether or not it could have affected a juror's thinking–on the basis of what that view might have disclosed. And any inquiry into whether the presence of the security camera in fact affected the thinking of a juror (*e.g.*, had a "prejudicial impact," doc. no. 184, at 11) is foreclosed by Rule 606 of the Federal Rules of Evidence. If we assume–charitably to the defendants–that the security and VTC cameras were an "outside influence" that was, by the mere passive presence of the cameras, "improperly brought to bear" within the meaning of Rule 606(b)(2)(B), that is all that could be proven without violating the prohibitions plainly set forth in Rule 606.[7] In Olano, a "*specific showing* that the alternate jurors in this case either participated in the jury's deliberations or 'chilled' deliberation by the regular jurors" was not made, and the verdict stood. Olano, 507 U.S. at 739 (emphasis added). In the case at bar, no "specific showing" sufficient to entitle defendants to relief could be made other than with juror testimony prohibited by Rule 606.

Stepping back and looking at all of the circumstances relevant to consideration of this motion, there is, quite simply, nothing sufficient even to raise a suspicion that

---

[7] In Dempsey, *supra*, the court observed that actual participation in deliberations by a non-juror would have entitled the defendant to a new trial "without demonstrating that it in fact affected the vote and thus prejudiced the defendant." *Id.* at 1092. In this case the equivalent of "actual participation" cannot be shown without impermissible juror testimony. (And that, of course, is aside from the fact that the facts as to the passive presence of the cameras fall far short of suggesting the potential for juror impact that would be inherent in "actual participation" by a non-juror.)

8

the mere passive presence of the security and VTC cameras might have had an impact on the jurors' deliberations in this case. Taking into account the facts which could permissibly be proven at an evidentiary hearing (and which the defendants might hope to prove), the court concludes that an evidentiary hearing is not warranted and that the motion is without merit.

## V.
## CONCLUSION

After careful consideration and for the foregoing reasons, the court concludes that the Defendants' Joint Motion for New Trial or, in the Alternative, Evidentiary Hearing, doc. no 184, should be, and is, **DENIED**.

Dated this 8th day of June, 2022.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

20-0240p056 rev_.docx