# IN THE DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-20-240-F |
| | ) | |
| BOBBY CHRIS MAYES, | ) | |
| CHARLES GOOCH, and | ) | |
| COURTNEY WELLS, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT MAYES' MOTION FOR NEW TRIAL
## BASED ON NEWLY DISCOVERED EVIDENCE

Throughout this entire case, Mr. Mayes has always maintained that he did not know pawn items were being overvalued or in-and-out transactions were taking place. At trial, the only witness who testified otherwise was the government's main witness, Andy Elliot, who, in keeping with his reputation for being a master manipulator, managed to obtain a non-prosecution agreement in exchange for his testimony before prosecutors had even met him. Consistent with Mr. Mayes' defense, new evidence has been discovered which confirms Mr. Elliott was not only responsible for the charged conduct, but intentionally concealed it. It is now abundantly clear that Mr. Elliott lied to the government to save himself and he lied at trial.

In light of this newly discovered evidence, which is set forth in greater detail below, Mr. Mayes respectfully submits that the interests of justice require this Court to enter an order granting him a new trial. In support of this motion, Defendant Bobby Chris Mayes states as follows:

## I. Factual Background

Pending before this Court are several post-trial motions, including a Rule 33 Motion for New Trial Based on Prosecutorial Error, and three individual Rule 29 Motions for Judgment of Acquittal. These motions were set to be heard on May 10, 2022. On May 9, counsel for Mr. Mayes filed a motion to continue the hearing based on events that unfolded over the weekend leading up to the hearing that resulted in the discovery of new evidence.

Specifically, on Tuesday, May 3, Courtney Wells' daughter approached Mr. Mayes' daughter, Mable, and told her that Ms. Wells left Oklahoma and was not coming back. *See* Affidavit of Mable Mayes, attached hereto as Exhibit "1." The next day, Mr. Mayes' daughter confronted him about leaving and he told her he had no intention of going anywhere. *Id.*

On Thursday, May 5 long-time Big Red employee Marti Lillard was cleaning out a closet at Oklahoma Motor Cars where Ms. Wells worked and discovered a black notebook containing notes that appeared to be written by Ms. Wells. *See* Affidavit of Marti Lillard, attached hereto as Exhibit "2." The content of these notes suggests that Ms. Wells was researching other countries to potentially live in. Ms. Lillard provided the notebook to Mr. Mayes. *Id.* Recalling his conversation with his daughter and knowing that Ms. Wells was on vacation, Mr. Mayes became concerned that Ms. Wells either had fled, or was planning to flee, and he contacted defense counsel about his potential reporting obligations. Defense counsel instructed Mr. Mayes to have someone from the dealership search Ms. Wells' office for evidence that she had in fact absconded.

On Saturday, May 7, Scott Banfield and Erin Allegre searched Ms. Wells' workspace and discovered a purple accordion folder containing: 1) printed email communications between Mr. Elliott and Ms. Wells spanning from 2013 to 2018, 2) copies of petty cash checks, and 3) copies of Norman Pawn and Gun checks with handwritten monthly totals of the line of credit amount. *See* Printed Emails, attached hereto as Exhibit "3"; Affidavit of Scott Banfield, attached hereto as Exhibit "4." The printed emails reveal a conspiracy between Mr. Elliott and Ms. Wells to falsify total loss letters, bribe Donna Mullins, steal from the dealership, overvalue pawn items, conduct in-and-outs, and most importantly, conceal it all from Mr. Mayes. The petty cash checks show money that Mr. Elliott and Ms. Wells stole from the dealership, and the handwritten monthly totals on the Norman Pawn & Gun checks show that Ms. Wells was tracking the line of credit in real time, contrary to her testimony at trial.

On Sunday, May 8, Mr. Mayes hand-delivered the accordion folder to defense counsel in Oklahoma City. After reviewing the contents of the folder and realizing its significance, defense counsel filed a motion on Monday, May 9 to continue the May 10 hearing. That same day, defense counsel contacted Assistant United States Attorney Tom Snyder to report Ms. Wells' possible abscension.

