*Speckin Forensics, LLC*

120 N. WASHINGTON SQUARE, SUITE 300
PMB 5068
LANSING, MICHIGAN 48933
517-349-3528 • FAX 954-839-8219

PLEASE DIRECT CORRESPONDENCE & PAYMENT HERE:
110 E. BROWARD BOULEVARD, SUITE 1700
FORT LAUDERDALE, FLORIDA 33301
954-763-6134 • FAX 954-839-8219

www.4N6.com

LEONARD A. SPECKIN
RETIRED DOCUMENT ANALYST

MICHAEL J. SINKE
RETIRED LATENT PRINT SPECIALIST
RETIRED CRIME SCENE RECONSTRUCTION
RETIRED FORENSIC DOCUMENT ANALYST

ROBERT D. KULLMAN
RETIRED FORENSIC DOCUMENT ANALYST

DR. GEORGE F. JACKSON Ph.D.
TOXICOLOGIST

ERICH J. SPECKIN
FORENSIC DOCUMENT ANALYST
INK DATING SPECIALIST

ROGER J. BOLHOUSE MBA
LABORATORY DIRECTOR
CRIME SCENE RECONSTRUCTION
FORENSIC ANALYST & CONSULTANT

THOMAS K. HUARD Ph.D.
DNA ANALYST & CONSULTANT

TERRY NADEAU
ARSON INVESTIGATOR

RICHARD L. BRUNELLE
RETIRED INK DATING CONSULTANT

DR. LAURENCE R. SIMSON M.D.
RETIRED FORENSIC PATHOLOGIST

ANTHONY A. MILONE
COMPUTER & GRAPHICS SPECIALIST
FORENSIC DOCUMENT SPECIALIST

DR. JULIE HOWENSTINE
SEROLOGIST
DNA ANALYST & CONSULTANT
CRIME SCENE RECONSTRUCTION

June 17, 2022

Brett Behenna
Behenna Goerke Krahl & Meyer
210 Park Ave. Suite 3030
Oklahoma City, OK 73102

Our File Number: 20220113
Re: US v. Mayes et al.

Dear Mr. Brett Behenna,

I am by training and experience a Forensic Document Analyst. I have been employed by Speckin Forensic Laboratories from 1993 to the present and have been the president of Speckin Forensic Laboratories since 1999. My primary function in my employment is the examination of documents to determine authorship as well as when documents were created and if they have been altered, changed, or added to.

I received my forensic document examination education beginning in 1993 through 1995. I then trained in the chemical analysis of inks to determine the age of documents from 1995 – 1996. I have a degree in Chemistry from Michigan State University.

I am the author or co-author of fourteen scientific papers in the field of forensic analysis and have testified as an expert in the field of Forensic Document Analysis in nearly four hundred matters – both civil and criminal – in over thirty states and eleven countries. A copy of my current Curriculum Vitae is attached as Exhibit 1. A list of cases that I have presented sworn testimony in is attached as Exhibit 2.

I have examined many cases of created documents, composite documents and documents created after the fact. In one very similar case I was able to prove that a series of emails had been fabricated regarding the movie rights to the movie The Last Samurai.

I am being compensated at a rate of $600 per hour. My compensation in this matter is in no way contingent on the content of my opinion, or on the outcome of this matter.

I received the purported original questioned documents by electronically first, then I received for examination via UPS Next Day Air (1ZR0X2974490161933). I further reviewed documents from the dealership in Oklahoma City onsite.  The examination task was to determine if the questioned documents were created on or about their purported dates or were manufactured or created after the fact.

Original Questioned Documents:

Q-1:    E-mail to Courtney Wells, Dated 4/5/2013
Q-2:    E-mail to Andy Elliott, Dated 3/16/2016
Q-3:    E-mail to Courtney Wells, Dated 3/16/2016
Q-4:    E-mail to Courtney Wells, Dated 8/4/2017
Q-5:    E-mail to Andy Elliott, Dated 8/4/2017
Q-6:    E-mail to Andy Elliott, Dated 8/31/2017
Q-7:    E-mail to Courtney Wells, Dated 9/3/2017
Q-8:    E-mail to Andy Elliott, Dated 2/12/2018
Q-9:    E-mail to Courtney Wells, Dated 2/12/2018
Q-10:  E-mail to Andy Elliott, Dated 4/13/2018

