# IN THE UNITED STATES DISTRICT COURT FOR THE

# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| -vs- | ) | **No. CR-20-240-F** |
| | ) | |
| **BOBBY CHRIS MAYES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## UNITED STATES' OPPOSITION TO
## DEFENDANT CHRIS MAYES' MOTION FOR A NEW TRIAL (DOC. 227.)

ROBERT J. TROESTER
United States Attorney

s/ THOMAS B. SNYDER
THOMAS B. SNYDER
Assistant United States Attorney
OBA# 31428
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8781 (Office)
(405) 553-8888 (Fax)
thomas.snyder@usdoj.gov

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .............................................................................................ii

BACKGROUND ............................................................................................................ 1

ARGUMENT .................................................................................................................. 2

I.  DEFENDANT CANNOT MEET THE HIGH LEGAL STANDARD
    REQUIRED TO JUSTIFY A NEW TRIAL ..................................................... 2

II. NONE OF THE DEFENDANT'S PROFFERED NEW EVIDENCE
    JUSTIFIES GRANTING A NEW TRIAL IN THIS CASE ................................... 5

    A. Background ................................................................................................. 5

    B. Ms. Wells' May 2022 New e-Mails are Inadmissible ........................................ 6

        1. Defendant cannot authenticate the e-mails ................................................... 6

        2. The e-mails are inadmissible hearsay ............................................................ 9

    C. The Old E-Mails Offered by Defendant are Inadmissible .............................. 10

        1. If real, the Old E-mails should have been discovered, but for
           Defendant's lack of due diligence .............................................................. 12

        2. Defendant is unable to authenticate the Old E-mails .................................. 12

            i.   The Old E-Mails Are Refuted By The Only Author Available
                 to Testify ......................................................................................... 13

            ii.  A Comparison to Known E-Mails Shows That the Old E-Mails
                 are Not Authentic ............................................................................. 13

            iii. The Old E-Mails Cannot be Authenticated Under a Totality of the
                 Circumstances Approach ................................................................... 15

            iv.  Mr. Speckin's Report Does Not Authenticate the Old E-Mails In
                 Any Way ........................................................................................... 19

    D. The Evidence of Purported Additional Fraud is Not Newly Discovered, is
       Merely Impeaching, and Does Not Constitute Grounds for a New Trial ........ 22

CONCLUSION ............................................................................................................ 24

CERTIFICATE OF SERVICE ..................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*E.E.O.C. v. Ethan Allen, Inc.,*
  259 F.Supp.2d 625 (N.D. Ohio 2003) ............................................................. 19

*United States v. Chatman,*
  994 F.2d 1510 (10th Cir. 1993) ...................................................................... 3

*United States v. Fluker,*
  698 F.3d 988 (7th Cir. 2012) ......................................................................... 13

*United States v. Hammers,*
  942 F.3d 1001 (10th Cir. 2019) ..................................................................... 10

*United States v. Henry,*
  164 F.3d 1304 (10th Cir. 1999) ..................................................................... 13

*United States v. Lebya,*
  504 F.2d 441 (10th Cir. 1974) ....................................................................... 3

*United States v. Lopez,*
  382 Fed. Appx. 680 (10th Cir. 2010) ......................................................... 3, 5

*United States v. Lozado,*
  776 F.3d 1119 (10th Cir. 2015) ..................................................................... 9

*United States v. Mitrione,*
  357 F.3d 712 (7th Cir. 2004) ......................................................................... 4

*United States v. Quintanilla,*
  193 F.3d 1139 (10th Cir. 1999) ..................................................................... 3

*United States v. Redcorn,*
  528 F.3d 727 (10th Cir. 2008) ....................................................................... 2

*United States v. Safavian,*
  435 F.Supp.2d 36 (D.D.C.2006) ................................................................... 13

*United States v. Siddiqui,*
  235 F.3d 1318 (11th Cir. 2000) ..................................................................... 13

*United States v. Sinclair*,
　109 F.3d 1527 (10th Cir. 1997)..............................................................2, 3, 4

*United States v. Weninger*,
　624 F.2d 163 (10th Cir. 1980)..................................................................2

## State Cases

*Re Estate of Wang Teh Huei*,
　2002 WL 1341762 (2002)..........................................................................19

## Federal Statutes

18 U.S.C. § 513(a) ........................................................................................1

18 U.S.C. § 1028A(a)(1) ..............................................................................1

18 U.S.C. 1343 ............................................................................................1

18 U.S.C. 1349 ............................................................................................1

## Federal Rules

Fed. R. Evid. 804(b)(3)(B) ..........................................................................10

Fed. R. Evid. 901(b)(1)................................................................................12

Fed. R. Evid. 901(b)(3)................................................................................13

Fed. R. Evid. 901(b)(4)................................................................................13

The United States of America, by and through United States Attorney Robert J. Troester and Assistant United States Attorney Thomas B. Snyder hereby submits its response to Defendant Bobby Chris Mayes' Amended Motion for New Trial Based on Newly Discovered Evidence (Doc. 227). The Defendant's Motion, which purports to be based on newly discovered evidence is actually supported by no evidence at all. The proffered evidence is wholly inadmissible, does not qualify as "newly discovered evidence," or both. Ultimately, the Motion offers no legal or factual basis to grant a new trial or disturb the verdict of the jury previously entered in this case.

