IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT IN
AND FOR LEE COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION

CASE NO: 05-CA-001604

SUSANA GARCIA BADARACCO,

  Plaintiff,

v.

RICARDO GARCIA BADARACCO,
HERMES INVESTMENT CO., INC.,
ATRUKAY, INC.,

  Defendants.
_____/

      200 South Biscayne Boulevard
      Miami, Florida
      Thursday, September 22, 2011

  VIDEOTAPED DEPOSITION OF ERICH J. SPECKIN

    VOLUME 2, PAGES 114 - 281

  Taken before Gina Garcia, RPR, CRR, Notary Public in

and for the State of Florida at Large, pursuant to

Defendants' Re-Notice of Taking Videotaped Deposition Duces

Tecum filed in the above cause.

GOVERNMENT EXHIBIT 22

143

BY MR. FRIDMAN
 Q   Right.
 A   -- with proposed changes from the people who authored the first one or maybe no proposed changes.
 Q   But you haven't written back to offer your opinion about the proposed standards, right?
 A   Yes, I have.
 Q   When was the last time you did that?
 A   I don't know. I told you, I can't recall.
 Q   So it had -- it wasn't recently?
 A   I don't recall the last time that I wrote back.
 Q   Ten years ago?
 A   I don't know.
 Q   Now, isn't membership in the American Society for Testing and Materials open to anyone who pays $75 to join?
     MR. MURPHY: Objection to form.
     THE WITNESS: I don't know about the overall organization. It might be. I believe there is some review process that you have to be actively involved in forensic sciences to be in the E30 committee, but I can't tell you what the process is because I don't know.

144

BY MR. FRIDMAN
 Q   Okay. Is this organization also referred to as ASTM?
 A   Probably by some people. It's ASTM International, but I'm sure some people refer to it at ASTM. I still do, I guess, on occasion.
 Q   Do you follow ASTM standards in the work you do?
     MR. MURPHY: Objection to form.
     THE WITNESS: Generally, yes.
BY MR. FRIDMAN
 Q   Do you think that they're good standards?
 A   I think they're way overblown for what you need to do. I would say I use it as a guideline, like it's intended, more than I use it as an absolutely every letter as followed. I don't know anybody that does that. I'm sure people do, but I don't know anyone that would -- that does it to that degree. But follow it in general, absolutely, yes.
 Q   So you may depart from the ASTM standards in your work as you see fit?
     MR. MURPHY: Objection to form.
     THE WITNESS: I would say omit more than depart. It's not like I would say I typically do something different than it says, but there's

145

a lot of stuff that you don't need to do. I guess it would be a departure, sure, yeah, I'd agree. Yeah, as I see fit, I would depart, yes, that would be fair.
BY MR. FRIDMAN
 Q   So other than these three professional affiliations you list on your CV, are these the only ones you hold?
 A   Yes.
     MR. MURPHY: Objection to form.
BY MR. FRIDMAN
 Q   And, actually, the Society of Forensic Ink Analysts no longer exists, so you only really have two professional affiliations; right?
 A   Correct. I should say, although it's not on my CV, I'm a licensed private investigator in the state of Michigan because you need to be to maintain forensic evidence in cases, only because it's a requirement, MI. I wouldn't consider that a professional affiliation, but I'm also a member of some private investigator's thing -- I don't even know the name of it as I sit here, so I'm not trying to say that I'm not a member of it, but I don't really consider -- I mean, all --
 Q   Okay.

146

 A   I'm not trying to -- it's not a knock on the association, it's just not something that I typically involve myself in, so it's not a significant thing to me.
 Q   Okay. Are you a member of the American Academy of Forensic Sciences?
 A   No.
 Q   Are you a member of the Canadian Society of Forensic Science?
 A   No.
 Q   Are you a member of the American Society of Questioned Document Examiners?
 A   No.
 Q   Why aren't you a member of these organizations?
 A   I was a member of the American Society -- or the American Academy of Forensic Sciences, the questioned document section. I don't deal with questioned document, like handwriting issues that frequently anymore, so it's not helpful for me.
 Q   Uh-huh.
 A   Same for the other two, especially the American Society of Questioned Document Examiners. I don't do that much handwriting work. I mean, I still do some, but it's not worth it for me to belong,

