1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE WESTERN DISTRICT OF OKLAHOMA

 3

 4   UNITED STATES OF AMERICA,

 5           Plaintiff,

 6   vs.                          Case No. CR-20-240-F

 7   BOBBY CHRIS MAYES,

 8           Defendant.

 9   ----------------------------

10

11

12           The deposition of ANDREW ELLIOTT, taken at the

13   instance of the Defendant herein, pursuant to court order and

14   by agreement as to time and date, before Tracy Thompson, CRR,

15   RDR, United States Court Reporter for the Western District of

16   Oklahoma, at the William J. Holloway United States Courthouse,

17   200 N.W. 4th Street, Oklahoma City, OK 73102, on February 3,

18   2025, commencing at the hour of 10:00 a.m.

19

20

21

22           Exhibit 1

23

24

25
```

```
1                        APPEARANCES

2    FOR THE GOVERNMENT:  Mr. Thomas Snyder, Assistant United
     States Attorney, United States Attorney's Office, 210 West Park
3    Avenue, Suite 400, Oklahoma City, OK 73102

4
     FOR BOBBY CHRIS MAYES:  Mr. Bill Zuhdi, Attorney at Law, PO Box
5    1077, Oklahoma City, OK 73101

6
     FOR ANDREW ELLIOTT:  Mr. Scott Adams, Adams & Associates, 300
7    N. Walker Avenue, Suite 100, Oklahoma City, OK 73102

8

9                      EXAMINATION INDEX

10   ANDREW ELLIOTT
            DIRECT BY MR. ZUHDI                          5
11          CROSS BY MR. SNYDER                         35

12

13                    DEFENDANT'S EXHIBITS

14        Defendant's Exhibit No. 1 . . . . . . . . . . .   6
          Defendant's Exhibit No. 2 . . . . . . . . . . .  12
15        Defendant's Exhibit No. 3 . . . . . . . . . . .  19
          Defendant's Exhibit No. 4 . . . . . . . . . . .  23
16        Defendant's Exhibit No. 5 . . . . . . . . . . .  21
          Defendant's Exhibit No. 8 . . . . . . . . . . .  14
17        Defendant's Exhibit No. 9 . . . . . . . . . . .  32
          Defendant's Exhibit No. 10  . . . . . . . . . .  18
18        Defendant's Exhibit No. 11  . . . . . . . . . .  23
          Defendant's Exhibit No. 12  . . . . . . . . . .  26
19        Defendant's Exhibit No. 13  . . . . . . . . . .  27

20

21

22

23

24

25
```

1      (Proceedings commenced at 10:00 a.m.)

2          THE COURT:  Good morning.  We're here in Criminal

3   20-240 and, for technical reasons, the related civil case

4   number, for the deposition of Andrew Elliott.

5      Counsel will please give your appearances.

6          MR. SNYDER:  Good morning, Your Honor.  Tom Snyder

7   here on behalf of the United States.

8          MR. ZUHDI:  Good morning, Your Honor.  Bill Zuhdi.

9   I'm here on behalf of Chris Mayes.

10          THE COURT:  Thank you.

11          MR. ADAMS:  Good morning, Your Honor.  Scott Adams on

12   behalf of Andy Elliott.

13          THE COURT:  Very well.  Let me take just a minute to

14   recite some ground rules that I think will come as no surprise

15   to anyone.  Obviously, it's a bit unusual to have a deposition

16   in open court with the assigned judge presiding over the

17   deposition.  I'm happy to say that I -- actually, I had this

18   experience somewhere in the neighborhood of 30 years ago with

19   Judge R.W. Pickens in Garfield County.  So to that extent, this

20   is not brand-new territory for me, but obviously every

21   situation is different.  And this situation assuredly is

22   different than the one I had 30-some-odd years ago.

23      Anyway, we're here in the framework, to a large extent,

24   established by my order of December 18 of 2024.  I do note that

25   Mr. Mayes asserts three grounds for relief, and those are

1  summarized in that December 18th order.  And I trust,

2  certainly, that counsel have taken the cue from that order that

3  the scope of examination in this deposition is fairly well

4  circumscribed and fairly well focused.  And I expect counsel to

5  stay focused.  The discovery that is permissible does not

6  relate to the underlying factual merits of the criminal case.

7      I suppose it would be tempting to use this as an

8  opportunity to get some testimony from Mr. Elliott in the can

9  for possible use at a possible retrial, but that's not what

10 we're here for, and that will not be permitted.

11     In the government's response to the defendants' -- to

12 Mr. Mayes' motion for discovery, the government raised the

13 spectre of an unfettered free-for-all.  I addressed that in my

14 December 18th order.  And to put it quite simply, we're not

15 going to have an unfettered free-for-all.  The deposition of

16 Mr. Elliott this morning is simply not another swing at cross-

17 examination of Mr. Elliott.

18     I do anticipate that there will be some focus on the four

19 pages of handwritten notes purportedly made by Mr. Elliott.

20 And those pages are attached as Docket Entry Number 400-1 to

21 the motion at Docket Entry Number 400.  And so as to those four

22 pages of handwritten notes, there's at least, so far as I can

23 tell, no dispute that they exist.  The government, at least,

24 implicitly denies ever having had them before the 2255 motion

25 was filed.

1    And then, of course, the other document that may receive

2  some attention this morning is the handwritten letter that

3  was -- Mr. Elliott referred to on cross-examination.  And the

4  government flatly denies that that handwritten document even

5  exists.

6    So I think, again, at the risk of being unduly

7  repetitious, I think the scope of the matters that are in play

8  and fair game this morning for deposition are pretty well

9  defined and fairly well circumscribed.  With that, unless

10  counsel on either side have any questions, I'll invite

11  Mr. Elliott to the stand for the taking of his deposition.

12    Does the government have anything to say before we take

13  that step?

14        MR. SNYDER:  No, Your Honor.

15        THE COURT:  Very well.

16        MR. ZUHDI:  No, Your Honor.

17        THE COURT:  Mr. Zuhdi, you may proceed.

18    Mr. Elliott, you're invited to the stand.

19              ANDREW ELLIOTT,

20    called as a witness on behalf of the defendant, having

21  been first duly sworn to tell the truth, testified as follows:

22        THE COURT:  You may proceed.

23              DIRECT EXAMINATION

24  BY MR. ZUHDI:

25  Q.   Mr. Elliott, my name is Bill Zuhdi, and I represent Chris

1    Mayes.  And I'm here to ask you some questions per the court

2    order.  And if I say anything that you need me to repeat to

3    understand better, just please ask me.  And if you need a break

4    -- His Honor, of course, but just let us know if for any reason

5    you need a break.  And other than that, I will begin.

6        Please state your full name.

7    A.   Andrew Jeffrey Elliott.

8    Q.   And where do you reside, Mr. Elliott?

9    A.   Arizona.

10   Q.   And other than your trial -- other than your counsel, have

11   you spoken with anybody about your deposition here today,

12   preparation, that sort of thing?

13   A.   No.

14   Q.   Sir, would you look at -- if you look there at your

15   binder, if you'll open the binder up and look under Exhibit 1,

16   Defense Exhibit 1, it's under the Number 1 tab.  Are you there?

17   A.   Yes.  And by the way, when you asked me did I talk to

18   anybody, is it about coming here?

19   Q.   Just did you discuss your testimony or anything like that

20   with anyone else -- your anticipated testimony -- other than

21   your lawyer?

22   A.   Like, ever?

23   Q.   Since you've been notified of this.

24   A.   Oh, since he called me and said I need to come here?

25   Q.   Yes.

```
1   A.   No.

2   Q.   And before, were you anticipating testifying -- did you

3   discuss the case with somebody else before, that you thought

4   you may have to come up here and testify?