The parties appeared before the Court on May 10. Counsel for Mr. Mayes explained that new evidence was discovered over the weekend that would have materially aided Mr. Mayes' defense at trial and that additional time was needed to investigate the new evidence and, if necessary, file additional briefing. Counsel for Ms. Wells also confirmed at the hearing that Ms. Wells went on "vacation," that she left a note for her daughter suggesting

she did not intend to return, and that neither he nor her daughter had been able to reach her. The Court granted Mr. Mayes' request for a continuance and ordered supplemental briefing on the newly discovered evidence by June 10.

Later that day, counsel for Mr. Mayes specifically requested that Mr. Mayes search his emails and text messages for any communications from Ms. Wells. At that time, Mr. Mayes checked his personal email account, which he does not check on a regular basis[1], and discovered an email from Ms. Wells, dated May 3, 2022, which can only be described as a confession to the crimes for which the defendants were convicted. *See* Email Dated May 3, 2022 at 9:33 AM, attached hereto as Exhibit "6."

Ms. Wells explained in her email that she and Mr. Elliott had been lying to and stealing money from Mr. Mayes for years, that she never said anything because she "was so deep with him [she] was afraid [she]'d get all the blame and [Andy] would get nothing," and that she "[c]ouldn't say the truth in court or to anyone because then everyone would know [she] had been taking money and helping Andy." *Id*. Ms. Wells also stated that she would be gone by the time Mr. Mayes saw her email and that she left a folder for him in her desk "of a few emails and copies of checks." *Id*. The folder Ms. Wells was referring to appears to be the one that was discovered on Saturday, May 7. Ms. Wells also sent a follow-up email which states, "Fyi I told [my daughter] that you were going with us so she would

---

[1] Alias Forensics, a cybersecurity company, obtained the login information for Mr. Mayes' personal email account and confirmed that Mr. Mayes logged into his account on May 10, 2022 at 19:35:15, and the last log-in prior to that time was on April 5, 2022. *See* Affidavit of Andrew Peters, attached hereto as Exhibit "5."

4

feel better. Just wanted you to know in case she says something to the girls. I'm really sorry once again." *See* Email Dated May 3, 2022 at 12:35 PM, attached hereto as Exhibit "7."

On May 11, 2022, the Court granted the government's petition to revoke Ms. Wells' bond. As of the date of this filing, her whereabouts remain unknown.

**II.     Authentication Efforts**

Mr. Mayes has undertaken several different methods of authenticating the printed emails, which have been deleted from Ms. Wells' and Mr. Elliott's Big Red email accounts. On May 11, 2022, counsel for Mr. Mayes issued a subpoena to Google requesting all information and/or data (including email contents) for each of the printed emails that were found in Ms. Wells' folder. Google representatives responded to the subpoena and informed counsel they would only produce responsive documents if counsel agreed to narrow the scope of the subpoena so as not to include the contents of any communications. After much discussion, counsel for Mr. Mayes agreed to limit the scope of responsive documents to "header information" in the hopes that it would enable counsel to corroborate that an email was in fact sent on the specific dates and times of the printed emails. Ultimately, however, the printed emails were too old and Google was not able to provide any useful information to either confirm or deny the emails' existence. Mr. Mayes also retained Alias Forensics to conduct a forensic analysis of the tablet known to have been used by Ms. Wells in an effort to establish whether the printed emails, which had been deleted from Ms. Wells' and Mr. Elliott's email accounts, could be located on the tablet. The tablet is encrypted, however, and Alias Forensics has been unable to decrypt it.

While Google and Alias Forensics largely resulted in dead ends, other methods of authentication were more successful. Most notably, counsel for Mr. Mayes provided the printed emails to a forensic document examiner, Erich Speckin, for review. That document examiner has reached a number of conclusions regarding the emails that strongly support their authenticity. *See* Speckin Report and CV, attached hereto as Exhibits "8" and "9." First, Mr. Speckin compared the printed emails to other emails from the Big Red domain and identified no discrepancies or "misalignments." This is significant because it is Mr. Speckin's expert opinion that it would be extremely difficult for someone to falsify ten emails without any misalignments whatsoever. Additionally, Mr. Speckin compared the toner patterns on the printed emails to the toner patterns on other documents that were printed at the Big Red dealerships from 2013 to 2022. Based on this comparison, Mr. Speckin was able to conclude that three of the emails were printed or copied in 2018. Finally, Mr. Speckin has identified four different toner/paper combinations, meaning the emails were not all printed or copied at the same time. These observations taken together strongly support the credibility of the printed emails.