Documents from Purple Folder:

K-1:    1. Deal Recap - Jody Moore 12-07-2017 [Triplicated].pdf
K-2:    2. Deal Recap - Shane Bailey Sr. - 12-30-2017 [Non-triplicated].pdf
K-3:    3. Assignment of Membership Interest - Courtney Wells - 03-07-2022.pdf
K-4:    4. Travis Copley - Invoice - 12-31-2017.pdf
K-5:    5. Assignment of Membership Interest - C. Wells - 3-7-22.pdf
K-6:    6. Deal Recap - Gart Fravert 12-31-17 [Triplicated].pdf
K-7:    7. OK Tax Commission - Mitsubishi 1-5-2018.pdf
K-8:    8. Copy of Checks payable to Petty Cash - BRSI - 2016.pdf
K-9:    9. Notes re Browser _ Destinations.pdf

Documents from Yellow Folder:

K-10:  1. Account Transactions - Republic Bank _ Trust - 2017.pdf
K-11:  2. NPG, LLC - Checks - 2017.pdf
K-12:  3. Account Transactions - Republic Bank _ Trust - NPG - 2015.pdf
K-13:  4. NPG, LLC - Checks - 2016.pdf
K-14:  5. Check Search by Payee - 10-18-2017.pdf
K-15:  6. Check Search by Payee - 10-18-2017.pdf
K-16:  7. NPG, LLC - Checks - 2016.pdf
K-17:  8. NPG, LLC - Checks - 2017.pdf
K-18:  9. BRSI - Fees Owed Others - 03-03-2017.pdf
K-19:  10. Account Transactions - Republic Bank _ Trust - 2016.pdf
K-20:  11. NPG, LLC - 2017.pdf
K-21:  12. Account Transactions - Republic Bank _ Trust - 2016.pdf

K-22:  13. Account Transactions - Republic Bank _ Trust - 2016.pdf
K-23:  14. Account Transactions - Republic Bank _ Trust - 2016.pdf
K-24:  15. Account Transactions - Republic Bank _ Trust - 2016.pdf
K-25:  16. Account Transactions - Republic Bank _ Trust - 2016.pdf
K-26:  17. Account Transactions - Republic Bank _ Trust - 2016.pdf
K-27:  18. Account Transactions - Republic Bank _ Trust - 2016.pdf
K-28:  19. Account Transactions - Republic Bank _ Trust - 2016.pdf

Documents in Black Folder:

K-29:  Handwritten notes

I further received known handwriting of Courtney Wells for comparison to K-29 to determine if the handwriting on the pages were authored by Courtney Wells or not.

Procedure:

*Visual Document Examination*

A visual examination of the documents was conducted using alternate lighting sources and transmitted light. This included an inspection with the naked eye as well as under magnification using a microscope.

*ESDA*

ESDA (Electro Static Detection Apparatus) impressions are latent impressions that are generally left when information is written on a top page, leaving an impression or impressions on the page or pages underneath. The ESDA is a generally (or universally) accepted tool for forensic analysis of documents, used by police departments and forensic document analysts around the country, as well as by the Federal Bureau of Investigation and other federal agencies. While conducting my ESDA examinations I adhered to the procedures set forth by the manufacturer, the training I have received in the use of this instrument and the American Society for Testing and Materials guide for the examination of indentations (E 2291-03) and further detailed by SWGDOC Standard for Indentation Examination. These procedures are generally accepted as appropriate in the field of forensic document analysis.

ESDA examinations were performed on the front sides of each questioned document (Q-1 through Q-10) and the K-29 group of handwritten pages.

*VSC6000*

The VSC6000, among other things, uses ultraviolet light and infrared analysis techniques to evaluate and compare inks and/or latent chemicals on documents. The VSC6000 is universally accepted tool for forensic analysis of documents, used by police departments and forensic

document analysts around the country, as well as by the Federal Bureau of Investigation and other federal agencies. While conducting the VSC6000 examinations of the questioned document, I adhered to the procedures set forth by the manufacturer and the training I have received in the use of this instrument. These procedures are generally accepted as appropriate in the field of forensic document analysis.