## BACKGROUND

On September 16, 2020, a federal grand jury indicted Bobby Chris Mayes, Charles Gooch and Courtney Wells on twenty-five counts, including Conspiracy to Commit Wire Fraud (Count 1) in violation of 18 U.S.C. § 1349; Wire Fraud (Counts 2–13) in violation of 18 U.S.C. § 1343; Uttering Forged Securities (Counts 14–19) in violation of 18 U.S.C. § 513(a) and Aggravated Identity Theft (Counts 20-25) in violation of 18 U.S.C. § 1028A(a)(1). (Doc. 1.)

On November 3, 2021, all three defendants proceeded to trial. On November 19, 2021, the jury returned its verdicts – guilty as to Mr. Mayes and Mr. Gooch on all counts, and guilty as to Ms. Wells on Counts 1, 3, 4, 7–10 and 14–25. The jury returned not guilty verdicts as to Ms. Wells on Counts 2, 5, 6, 11, 12, and 13.

Afterwards, the Defendants filed a series of motions challenging the verdict, including motions for acquittal and a motion for new trial based on alleged government misconduct. Those motions were set for hearing on May 10, 2022. (Doc. 211.) On May

9, 2022, Mr. Mayes' counsel claimed to have discovered information that led to the chain of events and "new evidence" which now underlies the present motion. (Doc. 221). Defense counsel requested the opportunity to investigate and brief these news issues and the current motion is the result of those efforts. (*Id.*)

## ARGUMENT

## I. DEFENDANT CANNOT MEET THE HIGH LEGAL STANDARD REQUIRED TO JUSTIFY A NEW TRIAL

Rule 33 of the Federal Rules of Criminal Procedure permits a district court to grant a new trial "if the interest of justice so requires." However, the Tenth Circuit has noted that this standard is "extremely stringent." *See United States v. Weninger*, 624 F.2d 163, 167 (10th Cir. 1980). When evaluating a motion for a new trial on the basis of newly discovered evidence, the Tenth Circuit analyzes five factors:

> (1) The evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by [his] own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997) (citations omitted). It is also required that the evidence offered in support of the motion must be actual evidence which would be admissible at any new trial. *See United States v. Redcorn*, 528 F.3d 727, 744 (10th Cir. 2008) (upholding the denial of a motion for a new trial, noting that at least some of the proffered evidence was "both inadmissible and incorrect").

Motions for new trial are disfavored for obvious reasons. The finality of jury verdicts would be far too easily undermined if defendants were allowed to obtain a new

trial based on evidence that was either reasonably available to them at the time of the first trial, is of such a character that it either would not be admissible in any trial, or is not material. Accordingly, it has long been held that "[a] motion for a new trial is not regarded with favor and should only be granted with great caution." *Sinclair*, 109 F.3d at 1531 (citing *United States v. Chatman*, 994 F.2d 1510, 1518 (10th Cir. 1993)).

Moreover, when the "[the defendant] could have reasonably anticipated the relevance [of the evidence] to his defense and sought to obtain [the evidence] before trial," a new trial is not warranted. *Sinclair*, 109 F.3d at 1531. "It is too well settled for discussion that a new trial is not warranted by evidence which, with reasonable diligence, could have been discovered and produced at the trial." *United States v. Lebya*, 504 F.2d 441, 442–43 (10th Cir. 1974).

Further, "[e]vidence, newly discovered or otherwise, which touches only on issues tangential to a defendant's defense, cannot serve as an adequate foundation for granting a new trial." *United States v. Quintanilla*, 193 F.3d 1139, 1148 (10th Cir. 1999) (citing *Sinclair*, 109 F.3d at 1531). Moreover, evidence which merely impacts the potential credibility of a witness often does not meet this high standard because "the jury had the opportunity to view the witness and assess their credibility, and in rendering its verdict against [the defendant], it is evident it credited the testimony of the government's witness over him . . . ." *United States v. Lopez*, 382 Fed. Appx. 680, 688 (10th Cir. 2010).

Because none of the evidence offered in support of the Motion actually meets the high hurdles required by Rule 33, the motion can be denied on that basis alone. However, it helpful to address the motion's claim that there are two tests that can be applied when

evaluating a new trial motion – the probability test and the possibility test, the latter being a much more relaxed standard. The motion argues that the Court should apply the possibility test because the "government recklessly and negligently relied upon Mr. Elliott's perjured testimony" to obtain a conviction. (Doc. 227, p. 8-9.) There are numerous defects in this position. First, it is bootstrapping because it is only if the Court accepts the new evidence as authentic that the argument could be made that Mr. Elliott perjured himself. Second, the argument is internally incoherent. If the new e-mails are accepted as authentic, the defendant's motion must also demonstrate how these materials were not reasonably discoverable by them through the exercise of due diligence (something they completely fail to do). In other words, they must justify that these materials were so hidden or secret that they could not have found them prior to trial. If they are able to make such a showing, it is simply impossible to then argue that the *Government* was allegedly reckless or negligent in failing to uncover these "secret" e-mails.