147

1  since most of the work I do involves inks.
2    Q    What were the circumstances that you left
3  the American Academy of Forensic Sciences?
4    A    I resigned.
5    Q    Why did you resign?
6    A    The same ethics complaint was filed with
7  the American Academy, and I couldn't attend the
8  hearing, but they wouldn't reschedule it, so I simply
9  resigned since I didn't care anymore.  I had already
10 been cleared of everything by the Midwestern
11 Association several months before.
12   Q    So why didn't you try to fight the ethics
13 complaint with the American Academy of Forensic
14 Sciences?
15   A    I couldn't be there.  I was under subpoena
16 to testify in Los Angeles.  They set a date when I
17 was in a trial.  I couldn't do anything.
18   Q    Was the hearing held?
19   A    I have no idea.
20   Q    Did they make findings and conclusions?
21   A    I have no idea.  I don't believe so, but I
22 never heard that there was one.
23   Q    Are you certified by the American Board of
24 Forensic Document Examiners?
25   A    No.

148

1    Q    Who is Howard Rile?
2    A    He is a document examiner from Los Angeles.
3    Q    Do you recall a letter to you written by
4  the American Board of Forensic Document Examiners in
5  May 1998 asking you to cease and desist representing
6  yourself as eligible for certification by the board?
7    A    I remember a letter -- yeah, May 4th, 1998,
8  generally saying that, but it was a little more
9  couched than that to get around the fact that it was
10 misleading.  It says:  Please discontinue saying A
11 and B.  A is that you expect to take the national
12 boards in February of 1996.  Clearly, in 1998, I was
13 not saying I intended to do something two years ago
14 when I knew I didn't do it, so of course it would be
15 misleading if I was saying that.  So it's a couched
16 letter that was intended to just try to make me look
17 bad in situations like this, but it was a nonsensical
18 letter.  I wasn't saying that in 1998.  It was
19 foolish.
20        I answered your question earlier in a
21 deposition that I said I believe in June of 1995 that
22 I intended on taking the boards in February of 1996
23 or I had hoped to.  I didn't, but I wasn't saying in
24 1998 that I -- that was just a foolish letter.
25   Q    Do you remember the letter saying:  It has

149

been brought to the attention of the American Board
of Forensic Document Examiners Board of Directors
that on several occasions you have cited as a
qualification that you are eligible for certification
by the American Board of Forensic Document Examiners
and expect to take the national board examinations in
February of 1996.  Is that what the letter said?
   A    I don't have it committed to memory, but I
believe it was something along those lines.  I mean,
I don't recall it verbatim.  I only remember May 4th
because that's my dad's birthday.
   Q    Okay.  But that's generally what the letter
said?
   A    Generally, yeah, that's what I just told
you.
   Q    Did --
   A    It's untrue, though.  No, I hadn't used it
as a qualification.  I had been asked and I said I
expected to take it.  I don't remember in what
context I was asked, but I did say in 1995 that I
expected to take it in '96, and I did.
   Q    It was listed in those Lawyers Weekly
articles; right?
   A    That part was not.
   Q    That we discussed earlier?

150

   A    That part was not.  It said "eligible for
certification," which likely because I intended to
take the boards or the exams several months later...
   Q    And did you take them?
   A    No.  I said that.
   Q    Have you ever taken those exams?
   A    No.
   Q    Do you remember the letter stating:  It is
the unanimous consensus of the ABFDE board of
directors that your representation is, at the very
least, inaccurate and, at worst, could be viewed as a
fraudulent misrepresentation.  You're requested to
cease and desist referring to yourself as eligible
for certification until you are authorized by the
ABFDE to do so.
        Do you remember the letter stating that?
   A    Yes.
   Q    Did you write back to them and tell them
that they were wrong?
   A    I did nothing, no.  If asked if I completed
their requirements, I still say yes to this day.
   Q    Did you ever talk to Mr. Rile about that
letter?
   A    No.
   Q    You never talked -- discussed it?