5   A.   No.  Scott asked me to review these documents.

6   Q.   Okay.  Thank you.  So I'm directing your attention to

7   what's been marked as Exhibit 1.  That's four pages of

8   handwritten notes, this 13 numbered paragraphs.  Do you see

9   those?

10  A.   Yes.

11  Q.   And you've studied those already?

12  A.   Uh-huh.

13  Q.   And do you recognize it from any other time?

14  A.   No.  I know exactly what these are.

15  Q.   Okay.

16       MR. SNYDER:  Your Honor, I just want to interpose an

17  objection.  It's my understanding that these four pages of

18  handwritten notes may be subject -- or this will come out from

19  the testimony -- may be subject to a claim of privilege.

20  Mr. Adams can probably address that more directly than I can.

21  I didn't want the record to indicate somehow we were

22  acquiescing to these being discussed in open court, if there

23  was an active claim of privilege, that somehow the government

24  acquiesced some kind of waiver by not objecting.

25       THE COURT:  Well, I'm not sure the government has a
```

1   dog in that privilege fight.  And we've got, to put it mildly,

2   a very capable lawyer here in the jury box in case anything

3   along those lines needs to be addressed.  So I'm actually not

4   going to rule one way or the other on that objection because I

5   don't -- I'm not sure the government has standing to assert the

6   objection.

7        You may continue.

8            MR. ZUHDI:  Thank you, Your Honor.

9   Q.   (BY MR. ZUHDI) Sir, do you recognize those four pages of

10  handwritten notes?

11  A.   Yes.

12           MR. ADAMS:  Your Honor, I was going to interpose an

13  objection.  This is a little unusual because you're in the

14  deposition and you're in here, but we really propose an

15  objection that this is clearly attorney/client privilege.  I

16  think it's important for the record to reflect I did not know

17  that Mr. Mayes' side had these --

18           THE COURT:  Well, before we get into recitals of fact

19  as to matters that Mr. Zuhdi may get into with the witness, I'm

20  going to ask you to refrain from reciting facts that Mr. Zuhdi

21  may get into with the witness.  If you're asserting privilege,

22  that's noted.  In terms of any legal effect that this document

23  may be given, then, there may be privilege considerations that

24  apply to that.  But the document is now on the table for

25  everybody in the courtroom.  And so, in that sense, the

1  assertion of privilege is noted but academic.  And I think that

2  is a sufficient ruling on that issue for this morning.

3            MR. ADAMS:  Okay.

4            THE COURT:  You may proceed.

5            MR. ZUHDI:  Thank you, Your Honor.

6            THE COURT:  And, by the way, Mr. Zuhdi, I'm not going

7  take over your deposition, but -- bear with me just a minute.

8       The last statement by the witness was, "I know exactly

9  what these are."  And, again, I'm not going to take over your

10 deposition, but as I said when we had our hearing on the very

11 issue of taking this deposition, I'm the decider.  And the

12 decider wants to know the answer to that -- what the

13 elaboration might be on that statement.  And you're invited to

14 address that.

15            MR. ZUHDI:  Thank you, Your Honor.

16       May I ask one question first, Your Honor?

17            THE COURT:  Surely.

18 Q.  (BY MR. ZUHDI) Is that your handwriting, Mr. Elliott?

19 A.  Yes, that is my handwriting.

20 Q.  And you were -- as the Court just addressed to us, you

21 were going to say something; you know exactly what these are.

22 Will you go ahead and answer that question?

23 A.  Yes.  So when I took Scott on as an attorney, Scott had a

24 series of questions for me.  And I took these questions home,

25 and I got -- sat down with Chris because the whole time

1    everybody -- Chris was the author of all the stories for

2    everybody to have the same story.  And so I took these

3    questions, I sat in Chris's office, and Chris was the author of

4    these questions I had.

5           MR. ZUHDI:  Your Honor, I have an objection.

6    He's stating -- he's going beyond the question in that he's

7    saying that Mr. Mayes is the author; yet the question is --

8           THE COURT:  That's overruled.  I'm going to hear the

9    rest of his answer.

10          THE WITNESS:  Yeah, so I sat down in Mr. Mayes'

11   office in the Norman Mitsubishi Yamaha building, and we went

12   line by line over these questions that Scott had asked me, and

13   Scott wanted the answers.  And basically, Chris gave me the

14   answers to every one of these.  I then took this piece of

15   paper, these four pieces, back to Scott's office, and I gave

16   them to Scott.  And Scott asked me one question.  He goes:  "Is

17   this the truth?"  And my wife was with me.  And it was not the

18   truth.  And at that point, I decided that's when I stopped

19   lying.

20          MR. ZUHDI:  Your Honor, may I go to my table just for

21   a moment?

22          THE COURT:  Surely.

23   Q.   (BY MR. ZUHDI) Mr. Elliott?

24   A.   Yes, sir.

25   Q.   You just said your wife was with you.  And your wife said

1  -- so it was your wife and Mr. Mayes and you; is that correct?

2  A.    No.  I went and sat with Mr. Mayes in his office with a

3  series of questions.  Chris instructed me exactly how each one

4  of these needed to be answered because this was going to be our

5  story because that was how I would stay out of trouble.  I go

6  back to Scott's office, and my wife goes with me this time to

7  Scott's office.  And Scott asked me a question:  "Are these

8  four pages -- is this the truth?"  And I broke down and started

9  crying and I said, "No."  And my wife said, "You're not going

10  to lie no more."

11  Q.    So you and your wife were in Mr. Adams' office?

12  A.    Yes.

13  Q.    You were telling him this?

14  A.    Yes.

15  Q.    Your wife witnessed this?

16  A.    Yes.

17  Q.    And if -- if Mr. Adams had emailed me and he said that you

18  never provided him with any handwritten statement that he did

19  or did not give to the government, would that be an incorrect

20  statement?

21  A.    These four pieces of paper, I walked into his office; I

22  laid them down; and then we all had this conversation, and I

23  never saw the pieces of paper ever again.  So that, I can't

24  tell you, if he ever got them or not or where they went.

25  Q.    And so when you went into Mr. Mayes' Office, as you are

1  claiming you did, did you have Ms. Mullins' 302, dated June 16,
2  2017 with you?
3  A.    I don't know what that is.
4  Q.    Did you have -- what did you have with you when you --
5  A.    I had a series of questions that Scott had asked me that I
6  was getting answers for.
7  Q.    You had a series of questions?
8  A.    Uh-huh.
9  Q.    Was it like one page of questions, two pages?  How -- what
10  were the questions?
11  A.    They were just questions, and I was answering them in
12  accordance to these four pieces of paper.  I didn't have any
13  documents other than some questions from Mr. Adams.
14  Q.    Do you still have those questions?
15  A.    No.
16  Q.    Turn to Exhibit 2 for a moment, please.  Do you recognize
17  Exhibit 2, Mr. Elliott?
18  A.    No.  But I can read it.  Would you like me to read it?
19  Q.    No.  Do you recognize it?  Have you seen it before?
20  A.    I don't know.
21  Q.    Did -- did you listen to a recording between Ms. Mullins
22  and FBI Agent Lowrance that was done in June 16th of 2017?
23  A.    I don't recall.
24  Q.    Sir, if you will look at Exhibit 2, on page 4.  Let me see
25  here.  I'm sorry.  Look at page 4 of the handwritten notes,

1  Exhibit 1.

2      Do you see where it says -- line 2, it's under paragraph

3  13, line 2?  It's the second paragraph down, paragraph 13?

4  A.   Yes, I see where it says line 2.

5  Q.   Okay.  And can you read line 2 out loud?

6  A.   "Donna said she never saw invoices associated w/ loans."

7  Q.   And then will you turn now to Exhibit 2.  Look at the

8  first page.  Can you read the lines?  Do you see where it says

9  4:45?

10 A.   "Mullins never saw the invoices associated with loans she

11 made."

12 Q.   Now, would you say that both of those address that Mullins

13 said she never saw the loans, correct?

14 A.   That's what they say.

15 Q.   And, in fact, some of that's almost word for word.  "Never

16 saw," and you, in your handwritten notes, you said, "never

17 saw," Donna said she "never saw."  Do you see that?

18 A.   I see that they both say the same thing.

19 Q.   And your testimony is that even though we have that

20 example -- and I have many more examples -- that you didn't