Additionally, Erin Allegre, the comptroller for Big Red Sports and Imports and Oklahoma Motor Cars, conducted an extensive review of the dealerships' financial records and has confirmed that at least $140,000 was stolen. *See* Affidavit of Erin Allegre, attached hereto as Exhibit "10." This corroborates the September 3, 2017 email from Mr. Elliott to Ms. Wells ("Hey gorgeous i will need some petty cash for this week, probably $4k malke sure you do the usual so the boss man doesn't see it going out and yes ill give you a little of it") as well as the May 3, 2022 email from Ms. Wells to Mr. Mayes, where she admits

to Mr. Mayes that she had been stealing from him for years. To further corroborate the fact that Mr. Elliott frequently stole money from the dealership, Ryan Harshaw, a former sales representative for The Key, confirmed that he witnessed Mr. Elliott stealing money from the safe at Big Red. *See* Affidavit of Ryan Harshaw, attached hereto as Exhibit "11." Likewise, Mr. Banfield confirmed that Mr. Elliott was fired in 2019 for stealing money from the Big Red auto auction account. *See* Exhibit "4."

### III. Argument and Authority

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." When considering Rule 33(a) motions based on newly discovered evidence, district courts are afforded "broad discretion because 'its vantage point as to the determinative factor—whether newly discovered evidence would have influenced the jury—has been informed by the trial over which it presided." *United States v. Jordan*, 806 F.3d 1244 (10th Cir. 2015) (quoting *United States v. Stewart*, 433 F.3d 273, 296 (2d Cir. 2006)). "Having presided over the trial, [the district court] is in a better position to decide what effect the newly discovered materials might have had on the jury." *Id*. (quoting *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995)).

"A district court serves as a 'gatekeeper to a new trial, deciding in the first instance whether the defendant's proffered new evidence is credible.'" *Jordan*, 806 F.3d at 1252 (10th Cir. 2015). The analysis by Mr. Speckin, which supports the authenticity of the printed emails, and the embezzlement uncovered by Ms. Allegre, which corroborates the

embezzlement discussed in the printed emails, both establish the credibility of the newly discovered evidence.

Having established the credibility of the new evidence, there are two tests for prevailing on a motion for new trial: the probability test, and the possibility test. Under the probability test, the defendant is entitled to a new trial if: 1) the evidence was discovered after trial; 2) the failure to learn of the new evidence was not caused by his own lack of diligence; 3) the new evidence is not merely impeaching; 4) the new evidence is material to the principals involved; and 5) the new evidence is of such a nature that it would probably produce an acquittal. *United States v. Sinclair*, 109 F.3d 1527 (10th Cir. 1997).

The Tenth Circuit has recognized, however, that a lower standard, known as the possibility test, should be applied when the government "knowingly, recklessly, or negligently" used perjured testimony. *Id*. at 1532. Under the possibility test, a defendant is entitled to a new trial if: 1) the court is reasonably well satisfied that the testimony given by a material witness is false, and 2) without it, the jury might have reached a different conclusion. *Id.*[2] The interests of justice require a new trial under either standard.

### A. A New Trial Is Warranted under the Possibility Standard

The possibility standard should be applied in this case because the government recklessly and negligently relied upon Mr. Elliott's perjured testimony to obtain a

---

[2] When the possibility test was first articulated, it also required that the defendant was surprised by the false testimony at trial. Courts have since rejected this element and found that, while surprise is a factor evincing the falsity of the testimony, it is not determinative of a defendant's right to a new trial. *Sinclair*, 109 F.3d at 1532 (citing *United States v. Liebowitz*, 919 F.2d 482 (7th Cir. 1990)).

conviction. Prosecutors in this case offered Mr. Elliott a non-prosecution agreement before they ever even met him because they knew from his hypothetical proffer letter that he would say what they wanted. They ignored witnesses who told them Mr. Elliott could not be trusted because prosecutors knew he was the only witness that would testify Mr. Mayes was aware of the conduct alleged in the Indictment.