*Toner Comparison by Thin-layer Chromatography*

Samples of black toner were taken from each questioned document to compare the toner on each questioned document (Q-1 through Q-10). To sample the toner, a Harris Uni-Core (0.5 mm) tool was used to remove a small portion of the toner line. Four punches from each selected writing were compared by extracting with 6 µL of pyridine for 3 minutes. Then, 4 µL of each extract was spotted on a thin layer chromatography (TLC) plate. The TLC plates was developed in a solvent mixture of ethyl acetate, ethanol, and water (70:35:30). The samples were then compared based on the dye separations, colors, number of bands, and relative intensities.

Results:

*Visual Document Examination*

After receiving the questioned documents for examination, the paper was examined for a watermark, and no watermark was present. The questioned documents were examined for misalignments and no misalignments were identified. Two questioned documents (Q-1 and Q-7) were printed containing color while the other questioned documents were not printed in color. Q-1 and Q-7 contained the logo for Big Red Sports/Imports printed color.

An alignment grid was used to examine the text within each document and compare the text, the format of the emails, the headers, and the lines near the headers.   No misalignments were noted within any of the questioned documents.   It would be difficult for a person to cut-and-paste 10 documents together with no observed misalignments.

The questioned documents were examined for photocopy printer damage. Three questioned documents (Q-2, Q-5, and Q-9) were determined to have the same photocopy printer damage. This is evidence that the three questioned documents were photocopied and on the same printer and share a common source. The photocopy printer damage was compared to the submitted documents and the same photocopy printer damage was not identified in any of the submitted documents.

The options and processes for printing an email through Gmail were researched/tested. Based on this testing it was determined that four questioned documents, Q-2, Q-6, Q-8, and Q-10, headers and footers were redacted. When an e-mail through Gmail, there is an option to include or exclude a header and footer. If the end user chooses to exclude the header and footer, both the header and footer will not be printed on the e-mail. If the end user chooses to include the header and footer, the header will contain the printed date, folder the e-mail was in, and the subject of the e-mail in the header, and the footer will contain the URL for the e-mail. On Q-2, Q-6, Q-8, and Q-10, there is a header without the footer and the header is missing the printed date to the

left. This is a likely reason why there is also evidence of a photocopier being used to create the documents as well as printers. All the other questioned documents (Q-1, Q-3, Q-4, Q-5, Q-7, and Q-9) did not have a header and footer.

*ESDA*

There were no significant impressions identified on the questioned documents.

*VSC6000*

The questioned documents were examined and compared to one another with infrared lighting, UV lighting, and under spot fluorescence. There were no differences identified when examined and compared.

*Toner Comparison by Thin-layer Chromatography*

After examining the TLC plate, the results show at least four different toner/paper combinations. The first is Q-3 and Q-4; Q-2 and Q-8; Q-9 and Q-10, and then Q-1, Q-5, Q-6, and Q-7.

*Handwriting examinations*

Based on the formative, spatial, and proportional similarities that exist between the K-29 group of handwritten notes and the known writings of Courtney Wells that were submitted, it is my opinion that the K-29 group of writings were written by Courtney Wells.

*Further examination*

Based on the photocopy damage patterns that were noted above on the three documents, a site visit was made to observe documents that were created in the normal course of the dealership and contained in the personnel files and car sales files spanning from 2013 to 2020.

The damage pattern observed in the three noted questioned documents (Q-2, Q-5, and Q-9) was found in samples from November 2018 and not in other times frames examined.

Conclusion:

My opinion is based on the observations I made during my examinations and my ability to evaluate these observations, based on the training and experience I have in the area of document examination. It is my opinion that it is highly probable that:

1. The questioned documents were not all created at the same time based on the photocopier damage patterns and the variety of toner/paper combinations.
2. The K-29 group of pages was authored by Courtney Wells.
3. The printing alignment of the text within each email shows no evidence of cut-and-paste type creation.

4.  The three pages (Q-2, Q-5, and Q-9) with similar photocopy damage patterns correspond to a copied date in or about November 2018 and no other time frames. It is significant to note that these three emails show different toner/paper formulations and were not done on the same machine at the same time.
5.  The comparison to other documents made onsite is strong evidence that at least the three noted emails with the observable damage patterns were created/printed in late 2018.

These opinions are drawn to a reasonable degree of scientific certainty and based on recognized scientific principles.

Very truly yours,

Erich J. Speckin
Forensic Document Analyst