Finally, the Tenth Circuit has denied adopting a possibility standard. "[W]e have never expressly adopted [the possibility] test for the granting of new trials . . . this court has applied the stricter probability standard in cases involving the post-trial discovery of perjury and the recantation of testimony." *Sinclair*, 109 F.3d at 1532. Additionally, the Seventh Circuit, in which the possibility test originated, overruled the possibility test and replaced it with the "reasonable probability test" followed in other circuits. *United States v. Mitrione*, 357 F.3d 712, 717–18 (7th Cir. 2004), *vacated on other grounds*, 543 U.S. 1097 (2005). The Tenth Circuit has "consistently and repeatedly applied the 'probability

standard' to motions for a new trial based on newly discovered evidence." *United States*

*v. Lopez*, 382 Fed. Appx. 680, 687 (10th Cir. 2010) (citations omitted).

## II.  NONE OF THE DEFENDANT'S PROFFERED NEW EVIDENCE JUSTIFIES GRANTING A NEW TRIAL IN THIS CASE

### A.  Background

Before turning to the specifics of the evidence that is offered in the Defendant's

Motion, it is worth noting the highly dubious nature of the way in which this entire scenario

unfolded.  Ms. Wells was last seen on May 2, 2022.  According to probation, Ms. Wells

was scheduled for a camping trip that ran from May 2, 2022, to May 8, 2022.  Attached

hereto as Exhibit 2 is the documentation of that reservation.  Ms. Wells is a single mother

of an 18-year-old daughter.  Mother's Day 2022 was on May 8, 2022.  Ms. Wells was

understandably scheduled to return to be with her daughter on Mother's Day.  Furthermore,

it is believed that Ms. Wells' daughter was scheduled to graduate from high school in May

2022, an important milestone.  Further, presentence reports are not completed and

sentencing is still a long way off for any of the defendants, so Ms. Wells did not face any

threat of incarceration for many months.  In fact, the Court was poised to rule on existing

new trial/acquittal motions at the May 10 hearing which, if successful, could have

eliminated her conviction entirely.

Set against this backdrop, the notion that Ms. Wells decided to become a fugitive,

abandoning her daughter just prior to Mother's Day and her high school graduation with

nothing that would explain or justify the timing of such a decision, is more than a little hard

to beleive.  Simultaneously, Mr. Mayes purports to have discovered a trove of information

that strongly implicates Ms. Wells (and Mr. Gooch) in criminal behavior and purports to exonerate him. The *only* person who benefits in any way from Ms. Wells' inexplicable disappearance is Mr. Mayes.

### B. Ms. Wells' May 2022 New e-Mails are Inadmissible

The first set of e-mails that the Defendant's motion relies upon are two e-mails purportedly sent by Ms. Wells on May 3, 2022. (Doc. 227-6 and 227-7.) The Defendant does not and cannot authenticate those e-mails and therefore neither constitutes evidence. Even if the Defendant could authenticate those e-mails, they are inadmissible because they are self-serving hearsay that does not fall within any exception. Because these e-mails would never be admissible at any trial they are irrelevant.

#### 1. Defendant cannot authenticate the e-mails.

With respect to authentication, the motion offers nothing to support or authenticate these e-mails. The motion does attach data showing that someone using Courtney Wells' e-mail account at bigredsports.com sent an e-mail to cmayes11@gmail.com on or about May 3, 2022 at 9:33 a.m. and a second e-mail on the same day at 12:35 p.m. However, there is nothing offered to show that Ms. Wells is actually the one who wrote or sent these e-mails. Anyone with access to Ms. Wells' account could have sent them.[1] There is no evidence offered to show where or how Ms. Wells sent these e-mails, that she was at work on May 3, 2022, or that she otherwise accessed either her office or the network in any other

---

[1] As reflected in Exhibits 15 through 19, it is clear that people routinely accessed other people's bigredsports.com e-mails. Indeed, someone was routinely accessing Andy Elliott's bigredsports.com e-mail account while Mr. Elliott was in Arizona, years after he left his employment.

capacity that day. As it turns out, there is good reason to doubt whether Ms. Wells wrote these e-mails.

According to the Norman Police Report filed by Ms. Wells' daughter, she last saw Ms. Wells early in the morning on May 2, 2022. (Ex. 3.) Ms. Wells and her husband Mr. Landers were scheduled for a camping trip in Branson, Missouri and were due back on May 8, 2022. (Ex. 2.) Ms. Wells provided her probation officer with the reservation, which showed Ms. Wells made it on April 21, 2022, at 4:17 p.m. (*Id.*)

Given this timeline, there are several significant things to note. First, FBI investigators obtained historical cell site data for the cell phones for Ms. Wells and Mr. Landers. (Exs. 4 and 5.)[2] Those records show that on May 2, 2022, at approximately 12:02 p.m.[3], Ms. Wells' phone stopped transmitting location data. At approximately 11:42 a.m. on the same day, Mr. Landers' phone stopped transmitting location data. In other words, their phones were turned off by that time and their flight from law enforcement had apparently begun. Accordingly, Ms. Wells fled on the morning of May 2, 2022. This time is consistent with her daughter's report to Norman Police that she had last seen her mother and Mr. Landers on the morning of May 2, 2022. As far as the United States knows, no one has seen or heard from either of them since.