151

1 A I don't think so.
2 Q Never had a conversation with him?
3 A I'm sure I've had conversations with him.
4 I don't believe that I've ever mentioned the letter.
5 Maybe I have. I don't know.
6 Q Or the accusation?
7 A It's possible I mentioned an accusation
8 that I was unhappy about it, but I can't say
9 specifically if it was him that I said that to; but I
10 remember some face to face with someone in the late
11 '90s, but I can't remember who it was. Someone had
12 approached me, and I don't remember who it was. I
13 don't think it was Howard Rile, though, but I'm not
14 sure, I don't know. You'd have to ask him.
15 Q Why haven't you ever sat for that board
16 examination?
17 A Number one, because I don't care. Number
18 two, I don't deal with handwriting examination that
19 frequently. It's not worth the time and energy that
20 it takes. Because it's a multi-step process, it
21 takes almost two years. For the few cases that I do
22 in handwriting examination, it's -- it's not worth
23 it.
24 Q But it would be an impressive credential to
25 have, right?

152

1 MR. MURPHY: Objection to form.
2 THE WITNESS: I don't know about
3 impressive. I don't -- I don't mean anything
4 bad to the board. My father was a member for 30
5 years. I don't think it's impressive, though,
6 no. I would say going to Harvard would be more
7 impressive, but not saying you're a member of
8 the American Board, no, I don't think that's
9 impressive.
10 MR. MURPHY: Do you have a copy of that
11 letter you want to make an exhibit that you've
12 apparently been reading quotes from and asking
13 him if he remembers it?
14 MR. FRIDMAN: No. I'm not going to make it
15 into an exhibit.
16 MR. MURPHY: You know, one guy in -- I seem
17 to remember, maybe it was just a story instead
18 of a case, he stood up reading the Lord's -- had
19 a copy of the Lord's prayer in his hand and was
20 reading it to a witness, reading something to
21 the witness trying to get him to agree to it. I
22 seem to remember that becoming an issue at some
23 point in time. Perhaps we'll talk about that
24 later. You do have the letter, right?
25 MR. FRIDMAN: Why are you interrupting my

153

deposition, Mr. Murphy?
    MR. MURPHY: Because I'm concerned that you
may not be doing something that's proper with
this witness, and so I asked why you didn't make
it an exhibit since you seemed to be reading
from it. If you don't have a copy of it, then
that sort of troubles me because I seem to
remember that being one of those things that the
Florida bar doesn't think is the proper way to
examine a witness. If you do have -- if you do
have a copy, then I would like to see it
sometime.
BY MR. FRIDMAN
    Q Mr. Speckin, do you have a copy of that
letter?
    A I do not.
    MR. MURPHY: Would you give us -- would you
provide us with a copy of that letter?
    MR. FRIDMAN: Let's ask the next question.
    MR. MURPHY: Okay. I'll write a letter
then to you and ask, since you can't answer that
question now.
BY MR. FRIDMAN
    Q Do you have any properties at 15601 Nectar
Lane, Haslett, Michigan?

154

    A Again, I'm not going to answer questions
about financial or real estate holdings or anything
like that, that's not subject to deposition.
    Q How about 408 Northeast 6th Street?
    A Okay. What I own is not the subject of the
deposition, or what I don't own, for that matter.
    Q Are you aware of a federal tax lien filed
on November 2nd, 2010 at a property, 408 Northeast
6th Street, Unit 248, Fort Lauderdale, Florida in the
amount of $241,177?
    A I am.
    Q So you do have a federal tax lien in that
amount filed against you?
    A That's not my building. I am aware of the
lien.
    Q You are aware of the lien. You are the
debtor of that tax lien, though; right?
    A Personally, yes.
    Q Are you aware of a state tax lien in the
amount of $3,184 filed July 20th, 2010 at the address
of 15601 Nectar Lane, Haslett, Michigan?
    A Maybe I should be clear. Are these -- are
you saying that I still owe the debt or that these
liens were filed? Your question was: Were the liens
filed, right?