21 have the 302 in front of you when you wrote this out?

22 A.   I didn't have anything in front of me but a series of

23 questions from Scott.

24      THE COURT:  Again, I have more than a -- since I'm

25 ultimately going to be called upon to rule on this 2255 motion,

1    I have reason to be not quite totally passive.  And what I need

2    is some clarification.  The indictment in this case, Criminal

3    20-240, was filed on September 16 of 2020.  So that's one, if

4    you will, milepost in terms of dates relevant to this case.

5        Mr. Elliott -- and if you're not able to, then I certainly

6    don't want you to guess or speculate, but can you give us an

7    estimate -- with that understanding, can you give us an

8    estimate as to when you wrote out these -- what we have here on

9    Exhibit 1, these four pages of handwritten notes?  Can you tell

10   us roughly when it would have been that you would have written

11   this out?

12           THE WITNESS:  I want to say I don't recall, but I

13   would say it would be probably 2019.  But I would have to get

14   with Scott.

15           THE COURT:  Understood.  And I appreciate your

16   careful answer because, obviously, the document is not dated.

17   And so that clarifies that.

18        You may continue.

19           MR. ZUHDI:  Thank you, Your Honor.

20   Q.   (BY MR. ZUHDI) If you will look at Exhibit 8.  We'll be

21   returning to the notes, but Exhibit 8 for right now, please.

22   And I've got some questions to ask you before I have you look

23   at that.  Just have that ready.

24        Did you tell McKenzie Anderson or the FBI Agents Schmitz

25   or Lowrance or anyone at the U.S. Attorney's Office that you

1  had four pages of handwritten notes?

2  A.    No.

3  Q.    Would you look at Exhibit 8 now, please.  That is United

4  States Department of Justice -- this is your nonprosecution

5  letter; is that right?

6  A.    I don't know, but I'll read it.

7  Q.    Okay.  And pay special attention to the second paragraph,

8  if you would, please.

9  A.    I see it.

10  Q.    And so will you look at the second -- page 2 of that

11  letter?  Is that your signature, Andy Elliott, you signed that?

12  A.    Uh-huh.

13  Q.    And your attorney signed it, and Ms. Anderson signed it,

14  correct?

15  A.    Okay.

16  Q.    Is that correct?

17  A.    If that's their signatures, yeah.

18  Q.    And it's dated July 20, 2020?

19  A.    Okay.

20  Q.    And would you read for me the sentence that begins, "The

21  understanding," and go to -- I'll stop you when -- go to where

22  it's --

23          THE COURT:  You're asking him to read it aloud?

24          MR. ZUHDI:  Yes, Your Honor.

25          THE COURT:  Well, I'll tell you what.  We've all got

1  it, so let's just all take a minute and read it, and then you

2  can ask the next question, rather than burdening the record

3  with him reading it aloud.

4          MR. ZUHDI:  Yes, Your Honor.

5          THE COURT:  Okay.

6          MR. ZUHDI:  Thank you, Your Honor.

7  Q.  (BY MR. ZUHDI) Mr. Elliott?

8  A.  Yes.

9  Q.  So you didn't truthfully disclose all information you

10 had -- did you? -- with respect to the Big Red Sports &

11 Imports --

12         MR. ADAMS:  Object to the form, Your Honor.

13         THE COURT:  I think he can handle it.  That's

14 overruled.

15         THE WITNESS:  I have been completely truthful.  I

16 actually -- those four pages that I wrote on were all lies in

17 the beginning that I and Chris Mayes sat down and put together.

18 And so until I changed to tell the truth, I mean, I wouldn't

19 even have had an opportunity.

20 Q.  (BY MR. ZUHDI) Well, were you telling the truth when you

21 went to the grand jury in July 2020?

22 A.  Yes, I was.

23 Q.  And were you telling the truth when Ms. Anderson and you

24 signed this letter?

25 A.  Yes, I was.

1   Q.   And does that letter allow you to decide and pick and

2   choose what information you're going to give them?  Do you see

3   that in here anywhere?

4   A.   That wasn't any information, to me, that I felt like was

5   good or bad.  It was a series of lies that I put together that

6   I was going to give my attorney/client privilege deal that he

7   was, like, "Answer these questions."  And so when I was giving

8   him that back, I gave him back or I brought to his office a

9   sheet of lies, which I didn't think even -- I didn't even think

10  about that because it was just -- I was in the middle, for

11  years, of daily lies with Chris, so --

12          MR. ZUHDI:  Your Honor, I object that we're beyond

13  the scope of the question.  I was asking him merely did he give

14  this information to the government and is he supposed to, per

15  this paragraph, where it says he's supposed to truthfully

16  disclose all information with respect to the activities.  And

17  we're going on into -- beyond that, Your Honor.

18          THE WITNESS:  Yeah, I did disclose all the

19  information.

20          THE COURT:  Next question.

21  Q.   (BY MR. ZUHDI) Okay.  But you did tell me you did not

22  disclose those four written pages to the United States

23  Attorney's Office or to any FBI agents, correct?

24  A.   I didn't even view that as information.

25  Q.   Have you ever spoken to Ms. Anderson, just you and her?

1   A.    No.

2   Q.    Have you ever spoken to Ms. Anderson on the phone with

3   somebody else in the room with you?

4   A.    I don't recall.

5   Q.    But do you recall ever talking to Ms. Anderson on the

6   phone?

7   A.    Yeah, I mean, I don't believe so, but I don't recall.  So

8   -- I mean, this is a long time ago, but I don't remember that.

9   Q.    And you had ample opportunity to tell Ms. Anderson about

10  the four pages of handwritten notes, didn't you?  I mean, for

11  example October 2, 2020, you had a very lengthy meeting with

12  Ms. Anderson, Mr. Snyder, and Agent Schmitz?

13  A.    Yeah.  Again, this was before I started telling the truth.

14  Q.    And when you testified at trial that you only have your

15  word -- let's look at Exhibit 10.

16        Do you see here where you say you don't have a single text

17  message?  Look at lines 8 through -- do you see what's in green

18  there?

19  A.    I see the sheet, uh-huh.

20  Q.    And if you would read that green part to yourself, and

21  then I'll ask you a question.

22  A.    Where it says, "I don't have a single text message"?

23  Q.    Yes.  Other than your word.

24  A.    That confirms anything that you're saying about Chris.  I

25  don't need a text message to confirm anything.  You don't have

ANDREW ELLIOTT - DIRECT EXAMINATION BY MR. ZUHDI      19

1   a single document, other than your word, for the jury to

2   believe anything that you're saying; is that true?  I would not

3   be under oath telling a lie.

4   Q.   So at that time, you didn't tell -- answer that question?

5   You didn't tell -- you didn't tell Mr. Behenna that you had

6   four pages of handwritten notes to support you at least in some

7   part -- in some parts of it, did you?  You didn't tell him

8   that, did you?

9   A.   No.  I didn't have these.

10  Q.   That you had written them; you didn't tell him you had

11  written them?  You didn't tell anybody at the trial about the

12  handwritten notes, correct?

13  A.   Me --

14  Q.   Yes.  Your four pages of handwritten notes.

15  A.   -- and my attorney and my wife.  As I set those papers

16  down on Scott's desk, they were all a lie.

17  Q.   But when you asked the question -- when you were asked the

18  question and you answered it here, you didn't dispute you

19  didn't have anything in writing.  You just said you would not

20  be here telling a lie under oath, right?

21  A.   Right.  Which I did not tell a lie under oath.

22  Q.   Okay.  So if you look at Exhibit 3, please.  Do you see

23  there, the top green part?  If you would read that and the

24  green -- in green below it too.

25            THE COURT:  Just read it to yourself and then look

1    up, and he'll ask the next question.

2            THE WITNESS:  I read it.

3    Q.   (BY MR. ZUHDI) Okay.  So in Exhibit 3, you're talking

4    about Bible study, correct?

5    A.   Uh-huh.

6    Q.   And if you look back to Exhibit 1, look at paragraph 6.

7    If you would read to yourself the first four lines.

8    A.   Is this Number 6?

9    Q.   Yes.  Paragraph 6, the first four lines.

10   A.   Okay.

11   Q.   So comparing Exhibit 6 -- I'm sorry, Exhibit 1, paragraph

12   6, where you're talking about Bible study with Ms. Mullins.

13   And then if you look at Exhibit 3, your trial testimony, you

14   did have something besides your word that somewhat -- at least