At least six witnesses, including Scott Banfield, Jeremy Silva, Nathan Holmes, Roger Mayes, Brandon Myers, and Leana Waters, testified at trial that Mr. Elliott is dishonest, a "manipulator," a "liar," always has a plan "for the wrong, for the bad," is "like a snake," and is "not one bit honest." Tr. at 1950; 1994; 1998-84; 2030; 2043; 2070; 2096. Even the government ultimately agreed. Tr. at 2540 ("You've heard over and over and over again that Andy Elliott was a bad guy, he engaged in fraud, he was a liar, he was a snake. **We agree**."). But they needed Mr. Elliott's testimony to convict Mr. Mayes, so prosecutors negligently turned a blind eye to the overwhelming consensus, told to them by witnesses both before and during trial, that Mr. Elliott is a habitual liar. The government's reliance upon Mr. Elliott was reckless and negligent and, as a result, this Court should apply the possibility test. Under that test, a new trial should be granted where a material witness testified falsely, and the new evidence *might* have led the jury to reach a different result.

The newly discovered evidence clearly establishes that Mr. Elliott's testimony at trial was false. For example, Mr. Elliott testified that "everybody in the dealership that would be in upper management was a part of" total loss letters. Tr. at 242. When asked specifically who in management he was referring to, Andy testified, "I mean, Chris Mayes knows about it, Chuck Gooch knows about it, anybody – Courtney Wells knows about it.

I mean, anybody in the company knew what was going on inside of our company. I mean, everybody was in it." *Id*. He further testified that "the total loss letters were [made] by anybody and everybody who had access to a template." Tr. at 282. This testimony is directly contradicted by the April 5, 2013 email from Mr. Elliott to Ms. Wells, which states, "TL [total loss] are between me you and leann do not let chris know. Even if its peaks idea he will f***ing loose his s**t and he has no idea how a deal should be worked."

Mr. Elliott testified that Mr. Mayes was directly involved in giving Donna Mullins money, claiming that "Chris Mayes and Courtney and Donna" knew about the bribes and that "me and Chris and Courtney paid" bribes to Donna. Tr. at 496-97; 506; 537. He further testified that "[n]obody ever handed Donna Mullins a dollar, except me, and I was handed it from Courtney by permission of Chris." Tr. at 537-38. This testimony is directly contradicted by the March 16, 2016 email from Mr. Elliott to Ms. Wells, which states, "He's not going to find shit out. Donna knows not to tell him and whats he going to do look through our private texts??? Just handle your part and itll be cool."

Mr. Elliott testified that he talked to Mr. Mayes about pawn items "all the time." (Tr. at 271). This is directly contradicted by the August 31, 2017 email from Ms. Wells to Mr. Elliott, which states, "Chris is going crazy over the pawn values. … You said he would never figure it out and now hes going crazy on me [] asking what happened." Critically, this email also corroborates Mr. Mayes' defense at trial that he first learned items were being overvalued in August 2017 when Faith Edwards, a long-time Big Red employee, went to him with information about a copier that stood out to her as being significantly overpriced. Tr. at 1633. Ms. Edwards testified that after she brought the copier to Mr.

10

Mayes' attention, the pawn shop stopped immediately. *Id*. While the government claimed that Mr. Mayes shut down the pawn shop because Ms. Moody was preparing to send anonymous packages to lenders (packages went out in September 2017 and there is no evidence that Mr. Mayes had any knowledge of what Ms. Moody was planning to do), the August 31, 2017 email confirms that Ms. Edwards was in fact telling the truth.

Mr. Elliott testified that he was afraid of Mr. Mayes and felt threatened by him. Tr. at 430. He further testified that everything he did was at the direction of Mr. Mayes. Yet, the September 3, 2017 and February 12, 2018 emails demonstrate that Mr. Elliott and Ms. Wells had been stealing from Mr. Mayes for years. Mr. Elliott told Ms. Wells, "i got this. You stress way too much over nothing. … I promise the boss man will never find out. I've got him sold on these guys are all straight and would never give cash under the table. He suspects NOTHING! Now relax and let daddy do his job." The fact that Mr. Elliott and Ms. Wells were embezzling from Mr. Mayes makes it highly unlikely that Mr. Elliott was telling the truth when he testified that he was afraid of Mr. Mayes and only did what Mr. Mayes told him to do.