---

[2]     For the sake of volume, only the pertinent portions of the cell site records have been attached to this motion, but the entire records have been produced to defense counsel simultaneously with this motion.

[3]     The times in the cell site data are listed in UTC time, which is 5 hours ahead of CST.

The Defendant's motion offers no evidence that Ms. Wells actually authored the e-mails in question. The login information relating to her bigredsports.com account shows that the last login before the e-mails was on April 26, 2022 from IP Address 184.176.5.121, the suspected location of Oklahoma Motorcars/Native Harvest operations. Thus, the e-mails had to have been written from that location. There is no proof that Ms. Wells was even in Norman on May 3, 2022. Not a single employee at either Big Red, Native Harvest, Oklahoma Motorcars, or anywhere else claims to have seen Ms. Wells at those locations on May 3, 2022, where she could have accessed her e-mail from a business computer. No surveillance camera footage or other information is offered to corroborate her physical presence. These e-mails were written at 9:33 a.m. and 12:35 p.m. on a Tuesday, when all of those locations would have been bustling with activity. We are simply left to speculate that Ms. Wells sent these e-mails a day after she left based purely on the fact that they came from her e-mail account. That is hardly sufficient authentication.[4]

There are some other interesting observations that raise questions about the timing of her disappearance and these emails. First, there is no evidence that Ms. Wells ever checked in or actually went to the campground. However, as reflected in Exhibit 2, Ms. Wells made her campground reservation on April 21, 2022 at 4:17 p.m. According to her

---

[4]      It is also bizarre that the two e-mails were written over three hours apart. To accept that Ms. Wells wrote these e-mails, one would have to believe that she left home on May 2, 2022 for her purported campaign and turned off her phone to avoid detection. She then stayed in town for the rest of that day and into the next morning for no apparent reason, and then went to her office at Native Harvest to write a "confession". She then either sat in her office for three hours waiting to send the second e-mail and/or left and came back three hours later, all while she was allegedly in the process of fleeing from justice.

phone records, Ms. Wells called Mr. Mayes on April 21, 2022 at 3:54 p.m. and the two had an approximate 3 minute conversation -- just 24 minutes before she made the reservation that would later serve as part of the cover for her disappearance. (Ex. 4.)

### 2. The e-mails are inadmissible hearsay.

Even if the Court were to accept that Ms. Wells actually authored these e-mails, they are inadmissible. The Defendant's motion relies on Federal Rule of Evidence 804(b)(3). What the motion completely ignores with respect to the May 3, 2022 e-mails is that at the time they were purportedly written, Ms. Wells had already been convicted of the very things to which she purported to "confess." Moreover, given that she was apparently planning to flee, Ms. Wells had no intention of facing any consequences from these belated "confessions." These simple facts move these statements outside of the hearsay exception.

For a hearsay statement to be admissible as against the declarant's interest, the statement must be against the declarant's interest *at the time it was made*. *United States v. Lozado*, 776 F.3d 1119, 1125 (10th Cir. 2015). The determination of whether a statement was against interest is based on the context and the circumstances under which the statement was made and whether the person would not have made the statement if they believed it to be true. *Id.* Here, because Ms. Wells had already been convicted of engaging in the very scheme to which she purportedly "confessed" the statements are simply not against her interest when they were made in May 2022. If such post-conviction "confessions" were sufficient to overturn a conviction, it is hard to imagine a conspiracy conviction that would last long after the trial. One co-defendant need simply to "confess" on their way to jail and the remaining co-defendants would then proceed to a new trial.

Moreover, her disappearance itself prevents the e-mails from being statements against instance. In *United States v. Hammers*, 942 F.3d 1001 (10th Cir. 2019), the court analyzed this hearsay exception in connection with a suicide note/confession. The court found that the statements were not against interest, because it was clear that the declarant clearly had "no intention of sticking around to face criminal prosecution." Much like the purported suicide note confession, even if she wrote it, it appears Ms. Wells had no intention of staying around to face the consequences of her statements. As such, her statements would not be against interest.

Even if Ms. Wells' statements were found to be against her penal interest, the defendant would still have to demonstrate that that there are sufficient "corroborating circumstances that clearly indicate its trustworthiness." *See* Fed. R. Evid. 804(b)(3)(B). Far from satisfying this standard, all of the available evidence strongly points to the lack of trustworthiness of these statements.

### C.     The Old E-Mails Offered by Defendant are Inadmissible

Another part of Defendant's Motion is a series of e-mails that were allegedly discovered in Ms. Wells' office after her disappearance (collectively referred to as the "Old E-Mails"). These e-mails are no less suspicious than Ms. Well's disappearance and have not and cannot be authenticated. They are not admissible and there is good reason to believe that they have been fabricated.