15   in this part of it, says supported what you were saying,

16   because it supported Bible study.  In 1, you're saying you're

17   doing Bible study.  And then in paragraph 6, you say you're

18   doing Bible study.  So, therefore, that was in support.  So you

19   did have a document other than your word.  You just chose not

20   to disclose it to anyone; isn't that true?

21   A.   I don't see what document I had.

22           MR. ADAMS:  Objection.

23   Q.   (BY MR. ZUHDI) You had the four pages of handwritten

24   notes.

25   A.   That I gave to my attorney that I didn't turn in.

ANDREW ELLIOTT - DIRECT EXAMINATION BY MR. ZUHDI    21

1  Q.   And you didn't answer the question that he had asked you

2  properly because you did have -- so let's go to --

3  A.   I didn't have those.

4  Q.   Let's go to Exhibit 5.

5           THE COURT:  And you're certainly going to be

6  permitted to go to Exhibit 5.  I'm just -- as you go in that

7  direction, Mr. Zuhdi, I think, in fairness, I'll let you know

8  that at least to the extent that I'm guided by the last couple

9  of questions and answers, I'm having a serious difficulty

10 associating this with anything that's relevant to Ground 1 and

11 Ground 2.  But, again, I'm not going to interrupt you, so --

12 unnecessarily, so you may proceed.

13           MR. ZUHDI:  Thank you, Your Honor.  Would you like me

14 to explain why I believe it's relevant?

15           THE COURT:  No, I'd like you to ask the next

16 question.

17           MR. ZUHDI:  Thank you, Your Honor.

18 Q.   (BY MR. ZUHDI) Sir, please go to Exhibit 5.  And this is

19 your testimony at trial.  And please read that one green line

20 to you next.

21 A.   "I don't believe she's the most honest person in the

22 world."

23 Q.   And then if you look at Exhibit 1, paragraph 12.  Toward

24 the last sentence of paragraph 12, it begins with, "She only

25 told me."  Do you see that sentence?  Read that to yourself.

1   A.   Okay.

2   Q.   Okay.  So there you're saying she's a liar in those

3   handwritten notes.  And then your testimony is -- you said you

4   believe she's not the most honest person in the world.  So in

5   the four pages of handwritten notes, not everything in there is

6   a lie, is it?  At least as far as you're concerned, that's not

7   a lie, right?  You testified to it.

8   A.   I don't understand the question.

9        THE COURT:  Nor do I.

10  Q.   (BY MR. ZUHDI)  Mr. Elliott, you've testified that

11  everything was a lie in the four pages of handwritten notes.

12  A.   No.  I told you that Chris authored and I wrote all four

13  pages in his office.

14  Q.   Okay.

15  A.   That's what I said.

16  Q.   Okay.  And so the four pages of handwritten notes did

17  have, as far as you're concerned -- we'll just take everything

18  you say for truth for argument sake.  As far as you're

19  concerned, it did have true statements in it, didn't it?

20  A.   No.  I'm telling you that this -- every answer that I had

21  from Scott's questions, Chris gave me the answers to every one

22  of these to turn back in to my attorney.

23  Q.   Sir, that's not my question.

24  A.   Right.  So I don't have the questions.

25  Q.   Okay.  My question -- I'll repeat it.  My question is that

1    not everything -- as far as you're concerned, not everything in
2    here is a lie; there are some true statements.  Do you admit
3    there are some true statements?  I've been going over these
4    statements.
5    A.    I won't admit that.  I would have to go through and see
6    the questions to all these answers.  Because I can see some of
7    this stuff that I say here, it is totally a massive lie.
8    Q.    Okay.  So were you lying at trial when you said you
9    believe she's not the most honest person in the world?
10   A.    No, I was truthful about that.
11   Q.    Okay.  And then in the handwritten notes, were you
12   truthful again where you said she's a liar?
13   A.    She is not the most honest person.
14   Q.    So that's a true statement, then?
15   A.    That is a true statement, and that's why it's in the court
16   documents.
17   Q.    And it's in your handwritten notes that you wrote.  Okay.
18   Let's go to giving money to Ms. Mullins.  Okay?  Again,
19   comparing the handwritten notes to your trial testimony.  Let's
20   look at Exhibit 4.  Do you see the bottom line in green?  Read
21   that to yourself.
22        Okay.  There you're saying nobody ever handed Mullins
23   money -- a dollar except you, correct?
24   A.    (Witness reading document to himself.)
25   Q.    And then if you look at Exhibit 6 -- I'm sorry.  Look at

ANDREW ELLIOTT - DIRECT EXAMINATION BY MR. ZUHDI     24

1   Exhibit 11.  Do you see the green in Exhibit 11?

2   A.    Yes.

3   Q.    "She was always struggling with money, complaining"?

4   A.    Uh-huh.

5   Q.    Okay.  Now, if you look at Exhibit 1 -- that's your trial

6   testimony.  And now we're looking at Exhibit 1, this is the

7   four handwritten notes.  Okay?  Look at paragraph 6.  And you

8   say there -- about the middle, you say, "I handed money to help

9   and she cried and said thank you."  So, again, there, those are

10  true statements, correct?

11  A.    I handed Donna money, yes.

12  Q.    And you testified to that in court also?

13  A.    Yes, I did, that I gave her money.  Yes, sir, I did.

14  Q.    Okay.  Now look at -- let's see here.

15        What did you do with the notes that you said -- the

16  questions that Mr. Adams gave you?

17  A.    I don't recall.

18  Q.    Did you listen to the recording of Ms. Mullins' interview

19  by -- I know I asked you this before, but I can't recall if you

20  answered it -- by Mr. Lowrance -- Agent Lowrance?

21  A.    I don't believe so.  I don't recall.

22  Q.    So you said that Chris Mayes was with you when you wrote

23  the notes and he told you what to write, correct?  That's what

24  you testified to?

25  A.    That's correct.

1  Q.   So even though Chris Mayes was with you -- as you -- I

2  mean, you're claiming that, that he was with you when you wrote

3  these handwritten notes -- you didn't inform -- you didn't tell

4  Ms. Anderson or the FBI agents or anyone at U.S. Attorney's

5  Office that, "Hey, I wrote these notes with Chris there.  He

6  was telling me what to do"?  Did you tell any of the law

7  enforcement, government agencies?

8  A.   I didn't tell anybody anything about those four pages.

9        MR. ZUHDI:  Your Honor, I would offer Exhibit 1 into

10  evidence.

11        THE COURT:  Before I inquire of the government, let

12  me say what my inclination is.  Exhibit 1 is already attached

13  to Docket Entry Number 400 as 400-1, as I recall.  And for that

14  reason, I'm not sure there's -- it's necessary to receive it as

15  evidence.  It's judicially noticeable in the record.

16     Is there any reason to have it separately, in evidence, as

17  an exhibit?

18        MR. ZUHDI:  Your Honor, I was just making sure that I

19  was -- it was probably overkill on my part, Your Honor.

20        THE COURT:  Well, it will not be received -- it's

21  already in the evidence as Docket Entry Number 400-1.  And for

22  that reason, it will not be received again.  And I think we can

23  all proceed on the basis that Exhibit 1 that's on the table

24  this morning is the same as that document.

25     You may continue.

ANDREW ELLIOTT - DIRECT EXAMINATION BY MR. ZUHDI    26

1          MR. ZUHDI:  Thank you, Your Honor.

2          MR. ZUHDI:  Your Honor, may I go to my table for just

3     a quick --

4          THE COURT:  Surely.

5          MR. ZUHDI:  Thank you.

6     Q.   (BY MR. ZUHDI) Mr. Elliott, is your wife a client of

7     Mr. Adams?

8     A.   I don't understand.

9     Q.   Is Mr. Adams your wife's lawyer?

10    A.   I mean, I would have to ask if he's representing me or my

11    family.  I don't understand.

12    Q.   Do you know if -- I mean, you don't know if your wife --

13    does your wife have a lawyer?

14    A.   I still don't understand the question.  If you're asking

15    me does Scott represent my family, my wife, or both of us, I

16    really don't understand how I set that up when I did it with

17    Scott, so I don't understand it.

18    Q.   Did you sign some kind of agreement with him or something?

19    A.   I have no idea.  My wife was with me.

20    Q.   I'll ask you:  The questions that Mr. Adams gave you, did

21    you turn that over to the government, give them a copy, or tell

22    them anything about those questions?

23    A.   No, sir.

24    Q.   Can you go to Exhibit 12, please.  Do you see the area in

25    green there?  Would you read that, please, to yourself?

ANDREW ELLIOTT - DIRECT EXAMINATION BY MR. ZUHDI    27