Having established that Mr. Elliott's testimony was false, the Court must consider whether the jury *might* have reached a different conclusion if the new evidence had been available. It is clearly the case that, had the printed emails and/or the May email been available at the time of trial, the jury might have concluded that Mr. Mayes was innocent.

**B.      A New Trial Is Warranted under the Heightened Probability Standard**

Even under the heightened probability standard, a new trial is warranted. As to the first and second factors, the new evidence was discovered after trial and the failure to learn

of it was not caused by Mr. Mayes' own lack of diligence. "Due diligence does not require that a defendant exercise the highest degree of diligence possible to locate evidence prior to trial; only 'reasonable diligence' is required." *United States v. LaVallee*, 439 F.3d 670, 701 (10th Cir. 1970). Prior to trial, Mr. Mayes conducted a search of company emails for anything related to the practices alleged in the Indictment. The printed email communications that were found in the accordion folder were not discovered at that time because they had been deleted and there was no way for Mr. Mayes to know they existed. Nor was there any reason for Mr. Mayes to suspect Ms. Wells had been embezzling from him. It wasn't until Ms. Wells absconded that the chain of events leading to the discovery of the new evidence was set into motion.

As to the third factor, the new evidence is not merely impeaching because, while it does contradict Mr. Elliott's testimony at trial, it goes beyond that and negates Mr. Mayes' guilt of the crimes for which he was convicted. For that same reason, the new evidence is material to the principals involved. Mr. Mayes' defense has never been that pawn shop items were not being overvalued or that in-and-out transactions were not occurring; his defense was that he did not know. The new evidence goes directly to his knowledge and confirms not only that he was completely unaware of the practices taking place at the dealerships, but that Mr. Elliott and Ms. Wells intentionally kept him in the dark.

Finally, the new evidence is of such a nature that it would probably produce an acquittal at a new trial. *See Casias v. United States*, 337 F.2d 354, 356 (10th Cir. 1964) ("No one can doubt that a confession by another party to the crime for which the petitioner has been tried and convicted, if discovered after conviction, would be grounds for a new

trial."). This is particularly true when considered in conjunction with the weight of the evidence against him, which is more fully briefed in Mr. Mayes' Rule 29 motion. (Doc. Nos. 198, 218). As the Court acknowledged near the end of the government's case-in-chief, the government presented "general testimony that [Mr. Mayes] knew what was going on, but little or no evidence tying him to specific transactions." Tr. at 1686-89. The testimony that Mr. Mayes "knew what was going on" was provided solely by Mr. Elliott, who is the only person that testified Mr. Mayes knew pawn items were being overvalued and in-and-out transactions were taking place. Mr. Elliott's testimony was the lynchpin of the government's case against Mr. Mayes, and the new evidence proves that it was false. Without any credible testimony that Mr. Mayes "knew what was going on," and no evidence tying him to specific transactions, Mr. Mayes would likely be acquitted.

### C. The Newly Discovered Evidence Is Admissible

Finally, in order for the new evidence to produce an acquittal under either standard, it must be admissible. *United States v. Hill*, 737 F.3d 683, 687 (10th Cir. 2013) ("Implicit in a claim of newly discovered evidence is that there is new *evidence* – that is, material and admissible at trial."). Assuming Mr. Elliott testified at a new trial and his testimony at the new trial mirrored his testimony in the first trial, the printed emails would be admissible as prior inconsistent statements. Even if Mr. Elliott did not testify, the emails would be admissible under Fed. R. Evid. 804(b)(3), which provides a hearsay exception for statements against interest. This exception applies when: i) the declarant is unavailable; (ii) a reasonable person in the declarant's position would have made the statement only if it

13

were true, because it is so against the declarant's interest; and iii) there are sufficient corroborating circumstances to clearly indicate the statement's trustworthiness.

A declarant is considered unavailable if, in relevant part, he is exempted from testifying because a privilege attaches, or he is absent from trial and the statement's proponent is unable through process or reasonable means to procure his attendance. Ms. Wells is an unavailable declarant because she has absconded and her whereabouts are unknown, so it would be impossible for Mr. Mayes to procure her attendance at a new trial. Additionally, even if Ms. Wells were found, both Ms. Wells and Mr. Elliott may assert their Fifth Amendment right, which would render them unavailable due to privilege. *See United States v. Baca*, 447 F.Supp.3d 1149, 1211 (D.N.M. March 20, 2020) (concluding that a co-conspirator who invoked his Fifth Amendment right to silence was unavailable for purposes of 804(b)(3)).