Before examining the actual e-mails, it is helpful to start from a broad overview. Reviewing these ten e-mails against the evidence that was presented at trial and the arguments made by the United States in its responses to the various post-trial motions, one

is left with the inescapable conclusion that the e-mails are oddly comprehensive.  Not only do they purport to exonerate Mr. Mayes of any involvement in the crimes for which he has already been convicted, they cover almost every possible argument that formed the United States' theory of the case.  It simply strains credulity that Mr. Elliott and Ms. Wells documented the entirety of the Government's case against Mr. Mayes for a trial that had not yet happened, print out only those 10 e-mails, and keep a hard copy at Big Red—despite it incriminating themselves.

For instance, in one of the e-mails, dated August 31, 2017, Ms. Wells allegedly says that she "told [Mayes] he signed the LOC checks like you said and of course he doesn't remember so that's good." (Doc. 227-3, p. 6.)  As the Court recalls, from the witness stand, Mr. Mayes did his best to justify the letter of credit, claiming that it was a legitimate vehicle to fund the pawnshop and even trying to spin a yarn about why he was so angry with Mr. Gooch and ultimately had to fire him because the LOC got out of hand.  In the United States' response to Mr. Mayes' new trial motion, it was pointed out how ludicrous that explanation was and how Mr. Mayes' attempt to explain it away was likely a particularly damaging part of his testimony.  Now, miraculously, Mr. Mayes uncovered an e-mail which purports to show that Ms. Wells pulled a fast one on Mr. Mayes in getting him to sign the LOC checks, something which Mr. Mayes never hinted at during trial. Indeed, at trial, Ms. Wells actually testified that the LOC was Mr. Mayes' idea and Mr. Mayes attempted to justify that same LOC, never denying that it was his idea.

### 1. If real, the Old E-mails should have been discovered, but for Defendant's lack of due diligence.

Defendant's motion makes no showing that there was an exercise of due diligence to locate these e-mails prior to trial. The Motion claims that Mr. Mayes searched for e-mails before trial and did not find anything. However, when these e-mails were actually found, it required no extraordinary effort to find them. Someone simply searched Ms. Wells' office. If this Court is to believe, as the motion contends, that these e-mails were printed and maintained by Ms. Wells in her office since at least November 2018, that means that they could have been located through the simple task of looking in her office. Ms. Wells worked for Mr. Mayes and his dealership the entire time that this case was proceeding, meaning her office and its contents were *always* under his supervision and control. If someone had looked in her office in 2018, this folder would have been discovered. If it was not in her office in 2018, it throws considerable doubt on the authenticity of the e-mails (supporting the evidence that they are recent fabrications). If one posits that Ms. Wells "hid" these e-mails, the natural questions are why she would have kept them at all and why she would have left them behind? The Defendant's motion makes no showing that any degree of actual diligence was used to try to locate evidence of this type.

### 2. Defendant is unable to authenticate the Old E-mails.

Turning to the specific e-mails, these Old E-mails have no authentication whatsoever. An e-mail is typically authenticated by the testimony of the person who authored the e-mail. *See* F.R.E. 901(b)(1). Alternatively, it can be authenticated by a

witness who can testify that he or she witnessed the person author or receive the e-mail. *See United States v. Fluker*, 698 F.3d 988 (7th Cir. 2012)(including a comprehensive discussion of methods of e-mail authentication); *see also United States v. Siddiqui*, 235 F.3d 1318, 1322 (11th Cir. 2000). Moreover, it is possible to authenticate an e-mail by comparing it to e-mails already authenticated and in evidence under F.R.E. 901(b)(3). *See, e.g., United States v. Safavian*, 435 F.Supp.2d 36, 40 (D.D.C.2006). Finally, an e-mail can be authenticated by reviewing the totality of the circumstances under F.R.E. 901(b)(4), including its "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item." *See also United States v. Henry*, 164 F.3d 1304, 1305 (10th Cir. 1999). None of the Old E-Mails passes muster by any of these standards.

### i.    The Old E-Mails Are Refuted By The Only Author Available to Testify

The purported authors and recipients of the Old E-mails are Ms. Wells and Mr. Elliott. Ms. Wells is unavailable to confirm or deny the authenticity of these e-mails. However, Mr. Elliott has submitted a sworn affidavit attached hereto as Exhibit 6 stating that he did not either send or receive any of these e-mails.

### ii.    A Comparison to Known E-Mails Shows That the Old E-Mails are Not Authentic

Mr. Elliott declares that he rarely used e-mail for business and when he did, he used andye67@gmail.com, not andy@bigredsports.com. This fact is consistent with the other evidence produced by *both* parties in this case. For example, attached hereto as Exhibit 7 is a document which the *Defendants* marked as Exhibit 46 at trial. That document contains two e-mails from October 2018. In both of those e-mails, Mr. Elliott is copied, but at

andye67@gmail.com, not andy@bigredsports.com. Similarly, Exhibit 8 is *Defendants'* exhibit 47 from the trial. Again, the top e-mail is a response from Mr. Elliott, again using his gmail.com account, not bigredsports.com. In fact, so far as the United States is aware, there is not a *single* e-mail from any of the time periods covered by the Old E-Mails, in which Mr. Elliott sent *anything* from his bigredsports.com e-mail. The evidence produced by Google in response to the Government's search warrant again does not appear to have a single instance in which Mr. Elliott ever sent any e-mail from andy@bigredsports.com during that time period. (Wildeman Decl., ¶ 6b) This *substantially* corroborates Mr. Elliott's affidavit denying the authenticity of these e-mails.