```
 1  A.   You want me to read it or --
 2  Q.   No.  Just to yourself.
 3           THE COURT:  Read lines 16 through 20 to yourself and
 4  then look up, and that'll be his cue to ask a question.
 5           THE WITNESS:  Okay. (Witness complied.)
 6  Q.   (BY MR. ZUHDI) So Mr. Behenna asked you a question:  Did
 7  they give you -- did they ever ask you to give a statement
 8  about what you would say before you got immunity?  And you
 9  testified, "We gave them a handwritten letter."
10       And then Mr. Behenna responded, "Right, your lawyer -- "
11       And at that time, you jumped in there and said, "Before
12  that."  That's correct -- right? -- what you just read?
13  A.   It says, "-- before that."
14  Q.   Okay.  And then, so look at Exhibit 13, and that would be
15  the proffer letter that Ms. -- that you were asked about,
16  correct?  It says, "And your lawyer did give a proffer letter
17  to Ms. Anderson, correct?"  That would be the proffer letter
18  there, Exhibit 13?
19  A.   I believe so.
20           THE WITNESS:  Is that right, Scott?
21           THE COURT:  He --
22           THE WITNESS:  Oh, okay.  Well, I think it was this
23  letter.
24  Q.   (BY MR. ZUHDI) Okay.  So you testified about a handwritten
25  letter you gave "them."  Is "them" -- "them" would be the U.S.
```

1    Attorney's Office, Ms. Anderson, or Agents Schmitz or Agent
2    Lowrance?
3    A.    I gave Scott in his office.  We handwrote about -- a bunch
4    of pages of facts that happened, and that's what I gave to
5    Scott.  That was a handwritten letter that I wrote in his
6    office.
7    Q.    And --
8    A.    But I never gave it to anybody.
9    Q.    Well, when you said -- you testified about a handwritten
10   letter you gave "them."  So who was "them"?
11   A.    Scott.
12   Q.    Is -- "them" is like more than one person.
13   A.    Yeah.  So it would be Scott.
14   Q.    And so you gave Scott that letter before the -- I'm sorry.
15        Did you give Scott the handwritten letter you wrote before
16   Mr. Adams sent that proffer letter?
17   A.    Yeah.  I sat in his office and wrote out facts on a legal
18   pad.
19   Q.    And when you were through testifying that day, your last
20   day of testimony, after you testified about this, about that
21   you gave him a handwritten letter before that, did you tell --
22   well, let me ask you this:  Did Ms. Anderson ask you what were
23   you talking about?  What handwritten letter are you talking
24   about?  Did she ask you that?
25   A.    I don't recall.

ANDREW ELLIOTT - DIRECT EXAMINATION BY MR. ZUHDI       29

1   Q.   Did Mr. Snyder ask you what handwritten letter you were
2   talking about?
3   A.   I don't recall.
4   Q.   Did Agent Schmitz or Agent Lowrance ask you, "What
5   handwritten letter did you just testify about"?
6   A.   I don't recall.
7   Q.   Did you tell them, "Hey, the handwritten letter I was
8   talking about, you might want to know what it is.  This is --
9   this is something I'd written up"?  Did you tell anyone that in
10  the United States Attorney's Office or FBI?
11  A.   Me and Scott handed this proffer, if that's what it's
12  called, to the people that Scott gave it to.  And that legal
13  pad -- it's not a letter, it's a -- it's my testimony.  I wrote
14  down the story -- the line of events I gave to Scott.  And then
15  Scott, I believe, turned it into this and then gave that to
16  them.
17  Q.   So no one in the -- from the United States -- no one from
18  the U.S. Attorney's Office or agents asked you what you just
19  testified about?
20  A.   I don't understand.
21  Q.   Did they -- well, did anyone ask you what did you mean
22  when you said, "No, the handwritten letter before that"?
23  A.   I really don't understand that part.
24          THE COURT:  Nor do I.
25          MR. ZUHDI:  Okay.  Apologize for not being --