In order for a statement to be so against the declarant's interest that a reasonable person would only say it if it were true, it "must be against the declarant's proprietary, pecuniary, or penal interest." *United States v. Lozado*, 776 F.3d 1119, 1125 (10th Cir. 2015). A reasonable person would clearly know that embezzling from your employer and bribing a loan officer could subject him to criminal prosecution. Moreover, when the declarant's actual knowledge as to the potential consequences of the statement can be established, that is part of the "reasonable person" calculus. *Id*. at 1126. In this case, the statements themselves reveal that Mr. Elliott and Ms. Wells had actual knowledge of the pecuniary consequences of their statements. *See* Exhibit 3 ("If chris finds out weve been giving her money … we are f***ed. He will fire us and sue us until we are dead or broke.").

Finally, there are sufficient corroborating circumstances that clearly indicate the trustworthiness of the newly discovered evidence. The Sixth Circuit held in *United States v. Price* that 804(b)(3) does not require the information within the statement be clearly corroborated; "it requires only that there be corroborating circumstances which clearly indicate the trustworthiness of the statement itself." 134 F.3d 340, 347 (6th Cir. 1998). Likewise, the Seventh Circuit held in *United States v. Garcia* that the trial court "does not need to be completely convinced as a prerequisite to admission that the exculpatory statements are true. Rather, the trial court need only find that sufficient corroborating circumstances exist which indicate the statement's trustworthiness. The jury may then make the ultimate determination concerning the truth of the statements." 986 F.2d 1135, 1141 (7th Cir. 1993). For all the reasons set forth above, including but not limited to the document examination by Mr. Speck and the embezzlement uncovered by Ms. Allegre, the printed emails and the May 3 email are sufficiently corroborated by circumstances that clearly indicate their trustworthiness.

IV. **Conclusion**

The newly discovered evidence in this case confirms that Mr. Elliott and Ms. Wells conspired together to commit the crimes for which Mr. Mayes was convicted. Consistent with Mr. Mayes' testimony at trial, the new evidence establishes that Mr. Elliott and Ms. Wells actively worked to conceal the charged conduct from him and that Mr. Elliot lied when he testified that Mr. Mayes was a knowing participant. It is not only possible, but probable, that a jury hearing this new evidence would conclude that Mr. Mayes is innocent.

Therefore, pursuant to Rule 33(a) and the interests of justice, Mr. Mayes respectfully requests this Court enter an order granting a new trial.

          Respectfully submitted,

          /s/ Rachel N. Jordan
          Rachel N. Jordan, OBA # 32704
          HB LAW PARTNERS, PLLC
          4217 28th Avenue NW, Suite 101
          Norman, OK 73069
          Telephone - (405) 561-2410
          Facsimile - (405) 563-9085 (fax)
          rjordan@hblawpartners.com
          Attorney for Mr. Mayes

          /s/ Vicki Zemp Behenna
          Vicki Zemp Behenna, OBA # 10734
          Wm. Brett Behenna, OBA # 30485
          BEHENNA GOERKE KRAHL & MEYER, PLLC
          210 Park Avenue, Suite 3030
          Oklahoma City, OK 73102
          Telephone - (405) 232-3800
          Facsimile - (405) 232-8999
          vzb@lawfirmokc.com
          bb@lawfirmokc.com
          Attorneys for Mr. Mayes

          s/ William H. Bock
          William H. Bock, OBA # 13888
          WILLIAM H. BOCK, INC.
          6402 N. Santa Fe Avenue, Suite A
          Oklahoma City, Oklahoma 73116
          (405) 848-5400
          (405) 848-5479 Fax
          billybock@wbocklaw.com
          Attorney for Mr. Mayes

**CERTIFICATE OF SERVICE**

    I hereby certify that on the 17th day of June, 2022, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and

transmittal of Notice of Electronic Filing, which will automatically send e-mail notification of such filing to all attorneys of record.

/s/ Rachel N. Jordan