Moreover, there were numerous other undisputed e-mails submitted from Ms. Wells in this case that bear no resemblance at all to the Old E-Mails. For example, Government Exhibits 21–23 (attached hereto as Exhibits 9-11) are all e-mail chains in August through October 2016 in which e-mails written by Ms. Wells are included. Similarly, Government Exhibit 228 is another e-mail from Ms. Wells in July 2016. (Ex. 12.) Finally, Ex. 13 is a series of Courtney Wells e-mails from in or about 2017 that were culled from the Google production. (Wildeman Decl., ¶ 4.) *All* of these e-mails are remarkably similar to one another and remarkably dissimilar to the Old E-Mails. For example, Ms. Wells appears to have a regular signature block in her e-mail that contains her name, job title, companies, and contact information. This standard signature is found during the same time period in which the Old E-Mails were purportedly written. The Old E-Mails contain no such signature blocks and simply do not look anything like actual, previously authenticated, e-mails from Ms. Wells.

### iii. *The Old E-Mails Cannot be Authenticated Under a Totality of the Circumstances Approach.*

Finally, under a totality of the circumstances approach, there is little to support any finding that these Old E-Mails are authentic. In fact, there is direct evidence of fabrication.

The Government submitted a search warrant seeking information relating to the various e-mail accounts at issue. The information provided by Google and summarized in the attached affidavit of Agent Wildeman is decisive on this issue.[5] The first three Old E-Mails were too old to have any information from Google. However, with respect to the remainder, Google did produce information around the time frames covered by the e-mails and there is not a hint or trace of those e-mails being sent or received. For instance, Document 227-3, p. 6 is an e-mail dated August 31, 2017. Google did produce a number of e-mails from the various accounts around this time, but there is no trace of the disputed email.

Even more interesting, the Google production included an e-mail dated March 26, 2022 from quartneeee@gmail.com to andy@bigredsports.com. (Ex. 14.) That e-mail bears an uncanny resemblance to one of the Old E-mails:

| March 26, 2022 E-mail from quartneeee@gmail.com to andy@bigredsports.com | April 13, 2018 e-mail from quartneeee@gmail.com to andy@bigredsports.com (Doc. 227-3, p.10) |
|---|---|

---

[5] All of the raw data produced by Google to the Government has been produced to the Defense simultaneously with the filing of this motion so that they can conduct their own review of those materials.

| *I told you not to email me on my bigred* email *about* | *I told you not to email* or text *me on my bigred* acct *about* |

This e-mail alone is more than sufficient for the Court to disregard the entirety of these Old E-mails. Someone clearly attempted to fabricate an e-mail to Mr. Elliott that bears an uncanny resemblance to one of the supposed e-mails that was later found. There is simply no legitimate explanation given the fact that Andy Elliott had been gone from Big Red and was not using that account for *years* by this point. The two documents are almost verbatim copies and even share the same formulation of "bigred." This is irrefutable proof that in the months after the trial someone was running tests to see how e-mails could be fabricated months before Ms. Wells disappeared.

In fact, the login report for the andy@bigredsports.com account reveals another interesting fact. (Ex. 16.) There is a login to that account on March 26, 2022 at 1605 UTC.[6] The e-mail was written at 1835 UTC. (Ex. 14.) Someone then logged out of the andy@bigredsports.com account at 1906 UTC, just 30 minutes after the e-mail was fabricated.[7] Significantly, both the login and logout were done from IP Address

---

[6]     The e-mail shows its time in UTC. The login accounts show their time stamps in Z time or Zulu time. Zulu time is more commonly referred to as UTC.

[7]     The actual copy of the e-mail found at Exhibit 14 was found in the production materials relating to the quartneeee@gmail.com account. While there should have been a copy also found at the andy@bigredsports.com account, no such copy was found, indicating that it was deleted, likely by the same person who was logging in and out of the e-mail account when the test run at fabricating e-mails was undertaken. (Wildeman Decl., ¶ 6a.)

**184.176.5.121**.  While the United States has requested the precise identification of the location of that IP address, it is believed to be the location of the Native Harvest/Oklahoma Motorcars location where Mr. Mayes and Ms. Wells both worked.  This can be partially verified from the subscriber login information for all of the accounts which show regular login activity from **184.176.5.121**, including both bigredsports.com and gmail.com accounts.  In fact, on May 3, 2022, the same day that Ms. Wells allegedly wrote the two e-mails attached to the defense motion, someone logged into the andy@bigredsports.com account twice from **184.176.5.121**.  Someone continued to login into that account on May 10, June 16, and as recently as July 7, 2022, all from **184.176.5.121**.  Moreover, someone continued to login to the courtney@bigredsports.com account after she allegedly disappeared.  The login activity for that account shows logins on May 4, 2022 (twice) and May 6, 2022.  Again, these three logins all came from **184.176.5.121**.[8]  The most logical explanation for these logins is someone scrubbing those e-mail records for any traces of the e-mail fabrication that may have remained in those accounts.