```
 1              THE COURT:  Let me ask a question.  Mr. Elliott,
 2  referring to the notes that you have described as having
 3  written, as I recall, in Mr. Adams's office, right?
 4              THE WITNESS:  Yes, sir.
 5              THE COURT:  On a legal pad?
 6              THE WITNESS:  Yes, sir.
 7              THE COURT:  And you wrote them down, and that was
 8  your account of certain facts relating to this overall matter,
 9  right?
10              THE WITNESS:  Yes, sir.
11              THE COURT:  And you gave those notes to Mr. Adams?
12              THE WITNESS:  Yes, sir.
13              THE COURT:  Are you aware of those notes themselves
14  ever having served any purpose other than your communication
15  with your lawyer?
16              THE WITNESS:  No, sir.
17              THE COURT:  Next question.
18  Q.   (BY MR. ZUHDI) The jury heard you testify about a
19  handwritten letter that you gave to them, didn't they?
20  A.   I don't understand.
21  Q.   Well, you were testifying at trial, right?  You were
22  answering questions at trial, correct?
23  A.   Yes, I was.
24  Q.   And there was a jury sitting there?
25  A.   Okay.
```

1    Q.    And when you testified that there was a handwritten letter

2    you had given them for the proffer letter, the jury heard that,

3    didn't they?

4    A.    I don't remember.

5    Q.    Well, they were sitting there within earshot of you?

6            THE COURT:    Okay.    Well, look, we're looking at

7    Exhibit 12.    It says what it says.    So, yes, that was audible

8    in the courtroom.    Next question.

9    Q.    (BY MR. ZUHDI) Did you correct your testimony -- did you

10   ask to correct your testimony and say, "I need to clear up what

11   I meant in case the jury is thinking there's some other

12   additional evidence against Mr. Mayes out there"?

13   A.    Again, I don't understand.

14   Q.    Did you ask to clear up your statement that there was a

15   handwritten letter --

16   A.    I know you're saying that, but I'm saying I don't

17   understand the fixing or correction part.

18   Q.    Okay.    If "correction" is not the word to explain, would

19   you -- did you ask anybody to let you explain what you meant?

20   A.    Nobody asked me any question.    Or if it is, we need to go

21   back and review it.    But I answered every question right there.

22   Q.    Okay.    No, I'm talking about when you finished testifying

23   and you're talking to the assistant United States attorneys.

24   If I understand, they never asked you about it.    That's what

25   your testimony is, correct?

ANDREW ELLIOTT - DIRECT EXAMINATION BY MR. ZUHDI      32

1   A.   I answered every question I was asked.

2   Q.   Did they ever ask you about what you're talking about, the

3   handwritten letter; yes or no?

4   A.   No one ever asked me that question right there.

5   Q.   And did you ever volunteer to them, "Hey, I can explain

6   what I just said"?  Or did it just die right there?

7   A.   I never volunteered any information.  I answered what I

8   was asked.

9   Q.   Well, I mean, you interrupted Mr. Behenna -- correct? --

10  and corrected him.  You said, "No, before that."  And you were

11  talking about the handwritten --

12  A.   I don't recall.  And I don't remember that.

13  Q.   And you characterized it in your testimony as a

14  handwritten letter.

15  A.   Okay.  I don't recall that, though.

16  Q.   You just read it.

17  A.   Right.  I'm saying I don't recall it.  I'm reading it, but

18  I don't recall the moment.

19  Q.   Exhibit -- if you'd look at Exhibit 9, please.  If you'd

20  go down around 19 and 20, read those lines to yourself, please.

21  A.   Okay. (Witness complied.)

22  Q.   Okay.  There you're -- you said -- you think it's

23  important that you've been flawless with your words, right?

24  A.   I see that's what it says.

25  Q.   Yeah, but that's what you said, correct?

ANDREW ELLIOTT - DIRECT EXAMINATION BY MR. ZUHDI     33

1  A.   Yeah.  I'm just reading what it's in context to here

2  because I think it was about a video that they played about

3  relationship building, and I think I was teaching salespeople

4  something.  And I was using this in context with teaching

5  salespeople.  I'm reading above it.

6  Q.   Well, that's fine.  Are you done?

7  A.   Yeah.

8  Q.   So you believe it's important to be flawless in your

9  words, correct?  Because you just testified to it.

10 A.   Yes, sir.

11 Q.   And your statement about the handwritten letter, you're

12 now saying you weren't -- your statement about the handwritten

13 letter is now you're saying it wasn't a handwritten letter; it

14 was pages on a pad.  Is that correct?  Isn't that what you

15 testified to a little bit earlier here?

16 A.   I really don't understand.

17 Q.   Well, do you believe that you testified originally it was

18 a handwritten letter that "we" gave "them," that's what your

19 testimony was?

20 A.   We can go back and read the whole thing.  I'm cool with

21 that.

22 Q.   No, I'm asking you the question, and then other people can

23 ask you questions.

24 A.   That was said in there, yes.

25 Q.   And now you're saying that it's -- it was on a pad and it

1    was sheets or something you were writing on -- correct? -- on a

2    pad?

3    A.    I'm talking about me and my attorney.

4          MR. ADAMS:  Your Honor, at this time, I just want to

5    make an objection.  If we look back at Exhibit Number 12 that

6    he keeps quoting from, which is this handwritten letter thing,

7    clearly what -- this is during the trial when Mr. Behenna is

8    examining Mr. Elliott and he says, "Did they ever ask you to

9    give a statement about what you would say before you got

10   immunity?"  Mr. Elliott answers, "We gave them a handwritten

11   letter."  Then Mr. Behenna, "Right, your lawyer."  And he

12   answers, "-- before that."  And then Mr. Behenna's speaking.

13   He knows exactly what he's talking about.  Your lawyer wrote

14   what we might -- right? -- think is a hypothetical statement.

15   I mean, he's referring back --

16         THE COURT:  Okay.  Okay.  That's enough argument.

17         MR. ADAMS:  It's confusing to Mr. Elliott.

18         THE COURT:  Mr. Adams, you may be seated.

19         MR. ADAMS:  Yes, sir.

20         THE COURT:  Next question.

21   Q.    (BY MR. ZUHDI) So you're not being flawless in your words

22   there when you described it to the jury as a handwritten

23   letter, and now you're describing it as it was on a pad and

24   written, correct?

25   A.    Okay.  Let me give you an answer.  So as I read above the

ANDREW ELLIOTT - CROSS-EXAMINATION BY MR. SNYDER        35

1  green here, a video was played of me teaching salespeople to
2  have a goal to be flawless with their words.  And if you read
3  it, I talk about, "You have to be flawless with your words.  I
4  think it's important."
5  Q.   Yes, sir.
6  A.   And I was talking in context to when you're training
7  salespeople, yes.  But I did say that, absolutely.
8  Q.   So is that the only time in your opinion -- or in your
9  teachings that you should be flawless is only when it's with
10 salespeople?
11 A.   No.  I think your goal should be good with your words.
12        THE COURT:  I presume you're ready to move on to
13 something else.
14        MR. ZUHDI:  Yes, Your Honor.  I'm very close, Your
15 Honor, to being wrapped up.
16     Your Honor, may I go to my desk for a moment?
17        THE COURT:  Surely.
18        MR. ZUHDI:  Your Honor, I have no more questions.
19 Thank you.
20        THE COURT:  Very well.
21     Does the government have any questions?
22        MR. SNYDER:  Your Honor, just like two or three,
23 maybe, to clarify a timeline issue.
24        THE COURT:  Surely.
25                  CROSS-EXAMINATION

1  BY MR. SNYDER:

2  Q.   So, Mr. Elliott, I just want to -- I want to try to put

3  those four pages of handwritten notes in maybe a slightly more

4  specific time.  And I think it's consistent with what you said

5  earlier.  But you wrote those four pages at a time when you

6  were not cooperating with the government, right?

7  A.   Yes, sir.

8  Q.   And so when you look at your -- let me find it real quick.

9       If you look at Exhibit 8 in front of there, that's your

10  immunity letter, correct?  We established earlier, dated July

11  20 of 2020?

12  A.   Yes, sir.

13  Q.   So those four pages of handwritten notes were definitely

14  written before July of 2020, correct?

15  A.   Absolutely.

16  Q.   And then if you look at paragraph 13 -- or, excuse me --

17  Exhibit 13, that is the January 31, 2020, hypothetical proffer

18  letter, correct?

19  A.   Yes.

20  Q.   So those four pages of handwritten notes would have

21  definitely been written prior --

22  A.   Before the proffer.

23  Q.   -- to January of 2020?

24  A.   Yes, sir.

25  Q.   So, again, is that consistent with 2019 as being a rough

 1  approximation?

 2  A.   Yes, sir.

 3         MR. SNYDER:  Your Honor, no further questions.  I

 4  would, I guess, note, like a typical civil deposition would

 5  have all of his exhibits just attached as exhibits so that the

 6  reader can go back and forth and look at them.  That doesn't

 7  make them exhibits for Court purposes, but they probably ought

 8  to be attached to the transcript, and we'd have no objection to

 9  that.

10         THE COURT:  Let me, first of all confer with the

11  reporter.  Just a second.

12     (Off-the-record discussion between the reporter and the

13  Court.)

14         THE COURT:  Does Mr. Mayes have any objection to

15  that?

16         MR. ZUHDI:  No objection, Your Honor.

17         THE COURT:  That's what will be done, then.

18     And do we have any redirect limited to cross?

19         MR. ZUHDI:  No, Your Honor.

20         THE COURT:  That concludes the deposition of

21  Mr. Elliott.  And you may step down.

22         THE WITNESS:  Thank you.

23         THE COURT:  Now -- and you're excused.  You can stay

24  if you find this entertaining, but you're also excused if you'd

25  like to be excused.

 1          THE WITNESS:  I'll just sit and wait, if that's okay.

 2          THE COURT:  Surely.

 3     Now, that brings into high relief the question of when I

 4 may expect Mr. Mayes' memorandum in support of his 2255 motion.

 5 You've got the testimony of Mr. Elliott now.  I'm fairly

 6 strongly oriented towards setting a date -- and a date not too

 7 terribly far out -- for the filing of Mr. Mayes' memorandum.

 8     Mr. Zuhdi, you're invited to the lectern to tell me what,

 9 if anything, stands in the way of your ability to file that

10 memorandum.

11          COURTROOM DEPUTY:  It's currently due on March 5th.

12          THE COURT:  Oh, it is due on March 5th.  Okay.  I

13 presume that is a workable date?

14          MR. ZUHDI:  Yes, Your Honor.  100 percent, it'll be

15 there.  If the Court would like it earlier, I will do what it

16 takes to get it done earlier.  I was wanting this transcript

17 and that sort of information to finish it out.

18          THE COURT:  March 5th works.  Between now and March

19 5th, I'm having cataract surgery twice, and I don't care to be

20 reading those until after March 5th.  Very well.

21     Anything further from counsel on either side?

22          MR. SNYDER:  Not from the government, Your Honor.

23          THE COURT:  Mr. Zuhdi?

24          MR. ZUHDI:  No, Your Honor.

25          THE COURT:  Very well.  Court will be in recess.

1    (Deposition concluded; signature Required.)

2         REPORTER'S CERTIFICATION

3    I, Tracy Thompson, Certified Shorthand Reporter within and

4   for the State of Oklahoma, certify that the above-named witness

5   was sworn; that the deposition was taken in shorthand and

6   thereafter transcribed; that it started at 10:00 a.m., and

7   ended at 11:05 a.m., that it is true and correct, and that I am

8   not attorney for nor relative of any of said parties nor

9   otherwise interested in the event of said action.

10        IN WITNESS WHEREOF, I have hereunto set my hand and

11  official seal this day of 2025.

12

13  _____
    Tracy Thompson, CSR, CRR, RDR
14  CSR No. 1075
    Expiration Date:  12/2025

15

16

17

18

19

20

21

22

23

24

25