In sum, not only is there evidence of deliberate manipulation of Mr. Elliott and Ms. Wells' e-mails, but there is also clear evidence that the person doing it was doing it from the same location where Mr. Mayes, Ms. Wells and others still work.  This also demonstrates that it is apparently quite easy to access someone else's bigredsports.com account, giving more doubt to whether the May 2022 e-mails were written by Ms. Wells.

---

[8]     There is also reason to be skeptical of any e-mail records coming from any of the entities controlled by Mr. Mayes.  As reflected in Ex. 20 and the Wildeman declaration, there is evidence that much information has been deleted from some of those e-mail accounts.

The e-mails also do not read like they were written by Ms. Wells. As the Court knows from the trial, Ms. Wells was intelligent, articulate and self-made. The Old E-Mails are crass, replete with typos and graphic sexual content that is ludicrous on its face. Nothing about Ms. Wells, her demeanor at trial, or her authenticated e-mails is consistent with the type of vile garbage contained in these purported e-mails.

Next, even assuming that Mr. Elliott had a bigredsports.com e-mail that was in use, why would he choose to use that business e-mail, which was controlled by the company, to communicate *about defrauding the company*? Surely he would use his personal e-mail account, which only he controlled. The same is true of Ms. Wells. Why would she use her company e-mail for these types of communications?

Further, why would Ms. Wells save these e-mails at all? What could she possibly stand to gain by preserving e-mails that do nothing but incriminate her? Particularly after she was indicted for this very activity, why would she keep evidence, in hard copy in her office, that would all but guarantee her conviction? Moreover, with respect to the more sexually explicit e-mails, why would Courtney Wells keep them at all? Document 227-3, page 5 is an e-mail that contains no substance, just graphic sexual content. Why would Ms. Wells print and save such an e-mail? Why would anyone? This is particularly puzzling in light of the fact that there is no evidence that Ms. Wells had any kind of personal or sexual relationship with Mr. Elliott.

No matter what yardstick one applies to these old, purportedly newly discovered, e-mails, there is simply no evidence that they are authentic and in fact, more than ample evidence to conclude that they are a complete farce.

### iv. Mr. Speckin's Report Does Not Authenticate the Old E-Mails In Any Way

The only attempt to authenticate any of the Old E-Mails comes through Mr. Speckin's expert report. However, when examined, Mr. Speckin's report says remarkably little of actual substance and his credentials are in substantial doubt.

As for Mr. Speckin's credentials, there are a number of serious red flags that should give the Court pause to accept any conclusions drawn by Mr. Speckin.[9] Mr. Speckin's resume contains statements about his experience that are misleading. For example, for his education, Mr. Speckin first reports that he went to Purdue University "at age 15 to study engineering." (Doc. 227-9.) In reality, Mr. Speckin took two summer classes at Purdue in Calculus and Problem Solving and Computers. (Ex. 21.) While perhaps not an actual lie, it is certainly a carefully drawn statement designed to create a false impression of his educational background.

Turning to his publications, not one of the 13 scientific papers that he claims to have at least co-authored has anything to do with handwriting analysis or document analysis in general. All of them seem to focus on the specific ink analysis and dating, which are not things he employed to reach his primary conclusion here.

As a forensic document examiner – his resume shows no actual training, no publications, no memberships in societies that actually engage in such examination, and no

---

[9]     *Re Estate of Wang Teh Huei*, 2002 WL 1341762, Hong Kong Court of First Instance (2002) contains a comprehensive and at times scathing critique of Mr. Speckin and his methods. In *E.E.O.C. v. Ethan Allen, Inc.,* 259 F.Supp.2d 625 (N.D. Ohio 2003), another court excluded Mr. Speckin's proposed expert testimony finding it "not based on sound scientific theory."

certifications of any kind. Indeed, while he claims that he some professional affiliations in his resume, notably absent are any of the organizations that one would expect to find on the resume of a qualified forensic document examiner – the American Society of Questioned Document Examiners, the American Academy of Forensic Sciences, the Canadian Society of Forensic Science, and the like. When previously pressed under oath about why he had no such memberships, Mr. Speckin has explained that while he used to have some such memberships, "I don't deal with questioned document, like handwriting issues that frequently anymore so it's not that helpful for me." (Ex. 22.) Presumably, since Mr. Speckin *still* does not belong to such groups or have any relevant certifications in questioned document analysis, he still does not deal with questioned document issues that frequently and likely still "doesn't care" about such certifications.

Even assuming Mr. Speckin is qualified to offer some expert opinion, the most Mr. Speckin can say is that three of the Old E-mails in question, from March 2016, August 2017 and February 2018 were potentially printed in November of 2018. Of course, this in no way authenticates any of the other seven e-mails and therefore they can and should be disregarded entirely. Moreover, even if you accept his conclusion that these e-mails were printed or copied in November of 2018, that does not, in any way, authenticate the actual e-mails. An e-mail could be printed or copied at any time and it would do little to authenticate it.