```
1                          JURAT PAGE
2       I, ANDREW ELLIOTT, do hereby state under oath that I have
3   read the above and foregoing deposition in its entirety and
4   that with my corrections, if any, the same is a full, true and
5   correct transcript of my testimony.
6
7
8              _____
9              ANDREW ELLIOTT
10
11
    STATE OF OKLAHOMA
12
    COUNTY OF _____
13
14
    SUBSCRIBED AND SWORN TO before me
15
    This _____ day of_____ 2025.
16
17
18
    _____
19
20
    Notary Public in and for
21
    The County of _____
22
23
24
    My commission expires _____
25
```

```
 1                    E R R A T A   S H E E T

 2

 3    Witness:  ANDREW ELLIOTT

 4    Reporter:  Tracy Thompson

 5

 6    Page   Line   Correction & Reason for Change

 7    ____   ____   _____

 8    ____   ____   _____

 9    ____   ____   _____

10    ____   ____   _____

11    ____   ____   _____

12    ____   ____   _____

13    ____   ____   _____

14    ____   ____   _____

15    ____   ____   _____

16    ____   ____   _____

17    ____   ____   _____

18    ____   ____   _____

19    ____   ____   _____

20    ____   ____   _____

21    ____   ____   _____

22    ____   ____   _____

23    ____   ____   _____

24    ____   ____   _____

25
```



1. CLEARLY TOLD HER MONEY WAS TO HELP HER HAVE GET LIFE TOGETHER.

2. GUIDELINES ARE BASED ON LTV OR SALE PRICE DEPENDING ON IF IT WAS NEW OR USED YAMAHA.

3. FINANCE DEPARTMENT WAS SONIA ENTIRE TIME DONNA WAS OUR BUYER DURING 2016.

4. TYLER BRADY, SONIA, ANDY, ROD WERE THE ONLY ONES IN THE TOWER IN 2016 DURING DONNA BUYING TIME.

★ (NICK PETERSON STARTED BACK IN JAN 31ST 2017, HIS PREVIOUS DATES WERE (2014 – 5-7-15) WHY WOULD DONNA SAY HE WAS IN TOWER WHEN HE WASNT EVEN EMPLOYED WITH US AT THAT TIME.

★ (BENTLY REDBURN – WORKED AT YAMAHA FROM APRIL 2015 to AUG 2015 AND RETURNE TO BIG RED AND DID NOT WORK IN YAMAHA AGAIN UNTIL JAN 31ST 2017 HE WAS NOT EMPLOYED AT YAMAHA DURING DONNAS BUYING DURING 2016.



DEFENDANT'S EXHIBIT

1

5. SAYS BIG RED TOWER...
   REMEMBER IT SAYING CURRENTLY IN
   TOWER CREATED INVOICES...
   WAS AT BIG RED & MITSU/YAMAHA....
   SAID ELLIOTT (IM NEVER ONLY ONE IN TOWER)
   STORY SEEMS TO START TO GO ROGUE —

6. SAYS I PLAYED HER
   — TIME LINE SHOWS SHE SET ME UP
   FROM DAY ONE WITH DOING BIBLE
   STUDY W/ HER & JOANE....

CAVED → I HANDED MONEY TO HELP AND SHE
DIDNT      CRIED & SAID THANK YOU.
FLINCH   SHE SHOWED ME SHE WAS EXTREMELY
TAKING   GRATEFUL FOR HELP. WAS NEVER TOLD
HELP     NO OR I WOULDNT HAVE GIVEN. PERIOD &
FROM
ME!    7. DIDNT GIVE MONEY EVERY TIME. DURING
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
       ·HELPING PERIOD. PUTTING NAME IN
       'COMMENT TO CREDIT ANYLIST BOX'
       IS NORMAL AND TEXTING OR CALLING
       WHEN SUBMITING IS NORMAL. 90% OF
       TIME CUSTOM IS ON OUR SHOWROOM
       FLOOR WAITING. WE WANT TO GET
       IT APPROVED FAST.
       QUESTIONABLE LOANS "SOME TIMES"
       GIVE ME A BREAK. EVERYONES
       CREDIT IS DIFFERENT. (LOL,) THEY BUY
                                    0 - 624 SC...

Mullins knew there were a <u>few</u> loans
that were questionable, which she approved
~~anyway~~ anyway.
(this has to be a joke)

8.  JANUARY - APRIL    

9.  NO PER LOAN FEE BECAUSE SHE
    WAS NEVER PAID TO DO A LOAN. <u>PERIOD.</u>

10.  I KNEW DONNA WAS STRAPPED
    BECAUSE SHE TOLD ME EVERY DAY!
    WHEN I GAVE HER MONEY SHE
    EXPLAINED IN DETAIL HOW SHE
    WAS CLEANING HER LIFE UP & FIXING
    PROBLEMS. SHE NEVER TURNED DOWN A
    DOLLAR OR I GLADLY WOULDN'T NEVER
    OFFERED A DOLLAR AGAIN. SHE NEVER MENTION
    HER JOB ONCE WHEN I GAVE HER MONEY
    TO HELP HER OR I WOULD'VE STOPPED
    IMMEDIATELY, IT NEVER HAD ANYTHING
    TO DO WITH WORK. EVER.

11.  I CALLED DONNA JUST LIKE I
    WOULD CALL ANY LOAN OFFICER.
    AND OK. EMP CREDIT UNION NEVER
    CUT US OFF... WE STILL USE THEM TODAY.

12. "THEY" KNOW MULLINS LOST HER JOB BECAUSE OF THE INVOICES. SHE NEVER MENTIONED INVOICES UNTIL MONTHS LATER. SHE ONLY TOLD ME THAT I CAN REMEMBER SAYING I GAVE HER MONEY, ~~&~~ SHES A LIAR.

13. IF THE YAMAHA IS NEW....
THE ONLY INVOICE ANYONE COULD EVER HAVE IS THE INVOICE THE TRUCKER GAVE US FROM YAMAHA WHEN THEY WOULD DROP THEM OFF IN CRATES IN THE BACK. ONLY A PARTS INVOICE. NOT A DEALER SALE SHEET INVOICE.

UNE 2.... DONNA SAID SHE NEVER SAW INVOICES ASSOCIATED W/LOANS.

AS SHE CLOSES... SHE STATES THE INVOICE SHE VIEWED WAS NOT AN ACTUAL YAMAHA INVOICE, SHE SAID "THEY DONT LOOK LIKE THAT" ...

THEN STATES IT WAS GENERATED BY SOMEONE IN THE SALES TOWER. CLEARLY SHES LYING THROUGH HER TEETH.

FD-302 (Rev. 5-8-10)                           - 1 of 3 -                    OFFICIAL RECORD

### FEDERAL BUREAU OF INVESTIGATION

Date of entry        06/21/2017

Donna S. Mullins, date of birth (DOB) ████ ██ 1969, social security account number ██████-0176, residence address ███████████████ Oklahoma City, Oklahoma 73170, cellular telephone number ████████-7124 was interviewed at the United States Attorney's Office in Oklahoma City.  Also present during the interview was Mullins' attorney Jake Aldridge and Assistant United States Attorney McKenzie Anderson.  After being advised of the identity of the interviewing agent and the nature of the interview, Mullins provided the following information:

**The below is an interview summary. It is not intended to be a verbatim account and does not memorialize all statements made during the interview. Communications by the parties in the interview room were electronically recorded. The recording captures the actual words spoken.**

**The interviewing agent told Mullins the conversation was being recorded.**

The recording began at approximately 12:39 PM.

**3:58-**  Elliott did not specify what the money was for.  He (Elliott) took advantage of me.

**4:45-**  Mullins never saw the invoices associated with loans she made.

**7:30-**  Mullins reviewed loan number 9355526.  All the information pertaining to the customer is input by the dealership.

**9:30-**  Mullins determined the "max out the door" price of a vehicle which includes certain "back end" items including gap insurance.  The max out the door price is based on the value of the vehicle, which is given to Mullins by the dealership.

**14:12-**  If Mullins had any questions about a loan, she contacted the finance department at the dealership.

**14:49-**  Nick Peterson, Bentley Redburn and Andy Elliott are in the "tower" at Big Red Sports.  Elliott is the general manager.

---