As to those three emails, Mr. Speckin claims to have found "trash marks" on them and to have found similar trash marks among documents made available to him by defense counsel. While these other documents have reportedly been preserved by defense counsel,

the United States has not had sufficient time to complete the process of gathering a suitable universe of proper exemplars from which such a comparison could be made. Mr. Speckin neither attaches nor explains what documents he saw that led him to reach his conclusion.

The FBI has begun its own analysis and attached hereto is a copy of that report. (Ex. 23). While there is an indication that some documents could be "suitable for comparison with contemporaneous periods", completion of that analysis requires gathering a suitable set of exemplars to compare against the e-mails. The FBI examiner would need full access to a wide range of business records to compile a proper set of exemplars to examine, not simply relying on the few boxes that apparently were selected by someone at Big Red for Mr. Speckin to review. There simply has not been suitable time and opportunity to complete that kind of analysis. If the Court is inclined to consider or rely upon Mr. Speckin's report, even with its limited conclusions, then a full-blown evidentiary hearing would be necessary to adequately flesh out the analysis, not to mention to probe Mr. Speckin's qualifications.

Even assuming the Court accepts some part of Mr. Speckin's conclusions and that those three e-mails were printed in 2018, there remain significant reasons to doubt the inauthenticity. As the Court knows from the trial, by November 2018, several things had already happened in this investigation. For example, Donna Mullins had been fired by Tinker for helping Big Red defraud the credit union and its customers and the FBI had interviewed Mr. Mayes about it. By August 2018, the FBI had begun to issue grand jury subpoenas for records relating to the Norman Pawn and Gun transactions. In early September 2018, the FBI interviewed Ms. Wells. (Trial Ex. 11.) In sum, by November

2018, when Mr. Speckin claims three of the e-mails were printed, the defendants, and probably everyone at Big Red Sports, knew that the FBI was investigating and closing in. Finally, the fact that someone printed three of the e-mails in November of 2018 does not authenticate the e-mails themselves. All of the serious questions about the authenticity of these records remain.

**D. The Evidence of Purported Additional Fraud is Not Newly Discovered, is Merely Impeaching, and Does Not Constitute Grounds for a New Trial.**

The last gasp of the motion tries to interject evidence of purported additional fraud committed by Mr. Elliott and Ms. Wells against the dealerships. The primary defect in this argument is that this information is not newly discovered for purposes of this motion. Long before trial, during trial, and even today, all of the financial books, records, and other information about Big Red's finances were within the exclusive and constant control of Big Red, Mr. Mayes, Ms. Wells and others. The bulk of the "new" evidence culled from these financial records and discussed in the declaration of Erin Allegre results from someone simply looking at those records. In sum, Ms. Allegre declares that she found petty cash checks which were obviously out of alignment. The motion makes no effort to explain how all of these findings could not have been made months and months ago. Simply looking at the documents apparently readily revealed it.

Indeed, at trial, the defense uniformly took the position that no cash payments were ever made to Donna Mullins, for example. However, they apparently never bothered to even look at their own business records to determine whether or not such a position was true. Rather, it appears that the dealerships were ripe with undocumented cash that could

have been used for any number of reasons by any number of people. The exercise of *any* degree of diligence would have uncovered these facts and Mr. Mayes' failure to do so does not now give him carte blanche to seek a new trial now.

The same is true of the alleged new evidence of Mr. Elliott paying cash bonuses from petty cash to salespeople. The individual who submitted the declaration, worked with Big Red Sports back in 2013 to 2014. He claims he received money from cash on hand to compensate him for sales. He also makes the painfully vague claim that these payments related to "car deals that might not have otherwise been approved." No explanation is offered to explain why he was not available to provide this same information prior to November of 2021. Given that the primary defense strategy was to attack Mr. Elliott's credibility, even a minimal level of due diligence would have been more than sufficient to obtain these vague allegations prior to trial. The failure to exercise that minimal due diligence at the time does not provide a basis for a new trial at this point.

Finally, this allegation of wrongdoing is more than cumulative, is one more collateral effort to impeach Mr. Elliott and therefore does not provide any basis for a new trial. The defendants did everything possible attack Mr. Elliott's credibility. A cavalcade of witnesses was called to attack his character and impeach him. The fact that Mr. Elliott allegedly paid bonuses to in cash to compensate a salesperson for his sales efforts (something Ms. Allegre admits was a common use of petty cash), which benefited the dealership and Mr. Mayes, would have made no difference in the context of the overall trial.

## CONCLUSION

For all of the foregoing reasons, the Court should deny the Defendant's motion for new trial.

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney

s/ THOMAS B. SNYDER
THOMAS B. SNYDER
Assistant United States Attorney
OBA# 31428
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8781 (Office)
(405) 553-8888 (Fax)
thomas.snyder@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2022, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

For Defendant, Bobby Chris Mayes:
W. Brett Behenna
Michelle L. Greene
William H. Bock
Vicki Zemp Behenna
Rachel Jordan

s/ THOMAS B. SNYDER
Assistant United States Attorney