Investigation on   06/16/2017   at  Oklahoma City , Oklahoma, United States (In Person)

File #  29P-OC-2094038

Date drafted   06/21/2017

by  Justin M. Lowrance

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



DEFENDANT'S
EXHIBIT
2

BRSI_000229

FD-302a (Rev. 05-08-10)

29P-OC-2094038

Continuation of FD-302 of (U) Donna Mullins recorded interview          , On 06/16/2017   , Page  2 of 3

**16:02-** Only someone in the "tower" at Big Red Sports could have created the fake invoice. The only one that is currently in the tower at Big Red Sports, who was also in the tower at the time of all of the loans identified by Tinker Federal Credit Union (TFCU) was Elliott.

**20:30-** Mullins never deposited any money she received from Elliott into her bank account.

**22:30-** Mullins has known Elliott and Chris Mayes for a long time. Elliott played with Mullins' heart strings and knew that Mullins was struggling. Mullins told Elliott no several times, but finally caved, which was wrong.

**23:23-** Sometimes when Mullins met with Elliott, he would give her money. There was no "per loan" fee. Sometimes Elliott would call her to let her know a questionable loan was coming in. Sometimes they would put "attention Donna" on the loan. Sometimes the loans were questionable because of no credit, or bad credit. Mullins knew there were a few loans that were questionable, which she approved anyway.

**25:45-** Mullins estimated Elliott paid her approximately $10,000 to $15,000 between January and April of 2016. Elliott paid her when they ate breakfast together after Bible study.

**27:19-** Elliott knew Mullins was "strapped" and he would lay out scenarios of how Mullins could use the money he gave her. Elliott told Mullins, if you help me out, I'll help you out. Mullins turned Elliott down two or three times, and told him it was wrong, and she could lose her job.

**29:09-** Elliott would call or text Mullins and tell her that he was sending a loan over, and ask her if she could take a look at it. Mullins would call Elliott back and tell him about the problems with the loan.

**30:26-** Elliott would keep calling and he was relentless, he "broke" Mullins. Mullins did not know if Elliott had this arrangement with any other bank. Mullins heard Oklahoma Employees Credit Union "cut off" the dealership.

**33:21-** Chris (Mayes) called Mullins after she left TFCU and offered her a job in the finance department at the dealership. "They" knew Mullins lost her job at TFCU because of the invoices.

BRSI_000230

FD-302a (Rev. 05-08-10)

29P-OC-2094038

Continuation of FD-302 of <u>(U) Donna Mullins recorded interview</u>       , On <u>06/16/2017</u> . Page <u>3 of 3</u>

**35:00-** As soon as Mullins left TFCU, she called Elliott and told him that he got her fired. Elliott denied knowing anything about it. Mullins has not had anymore conversations about TFCU since she has worked at the dealership.

**37:50-** Mullins already gave notice that she is leaving the dealership. She took a job at Arvest Bank.

**45:07-** If the vehicle is brand new, the accounting department would have an invoice. The invoice Mullins viewed, was not an actual Yamaha invoice, she said "they don't look like that." The fake invoice was generated by someone. The fake invoice originated in the sales tower, which is three people.

   The original recording is maintained in the 1D section of the file.



# UNITED STATES DEPARTMENT OF JUSTICE
### UNITED STATES ATTORNEY'S OFFICE
#### FOR THE WESTERN DISTRICT OF OKLAHOMA

210 PARK AVENUE, SUITE 400
PHONE: (405) 553-8700

OKLAHOMA CITY, OK 73102
Fax: (405) 553-8888

July 20, 2020

Scott Adams, Esq.
401 N Hudson Ave Ste 100,
Oklahoma City, OK 73102

Re:    Big Red Sports & Imports and Affiliates

Dear Mr. Adams:

If your client, Andy Elliott, fully complies with the understandings specified below, he will not be prosecuted by this Office for federal offenses of bank fraud, false statements to a bank, wire fraud, aggravated identify theft, and any other violations associated with the matter referenced above.

The understandings are that he will truthfully disclose all information with respect to the activities of himself and others concerning all matters relating to the above-described offenses about which this Office inquires of him, shall cooperate fully with agents of the FBI, and, truthfully testify before the grand jury and/or at any trial or other court proceeding with respect to any matters about which this Office may request his testimony.

It is further understood that this agreement is limited to the United States Attorney's Office for the Western District of Oklahoma and cannot bind any other federal, state or local prosecuting authorities, although this Office will bring his cooperation to the attention of other prosecuting offices if requested.

It is further understood that he will at all times give complete, truthful, and accurate information and testimony, and must not commit any crimes whatsoever. Should he commit any crimes or should it be judged by this Office that he has intentionally given false, incomplete, or misleading testimony or information, or has otherwise violated any provision of this agreement, he shall thereafter be subject to prosecution for any federal criminal violation of which this Office has knowledge.





25.1

BRSI_056013



including, but not limited to, perjury and obstruction of justice. It is understood, however, that before it is judged that he has violated this agreement, the government will first provide him an opportunity to explain any information the government believes to be incomplete or inaccurate. Any such prosecutions may be premised upon any information, statement, or testimony provided by him and such information, and leads derived therefrom, may be used against him.

No additional promises, agreements, and conditions have been entered into other than those set forth in this letter and none will be entered into unless in writing and signed by all parties.

Sincerely yours,

TIMOTHY J. DOWNING
United States Attorney

K. McKenzie Anderson
Assistant U.S. Attorney

_____
Andy Elliott

_____
Scott Adams
Attorney for Andy Elliott

2

25.2

BRSI_056014